1  JEFFREY H. DASTEEL (State Bar No. 110405)
   T. JEAN MOONEY (State Bar No. 211747)
2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
3  Los Angeles, California 90071-3144
   Telephone: (213) 687-5000
4  Facsimile: (213) 687-5600

5  Attorneys for Defendant Taco Bell Corp.

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11  FRANCIE E. MOELLER, et al.          )  Case No. C 02 5849 MJJ ADR
                                        )
12                     Plaintiffs,      )  DECLARATION OF JEFFREY H.
                                        )  DASTEEL IN SUPPORT OF
13           v.                         )  DEFENDANT'S MOTION FOR
                                        )  MODIFICATION OF CLASS
14  TACO BELL CORP.,                    )  DEFINITION
                                        )
15                     Defendant.       )  Date:  November 30, 2004
                                        )  Time:  9:30 a.m.
16  _____ )  Courtroom: 11

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JEFFREY H. DASTEEL

I, Jeffrey H. Dasteel, declare as follows:

1.   I am an attorney licensed to practice law in the State of California and am a partner in the law firm Skadden, Arps, Slate, Meagher & Flom LLP, counsel of record for defendant Taco Bell Corp. ("Taco Bell").  The following statement is based on my personal knowledge.  If called upon to testify as a witness, I could and would testify competently thereto.

2.   Attached hereto as Exhibit A is a summary of each of the named Plaintiffs' factual claims.  The information in the summary is drawn from the depositions of the Plaintiffs, excerpts of which are annexed to this declaration.

3.   Attached hereto as Exhibit B is a true and correct copy of excerpts from the July 2, 2003 Deposition of Named Plaintiff Katherine Jill Corbett.

4.   Attached hereto as Exhibit C is a true and correct copy of excerpts from the June 11, 2003 Deposition of Named Plaintiff Francie Moeller.

5.   Attached hereto as Exhibit D is a true and correct copy of excerpts from the July 3, 2003 Deposition of Named Plaintiff Edward Forbes Muegge.

6.   Attached hereto as Exhibit E is a true and correct copy of excerpts from the June 12, 2003 Deposition of Named Plaintiff Craig Thomas Yates.

7.   Attached hereto as Exhibit F is a true and correct copy of stipulated dimensions of the ten Northern California Taco Bell Restaurants in the Pilot Program survey.

8.   Attached hereto as Exhibit G is a true and correct copy of stipulated dimensions of the ten Southern California Taco Bell Restaurants in the Pilot Program survey.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed at Los Angeles, California, this 19th day of October, 2004.

Jeffrey H. Dasteel

DECLARATION OF JEFFREY H. DASTEEL
Case No. C 02 5849 MJJ ADR

2

374711.01-Los Angeles Server 2A - MSW

# Exhibit A

## EXHIBIT A

*Corbett.*  Plaintiff Katherine Jill Corbett has post polio syndrome and experiences weakness and paralysis from her neck down in varying degrees. (FAC ¶ 11; Corbett Depo. at 15:4-5, 15-18.) She has osteoarthritis in her hands, which results in problems with gripping and causes pain when pressure is applied on her fingers. (Id. at 16:15-20.) She is able to reach above her head and to reach out to grab things (id. at 16:21-25), but has some weakness with respect to pulling, pushing, or lifting things from below (id. at 17:1-4). As a result, Ms. Corbett is able to open the doors of some restaurants but not others. (Id. at 17:5-12.) She uses a power wheelchair that is approximately 25 inches wide (FAC ¶ 11; Corbett Depo. at 76:25-77:4), and has a side-lift van that she uses to travel with her wheelchair (id. at 32:5).

Ms. Corbett claims to have encountered barriers at three of the Restaurants.[1] For two of the Restaurants, Ms. Corbett claims that the entrance doors were "heavy" and the condiments and drink-related items, such as lids and straws, were too high to reach so that another customer had to assist her. (Id. at 40:4, 44:4-10; 17:4-16, 72:13-73:4, 82:22-83:16.) Ms. Corbett also alleges that the bathroom doors were too heavy. (Id. at 47:16-19, 86:19-24.) Ms. Corbett claims that at another restaurant the queue rail was "a big problem" requiring her to bypass the queue rails and take an alternate accessible path to the counter to purchase her food.[2] At another restaurant, the

---

[1]     These restaurants are located at 40 San Pablo Towne Center in San Pablo, 5000 Redwood Drive in Rohnert Park, and 180 Rowland Boulevard in Novato. (Corbett Depo. at 29:17-30:8, 102:23-103:1.)

[2]     At the San Pablo store, although Ms. Corbett encountered a chain that she had to remove before accessing the counter, she was able to remove the chain and place her order. (Corbett Depo. at 41:17-43:24.)

parking space was not big enough to accommodate the lift for her van, requiring her to park across two parking spots, the accessible parking spot and an undesignated parking spot. In addition, the toilet seat was "pretty low" in comparison with the grab bar that "wasn't low," and piping under the sink was not insulated. (Id. at 32:17-33:13, 47:19-22, 48:17-20, 49:1-4.) Ms. Corbett also alleges that the flushing mechanism for the toilet at one of the restaurants was a push-button type that, due to the weakness in her hands, she could not use and that the toilet cover dispensers were too high. (Id. at 86:24-88:5.)

Moeller. Plaintiff Francie Moeller has degenerative disc disease, spondylolisthesis, autoimmune disease, fibromyalgia, thoracic outlet syndrome, and gastritis, "which affect her muscles and tissue." (Moeller Depo. at 12:4-14; FAC ¶ 8.) She also has "a problem with [her] arms, raising [her] arms." (Moeller Depo. at 40:16-17.) She uses a scooter for mobility, described as "a three-wheeled wheelchair . . . that runs on batteries, [that is] about 48 inches long, about 28 inches wide." (Id. at 13:3-7.) She has visited the Taco Bell restaurant on Farmers Lane in Santa Rosa using a side unloading van. (Id. at 18:16-17, 19:3-5.)

Ms. Moeller claims to have encountered barriers at three of the Restaurants.[3] For each of the three company-owned stores, Ms. Moeller contends the accessible parking spaces were not wide enough for her van and lacked tow away signage. (Moeller Depo. at 18:18-19:5, 48:7-20; 12-14, 72:14-74:10.) She alleges that the condiments and drink dispensers were too high and entrance doors were "heavy" to open. (Id. at 20:17-18, 39:14-40:23, 53:2-11, 59:7-61:2, 67:15-24, 75:10-20, 81:8-10.) For two of the Restaurants, Ms. Moeller alleges there was no crosswalk from the store to the

---

[3]     These restaurants are located at 1416 Farmers Lane, 1835 Mendocino Avenue, and 771 Stony Point Road, in Santa Rosa.

parking area, only one accessible table in the dining area, no unloading zones next to the accessible parking, and queue rails that were too small for her scooter to navigate. (Id. at 18:16-21,19:3-5, 20:14-19, 23:15-25, 35:21-37:8, 48:7-20, 72:14-74:18, 78:4-17.) At one of the Restaurants Ms. Moeller contends that though the queue rail was sufficiently wide, the turning radius should have been bigger. (Id. at 54:5-10.) Ms. Moeller also alleges that at one of the Restaurants there were no rails on the ramp leading to the restaurant and there was insufficient turning radius surrounding the accessible table. (Id. at 20:14-15, 83:13-20.)

 *Muegge.* Plaintiff Edward Forbes Muegge was involved in an automobile accident in 1973 that resulted in a spinal cord injury and left him partially paralyzed. (Muegge Depo. at 9:22-24; FAC ¶ 14.) Mr. Muegge then used a cane and short leg brace for 23 or 24 years, at which time it became more and more difficult to walk. (Muegge Depo. at 10:3-8.) He returned to the hospital and was prescribed an electric scooter for mobility in 1999. (Id. at 10:9-13.) He has partial paralysis in both arms and hands, his right side is weaker than his left side, and he has limited use of his right hand. (Id. at 40:5-15.) He uses different-sized scooters for different purposes. He uses one scooter for "daily use," when he has a van that can transport it around. (Id. at 12:1-5.) This scooter is approximately 48 inches long and 30 inches wide. (Id. at 12:11-13:11.) Muegge uses a smaller scooter when traveling or when he worked at Santa Rosa Junior College. (Id. at 12:6-10, 14:3-10.) The smaller scooter is approximately 36 inches long and 24 inches wide. (Id. at 13:3-9.) It appears that he uses a side-lift van. (Id. at 98: 2-8.)

Mr. Muegge claims to have encountered barriers at six of the Restaurants.[4] For five stores, Mr. Muegge contends that the queue rails were inaccessible. (Muegge Depo. at 77:12-15, 83:9-14, 99:12-17, 109:2-4, 114:1-3.) He also alleges that he had a problem using the drink dispensers. (Id. at 78:23-79:18, 88:5-22, 110:2-12, 114:16-115:5.) For four of the stores, Mr. Muegge contends that although there were accessible seats, they were not accessible to him because his scooter would stick out into the aisle. (Id. at 79:19-80:13, 89:2-19, 110:13-22, 115:10-23.) For three of the stores, Mr. Muegge contends the bathroom doors were heavy or difficult to open. (Id. at 90:1-8, 111:11-15, 116:3-10.) He also claims that the condiments were too high or difficult to access. (Id. at 92:3-16, 111:21-112:3.) For two of the stores, he experienced difficulty in pressing the toilet flushing mechanism due to his disability. (Id. at 90:21-91:20, 103:16-23.) At one store, Mr. Muegge claims there was an entrance door without sufficient room to back up and that the bathroom pipes were not covered with padding. (Id. at 107:14-108:4, 110:23-111:10.) At another store, Mr. Muegge claims he did not have sufficient room to unload from his vehicle in the parking lot. (Id. at 98:1-18.)

Mr. Muegge first visited a restaurant located at 1835 Mendocino, Santa Rosa, (the "Mendocino Restaurant") in 1999. (Id. at 52:11-25.) On this first visit, he had difficulty maneuvering through or around the queue rail because he "couldn't fit" through the line with his scooter. (Id. at 55:18.) However, on Mr. Muegge's second visit to the Mendocino Restaurant, he observed that the "queue line was much - was more wider,

---

4    These restaurants are located at 1835 Mendocino, Santa Rosa; 1416 Farmers Lane, Santa Rosa; 2000 Santa Rosa Avenue, Santa Rosa; 5000 Redwood, Rohnert Park; 1700 East Cotati Avenue, Rohnert Park; and 406 East Washington Street, Petaluma. (Muegge Depo. at 74:4-23, 81:12-23, 95:20-22, 104:1-7, 112:12-17, 77:4-9.)

redesigned." (Id. at 64:13-14.)  Mr. Muegge learned that the Restaurant had been remodeled six months before his second visit. (Id. at 63:21-24.)

      *Yates.*  Plaintiff Craig Thomas Yates has a broken spinal cord, T-3, and a brachioplexus of the left arm. (Yates Depo. at 12:21-24.)  He uses a power wheelchair that is approximately 30 inches wide and fifty-seven inches long (FAC ¶ 17; Yates Depo. at 27:20-24), and drives a 1994 Ford Van, Econoline 150 (id. at 25:1-5).  It is unclear whether his van is a rear or side-loading van.  Mr. Yates claims to have encountered barriers at one of the Restaurants.[5]  In the company-owned store on Rowland Way, Mr. Yates claims the entrance door was too heavy and that the queue rail lacked a sufficient turning radius. (Yates Depo. at 25:19-26:25, 27:19-29:17.)  He also alleges that the drink and condiment dispensers were too high.  (Id. at 42:16-43:1.)  Mr. Yates also contends that the store lacked an accessibility sign for the bathroom and that there was no accessible seating. (Id. at 30:19-23, 40:19-41:6)

---

[5]    This restaurant is located at 180 Rowland Way in Novato.

Exhibit B

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   FRANCIE E. MOELLER, EDWARD MUEGGE,     )
     KATHERINE CORBETT and CRAIG THOMAS     )
 5   YATES,                                 )
                                            )
 6              Plaintiffs                  )
                                            )
 7   vs.                                    ) No. C02 5849
                                            )      MJJ
 8   TACO BELL CORP.,                       )
                                            )
 9              Defendant.                  )
                                            )
10                                          )
11
12
13
14
15        DEPOSITION OF KATHERINE JILL CORBETT
16             WEDNESDAY, JULY 2, 2003
17                  Pages 1 - 112
18             San Francisco, California
19
20
21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   5 Third Street, Suite 625
     San Francisco, California 94103
23   (415) 284-6930
24   REPORTED BY:  LISA M. METZER, CSR NO. 10707
25   FILE NO.: 9D0515D
```

Page 1

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4   FRANCIE E. MOELLER, EDWARD MUEGGE,     )
    KATHERINE CORBETT and CRAIG THOMAS     )
5   YATES,                                 )
                                           )
6              Plaintiffs                  )
                                           )
7   vs.                                    ) No. C02 5849
                                           )      MJJ
8   TACO BELL CORP.,                       )
                                           )
9              Defendant.                  )
                                           )
                                           )
10
11
12
13
14
15       DEPOSITION OF KATHERINE JILL CORBETT
16            WEDNESDAY, JULY 2, 2003
17               Pages 1 - 112
18          San Francisco, California
19
20
21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  5 Third Street, Suite 625
    San Francisco, California 94103
23  (415) 284-6930
24  REPORTED BY:  LISA M. METZER, CSR NO. 10707
25  FILE NO.: 9D0515D

Page 15

1     Q.   Could you describe for me the medical
2   condition that resulted in you using the wheelchair
3   for mobility?
4     A.   I originally had polio.  Poliomyelitis.  And
5   as I've aged, I've developed postpolio syndrome.
6     Q.   Can you tell me what the symptoms of that
7   are?
8     A.   Of which one?
9     Q.   Of the postpolio syndrome.
10     A.   It's a return to the state of the original
11   level of polio.
12     Q.   Which is what?
13     A.   I was originally experiencing weakness and
14   paralysis from my neck down.
15     Q.   And do you currently have weakness and
16   paralysis from your neck down?
17     A.   At varying degrees.  I have not yet returned
18   to the level of my original polio.
19     Q.   And when were you diagnosed with polio?
20     A.   Age 1.  Does that help?  1952.
21     Q.   And at that time, did you have paralysis from
22   the neck down?
23     A.   Yes, I was in a body cast for two years.
24     Q.   At the end of two years, how did those
25   symptoms change?

1    A.    I had had during -- while I was in the body

2    cast, they did extensive physical therapy, and I had

3    some return primarily in my upper body.

4    Q.    What strength do you have in your upper body

5    currently?

6    A.    It depends on the task.

7    Q.    Can you give me some sense of what the

8    limitations are that you have in your upper body?

9    A.    Well, I have arthritis in my hands now, which

10   is not related to the polio.  It's related to my

11   mother.  She has arthritis.

12   Q.    Seems to be genetic.

13   A.    It does.  I'm hoping I'm not getting the rest

14   of her symptoms.

15         So I have osteoarthritis in my hands.  So I

16   have problems with things that require grip.  Like

17   when you shook my hand today, I was really happy that

18   you went all the way to my palm and not my fingers,

19   because I don't like pressure on my fingers.  It

20   hurts.  I don't know what else.

21   Q.    Well, for example, are you able to reach

22   above your head?

23   A.    Yes.  Just do a straight reach, yes.

24   Q.    And to reach out and grab things?

25   A.    Yes.

Page 17

1    Q.   Okay.  But you have -- you have some weakness
2  in terms of being able to lift things when you reach?
3    A.   Yes, or pull things, or push things, or lift
4  things from below, yes.
5    Q.   A typical door to a restaurant, are you
6  generally able to open it?
7         MR. FOX:  Objection; vague.
8         You can answer.
9         THE WITNESS:  It depends on the door.
10        MR. EURICH:  Q.  Some you can, and some you
11  can't?
12   A.   Yes.
13   Q.   Can you tell me what your formal education
14  is?
15   A.   I have a bachelor's degree.
16   Q.   From ... ?
17   A.   Fitchburg State College in Massachusetts.
18   Q.   What year?
19   A.   1973.
20   Q.   What was your major?
21   A.   Education.
22   Q.   Did you -- what is your occupation?
23   A.   I don't work.
24   Q.   Okay.  Have you ever taught?
25   A.   Yes.

Page 18

1      Q.   When?

2      A.   1973 to about, maybe, '76 or '77.

3      Q.   At that point, was it your postpolio syndrome

4   that prevented you from continuing to teach?

5      A.   No.

6      Q.   Why did you stop?

7      A.   I was working in -- I got interested in other

8   nonprofit work.

9      Q.   What -- where did you teach from '73 to about

10   '76?

11      A.   Different places around the East Bay.

12      Q.   Is the East Bay where you lived as a child?

13      A.   No.

14      Q.   Massachusetts?

15      A.   Yes.

16      Q.   How did you happen to move to the East Bay?

17      A.   California seemed like a good place to be in

18   the '70s.

19      Q.   When did you make that move?

20      A.   1973.

21      Q.   After you graduated from Fitchburg State?

22      A.   Yes.

23      Q.   What nonprofit activities have you become

24   involved in since 1976?

25      A.   Oh, God.

Page 29

1      A.   A long time.  I like Taco Bell.

2      Q.   What are your earliest memories of visiting a

3   Taco Bell?

4      A.   Oh, God.  I don't know.  I remember driving

5   cross-country and crossing the border into California

6   and going to some, pardon the expression, pretend

7   Mexican place.  And whether it was a Taco Bell or not,

8   I don't remember.

9      Q.   With what frequency would you estimate you

10  visited Taco Bells over, say, the last five years?

11     A.   Two, three times a month.

12     Q.   Has -- is that frequency consistent with sort

13  of your long-term history of visiting Taco Bells?

14  Have you generally gone to Taco Bell two to three

15  times a month for as long as you remember?

16     A.   Yeah, some years more, some years less.

17     Q.   In the complaint that you reviewed yesterday

18  and confirmed its accuracy, there's a description of

19  you visiting a Taco Bell store described as on

20  San Pablo Dam Road in Richmond?

21     A.   Yes.

22     Q.   And that's described as being within

23  12 months prior to filing the complaint.

24          Can you estimate how many times you visited

25  that store during the calendar year 2001?

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 32

1    restaurant in Richmond?

2         A.   Yes.

3         Q.   Would you tell me what those barriers are as

4    you perceive them?

5         A.   Well, there's not -- I have a side-lift van.

6    Do I need to say more about that?

7         Q.   No.

8         A.   Okay.  And --

9         Q.   Well, let me ask you this.

10             What other kinds of lifts are there besides

11   side-lift?

12        A.   Back-lift.

13        Q.   Okay.

14        A.   Yeah.  Also minivans.

15        Q.   Okay.  And I'm sorry.  I interrupted.

16             What were you about to say?

17        A.   I have a side-lift van, and the parking space

18   there is not big enough to accommodate my van.  My

19   lift, I mean.  It accommodates my van.  It doesn't

20   accommodate my lift.

21        Q.   Have you ever made measurements of that --

22        A.   No.

23        Q.   -- or had somebody do it?

24        A.   Not to my knowledge.

25        Q.   Let me -- before I mark it, let me show you a

9D0515D
Katherine Jill Corbett - 7/2/2003

1   photograph and make sure we're talking about the same

2   parking space.

3           Does that look like the one you're

4   describing?

5       A.   I remember there being -- I thought there was

6   disabled parking on both sides, but it could be.   I

7   mean, it was two spaces on either side of the hash

8   mark.

9       Q.   And the problem you've encountered is that

10  the space next to the accessible parking isn't big

11  enough to accommodate your lift?

12      A.   If we're talking about the diagonally striped

13  white space, yes.

14      Q.   If there's not a car parked to the right of

15  you, it's not a problem?

16      A.   Well, it depends on what you mean.

17      Q.   Well, when you say there's not enough room --

18      A.   Yes.

19      Q.   -- I assume that's because if there's a car

20  parked at the next space, you can't get your lift out.

21      A.   Yes.

22      Q.   Okay.   Is there a problem if there's no car

23  parked there?

24           MR. FOX:   Objection to form.

25           Go ahead.

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 40

1      Q.   What other barriers to access, if any, did
2   you encounter after you parked in two spaces and were
3   able to use your lift and get --
4      A.   The door was heavy to open.
5      Q.   Do you have any opinion as to how much force
6   it took to open the door?
7      A.   Heavy.
8      Q.   Do you have any basis for estimating how
9   heavy a door you're able to open?
10     A.   No.
11     Q.   So as far as you know, it could have been in
12  compliance with the regs, but you simply weren't able
13  to open it?
14     A.   I wouldn't know.
15     Q.   What other barriers to access do you believe
16  you encountered on that visit?
17     A.   The big problem was a metal queue line.
18          MR. EURICH:  Again, I want to show you a
19  photograph that I may not mark.  I just want to make
20  sure we're talking about the same queue line.
21     Q.   Does that look like the queue line that you
22  found in this store?
23     A.   Yeah.  You're telling me this is specifically
24  that store?
25     Q.   Yes.

Page 44

1     A.    Yes.

2     Q.    And I think you told me your daughter wasn't

3    with you.  So this was just you solo?

4     A.    It was just me.

5     Q.    Did you encounter any other conditions that

6    you thought were barriers to access in this visit?

7     A.    Yes.

8     Q.    What?

9     A.    Getting drinks and cup -- the lids and the

10   straws.

11    Q.    It looks from the picture which is Exhibit 10

12   like the condiments and drinks are at the left end of

13   the counter as you face it; is that right?

14    A.    Okay.  Yes.

15    Q.    Is that consistent with your memory?

16    A.    Yes.

17    Q.    Did you have any trouble getting condiments?

18    A.    I don't remember.

19    Q.    But you do remember some -- something of your

20   experience getting the drinks?

21    A.    Doing the whole drink thing, yes.

22    Q.    Did you access the drink dispenser by coming

23   at it from the front or from the side?

24    A.    I usually try to get up to the side of them

25   if I can.

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 47

1   any special reason that that was important to you?

2       A.   If you've -- I don't know if you've had the

3   experience of carrying an uncovered drink while you're

4   moving in a wheelchair.

5       Q.   I have not.  That's the problem; right?

6       A.   Yes.

7       Q.   It spills?

8       A.   It's very easy to spill it, or it's more that

9   it slops all over your clothing.

10      Q.   Did you encounter any other circumstances at

11  the San Pablo Dam Road store in Richmond that you

12  haven't told me about that you regarded as a barrier

13  to access?

14      A.   Yes.

15      Q.   What else?

16      A.   I went to the bathroom, as you'll see I will

17  do again before we're done here today.

18      Q.   And what was the problem?

19      A.   The door is a little heavy.  The toilet seat

20  was pretty low.  Particularly in comparison to the

21  grab bar, which wasn't low.  And when I went to flush,

22  there was no handle.

23      Q.   What was there?

24      A.   There was just --

25      Q.   A button?

Page 48

1  A.  A stub of a handle like the -- I don't know

2 what it's called in plumbing terms, but if the

3 porcelain tank is there, something attaches.  The

4 handle attaches to whatever.

5  Q.  It was missing?

6  A.  The rod was there, but there was no handle on

7 it.  There was nothing on it.

8  Q.  So you weren't able to flush?

9  A.  I was not able to flush, but neither would

10 somebody else be.

11  Q.  You said the door was a little heavy.  But

12 you don't know how heavy it was?

13  A.  I don't.

14  Q.  So you wouldn't know whether it was in

15 compliance with the applicable regulations?

16  A.  Right.  I wouldn't know.

17  Q.  The toilet seat you said was low as opposed

18 to where the grab bar was?

19  A.  Well, it was lower as to where lots of times,

20 in wheelchair toilets, the toilets are not low.

21  Q.  Do you know whether it was in compliance with

22 the applicable regulations?

23  A.  I wouldn't know that.

24  Q.  Any other issues that you encountered with

25 the restroom?

Page 49

1      A.   Well, I wanted to wash my hands, and I

2   noticed that the piping under the sink wasn't

3   insulated, so I just used the cold water just to be

4   safe.

5      Q.   Because if you used the hot water, you were

6   fearful that you would touch the hot water pipe?

7      A.   Right.

8      Q.   Anything else about the bathroom?

9      A.   No, I don't think so.

10      Q.   Any other circumstances that you encountered

11   at the San Pablo Dam Road store in Richmond that you

12   haven't told me about?

13      A.   Moving around was pretty tough, and finding a

14   seat was difficult.

15      Q.   Was there -- you mentioned one customer who

16   helped you get the cap and straw?

17      A.   Right.

18      Q.   Were there other customers there?

19      A.   The morning I was there, a few customers were

20   there.

21      Q.   How long were you there?

22      A.   How long does it take to eat a Taco Bell

23   meal?  25 minutes, maybe.  I was reading.

24      Q.   When you say there was -- moving around was

25   tough, what do you describe it --

Page 52

1  trouble getting by?

2      A.   If they put it into the main aisleway, yeah.

3      Q.   But if they didn't put it in the main

4  aisleway, there wasn't a problem?

5      A.   Right.

6      Q.   And the other problem you've identified is in

7  the accessible seating that you found where the chair

8  would move and that you could use the table, that

9  people had a little trouble getting around you?

10     A.   And it was a little hard to identify the

11 seating.  I mean, I was glad I got there when not many

12 people were there, because that seat was available.

13 But I have no reason to believe that it would be

14 available if I went in just any old time.  Because it

15 normally has a chair, you know, like a removable chair

16 at it.

17     Q.   Did it when you were there?

18     A.   Yes.

19     Q.   Okay.  Do you have a problem with the fact

20 that there was a removable chair there?

21     A.   I did -- well, two things happened.  One is

22 that I have to then move it, because there's no

23 service out in the customer area.

24          And two is that, if I was going back to that

25 store to go indoors, I'd have to hope that no one was

Page 53

1    sitting at that table.  Because there's nothing like a

2    wheelchair symbol or something on the table that

3    people might be bounced or might be asked to move if

4    someone came and they needed that table.

5        Q.    Have you seen symbols on tables like that?

6        A.    Yes, I have.

7        Q.    Where?

8        A.    I have to remember the name of the store.

9    Borders does that.  Borders bookstore does that.  They

10   have wheelchair tables that are an offset base.  Is

11   that clear enough?

12            Instead of the point -- the base of the table

13   being in the middle, it's offset.  Not all the way to

14   one side, but offset.  And instead of the bottom of

15   the base being -- there's a metal base.  Instead of it

16   being, like, domed, it's flattened.  It's flattened so

17   I can get in with my chair.

18       Q.    And is there a symbol that marks such a

19   table?

20       A.    Yes.

21       Q.    Where?

22       A.    In the middle of the table.  There's like

23   just a -- you know, kind of identifying the table as a

24   wheelchair table.

25       Q.    The standard wheelchair symbol?

Page 72

1   use smaller spaces than I can, and it didn't seem to

2   be a problem, like it was on the wrong side.

3       Q.   Well, was that a van-accessible parking

4   place?

5       A.   I don't know what the markings were.  I just

6   looked at the ground.

7       Q.   And is the van-accessible parking place the

8   one that you told me about earlier?

9       A.   Right.

10      Q.   There may not be a problem with the second

11  accessible parking?

12      A.   I wouldn't know.

13      Q.   Okay.  What other concerns did you have about

14  access to the Taco Bell store in Rohnert Park?

15      A.   When I came up to the door, the door was

16  heavy, and someone inside the store rushed over to

17  open it.

18      Q.   Do you know whether the store was in -- I'm

19  sorry.

20           Do you know whether the door was in

21  compliance with applicable regulations?

22      A.   I wouldn't know.

23      Q.   But somebody helped you in --

24      A.   Yes.

25      Q.   -- by opening the door?

9D0515D
Katherine Jill Corbett - 7/2/2003

1          Was that a concern to you, that that's how

2     you had to get in there?

3          A.   I like it better when the doors, I can open

4     the doors by myself.

5          Q.   Did it embarrass you that you couldn't?

6          A.   It makes it more difficult.

7          Q.   Okay.  What happened next?

8          A.   I came into the store, and immediately I had

9     to sort of make a left/right decision.

10         Q.   What does that mean?

11         A.   I came into the store, and there was an

12    obstacle pretty much at a point in front of me, and I

13    had to sort of decide whether to go to the left or to

14    the right.

15         Q.   Okay.  Again, I want to make sure that I'm

16    showing you a picture and marking one that describes

17    what you've just talked about.

18              Is that the point that --

19         A.   No.

20         Q.   Okay.

21         A.   I came in from the -- you know, the picture

22    you showed me before with the outside seating, that

23    was the door I came in.

24         Q.   Let me show you certain pictures and see if

25    there's one that helps you depict what you just

1    A.    And I was guessing that was the accessible

2  way to go.  I wasn't clear that there was any

3  accessible way to go.

4    Q.    Did that work for you?

5    A.    In some respects, yes.  In some respects, no.

6    Q.    In what respect did that not serve your

7  needs?

8    A.    Once I was at the counter, there was not a

9  lot of room between the counter and the queue line.

10 So when I needed to move or turn or ask somebody a

11 question, I couldn't really move my chair.

12   Q.    Were you able to travel down the counter

13 between the counter and the queue line?

14   A.    As long as I didn't change position, yes.

15   Q.    Okay.  Do you have an opinion as to how much

16 space there was there?

17   A.    Not enough.

18   Q.    Well, there was enough for you to travel down

19 the queue line?

20   A.    As long as I didn't have to stop.

21   Q.    Oh, I'm sorry.  Let me ask that again.

22        There was enough room for you to travel right

23 between the counter and the queue line?

24   A.    In a straight line, yes.

25   Q.    Okay.  Do you know how wide your wheelchair

Page 77

1    is?

2         A.    Not exactly, no.

3         Q.    Do you have an estimate?

4         A.    25 inches, maybe.   It's a standard size.

5         Q.    When you went to the counter --

6         A.    Uh-huh.

7         Q.    -- which is at a location that's basically in

8    the middle of the photograph which is Exhibit 13, were

9    you served?

10        A.    Not immediately.

11        Q.    But soon?

12        A.    It seemed like a long wait for getting -- for

13   someone to come to the counter.

14        Q.    Were there people in the queue line at that

15   time?

16        A.    Not at the time -- not when I arrived.

17        Q.    So there was no one waiting to be served in

18   front of you.   You were the only one waiting to be

19   served?

20        A.    When I first arrived, yes.

21        Q.    And so you were waiting for somebody to come

22   from somewhere from the back of the restaurant to

23   serve you?

24        A.    To take my order as I was going by?

25        Q.    Yes.

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 82

1      Q.   They came around to the other side of the
2   queue line, left end of the counter, to get their
3   food?
4      A.   No.
5      Q.   How did they get their food?
6      A.   I went up to get the food.
7      Q.   And then gave it to each of them?
8      A.   Yes.
9      Q.   Did you encounter any other circumstances
10   that you were concerned about at this Taco Bell store?
11      A.   Yes.
12      Q.   What?
13      A.   When we had ordered, I had been given drink
14   cups.  And as I pointed out, I could only go in one
15   direction, so I had to go the entire length of the
16   counter, and then the entire circumference of the
17   store to get to the drink dispenser.
18      Q.   Other than the fact that you had to take that
19   route, was there any other problem with that?
20      A.   It was narrow.  But there weren't too many
21   people there.
22      Q.   Did you find that use of the drink dispenser
23   presented any problems for you?
24      A.   Yes.
25      Q.   What were those?

Page 83

1      A.   Reaching the sauces, the lids, and the straws
2  was difficult.

3      Q.   Were you able to dispense your drink?

4      A.   To actually put -- to just do the drink part?
5  Yes.

6      Q.   That wasn't a problem?

7      A.   Right.

8      Q.   But you had trouble reaching the cap?

9      A.   The cap and the straws and the sauces.

10     Q.   But were you able to reach it?

11     A.   No.

12     Q.   Who did it for you?

13     A.   The customer who had cut in front of me.

14     Q.   And when you say you had trouble reaching the
15  sauces, what was the difficulty there?

16     A.   I just couldn't reach where they were.

17     Q.   Did you access the drink dispenser and the
18  sauce -- the condiment section from the side or from
19  the front?

20     A.   I don't remember.

21     Q.   Your general practice is to access such a
22  thing from the side?

23     A.   If I can, yes.

24     Q.   And looking at the photograph which is
25  Exhibit 13, can you tell from that, or does it refresh

Page 86

1    sort of figure out which ones, if any, can be removed.

2        Q.    Okay.  But you found one that could?

3        A.    I found one.  I found two.  Two.

4        Q.    Did that serve your needs?

5        A.    No.

6        Q.    Why?

7        A.    I had three people.  The two tables were not

8    near each other, and to put more than one person in a

9    wheelchair at that table, either one of the tables,

10   meant we were out in the walkway area.

11       Q.    So what did you do?

12       A.    Maria and I ate, basically, on our laps, and

13   my daughter ate at the table.

14       Q.    Do you know whether the number of tables in

15   that store that were wheelchair accessible, which is

16   to say the chair could be removed, satisfied

17   applicable regulations?

18       A.    I don't know.

19       Q.    What other issues did you encounter in the

20   Rohnert Park store that we have been talking about?

21       A.    I went to use the bathroom and had problems

22   there.

23       Q.    What problems?

24       A.    The door was a little heavy.  I couldn't -- I

25   couldn't flush the toilet, for a different reason this

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 87

1   time, and couldn't get -- they had a dispenser, and it
2   was stocked for toilet seat covers, but I couldn't
3   reach it.
4       Q.   Do you know whether the whole force, the full
5   force required to open the bathroom door met
6   applicable regulations?
7       A.   I don't know.
8       Q.   What was the problem with the flush valve?
9       A.   Again, I'm not a plumber, but it was -- there
10  was no lever.  There was a metal thing, like a little
11  metal dome in the top of the toilet tank that I assume
12  required some pushing to activate.
13      Q.   Were you able to do that?
14      A.   No.
15      Q.   Why?
16      A.   I tried that type over the years before and
17  have never been able to do them.
18      Q.   Do you know whether that flush valve is
19  somehow in violation of any applicable regulations?
20      A.   I don't know.
21      Q.   And the toilet cover dispenser was simply too
22  high for you to reach?
23      A.   You don't by chance have a picture, do you?
24      Q.   No, I didn't take a picture of that one.
25      A.   Okay.  If you were sitting on the toilet, the

Page 88

1    paper cover dispenser would be at your left shoulder.

2        Q.    Okay.

3        A.    So when you're not on the toilet, I couldn't

4    reach it.  I could certainly reach it once I was on

5    the toilet.  However, it wasn't very useful then.

6        Q.    Sort of too late?

7        A.    Yeah, sort of too late.  Right.

8        Q.    Do you know what the reach distance was?

9        A.    I have no idea.

10       Q.    And do you know whether it violated any

11   applicable regulations?

12       A.    I don't know.

13       Q.    Okay.  Any other issues at the Rohnert Park

14   store that we've been talking about?

15       A.    I noticed or -- that we couldn't sit outside.

16   I couldn't find any seating that was either removable,

17   or what I would call extended-length tables in the

18   outdoor seating area.

19       Q.    And you noticed that on the way in?

20       A.    I looked at it on the way in and looked at it

21   harder on the way out because Maria went to pee, and

22   Mitsuko and I wanted to sit outside, and I realized I

23   couldn't sit anywhere.  Neither one of us could sit

24   anywhere.

25       Q.    Do you know whether the fact there was no

9D0515D
Katherine Jill Corbett - 7/2/2003

Page 103

1      A.    It's at the Roland exit, yeah.

2      Q.    As you get off the interstate, it's pretty

3   close; right?

4      A.    Right.   It's right next to some businesses.

5   Yeah, it's a big mall that went up there.

6      Q.    Okay.   How often have you been there?

7      A.    I used to live in Sonoma County and came back

8   and forth a bunch from '90 to '95.   So it was a

9   frequent place to stop and get a drink for the ride.

10     Q.    But you haven't been there since 1995?

11     A.    I've driven through it.   I usually go past it

12   about three times a year on my way to Eureka.   So I

13   probably stopped, I don't know, once a year, maybe

14   twice a year.

15     Q.    Since '95?

16     A.    Since '95.

17     Q.    Do you use the drive-thru there?

18     A.    Oh, yeah.

19     Q.    Always?

20     A.    Now I do, yeah.

21     Q.    Why?

22     A.    My memory is just that it wasn't very easy to

23   get around.

24     Q.    But you don't have any specific

25   recollection --

# Exhibit C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                    - - -
4
5    FRANCIE E. MOELLER, EDWARD      )
     MUEGGE, KATHERINE CORBETT,      )
6    and CRAIG THOMAS YATES,         )
                                     )
7            Plaintiffs,             )
                                     )
8        vs.                         )        No. C025849MJJADR
                                     )
9    TACO BELL CORP.,                )
                                     )
10           Defendants.             )
     _____)
11
12
13
14                  DEPOSITION OF
15                  FRANCIE MOELLER
16           182 FARMERS LANE, SUITE 100A
             SANTA ROSA, CALIFORNIA  95405
17
                 WEDNESDAY, JUNE 11, 2003
18
19
20
21
     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     5 Third Street, Suite 625
23   San Francisco, CA  94103
     (800) 288-3376
24   REPORTED BY:  RUTH GRANT, CSR NO. 10966
25   FILE NO.:  9D04B79

Page 12

1      A.    No.

2      Q.    Does anyone else live with you?

3      A.    No.

4      Q.    Can you just briefly tell me your medical

5    history that results in you being disabled?

6      A.    I have a number of different disability

7    conditions.  I have degenerative disc disease.  I have

8    spondylolisthesis.  I have autoimmune disease; we don't

9    know which one.  I have fibromyalgia.  I have thoracic

10   outlet syndrome.  I also have gastritis, both acid and

11   bile.  I think that's it.

12     Q.    Is it your understanding that all of those

13   conditions contribute to the fact that you are disabled?

14     A.    Yes.

15     Q.    How long have you used a wheelchair for

16   mobility?

17     A.    Since 1991.

18     Q.    Is that approximately when you opened ADA

19   Compliance --

20     A.    Yes.

21     Q.    -- testifying as expert?

22            You use what the complaint describes as a

23   "scooter" for mobility, correct?

24     A.    That's correct.

25     Q.    Could you describe it for me?  What is it, and

Page 13

1    to the extent you can tell me, what are its dimensions?

2         A.    I'm not clear.

3         Q.    "Scooter" is kind of a generic term.  Are you

4    able to be any more specific than that?

5         A.    It's a three-wheeled wheelchair, basically,

6    that runs on batteries, and it's about 48 inches long,

7    about 28 inches wide.

8         Q.    28 inches wide?

9         A.    Wide, approximately.  At least this one.

10        Q.    How did you come to be a plaintiff in this

11   case?

12        A.    The way I found out about it, I received an

13   e-mail through the disability network about Taco Bell

14   cases, and we were having some problems up here with

15   some Taco Bell, so I followed up on some information in

16   the e-mail and contacted Mr. Fox for information.

17        Q.    You said the disability network?

18        A.    Yes.

19        Q.    Tell me what that is.

20        A.    Conglomeration of many, many, many, many

21   people with disabilities from different organizations.

22   We have an open e-mail network where we talk about all

23   different issues.

24        Q.    Like a chat room?

25        A.    It's not the same as a chat room, but it's

Page 14

1    more like just an e-mail listing where people can send

2    out information for groups and organizations.

3        Q.   So if you receive an e-mail, it would often

4    have gone to all of the people on this e-mail list?

5        A.   Probably.

6        Q.   Do you have any estimate as to how many folks

7    are on this e-mail list?

8        A.   Not at all.

9        Q.   If somebody wanted to join the e-mail list,

10   how would they do it?

11       A.   I don't know.  I just got ahold of it via one

12   of the members of the disability caucus and they sent me

13   the information.

14       Q.   Do you recall from whom you received the

15   e-mail about Taco Bell stores?

16       A.   No.

17       Q.   Do you remember what it said?

18       A.   I really don't.  I remember it mentioned that

19   there was a case going on about Taco Bell.  And I don't

20   remember much more.  It's been quite a while since I saw

21   that.

22       Q.   Can you tell me approximately when you saw it?

23       A.   A year or two ago.

24       Q.   And why was that of particular interest to you

25   personally?

Page 18

1   different stores?

2          A.   That's correct.

3          Q.   When is the first time that you encountered

4   what you would describe as a barrier to access at the

5   Farmers Lane Taco Bell store in Santa Rosa?

6          A.   I really don't remember when the first time

7   was.

8          Q.   Can you estimate at all?  Was it more than two

9   years ago?

10         A.   I'm sure it was.

11         Q.   Can you tell me what the barrier to access was

12  that you first encountered at the Farmers Lane store?

13         A.   Do you want to be more specific?

14         Q.   No, unless you can't answer that.

15         A.   Well, parking.

16         Q.   What was the problem with parking at the

17  Farmers Lane store?

18         A.   Okay.  Parking is across a street similar to

19  here (indicating), out front of this building where you

20  have to cross in front of traffic, oncoming traffic.

21  There's no crosswalk.  The parking spaces are not wide

22  enough.  The unloading zone is not wide enough.  The

23  signage is inappropriate.  There's no tow away signage.

24              And I am not sure if that's the one that

25  has -- I think that only has one sign on one of the two

1    places.  One of the places I went to has no signs, but

2    two of them have only one sign.  I don't remember which

3    is which.  When we tried to go into that store, we had a

4    side unloading van, and we couldn't unload out of the

5    van because there isn't a wide enough unloading zone.

6         So that was the first thing I remember.

7         MR. EURICH:  Just one second.

8    BY MR. EURICH:

9         Q.  Ms. Moore, I think you're talking about the

10   wrong store.  I was there just this morning, and Farmers

11   Lane does not have parking across the street.  It may be

12   that one of the other two does.  Does that

13   representation refresh your memory at all?

14        A.  It does.  You're wrong.

15        MR. FOX:  When she pointed outside, it became

16   a little less clear.  When she said "street," I think

17   you mean --

18        MR. EURICH:  -- driveway?

19        MR. FOX:  -- within the lot, the driveway.

20        MR. EURICH:  I see, okay.

21   BY MR. EURICH:

22        Q.  I thought you were talking about an actual

23   street in between.  You're talking about the

24   drive-through route?

25        A.  Right, in front of the oncoming traffic.

9D04B79
Francie Moeller - 6/11/2003

Page 20

1        Q.    Have you measured or had someone measure the

2    parking spaces?

3        A.    No, I haven't.

4        Q.    And when you say there's no signage, there is

5    a handicap universal symbol on the actual parking place,

6    but you're saying there was no signage showing that --

7    what signage are you saying?

8        A.    Tow away signage that's required by law, a van

9    accessible signage that's required by law.

10       Q.    Let's move on from the parking.

11             What else did you find to be a barrier to

12   access at the Farmers Lane Taco Bell store in

13   Santa Rosa?

14       A.    The ramp to the restaurant doesn't have any

15   rails.

16       Q.    What else?

17       A.    You can't get past -- the front door is very

18   heavy.  When you get through the door, if you do,

19   there's queue lines that are fixed.

20       Q.    Now, are you able to open the front door of

21   this store?

22       A.    It's very difficult.

23       Q.    But you are able to do so?

24       A.    Yes, but it's very difficult.

25       Q.    And when you've gone there, have you gone by

Page 23

1    you encountered what you feel are barriers to access?

2         A.   Yes.

3         Q.   I think the store was built in '91.  Can you

4    tell me whether -- how soon after that you think you

5    first went there?

6         A.   Somewhere around '96 when I first moved here.

7         Q.   Where did you live before '96?

8         A.   Concord.

9         Q.   Is there a Taco Bell in Concord?

10        A.   Directly across the street from my house, my

11   house on Fernwood Drive.

12        Q.   Did you have any problems with that one?

13        A.   I wasn't in a wheelchair then, so I can't

14   judge it the same.

15        Q.   Once you get into the Farmers Lane Taco Bell

16   store, there's a queue line that you've described.  Does

17   your scooter fit in the queue line?

18        A.   No.

19        Q.   It doesn't even fit in the opening to begin

20   with, let alone all the way through?

21        A.   You can't get to the opening.  You'd have to

22   go to your left, and then in -- to get to the opening,

23   or you'd have to go in front of all the people in the

24   front.  And so you can't get into the opening for the

25   queue line from that door.

Page 35

1    blank?  Michelle Sanchez, Marian Sanchez.

2              MR. FOX:  Is that a different person?

3              THE WITNESS:  Yes.  I can't think of the

4    boyfriend's name right now, but they all live right

5    there.

6    BY MR. EURICH:

7         Q.   Do all these people use wheelchairs or

8    scooters for mobility?

9         A.   Yes, except for Marian.

10        Q.   And each of these individuals that you listed

11   for me have been to that location with you on at least

12   one occasion?

13        A.   No.

14        Q.   Who had been there with you on at least one

15   occasion, Van Tipton?

16        A.   No, we -- when we went over there and tried to

17   use it, we wouldn't go -- I had to go to scout it out

18   first.  We could not go in together.  None of those

19   people could go in there with me, together.

20        Q.   Why?

21        A.   There's nowhere to sit for more than two

22   people in a wheelchair.

23        Q.   Is it because the restaurant was basically

24   full --

25        A.   No.

Page 36

1       Q.   -- of people?

2       A.   No.

3       Q.   And when you say there's no place to sit, what

4  are you describing?

5       A.   Fixed seating.

6       Q.   Are you saying that there were only two tables

7  that have seating that is not fixed?

8       A.   I only saw one.

9       Q.   When you're talking about tables with seating

10 that is not fixed, you're basically describing a chair

11 that's moveable?

12      A.   Not in this case.

13      Q.   There was no chair there?

14      A.   No.

15      Q.   When were you at that Taco Bell at Farmers

16 Lane in Santa Rosa when you only saw one table where you

17 could sit in a wheelchair?

18      A.   Just a couple months ago.

19      Q.   And there was no chair at that table, there

20 was just an empty space?

21      A.   Yes.  The rest of the seating is fixed.

22      Q.   And so I'm confused.  If there was only one

23 place that someone could sit in a wheelchair, did you

24 ever go in there with any of the other officers who use

25 wheelchairs for mobility?

Page 37

1       A.    No.

2       Q.    So the thought was to meet there, but you

3    never actually did it?

4       A.    Not with them.

5       Q.    Did you meet there with anyone else who uses a

6    wheelchair for mobility?

7       A.    No, it's not accessible for more than one

8    person at a time.

9       Q.    And is that the only reason that you haven't

10   done that, is because there's only one -- your memory is

11   there's only one table where you could sit in a

12   wheelchair?

13      A.    That isn't the only reason.   That's the main

14   reason, though.

15      Q.    Do you know if Van Tipton has ever gone into

16   that Taco Bell at Farmers Lane?

17      A.    I can't be sure.

18      Q.    How about Tim O'Leary?

19      A.    I'm not sure.   I have not asked them.

20      Q.    Have any of these people, Darin Heatherly,

21   Ed Muegge, Michelle Sanchez, do you know if any of them

22   have ever gone into the Taco Bell at Farmers Lane in

23   Santa Rosa?

24      A.    I cannot give you an answer for them.

25      Q.    Mr. Muegge is also a plaintiff in this case,

Page 39

1    the disabled in the county and city, thus the name, Late

2    for Your Date.

3        Q.   And Mr. Muegge is part of this group or was?

4        A.   Yes.

5        Q.   You've told me with reference to the Farmers

6    Lane Taco Bell store in Santa Rosa that the respects in

7    which you believe there are barriers to access are

8    parking across the drive-through, there's no crosswalk,

9    the parking spaces aren't wide enough, the loading zone

10   is not wide enough, there's no signage, the ramp up to

11   the restaurant has no rails, the front door is too

12   heavy, there's a queue line, and there's only one place

13   for someone to sit in a wheelchair.

14           Is there any other respect in which you

15   believe that particular location present barriers to

16   access?

17       A.   I believe getting to the fountain is also

18   difficult.

19       Q.   Now, these are the self-service fountain

20   dispensers?

21       A.   That's correct.

22       Q.   We've been talking about the door where you

23   come into, and at least in this picture, the first thing

24   you encounter is the chain in this picture that's

25   Exhibit A.   It's at the other end of the counter that

1    you're describing?

2         A.    Yes, down here (indicating).

3         Q.    And what is the problem that you've

4    experienced with access to those?

5         A.    The problem you have is the fountain can't --

6    it goes to the side.  It didn't -- it isn't like you go

7    straight down the counter and it's right next to you if

8    you're going straight down.  It's back here.  And when

9    you're in a scooter, you can't do a front approach to

10   get to the soft drink containers to pour yourself a

11   drink.  You have to either back into it, or you would

12   have to go in forward and reach over something.

13        So approach is very difficult because it's in

14   the corner.  You can't get to any of the corner fountain

15   drinks.

16        Also for me, it's very high to reach.  I have

17   a problem with my arms, raising my arms, and it seems

18   high to try and get up to the soda fountains.

19        Q.    Have you ever measured it?

20        A.    No.

21        Q.    Have you had a problem with getting to the

22   condiments at this location?

23        A.    Same thing, same problem.

24        Q.    And just so I understand what you're saying,

25   it's that -- strike that.  It looks to me like you can

Page 48

1   Santa Rosa, and let's start with the parking.   Is there

2   a problem with the parking at the Mendocino Avenue Taco

3   Bell in Santa Rosa where you've encountered barriers to

4   access?

5        A.   Actually, yes.

6        Q.   Tell me.

7        A.   Tell you.   They are not wide enough.   The

8   unloading is not wide enough.   There's no van unloading

9   at all.   There are no tow away signs.   The curb ramp

10  comes into the very small unloading zone.

11       Q.   The curb ramp going up to the entrance?

12       A.   Goes into the unloading zone.   If you're in a

13  van, you can't get out of the van.

14       Q.   Why?

15       A.   There's no wide-enough spots to unload from a

16  van.

17       Q.   Because, as you said a moment ago, it's your

18  belief there is no van unloading?

19       A.   There is no van -- it's not my belief.   There

20  is no van unloading there.

21       Q.   What else?

22       A.   There's not a safe way to get to the curb cuts

23  at that place if you're coming in via bus rather than

24  car.

25            MR. FOX:   Are you okay?

1    at least rounded.

2             So you were able to get into it through that,

3    and you can actually get up to the counter on that one

4    and actually turn left to go down the aisle since

5    they've renovated it.  However, you can't get to the

6    Coke machines.  It's the same problem.  They are in the

7    corner of the restaurant.

8             And again, unless you can do a straight-on

9    front approach and you have good arm reach, it would be

10   very, very difficult to get to those soda machines or

11   the condiments.

12       Q.   How recently was it renovated?

13       A.   In the last couple years.  I don't know

14   exactly when.

15       Q.   And to what extent was it renovated?

16       A.   Quite a bit.  They moved most of the fixed

17   seating out of there and put in tables with chairs.

18   However, that causes one little problem, too, but that's

19   a whole other story.  But it doesn't have the fixed

20   seating anymore.  I think they just tried to open it up

21   for the college students.

22       Q.   You need to tell me if we should stop for a

23   while.

24       A.   No, this is going to be going on no matter

25   what.  My body goes to spasms whenever I sit for any

1    So it's not just restricted to those of us in
2    wheelchairs.
3        Q.   But for all the reasons you've expressed, you
4    generally object to bar stool seating, right?
5        A.   As the focus of -- the main focus of the
6    restaurant, yes.
7        Q.   Is the problem in getting access to the Coke
8    machine and the condiments at Mendocino Avenue
9    essentially the same issue that you described at Farmers
10   Lane?
11       A.   It's a little bit different.  It's in a corner
12   facing this way (indicating).
13           MR. FOX:  Hold on.
14   BY MR. EURICH:
15       Q.   How is it different?  And maybe we can use
16   Exhibit 1.  Is there a way you can use that in showing
17   me how it's different?
18       A.   This doesn't work at all.  If this is --
19       Q.   Can you draw it?
20       A.   A little bit, yeah.  This is not going to be
21   mechanical engineer here.
22       Q.   Everybody disclaims drawing ability at this
23   point.
24       A.   Actually, I don't.  I used to be able to do it
25   relatively well.

9D04B79
Francie Moeller - 6/11/2003

Page 60

1              Okay.  The soda machine is something like

2     right in this corner, at least if this was where your

3     queue line is coming in.

4          Q.   Can you draw the queue line.

5          A.   Well, this is the rounded one.  I don't know

6     how much space it is, so I'd be guessing.

7          Q.   But the line that runs across the page is the

8     counter?

9          A.   Yes.  Well, yeah, that would be.

10         Q.   Why don't you label it "counter."

11         A.   That would be counter, where you order.

12         Q.   Okay.

13         A.   Your condiments and your sodas, all your soda

14    machines, are across the back wall here, all the way

15    into this corner.  You can't get into this corner,

16    especially if you are in a scooter or wheelchair.

17    There's just no way to get to this corner.  You have to

18    back up into the wall.  You have no -- there's just no

19    way you can reach it.

20         Q.   Well, only if you could reach it by front

21    access could you get to it, right?

22         A.   Not even necessarily, because, again, it's

23    very high, and you have to be able to reach up to get

24    to, again, the soda machine, to pump things.  They don't

25    make them low enough to make it easy to lift a glass and

Page 61

1   get it up there and hold onto it and so on.   To me, it's

2   too high.

3        Q.   But you don't know whether the dimensions

4   comply with the ADAAG for front access?

5        A.   I don't think it does, because to be able to

6   get over here safely, there's no way you can do a

7   separate approach here.

8        Q.   Why?

9        A.   You would have a problem -- because it's a

10  corner.   Even on a door -- you have to have a little bit

11  of room to get over here.   So it would be really

12  difficult for anyone, even on a straight front approach,

13  to get into that little corner straight on, because

14  you're going to have to be able to get up, to back up,

15  to get out.   You need some room to swing so you're not

16  backing up into people.   It needs to be a little bit of

17  room here, either for a backup or whatever, for somebody

18  in a wheelchair, if you really want to be safe.

19       Q.   Don't you have to back up any time you have

20  front access?

21       A.   Not when -- normally you have some room.   You

22  rarely have something that's stuck in a corner like this

23  is.   That's very, very difficult to do in this corner.

24  And you're -- again, you're making the assumption people

25  have front access, which they don't always.   Remember,

Page 67

1       Q.    But more recently you've noted that those
2   problems were gone?
3       A.    I haven't measured anything, so I can't tell
4   you for sure, but I notice that they had moved the
5   garbage can that was offending and wrapped the pipes.
6   And you can actually use the mirror.  It's actually
7   lowered.  I don't know if it's in compliance.  I have
8   not measured anything, but it was a change that just
9   took place recently.
10      Q.    And how recently?
11      A.    In the last couple of months.
12      Q.    So big trash can that was below, moved, the
13  pipes were wrapped, and the mirrors were lowered, but
14  you don't know if they were lowered enough.
15      A.    Right.  And the door is still too heavy.
16      Q.    How do you know?
17      A.    I could feel.  My arms are very sensitive.
18  It's real heavy for me to open that, that door.  I
19  guarantee you it's also over a five-pound pull-push
20  pressure.
21      Q.    And is this the door to the restroom?
22      A.    Yeah.
23      Q.    How about the front door to the restaurant?
24      A.    That's too heavy, too.  Automatic doors seem
25  to be too heavy to me.  I don't think any of them are in

1    A.    I just did a very quick review.  Just looked

2  around one time to see how I remembered it.

3    Q.    How often have you patronized the Stony Point

4  store?

5    A.    About five or six times.  It's right next to

6  Patty's house.

7    Q.    And who's Patty?

8    A.    She's my secretary.

9    Q.    Over what time have you been at the Stony

10  Point store, five or six times?

11    A.    In the last year?

12    Q.    And prior to that.

13    A.    I don't remember going there prior to that.

14    Q.    Let's start with parking lot.  What barriers

15  to access do you believe exist at the Stony Point Taco

16  Bell store in Santa Rosa with reference to the parking

17  lot?

18    A.    Van, no van unloading.

19    Q.    What else?

20    A.    No signage, no tow away signage.

21    Q.    Is this restaurant adjacent to a larger

22  shopping center?

23    A.    It's not exactly adjacent.  It's kind of on

24  the street, and there's a shopping center in the back.

25    Q.    Is there some sharing of parking that you have

9D04B79
Francie Moeller - 6/11/2003

Page 73

1  observed between the shopping center and the store?

2       A.   No, not for this one that I observed.

3       Q.   No van unloading, no tow away signage.  What

4  else?

5       A.   The curb cut, again, comes into the unloading

6  zone.  There is one other curb cut, but it's down

7  between two parking spaces in a different area.  The

8  only way you can access either of them is to go behind

9  parked cars to get to them, to get onto the sidewalk.

10      Q.   And that's the sidewalk to where?

11      A.   To the restaurant, to get into the actual

12  restaurant.

13      Q.   So your point is you have to go across the

14  drive-through area in your wheelchair to get to the

15  restaurant?

16      A.   Right.  Or -- unless -- if you can unload --

17  if you park right near the door, then you can get up to

18  the one right next to the car.  But only one car would

19  have that convenience.  Everybody else would have to go

20  behind the -- a parked car.

21      Q.   So there's one accessible parking space where

22  you would want it to be and one that isn't?

23      A.   Semi-accessible.

24      Q.   Okay.

25      A.   Not fully accessible.

Page 74

1    Q.   And that's because there's no van unloading?

2    A.   It's also not wide enough.

3    Q.   The parking place itself is not wide enough?

4    A.   No.

5    Q.   Have you measured it?

6    A.   No.

7    Q.   But you have a good sense of these things?

8    A.   Yeah.

9    Q.   What else in the parking lot?

10   A.   The unloading zone isn't wide enough.

11   Q.   That's --

12   A.   Again, there would be no sidewalk access,

13   either, to it.  If you were coming on a bus, you'd be in

14   the same position.  You'd have to go through the

15   drive-through-or-whatever area.

16   Q.   Is this similar to the Mendocino Avenue store?

17   A.   That's correct.  There's no crosswalks or

18   anything like that.

19   Q.   Anything else with reference to the parking

20   lots that you believe is a barrier to access at the

21   Stony Point Taco Bell store?

22   A.   I think that's it.

23   Q.   Let's go in the restaurant.  What about the

24   front door?

25   A.   It's a little bit heavy.

1       Q.   You don't know whether it complies with the

2  five-pound limit?

3       A.   I'd probably say it doesn't.  Guessing.

4       Q.   But it's close?

5       A.   I can't tell you how close it is.  I would

6  tell you that it does have -- I think that's the one

7  that has that fixed bar that you have to press on to get

8  out of, and you have to be holding it down in order to

9  open the door to get out.

10      Q.   And what's your issue with that?

11      A.   Have you ever tried to do that on a scooter

12  where you have to lean across the scooter like this to

13  open a door this way while you're trying to maneuver

14  (indicating)?  Very difficult.  And it makes it even

15  heavier and harder to push.

16      Q.   Are you saying the door will not open at the

17  Stony Point store unless you are pushing in the door?

18      A.   Yeah.  Any doors that have -- those push doors

19  will not open unless you're pushing on the bar.  At

20  least most of them work that way.

21      Q.   Take me inside the store.  What barriers to

22  access do you observe in the Stony Point Taco Bell

23  store?

24      A.   Nice tight purple queue bar.  Too small.

25      Q.   If there were no customers at the counter,

Page 78

1          THE WITNESS:  Yeah.  That's not what we're

2   talking about.

3   BY MR. EURICH:

4      Q.   Well, explain to me your issue with the

5   aisles, with accessible tables being on aisles.

6      A.   If you're closer to a window, for instance,

7   and you need more room to move around, you can pull the

8   table closer to the window, maybe, and give yourself a

9   little bit more space.  We just had that happen over at

10  Lyon's, where we moved the table next to us where I

11  could get in on the side, from the side.  If

12  you're -- if it's a fixed table, right in the middle of

13  a room, you might not be able to do that.  You might not

14  be able to push it over or move it.

15     Q.   If it's a fixed table, you wouldn't be able to

16  pull it over and move it, right?

17     A.   If it's fixed, you can't.

18     Q.   So is the problem you have with the fact of

19  fixed tables?

20     A.   No.  In this case, again, you're saying -- if

21  this table -- if I'm right, there's a booth on the other

22  side of it, then the table, and then two chairs.  So you

23  can't move anything but the two chairs.  So you're right

24  there, you're in the aisle where people are walking by.

25  I don't believe there's enough room that when you're

Page 81

1    address those issues.

2          Q.   What else do you regard as a barrier to

3    access at the Stony Point store?

4          A.   Again, the limitation of only one table that I

5    saw.

6          Q.   You've already told me that.  What else?

7          A.   Trying to think.  What else do I remember from

8    that store?  The condiments and sodas, same thing.  The

9    reach range seems way too high for me.  I'm just -- I

10   have that problem.

11         Q.   You've not measured the Stony Point reach

12   range for the condiments and sodas?

13         A.   No, I haven't.

14         Q.   How is it configured in the store?  Is that an

15   issue for you?

16         A.   Well, all of them seem to be too tight of a

17   square for me.

18         Q.   Is it like Farmers Lane or like the Mendocino

19   Avenue store?

20         A.   I think it's more like the Farmers Lane than

21   it is the Mendocino.

22         Q.   So your memory is that the location of the

23   condiment and drink dispensers is similar to Exhibit 1?

24         A.   It's more like it, not exactly, but it also

25   would be the opposite way -- opposite direction, also.