1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MOELLER ET AL,                              No. C02-05849 MJJ

12          Plaintiff,                    **ORDER DENYING IN PART AND**
                                          **GRANTING IN PART PLAINTIFFS'**
13      v.                                **MOTION FOR PARTIAL SUMMARY**
                                          **JUDGMENT**
14   TACO BELL CORP.,

15          Defendant.
     _____/

16

17

18                              **INTRODUCTION**

19          Before the Court is Plaintiffs Francie Moeller, Edward Muegge, Katherine Corbett, and

20   Craig Thomas Yates' (collectively, "Plaintiffs") Motion for Partial Summary Judgment.[1]  Defendant

21   Taco Bell Corp. ("Defendant" or "Taco Bell") opposes the motion.  For the following reasons, the

22   Court **DENIES**, in part, and **GRANTS**, in part, Plaintiffs' Motion for Partial Summary Judgment.

23                           **FACTUAL BACKGROUND**

24          This class action arises from Defendant's alleged violations of federal and state disability

25   civil rights laws.  Plaintiffs claim that Defendant's California restaurants maintain architectural

26   elements that discriminate against customers who use wheelchairs or scooters by preventing equal

27   enjoyment and access to Defendant's services.  At issue are three architectural elements in

28   Defendant's California restaurants: (1) the dimensions of the queue lines which are the barriers that

_____

[1]Docket No. 255.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   are put in place to cause customers to form a single line as they approach the counter, order, and

2   pick up their food; (2) the force necessary to open interior and exterior doors; and (3) the number of,

3   and knee clearance at, accessible seating positions at indoor dining areas.

4          Plaintiffs are a group of physically disabled California residents who use either electric

5   scooters or wheelchairs as their primary means of mobility.  Defendant is a corporation incorporated

6   under the laws of California, with its principal place of business in California.  (First Amended

7   Complaint ("FAC") ¶ 19; Ans. ¶ 19.)  Defendant owns, operates, leases, and/or leases restaurants in

8   California to Taco Bell.  (*Id.*)  Such restaurants include combination restaurants in which Taco Bell

9   products and products of other restaurants are sold.  (*Id.*)

10         In their operative Complaint, Plaintiffs seek an injunction ordering Defendant to adopt

11  policies to ensure access for customers who use wheelchairs and scooters, and to bring all of its

12  restaurants into compliance with the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the

13  "ADA"), the Unruh Civil Rights Act, California Civil Code § 51 *et seq.* ("the Unruh Act"), and the

14  California Disabled Persons Act, California Civil Code § 54 *et seq.* (the "CDPA").  (FAC ¶¶ 50-73.)

15  Plaintiffs also seek the minimum statutory damages per offense under the Unruh Act and the CDPA.

16         On October 5, 2004, this Court granted the parties' stipulation to appoint a Special Master.[2]

17  The parties agreement called for the Special Master to conduct site visits of Defendant-owned Taco

18  Bell restaurants in California.  The purpose of the site visits, among others, was for the Special

19  Master to use his expertise under the Department of Justice Standards for Accessible Design ("DOJ

20  Standards"), and Title 24 of the 2002 California Building Code ("Title 24"), to determine the

21  dimensions, values, and measurements of the customer accessible elements at the restaurants under

22  the DOJ Standards and/or Title 24 at the time of the site visit and to make recommendations as he

23  sees fit for bringing into compliance those elements whose dimensions, values, or measurements do

24  not comply with DOJ Standards and/or Title 24.

25         This Court's Order Appointing Special Master provided that except as to dimensions, values,

26  and measurements that were not challenged or that were resolved during the monthly meet and

27  confer process above, any party may file objections or move to adopt or modify the Special Master's

28
_____

[2]Docket No. 101.

Report, or any portion thereof, not later than twenty days after the Report is filed with the Court. By Order dated September 19, 2006, this Court set the deadline for objections at January 12, 2007.

On January 12, 2007, Plaintiffs filed a Motion to Make Findings of Fact, and to Adopt the Special Master's Reports with Limited Objections.[3]

Also on January 12, 2007, Defendant filed its Objections to the Special Master's Report.[4] Defendant did not object to or otherwise challenge the Special Master's queue line measurements or the number of seating positions in any restaurant. (Def.'s Objections to Special Master's Interim Survey Report.) Defendant objected to the Special Master's measurement of knee clearance at a single restaurant. (*Id*. at 103.) Plaintiffs do not currently move for summary judgment as to that measurement. Defendant made several objections concerning door force. (*Id*. at 77-80, 89, 117-19, 289-92.) The majority of Defendant's objections raised legal issues, however Defendant made factual objections to the door force on the women's restrooms at three restaurants. Plaintiffs do not currently move for summary judgment as to the door force on the women's restrooms for those three restaurants.

Plaintiffs currently seek partial summary judgment as to three specific architectural barriers in Defendant's California restaurants. Plaintiffs seek summary judgment as to the queue lines in 77 restaurants, the door force in 171 restaurants, and the indoor accessible seating in 54 restaurants. Plaintiffs seek an order finding that the architectural elements at issue are in violation of the ADA, the CDPA, and Unruh, thereby establishing liability for injunctive and monetary relief.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving

[3]Docket No. 243.

[4]Docket No. 247.

United States District Court
For the Northern District of California

party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *Id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

The standards and procedures for partial summary judgment are the same as for summary judgment. Hon. William W. Schwarzer, *Federal Civil Procedure Before Trial*, § 14:33 (citations omitted). Partial summary judgment is appropriate upon a showing that there is no genuine issue of material fact as to particular claims or defenses, where the court may grant summary judgment in the party's favor "upon all or any part thereof." Fed. R. Civ. Proc. 56(a),(b); *See also* Hon. William W. Schwarzer, *supra* at § 14:33 (citing *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999); *Wang Laboratories, Inc. v. Mitsubishi Electronics, America, Inc.*, 860 F. Supp. 1448, 1450 (C.D. Cal. 1993)); *See also*, *Long v. Coast Resorts, Inc.*, 267 F.3d 918, 921-24, 926 (9th Cir. 2001) (affirming in part district court's decision granting partial summary judgment to plaintiffs based on an application of ADA accessibility standards to stipulated facts); *United States v. AMC Entm't, Inc.*, 245 F. Supp. 2d 1094, 1101 (C.D. Cal. 2003) (granting partial summary judgment to plaintiffs based on an application of ADA accessibility standards to undisputed dimensional information in plaintiffs' expert's report); *Sapp v. MHI P'ship, Ltd.*, 199 F. Supp. 2d 578, 583 (N.D. Tex. 2002) (granting partial summary judgment to plaintiffs based on an application of ADA accessibility standards to undisputed facts).

United States District Court

For the Northern District of California

4

**ANALYSIS**

**I.      Summary of the Parties' Arguments**

A short summary of the parties' arguments is helpful in framing the issues before the Court.

**A.      Plaintiffs' Arguments**

Plaintiffs purport that their motion for partial summary judgment as to the three architectural barriers at issue is grounded upon undisputed facts.  In support, Plaintiffs rely on: (1) the Special Master's measurements[5] of the architectural elements at issue (with the exception of the excluded measurements, as noted above); (2) the construction tolerances[6] applied by Plaintiffs as stipulated by the parties; and (3) the construction dates[7] of the restaurants at issue.

Plaintiffs explain that their motion is limited to architectural elements that violate applicable new construction standards, which include restaurants that were built: (1) *after* January 26, 1993, and were thus subject to the "new construction" regulations under the ADA; and/or (2) *after* December 31, 1981, and were thus subject to California access regulations in affect at the time of construction.

---

[5]Exhibits 1-8 of the Declaration of Timothy P. Fox ("Fox Decl.") contain the Special Master's measurements and statistics regarding the architectural elements for each of Defendant's restaurants at issue in the pending motion.

[6]Plaintiffs explain that the DOJ Standards and – beginning in 1999 – Title 24 provide that "[a]ll dimensions are subject to conventional building industry tolerances for field conditions." DOJ Stds. § 3.2; Title 24-1999 § 1101B.4. Although Defendant has stipulated that the question of what constitutes a tolerance under this provision is an affirmative defense on which Defendant bears the burden of proof, for purposes of this Motion, Plaintiffs are seeking relief only with respect to architectural elements that are either (1) outside of tolerances to which the parties have stipulated, or (2) so far out of compliance as to be beyond any reasonable tolerance based on field conditions.  (Pl.'s Mot. at 9:1-9) (citing Joint Status Conference Statement (Docket No. 157) ¶ 18; *see also Index. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 782 (D. Or. 1997) (Holding that the question of what constitutes "conventional building industry tolerances" is "an affirmative defense upon which the defendant bears the burden of proof."); *AMC Entm't, Inc*., 245 F. Supp. 2d at 1100 (Granting summary judgment to the plaintiff and rejecting the defendant's argument that small deviations should be excused as tolerances on the grounds that the defendant had "provided no evidence regarding any applicable conventional building industry tolerances. . .")).

For example, Plaintiffs explain they have applied a seven pound tolerance for interior door forces, a tolerance to which the parties have stipulated. (*See* "Chart of Acceptable Measurements for the DOJ Standards for New Construction and Alterations" ("Stipulated Tolerances") at 1, attached to Stipulation Concerning Acceptable Measurements (Fox Decl. ¶ 14, Ex. 9).) Plaintiffs have applied a tolerance of 3.9 inches to queue line dimensions, based on the testimony of Carlos Azalde, Defendant's Rule 30(b)(6) designee on queue line issues in both the Colorado litigation and the case at bar, who stated that a four inch deviation from the design of queue lines would be beyond construction tolerances. (*Colorado Cross Disability Coalition v. Taco Bell Corp*., Civil Action No. 97-B-2135 (D. Colo.) ("*CCDC v. Taco Bell*"), Dep. of Carlos Azalde at 33-34 (Ex. 10 to Fox Decl.) ("Azalde Colo. Dep.").)

[7]The parties have stipulated to the date on which each restaurant at issue was constructed.  (Pls.' Submission of Agreements Reached by the Parties.)  (Docket No. 241.)

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

**B.      Defendant's Opposition**

Defendant responds by emphasizing that new construction standards under the ADA apply only to those commercial facilities constructed after January 26, 1993.  42 U.S.C. § 12183(a)(1). Relying on the ADA's enactment, Defendant accords significance to Congress's exception for existing commercial facilities (those constructed before January 26, 1993) – requiring those existing facilities to be subject to new construction standards only if such work was "readily achievable." Defendant accuses Plaintiffs of improperly attempting to apply non-ADA legal standards (*e.g.* California state law standards) to Defendant's existing restaurants (those constructed before January 26, 1993).  Defendant requests the Court to exclusively apply the ADA's legal standards to all of the restaurants at issue.  Defendant alternatively argues that if the Court elects to apply non-ADA standards and regulations to the restaurants at issue, then Defendant still prevails as to Plaintiffs' ADA claims relating to those restaurants constructed prior to January 26, 1993 because Plaintiffs have failed to demonstrate that barrier removal or alteration, in those restaurants, is "readily achievable."

As to those restaurants constructed *after* January 26, 1993, Defendant argues that such issues have been rendered moot due to Defendant's recent remediation efforts and implementation of appropriate policies designed to provide "full and equal" access to its restaurants.

Lastly, Defendant argues that even if the Court applies non-ADA accessibility standards, the discretionary issuance of certificates of occupancy by the local building official charged with enforcing the accessibility requirements of the California Building Code constitutes prima facie evidence that Defendant's restaurants were in compliance at the time such restaurants were first open for business, thereby creating a genuine issue of material fact precluding summary judgment.

**C.      Plaintiffs' Reply**

In their reply, Plaintiffs clarify that they seek summary judgment under the ADA only with respect to those restaurants that were built after January 26, 1993.  Therefore, Plaintiffs submit that Defendant's analysis of the ADA's "readily achievable" standard for existing facilities is thus irrelevant and need not be resolved in this motion.  Plaintiffs' reply explains that they seek summary judgment on their ADA claims based only on violations of the DOJ Standards, and not on non-ADA

**United States District Court**
For the Northern District of California

1    standards as Defendant contends.  Plaintiffs also explain that they rely on non-ADA standards – such

2    as Title 24 – only to establish violations of state law under the CDPA and Unruh in the current

3    motion.

4    **II.    ADA, CDPA, and Unruh**

5        The parties disagree as to what legal standards apply to the architectural elements at issue.

6    Thus, the Court must first address the relevant statutes – the ADA, the CDPA, and Unruh – and the

7    elements of proof necessary to establish violations thereof.

8        **A.    ADA**

9        The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for

10    the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1);

11    *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (holding that the ADA provides a "broad

12    mandate" to eliminate discrimination against people with disabilities).  The statute recognizes that

13    "the Nation's proper goals regarding individuals with disabilities are to assure equality of

14    opportunity, full participation, independent living, and economic self-sufficiency for such

15    individuals."  42 U.S.C. § 12101(a)(8).

16        Title III of the ADA prohibits discrimination on the basis of disability in places of public

17    accommodation[8], both with respect to the accessibility of their physical facilities and with respect to

18    their policies and practices.  42 U.S.C. § 12182(a); *Moeller v. Taco* Bell, 220 F.R.D. 604, 606 (N.D.

19    Cal. 2004); *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1020 (9th Cir. 2002).  Liability is

20    imposed upon "any person who . . . operates a place of public accommodation" that discriminates

21    against an individual on the basis of disability.  *Id.*  Aside from attorney's fees, the only remedy

22    available to a private litigant under Title III of the ADA is injunctive relief.  42 U.S.C. §

23    12188(a)(1); *see also Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).

24        In enacting the ADA, Congress adopted two systems for regulating building accessibility: (1)

25    one to apply to newly constructed or altered facilities; and (2) a second to apply to facilities designed

26    and constructed for occupancy before January 26, 1993.  *See* 42 U.S.C. § 12183(a)(1) and §

27    _____

28        [8]The parties do not dispute that Taco Bell restaurants are "public accommodations" within the meaning of the ADA and the relevant California disability laws.  *Moeller*, 220 F.R.D. at 606.

12182(b)(2)(A)(iv).  Congress also directed the Department of Justice ("DOJ") to issue regulations implementing Title III.  42 U.S.C. § 12186(b).  The DOJ regulations are at Part 36 of 28 C.F.R.

Newly-constructed facilities – those constructed after January 26, 2003 – and altered facilities, must comply with the ADA Accessibility Guidelines ("ADAAG"), which were incorporated into the DOJ regulations as Appendix A of 28 C.F.R. Part 36.  *See* 28 C.F.R. § 35.151(c).  A failure to comply with the DOJ Standards in buildings constructed after January 23, 1996 is a violation of the ADA.  28 C.F.R. § 36.406(a).  When a facility is deemed "altered," the altered portion of the facility must be made accessible "to the maximum extent feasible."  The infeasibility exception "applies to the occasional case where the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards . . . ." 28 C.F.R § 36.402(c).

Existing facilities – those constructed before January 26, 1993, that are not deemed altered – are subject to a less stringent standard.  Existing facilities must remove architectural barriers to access only where such removal is "readily achievable."  *See* 42 U.S.C. § 12182(b)(2)(A)(iv).  The term "readily achievable" means "easily accomplished and able to be carried out without much difficulty or expense."  42 U.S.C. § 12181(9); *see also* 28 C.F.R § 36.304(a) (preexisting facilities must remove barriers to accessibility only "where such removal is readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense").[9]  The applicable regulations mandate that a public accommodation shall remove architectural barriers where such removal is readily achievable.  *See* 28 C.F.R. §§ 36.304(a), (b).  The regulations provide examples of steps to remove barriers, such as repositioning shelves, rearranging tables, chairs, vending machines, display racks, and other furniture, and widening doors.  *See id.*

Although existing facilities are not required to comply with the ADAAG (unless they have been altered), the ADAAG nevertheless provides guidance for determining whether an existing facility contains architectural barriers.  *Mannick v. Kaiser Foundation Health Plan, Inc*., 2006 WL

---

[9]In determining whether an action is readily achievable, the ADA provides a number of factors to be considered. 42 U.S.C. § 12181(9)(A)-(D).  Where an entity can demonstrate that the removal of a barrier is not readily achievable, discrimination also includes the failure to make such facilities available through alternative methods if such methods are readily achievable.  42 U.S.C. § 12182(b)(2)(A)(v).

United States District Court

For the Northern District of California

1   1626909 at *5 (N.D. Cal. 2006) (citing *Parr v. L & L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065,

2   1086 (D. Haw. 2000)).  However, deviations from the ADAAG are not necessarily determinative in

3   establishing barriers to access.  *Id*. (citing 28 C.F.R. Part 36, App. A, ADAAG 2.2).

4     The ADA does not foreclose reliance on state law remedies that provide greater protection.

5   42 U.S.C. § 12201(b).  In describing the ADA's relationship with other laws, the ADA provides,

6   > Nothing in this chapter shall be construed to invalidate or limit the remedies, rights,
7   > and procedures of any Federal law or law of any State or political subdivision of any
    > State or jurisdiction that provides greater or equal protection for the rights of
8   > individuals with disabilities than are afforded by this chapter. . . .

9   *Id*.

10     **B.**   **The Unruh Act and CDPA**

11     Both the CDPA and the Unruh Act prohibit discrimination on the basis of disability in the

12   full and equal access to the services, facilities and advantages of public accommodations.  Cal. Civ.

13   Code §§ 51(b) (Unruh Act), 54.1(a)(1) (CDPA).  *Moeller*, 220 F.R.D. at 606.  A prevailing plaintiff

14   is entitled to, among other relief, statutory minimum damages regardless of whether the plaintiff has

15   suffered any actual damages.  *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000)

16   (holding that "proof of actual damages is not a prerequisite to recovery of statutory minimum

17   damages" under the Unruh Act and the CDPA).

18     All buildings constructed[10] or altered[11] after July 1, 1970, must comply with standards

19   governing the physical accessibility of public accommodations.  *D'Lil v. Stardust Vacation Club*,

20   2001 WL 1825832, 2001 U.S. Dist. LEXIS 23309 at *21-22 (E.D. Cal. 2001).  From December 31,

21   1981 until the present, the standards have been set forth in Title 24 of the California regulatory code

22   (the "California Standards").  *People ex rel. Deukmejian v. CHE, Inc*., 150 Cal. App. 3d 123, 134

23   (1983).  In addition to setting forth design and construction standards, the California Standards

24   require public accommodations to maintain in operable working condition those features of facilities

25   and equipment that are required to be accessible to and usable by persons with disabilities.  Title 24-

26   1999 § 1101B.3.

27

28

---

[10]Cal. Health & Safety Code § 19956.

[11]Cal. Health & Safety Code § 19959.

United States District Court
For the Northern District of California

1    A violation of a California Standard constitutes a violation of both the CDPA and the Unruh

2    Act. *See, e.g., Arnold v. United Artists Theatre Circuit, Inc*., 866 F. Supp. 433, 439 (N.D. Cal.

3    1994).  Similarly, a violation of the ADA also constitutes a violation of both statutes.  Cal. Civ.

4    Code §§ 51(f) & 54(c).[12]

5    **III.    Mootness**

6    Because the issue of mootness goes to this Court's subject matter jurisdiction, the Court will

7    consider it first, and then turn to the architectural barriers at issue in this action: (1) queue lines and

8    auxiliary access lanes; (2) door force; and (3) seating accessibility.

9    As to queue lines, Defendant insists that Plaintiffs' claims are moot because Defendant has

10   removed queue lines at forty six restaurants and modified them at ten additional restaurants.  (Ford

11   Decl. at ¶¶ 6-70; Kane Decl. ¶¶ 6-39.)  Defendant also states that it intends to modify or remove

12   non-compliant queue lines by January 1, 2008.  (De Bella Decl. at ¶¶ 6-7.)  As to door force,

13   Defendant contends that Plaintiffs' claims are moot because Defendant has replaced the door closers

14   at ninety five of its restaurants (*id*.), and has expressed its intent to replace additional door closers at

15   the remaining stores in the near future.  (De Bella Decl. at ¶¶ 4-5.)  As to the accessible seating,

16   Defendant maintains that Plaintiffs' claims are moot because Defendant has added additional indoor

17   accessible seating at thirty one restaurants and modified the existing accessible seating at forty

18   additional restaurants.  (Ford Decl. at ¶¶ 6-70; Kane Dec. at ¶¶ 6-39.)  As to Defendant's proposed

19   modifications, Defendant argues that unless Plaintiff can come forward with admissible evidence

20   creating a reasonable expectation that Defendant's expressed intent is disingenuous, then Plaintiffs'

21   ADA claims are moot.

22   Plaintiffs dispute that their ADA claims are moot.  Plaintiffs challenge Defendant's

23   expressed intent to comply with the ADA insisting that injunctive relief remains necessary to ensure

24   future compliance.  Plaintiffs also argue that Defendant cannot satisfy the heavy burden to establish

25   that the challenged conduct cannot reasonably be expected to recur.  Lastly, Plaintiffs explain that

26

27   [12]The Unruh Act, as amended, § 51 provides that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 . . . shall also constitute a violation of this section." Cal. Civ. Code § 51(f).  Additionally, as of 1997, the CDPA incorporates by reference an individual's rights under the ADA.  Cal. Civ. Code §§ 54(c), 54.1.  Thus, a violation of the ADA also constitutes a violation of the CDPA. *Mannick*, 2006 WL 1626909 at *6 (citing *Pickern v. Best Western Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128, 1130 (E.D. Cal. 2002)).

28

*United States District Court*
For the Northern District of California

1   even if Defendant was able to meet its heavy burden of showing that the architectural elements have

2   been remedied, and that the challenged conduct will not recur, the legal questions presented by the

3   current motion are not moot because Plaintiffs are seeking monetary relief for class members under

4   California state law predicated on Defendant's violations of the DOJ Standards and Title 24.  Thus,

5   the question of whether the architectural elements at issue were in violation of the ADA and/or state

6   law before they allegedly were remedied must be addressed to determine Defendant's liability for

7   damages.

8          Mootness is a jurisdictional defect that can be raised at any time by the parties or the court

9   *sua sponte*.  *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1130 (C.D. Cal. 2005) (citing *Barilla v.*

10  *Ervin*, 886 F.2d 1514, 1519 (9th Cir. 1989)).  "[A] case is moot when the issues presented are no

11  longer 'live' or the parties lack a legally cognizable interest in the outcome."  *County of Los Angeles*

12  *v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

13  "[T]he question is not whether the precise relief sought at the time the application for an injunction

14  was filed is still available.  The question is whether there can by any effective relief."  *West v.*

15  *Secretary of Dept. of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000).  "Mere voluntary cessation of

16  allegedly illegal conduct does not moot a case; it if did, the courts would be compelled to leave [t]he

17  defendant ... free to return to his old ways."  *United States v. Concentrated Phosphate Export Ass'n*,

18  393 U.S. 199 (1968) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)); *see also*,

19  *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000).  Voluntary cessation of illegal

20  conduct does not render a challenge to that conduct moot unless "(1) there is no reasonable

21  expectation that the wrong will be repeated, and (2) interim relief or events have completely and

22  irrevocably eradicated the effects of the alleged violation."  *Barnes v. Healy*, 980 F.2d 572, 580 (9th

23  Cir. 1992); *see also Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 854 (9th Cir. 1985)

24  (quoting *Davis*, 440 U.S. at 631).  "The burden of demonstrating mootness 'is a heavy one.'"  *Davis*,

25  440 U.S. at 631 (quoting *W.T. Grant*, 345 U.S. at 632-33).  A number of ADA cases have held that

26  promised improvements and policy changes do not moot a claim for injunctive relief under that

27  statute.  *See, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1080 (N.D. Cal. 1997);

28  *Clavo v. Zarrabian*, 2004 WL 3709049 at *4 (C.D. Cal. May 17, 2004); *Watanabe v. Home Depot*

11

United States District Court

For the Northern District of California

1    *USA, Inc.*, 2003 WL 24272650, at *4 n.2 (C.D. Cal. July 14, 2003).

2            Here, a review of the undisputed factual record demonstrates that a number of Defendant's

3    restaurants continue to have architectural elements that remain non-ADA compliant.  Although

4    Defendant claims that it intends to modify or remove non-compliant queue lines by January 1, 2008,

5    and to replace additional door closers at the remaining stores in the near future, (De Bella Decl. at ¶¶

6    4-7), such representations do not render Plaintiffs' ADA claims moot.  *See, e.g., Cupolo*, 5 F. Supp.

7    2d at 1080.  As Defendant has admitted, many of the elements in its restaurants change frequently

8    due to "regular maintenance, remodels, repairs, and normal wear and tear."  (Def.'s Mot. for

9    Modification of Class Definition at 3:13-18.)   Defendant has explained that, because of this frequent

10   change, the fact that an element is in compliance at one time "is not dispositive of whether the same

11   element is in compliance" at another time.  (*Id.*)  Thus, evidence of the current compliant status of

12   certain elements is not dispositive of whether the elements will continue to be compliant in the

13   future.

14           For these reasons, the Court finds that Defendant cannot satisfy its heavy burden to show that

15   the past and existing ADA violations will not recur.[13]   Even if certain doors and seating were in

16   compliance in the summer of 2006, as Defendant contends, this Court may order effective relief as

17   to those elements in the form of an injunction requiring Defendant to (1) remedy the remainder of

18   these elements that are out of compliance; (2) maintain those elements in a compliant state; and (3)

19   ensure that those elements comply in any new or acquired restaurants.

20           Having resolved the issue of mootness, the Court now turns to the three types of architectural

21   barriers at issue in this action: (1) queue lines and auxiliary access lanes; (2) door force; and (3)

22   seating accessibility.

23   _____

24           [13]Defendant cites a number of cases involving physical changes in which courts have held ADA claims to be moot.
     All are distinguishable because in none of the cases was there evidence that the elements in question remained subject to

25   "frequent change."  Furthermore, in three of the cases, the plaintiffs had conceded that the claims were moot.  *Brother v. CPL
     Invts., Inc.*, 317 F. Supp. 2d 1358, 1372 (S.D. Fla 2004); *Pickern v. Best Western Timber Cover Lodge Marina Resort*, 194

26   F. Supp. 2d 1128, 1130 (E.D. Cal. 2002); *Parr v. L&L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1087 (D. Haw. 2000).
     Next, the *Troiano* case involved a government defendant, which the Eleventh Circuit found to be dispositive. *Troiano v.

27   Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004) ("when the defendant is not a private citizen but a government
     actor, there is a rebuttable presumption that the objectionable behavior will not recur.").  Finally, in the *Hickman* case – which

28   also involved a government defendant – the primary reason the case was held to be moot was that all of the prisoner plaintiffs
     has been paroled.  *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998).

**United States District Court**
For the Northern District of California

1    **IV.    Queue Lines and Auxiliary Access Lanes**

2          The first architectural barriers at issue are Defendant's queue lines and auxiliary access

3    lanes.             Plaintiffs insist that the queue lines in Defendant's restaurants listed in Exhibits 1[14]

4    and 2[15] violate applicable new construction standards.  As to the queue lines listed in Exhibit 1,

5    Plaintiffs claim that the queue lines are in violation of the applicable Title 24 regulations governing

6    the width of cafeteria lines and circulation aisles.  As a result of those Title 24 violations, Plaintiffs

7    claim that the queue lines in Exhibit 1 violate the CDPA as well.  As to the queue lines listed in

8    Exhibit 2, Plaintiffs claim that the queue lines are in violation of the ADA, the CDPA, and Unruh.

9    Plaintiffs more specifically contend that Defendant's segregated auxiliary access lanes for persons

10   who use wheelchairs or scooters, do not excuse Defendant's queue line violations, and that the

11   auxiliary access is also in violation of both California law and the ADA.  Defendant responds that its

12   queue lines do not violate the ADA or state law because the available auxiliary access lanes provide

13   persons who use wheelchairs or scooters with equivalent facilitation.  The Court now turns to

14   Defendant's queue lines and auxiliary access lanes in order to determine if they violate either the

15   ADA or state law.

16         The queue lines and auxiliary access in Defendant's restaurants are generally arranged as

17   depicted below:

18

19

20

21

22

23

24

25

26

27   [14]The queue line measurements in Exhibit 1 are taken from buildings built between December 31, 1981 and January 26, 1993.  (Fox Decl. ¶ 2, Ex 1.)

28   [15]The queue line measurement in Exhibit 2 are taken from buildings built after January 26, 1993.  (Fox Decl. ¶ 3, Ex 2.)



(Pl.'s Mot. at 10:9-21.)[16]

### A.    Queue Lines

#### 1.    Exhibit 1 – Unruh and CDPA

The queue lines in Exhibit 1 are measurements taken from stores built between December 31, 1981 and January 26, 1993.  (Fox Decl. ¶ 2, Ex 1.)  For stores built in that time frame, there are two categories of Title 24 regulations that require queue lines to be at least 36 inches wide.  The first category of Title 24 regulations pertains to "cafeteria line aisles" and requires a width of at least 36 inches.  *See* Title 24-1981 § 2-611(c)(4); Title 24-1984 § 2-611(d)(4); Title 24-1987 § 2-611(d)(4); Title 24-1989 § 611(d)(4).[17]  The second category of Title 24 regulations pertains to "circulation aisles and pedestrian ways" and also requires a width of at least 36 inches.  *See* Title 24-1981 § 2-402(d); Title 24-1984 § 2-402(d); Title 24-1987 § 2-402; Title 24-1989 § 402(h) (an "aisle" is

---

[16]For purposes of the current motion, neither party has identified whether the restaurants referenced in Exhibits 1 and 2 each contain auxiliary access lanes in addition to the queue lines.  However, because Plaintiffs' brief appears to concede for purposes of this motion that each of the restaurants at issue contain an auxiliary access lane, the Court will assume the same here.

[17]Mr. Azalde referred to Taco Bell's queue lines as "food service lines."  (Fox Decl. ¶ 15, Ex. 10, Azalde Colo. Dep. at 35.)

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   defined as a "circulation path between objects such as seats, tables, merchandise equipment,

2   displays, shelves, desks, etc"); Title 24-1981 § 2-710(a)(7)(A); Title 24-1984 § 2-710(b)(7)(A); Title

3   24-1987 § 2-712(b)(7)(A) ; Title 24-1989 § 712(b)(7)(A).

4          The stores listed in Exhibit 1 have queue lines in which at least one lane or turn is 32 inches

5   or less in width.  (Fox Decl. ¶ 2, Ex. 1.)  The width of 32 inches takes into account the 36-inch

6   requirement set forth in Title 24, minus the 4-inch queue line construction tolerance set forth by

7   Defendant's Rule 30(b)(6) designee.  (*Id*. at ¶ 20, Ex. 15, Azalde Depo. at 33-34.)  Accordingly,

8   Exhibit 1 sets forth restaurants with queue lines that violate Title 24 because they have queue lines

9   in which at least one lane or turn is 32 inches or less in width.  Because the queue lines in Exhibit 1

10  violate Title 24, they would also violate both the CDPA and the Unruh Act, *see, e.g., Arnold*, 866 F.

11  Supp. at 439, unless, as discussed more fully below, Defendant's auxiliary access lanes raise a

12  triable issue of fact as to whether the auxiliary access lanes provide a means of equivalent

13  facilitation.

14                        **2.      Exhibit 2 – ADA, Unruh, and CDPA**

15         The queue lines in Exhibit 2 are measurements taken from stores built after January 26, 1993.

16   (Fox Decl. ¶ 3, Ex 2.)  For stores built in that time frame, Plaintiffs rely on violations of the DOJ

17  Standards for newly-constructed facilities as basis for liability under the ADA, and also as a

18  predicate for liability under Unruh and the CDPA .  *See* Part 36 of 28 C.F.R; *see also* ADAAG

19  (incorporated into the DOJ regulations as Appendix A of 28 C.F.R. Part 36); 28 C.F.R. § 35.151(c)).

20         Queue lines in restaurants built after January 26, 1993 are required to comply with the

21  "accessible route" requirements of the DOJ Standards.  An "accessible route" is "[a] continuous

22  unobstructed path connecting all accessible elements and spaces of a building or facility."  28 C.F.R.

23  pt. 36, app. A, § 3.5.  Doors and counters are "elements" under the DOJ Standards.  *See id*. (defining

24  elements), §§ 4.3.9 (doors), 5.2 & 7.2 (counters).  Notwithstanding the existence of the auxiliary

25  access lanes, Plaintiffs argue that as part of the route that customers are expected to follow from the

26  entrance to the counter, the queue line must comply with the requirements governing such routes.

27         The DOJ Standards governing accessible routes prescribe specific measurements where a

28  route makes a 180-degree turn around an obstruction, as the queue line does where patrons make a

United States District Court
For the Northern District of California

1   180-degree turn around the post in the middle.  28 C.F.R. pt 36, app. A, § 4.3.3 ("If a person in a

2   wheelchair must make a turn around an obstruction, the minimum clear width of the accessible

3   route shall be as shown in Fig. 7(a) and 7(b).")  Figure 7(b) dictates that each lane must be a

4   minimum of 42 inches wide and the turn must be at least 48 inches wide, as shown below.

5

6

7

8

9

10

11

12

13   *Id*. at Fig. 7(b).  The DOJ Standards alternatively provide that each lane may be the minimum 36

14   inches permitted for accessible routes, provided that there is a 60-inch space at the turn for the

15   wheelchair-using patron to make a 180-degree turn in place.  *Id*. at § 4.2.1 (requiring a 36-inch width

16   for an accessible route) & §                                      4.2.3 ("The space required for a

17   wheelchair to make a 180-degree                    turn is a clear space of 60 inches

18   diameter (see Fig. 3(a) . . .").                     Figure 3(a) illustrates the latter turning

19   space, as shown below.



20

21

22

23

24

25

26

27

28   *Id*. at Fig. 3(a).  Accordingly, under DOJ Standards: (1) if the queue line's lanes are less than 42

16

Case 4:02-cv-05849-PJH   Document 307   Filed 08/08/07   Page 17 of 37

inches wide, a 60-inch diameter turning space is required; and (2) if the queue line's lanes are at least 42 inches wide, then a turning space of at least 48 inches is required.  In any event, the turn can never be less than 48 inches.

The restaurants identified in Exhibit 2 have queue lines that have: (1) at least one turn that is 44 inches or less than width; or (2) lanes that are 32 inches or less and turns that are 56 inches or less.  (Fox Decl. ¶ 3, Ex. 2.)  The width measurements of 44 inches, 32 inches, and 56 inches, represent the applicable DOJ Standards minus the 4-inch queue line construction tolerance set forth by Defendant's Rule 30(b)(6) designee.  (*Id.* at ¶ 20, Ex. 15, Azalde Depo. at 33-34.)  Because the queue lines in Exhibit 2 violate the DOJ Standards, they would violate the ADA, and in turn, the queue lines would also violate the CDPA and the Unruh, *see, e.g., Arnold*, 866 F. Supp. at 439, unless, as discussed more fully below, Defendant's auxiliary access lanes raise a triable issue of fact as to whether the auxiliary access lanes provide a means of equivalent facilitation.

## B.    Auxiliary Access Lanes

Plaintiffs assert that Defendant's use of the auxiliary access lanes discriminate against patrons who use wheelchairs by: (1) denying them the equal opportunity to benefit from its queue lines; and (2) segregating them from non-disabled patrons.  Plaintiffs emphasize that Defendant uses queue lines because they make the ordering process much easier for its customers.  Plaintiffs specifically point to the deposition testimony of Defendant's Rule 30(b)(6) witness in a similar action, where the deponent stated that the queue lines provide

> a stress-free ordering system for the customer. . . . If you don't have queue lines, the customers spend an inordinate amount of time jumping from line to line.  And typically by the time they get to the front of the line, they don't even know what they want.  So in the queue, they don't have to worry about what line they are in, they can concentrate on what they want to order.

(Fox Decl. at ¶ 20, Ex. 15, Azalde Depo. at 40.)  Plaintiffs also highlight Defendant's discovery responses, where Defendant stated that queue lines provide "faster and fairer" service to customers. (*Id.* at ¶ 16, Ex. 11.)  According to Plaintiffs, the auxiliary access lanes segregate them, and deprive them of the benefits associated with the queue lines.  Plaintiffs also state that disabled customers who are forced to use the auxiliary access lanes are put in the uncomfortable position of appearing to "cut" in front of the non-disabled customers waiting in the queue line, or must try to keep track of

United States District Court
For the Northern District of California

the order in which the other customers arrived to determine when they should approach the counter.

At the hearing in this matter, Plaintiffs' counsel directed the Court to two undisputed facts upon which the Court should grant summary judgment in their favor.  Plaintiffs' counsel first pointed to the undisputed fact that the DOJ's amicus brief in another action indicating that its view was that the segregated auxiliary access lanes violated DOJ Standards.  (Fox Decl. at ¶ 19, Ex. 14.)[18] Next, Plaintiffs' counsel argued that the factual record supports a finding that disabled persons are denied the benefit of the purpose of the queue lines, which is to provide a stress-free ordering system.[19]

Defendant insists that, Plaintiffs' factual contentions notwithstanding, the auxiliary access lanes provide equivalent facilitation for customer service when compared to the queue lines. Defendant emphasizes that it has a customer assistance policy that provides mobility-impaired patrons with the effective opportunity to order using the auxiliary access lanes instead of the queue lines.  (Blackseth Decl. at ¶ 9; Harkins Decl. at ¶¶ 4-7.)  Defendant also identifies facts indicating

[18]Although not dispositive on the issue, the Court gives deference to the DOJ's interpretation of the applicable standards.  In that other action, the DOJ submitted an amicus brief setting forth its view that Defendant's queue lines, and auxiliary access lanes for wheelchair-users, violate the DOJ Standards. (*CCDC v. Taco Bell*, Memo. of United States as Amicus Curiae in Opp. to Taco Bell's Summ. J. Mot. at 15-20 (Jan. 27, 1999) (Fox Decl. at ¶ 19, Ex. 14).)  An agency's interpretation of its own regulations is "controlling' unless it is "'plainly erroneous or inconsistent with the regulation.'" *Basiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  The fact that the agency interpretation is set forth in an amicus brief does not lessen the deference owed to that interpretation.  *See Basiri*, 463 F.3d at 930 (agency interpretation owed deference "even if through an informal process"); *Zurich American Ins. Co. v. Whittier Props. Inc*., 356 F.3d 1132, 1137 n.27 (9th Cir. 2004) (citing *Auer* for proposition that "agency's position set forth in a legal brief, in a case in which the agency is not a party, is entitled to deference.").

[19]In further support of their argument, Plaintiffs also cite to legal authority and argue that courts have found discrimination and segregation in public accommodations in violation of the ADA and California law on similar records. However, the Court notes that the authority upon which Plaintiffs rely are not procedurally postured as motions for summary judgment and are therefore distinguishable from the current case. None of Plaintiffs' legal authority supports the proposition that this Court may grant summary judgment, on this record, and accordingly find that Defendant's auxiliary access lanes do not provide equivalent facilitation in comparison to its queue lines.  *See Boemio v. Love's Restaurant*, 954 F. Supp. 204 (S.D. Cal. 1997) (finding violations of ADA and California law after bench trial); *Wyatt v. Ralph Grocery Co.*, 2002 WL 32985831 (C.D. Cal. Feb. 21, 2002) (finding violations of ADA and California law after bench trial); *Neighborhood Ass'n Of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50 (1st Cir. 2006) (denying plaintiffs' request for preliminary injunction).

Although not substantively relied on by Plaintiffs, the Court notes that partial summary judgment was granted in *United States v. AMC Entertainment, Inc*., 245 F. Supp. 2d 1094 (C.D. Cal. 2003). There the Court found that the defendant had failed to adduce evidence that the documented ADA violations were the result of designs and technologies that were implemented in order to provide substantially equivalent or greater access to and usability of the facility under section 2.2. *Id*. at 1101.  The court noted that there was no evidence that any of the documented violations have resulted in substantially equivalent or greater access to the theaters.  *Id*.  To the contrary, in the current case, there is a disputed factual question as to whether the auxiliary access lanes provide equivalent or greater access.

18

United States District Court

For the Northern District of California

1    that disabled persons have benefitted from the auxiliary access lanes and the customer assistance

2    policy.  (Blackseth Decl. at ¶ 9.)  In such instances, the disabled person stated they did not

3    experience any discomfort, embarrassment, or hostility from other able-bodied customers nor the

4    sense that they were being singled out by restaurant employees by being invited to place their order

5    at the auxiliary access lane next to the ordering counter.  (*Id.*)  Defendant also argues that it intends

6    to soon install indoor signage communicating such policy to its customers.  (Harkins Decl. at ¶ 7.)

7         The ADA and California law make it illegal to provide persons with disabilities with services

8    or facilities that are not equal to those provided others.  42 U.S.C. § 12182(b)(1)(A)(ii); Cal. Civ.

9    Code §§ 51(b), 54.1(a)(1).  The ADA also prohibits public accommodations from segregating

10   disabled persons from others.  *See* 42 U.S.C. § 12182(b)(1)(B) ("[g]oods, services, facilities,

11   privileges, advantages, and accommodations shall be afforded to an individual with a disability in

12   the most integrated setting appropriate to the needs of the individual."); *See also* 42 U.S.C. §

13   12182(b)(1)(A)(iii) (making it illegal to provide a person with a disability "a good, service, facility,

14   privilege, advantage, or accommodation that is different or separate from that provided to other

15   individuals." (Emphasis added)).  California law similarly requires persons with disabilities to be

16   afforded "full and equal" access to business establishments and places of public accommodation.

17   Cal. Civ. Code §§ 51(b), 54.1(a)(1).  Newly constructed facilities are able to depart from strict

18   adherence of the design specifications of the DOJ Standards if they provide a substantially

19   equivalent or greater level of access for people with disabilities.  28 C.F.R. pt 36, app. A, § 2.2

20   (defining "equivalent facilitation" providing that "[d]epartures from particular technical and scoping

21   requirements of this guideline by the use of other designs and technologies are permitted where the

22   alternative designs and technologies used will provide substantially equivalent or greater access to

23   and usability of the facility."); *see also* § 4.3.2(1) (providing that accessible routes and the route for

24   the general public coincide "to the maximum extent feasible.").  California law similarly provides

25   for an equivalent facilitation exception in certain circumstances.  Cal. Gov't Code § 4451(f)

26   ("[a]dministrative authorities . . . may grant exceptions from the literal requirements of the building

27   standards published in the California Building Standards Code relating to access for persons with

28   disabilities . . . only when it is clearly evident that equivalent facilitation and protection that meets or

19

1   exceeds the requirements under federal law are thereby secured.); *see also* Cal. Health & Safety

2   Code § 19957; *CHE, Inc.*, 150 Cal. App. at 139 (reversing trial court's grant of summary judgment

3   and finding triable issues of fact existed as to whether the facility at issue provided equivalent

4   facilitation.)

5      Here, after a review of the factual record the Court finds Plaintiffs' motion for partial

6   summary judgment raises a triable issue of material fact as to whether Defendant's auxiliary access

7   lanes provide equivalent facilitation in comparison to the queue lines.  The Court cannot find, as a

8   matter of law on this record, that the auxiliary access lanes are not equivalent facilitation compared

9   to the queue lines.  The current record indicates that the auxiliary access lanes, while separate, are in

10   close proximity to the queue lines.  Additionally, there is evidence in the record that the auxiliary

11   access lanes, in conjunction with Defendant's customer assistance policy, do not necessarily deprive

12   Defendant's disabled customers of the benefits associated with its restaurants or queue lines.  There

13   is also evidence that disabled customers who use the auxiliary access lanes do not necessarily

14   experience the discomfort, embarrassment, or hostility alleged by Plaintiffs.  For these reasons, the

15   Court cannot find as a matter of law, on this record, that the auxiliary access lanes are not an

16   equivalent facilitation to the queue lines.

17      Because triable issues of material fact exist as to whether the auxiliary access lanes deny

18   equal opportunity to benefit from the queue lines and whether the auxiliary access lanes segregate

19   disabled patrons, the Court cannot grant partial summary judgment.  For the foregoing reasons the

20   Court **DENIES** Plaintiffs' motion for partial summary judgment as to the queue lines and auxiliary

21   access lanes set forth in Exhibits 1 and 2.

22   **V.**  **Force Necessary to Open Interior and Exterior Doors**

23      The second architectural barrier at issue is the force necessary to open the interior and

24   exterior doors of Defendant's restaurants.

25      Plaintiffs claim that the force necessary to open the interior and exterior doors in Defendant's

26   restaurants listed in Exhibits 3, 4, and 5, violates applicable new construction standards, and

27   therefore violates the ADA, the CDPA, and/or Unruh.  More specifically, Plaintiffs claim that: (1)

28   the *interior* doors in Exhibit 3 – consisting of door measurements taken from buildings built after

1    January 26, 1993 – violate the ADA, and therefore violate the CDPA and Unruh; (2) the *interior*

2    doors in Exhibit 4 – consisting of door measurements taken from buildings built between December

3    31, 1981 and January 26, 1993 – violate Title 24 and therefore violate the CDPA; and (3) the

4    *exterior* doors in Exhibit 5 – consisting of door measurements taken from buildings built after

5    December 31, 1981 – violate Title 24 and therefore violate the CDPA.

6           In opposition, as to *all* of the restaurants at issue, Defendant contends that summary

7    judgment is inappropriate because Plaintiffs cannot satisfy their initial burden under the ADA of

8    demonstrating that the exterior and interior doors deprived Plaintiffs of effective access.  Defendant

9    claims there is no evidence in the record establishing that Plaintiffs cannot open the doors without

10   assistance, and therefore Plaintiffs have failed to show that the doors at issue are a barrier to their

11   effective access.  Next, as to the restaurants constructed *before* January 26, 1993, Defendant argues

12   that Plaintiffs cannot satisfy their burden under the ADA of demonstrating that removal of the

13   architectural barriers is "readily achievable."  Defendant also argues that in order for Plaintiffs to

14   prevail on their Title 24 claims for restaurants built prior to April 1, 1994, Plaintiffs must establish

15   that the doors in violation were "primary entrances."

16          The Court now turns to the door force in each of the restaurants as set forth in Exhibits 3, 4,

17   and 5.

18          **A.      Interior Doors – Exhibit 3**

19          Plaintiffs argue that the *interior* door force for those restaurants listed in Exhibit 3 –

20   consisting of door measurements taken from buildings built after January 26, 1993 – violates the

21   ADA, and therefore violates the CDPA and Unruh.  Because Plaintiffs rely upon an underlying ADA

22   violation as a predicate for liability under CDPA and Unruh, the Court must examine the applicable

23   DOJ Standards for interior door force to resolve the issue.

24          The applicable DOJ Standards for interior door force limit the force necessary to open them

25   to five pounds.  28 C.F.R. pt 36, app. A, § 4.13.11(2)(b).[20]  The parties in this action have stipulated

26

27          [20]The Court notes that the DOJ Standards do not provide a standard opening force for *exterior* doors.  *See*
28   *Independent Living Resources v. Oregon Arena Corp.*, 1 F. Supp. 2d 1124, 1155 (D. Or. 1998) (noting that the Access Board
     and DOJ have never promulgated any force standard for exterior doors).  However, because Plaintiffs do not rely on DOJ
     Standards as means to establish any exterior door force violations, the Court need not address the proper standard, if any,

United States District Court

For the Northern District of California

1   to a door force tolerance of seven pounds.  (Fox Decl. at ¶ 14, Ex. 9, Stipulated Tolerances.)  In

2   order

3   to avoid factual disputes as to Exhibit 3, and in accordance with the parties' stipulated tolerances,

4   Plaintiffs have included only the doors that require in excess of seven pounds of pressure to open.

5   ///

6   ///

7   (Fox. Decl. ¶ 5, Ex. 3.)  Here, because the doors listed in Exhibit 3 are subject to the DOJ Standard

8   of five-pounds as provided above, and because those doors each require in excess of seven pounds of

9   force to open, each of them is in violation of the ADA, and therefore also in violation of the CDPA

10  and Unruh.  *See* Cal. Civ. Code § § 51(f), 54(c) & 54.1(d).

11          For these reasons, the Court finds that Plaintiffs have satisfied their initial burden of

12  demonstrating an absence of a triable issue of material fact as to those interior doors listed in Exhibit

13  3.  *See Celotex Corp.*, 477 U.S. at 323.  Accordingly, the burden shifts to Defendant to show that

14  there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec.*

15  *Indus. Co.*, 475 U.S. at 586-87.  As discussed in more detail below, the Court finds each of

16  Defendant's door force arguments to the contrary to be unconvincing.  However, because

17  Defendant's door force arguments have application to each of the categories of doors listed in

18  Exhibit 3, Exhibit 4, and Exhibit 5, the Court will completely address the remaining doors in Exhibit

19  4 and Exhibit 5 before turning to Defendant's arguments.

20          **B.     Interior Doors – Exhibit 4**

21          Plaintiffs argue that the *interior* door force for those restaurants listed in Exhibit 4 –

22  consisting of door measurements taken from buildings built between December 31, 1981 and

23  January 26, 1993 – violates Title 24, and therefore violates the CDPA.

24          The applicable Title 24 standard for interior door force to open doors in facilities constructed

25  after December 31, 1981 is five pounds.  *See* Title 24-1981 § 2-3303(l)(2); Title 24-1984 §

26  2-3303(l)(2); Title 24-1987 § 2-3304(1)(2); Title 24-1989 § 3304(i.2)(1); Title 24-1994 §

27  3304(i.2)(1); Title 24-1999 § 1133B.2.5; Title 24-2001 § 1133B.2.5.  Again, in order to avoid

28  ─────────────────────

for exterior doors under the ADA.

**United States District Court**
For the Northern District of California

1   factual disputes, and in accordance with the parties' stipulated tolerances, the doors in Exhibit 4 each

2   require in excess of seven pounds of pressure to open.  (Fox Decl. ¶ 5, Ex. 3.)  Here, because the

3   doors listed in Exhibit 4 are subject to the five-pound Title 24 standard as provided above, and

4   because those doors each require in excess of seven pounds of force to open, each of them is in

5   violation of the Title 24, and therefore also in violation of the CDPA.  *See Arnold*, 158 F.R.D. at

6   447.

7          For these reasons, the Court finds that Plaintiffs have satisfied their initial burden of

8   demonstrating an absence of a triable issue of material fact as to those interior doors listed in Exhibit

9   4.  *See Celotex Corp.*, 477 U.S. at 323.  Accordingly, the burden shifts to Defendant to show that

10  there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec.*

11  *Indus. Co.*, 475 U.S. at 586-87.

12         **C.      Exterior Doors – Exhibit 5**

13         Plaintiffs argue that the *exterior* door force for those restaurants listed in Exhibit 5 –

14  consisting of door measurements taken from buildings built after December 31, 1981 – violates Title

15  24, and therefore violates the CDPA.

16         The applicable Title 24 standard for exterior door force in facilities constructed between

17  December 31, 1981 and November 1, 2002 was limited to eight and one-half pounds.  *See* Title

18  24-1981 § 2-3303(l)(2); Title 24-1984 § 2-3303(l)(2); Title 24-1987 § 2-3304(1)(2); Title 24-1989 §

19  3304(i.2)(1); Title 24-1994 § 3304(i.2)(1); Title 24-1999 § 1133B.2.5.  For facilities constructed

20  after November 1, 2002, the force necessary to open an exterior door was reduced to five pounds.

21  *See* Title 24-2001 § 1133B.2.5.[21]

22         Unlike the previous door force measurements, the parties have not reached a stipulation on

23  the applicable tolerances for maximum exterior door force under Title 24.  (Fox Decl. at ¶ 24, Ex.

24  19, Letter from R. Hikida to T. Fox dated May 24, 2006 (indicating "the Orange Empire chapter of

25  the ICBO has indicated that a 9 lb. maximum pull tolerance for exterior doors is appropriate.").)  In

26  light of the parties' correspondence setting forth a proposed tolerance of nine pounds, Plaintiffs have

27

28         [21]Plaintiffs explain that only one of the stores at issue in this motion was built after November 1, 2002, and that they
    Plaintiffs have applied only the pre-2002 standard.  (Pl.'s Mot. at 21:27 n.27.)

                                                23

United States District Court

For the Northern District of California

1   included within Exhibit 5 only those doors that require at least nine and one-half pounds to open.

2   (Pl.'s Mot. at 21:15-22:4.)  Taking into account the statutory door force maximums, the Court finds

3   that as to those facilities referenced in Exhibit 5 – that were constructed between December 31, 1981

4   and November 1, 2002 – the measurements exceed the statutory maximum door force requirement

5   by no less than one pound; and as to those facilities contained in Exhibit 5 – that were constructed

6   after November 1, 2002 – the measurements exceed the statutory maximum door force requirement

7   by no less than four and one-half pounds.  Accordingly, Exhibit 5 contains a list of non-compliant

8   exterior doors.

9        However, unlike the *interior* doors referenced in Exhibits 3 and 4, the doors in Exhibit 5

10  raise an additional issue by virtue of being *exterior* doors.  As to the exterior doors in Exhibit 5,

11  Defendant distinguishes between the doors that are "entrances," and the doors that are "primary

12  entrances" noting that Title 24 eliminated the reference to "primary" entrances after April 1, 1994.

13  Therefore, Defendant argues that in order for Plaintiffs to prevail on their Title 24 claims for

14  restaurants built prior to April 1, 1994, Plaintiffs must also establish that the non-compliant exterior

15  doors were "primary entrances" rather than just "entrances," citing Title 24-1994 § 2-3301.  *See*

16  Title 24-1989 § 417, *compare*, Title 24-1994 §§ 406, 417.

17       At the hearing in this matter, Plaintiffs' counsel responded to Defendant's "primary

18  entrance" distinction stating that under Title 24 all customer entrances, by definition, were "primary

19  entrances."  Plaintiffs pointed to the commentary found in the California State Accessibility

20  Standards Interpretive Manual for the Office of the State Architect.  In that manual the Office of the

21  State Architect responded to the question of what constitutes a "primary entrance" stating:

22            What is a primary entrance?

23            Section 417 states primary entrance shall mean any entrance to a
              facility which has a substantial flow of pedestrian traffic to any
24            specific major function of the facility.

25            As an example in a large shopping mall with several entrances to the
              mall area which would be considered the primary entrance?  All of
26            them would!

27  Office of the State Architect, California State Accessibility Standards Interpretive Manual §

28  3301(f)(1), at 95 (3d ed. 1989).  Plaintiffs also pointed to the decision in *People ex rel. Deukmejian*

24

United States District Court
For the Northern District of California

1    *v. CHE, Inc*., 150 Cal. App. 3d 123 (1983) arguing that "primary entrance" should be given a broad

2    definition by this Court.  Lastly, Plaintiffs' counsel alternatively argued that "[i]f the Court decides

3    that the primary entrance issue creates a factual issue, that [factual issue] only applies to the exterior

4    doors in restaurants built before April of 1994."  (Mot. Hr'g. Tr. 41:5-8.)

5            In *CHE, Inc*., the court addressed the issue of what constitutes a "primary entrance."  *CHE,*

6    *Inc*., 150 Cal. App 3d at 134-35.  There, the court stated that a "primary entrance" is "any entrance

7    to a facility which has a substantial flow of pedestrian traffic to any specific major function of the

8    facility."  *Id*. at 134 (citing Title 24-1981 § 2-417(k)); *see also*, Title 24-1984 § 2-417(k); Title

9    24-1987 § 2-417 at 26; Title 24-1989 § 417(s).  There, the court rejected the defendant's argument

10   that the then applicable statutory and regulatory scheme authorized separate primary entrances for

11   handicapped and non-handicapped patrons.  *Id*. at 135.  In doing so, the court stated, "[b]ecause we

12   find the required primary entrance must necessarily be burdened by a substantial flow of pedestrian

13   traffic, a public restaurant entrance used by no patrons other than the physically handicapped cannot

14   realistically be a 'primary entrance.'" *Id*.  Thus, the court recognized a distinction between "primary

15   entrances" and "entrances."

16           The Court finds the distinction between "primary entrances" and "entrances" to be

17   significant on this record.  After considering the "primary entrance" analysis from *CHE, Inc*. in

18   conjunction with the April 1994 amendment to Title 24, which eliminated the reference to "primary"

19   entrances, the Court finds that triable issues fact exist as to some of the exterior doors in Exhibit 5.

20   In particular, turning to the exterior doors for those restaurants built *before* April 1994, the

21   undisputed factual record does not allow this Court to find, as a matter of law, that those exterior

22   doors were burdened by a sufficiently substantial flow of pedestrian traffic to constitute "primary

23   entrances" as Title 24 then required.   Because the Court cannot determine, as a matter of law, that

24   the pre-April 1994 non-compliant exterior doors were "primary entrances" it cannot grant partial

25   summary judgment as to those doors.  However, as to the exterior doors for those restaurants built

26   *after* April 1994, the undisputed factual record is sufficient for the Court to find, as a matter of law,

27   that the non-compliant exterior doors were "entrances."  Accordingly, the Court finds that Plaintiffs

28   have satisfied their initial burden of demonstrating an absence of a triable issue of material fact as to

1  the exterior doors for those restaurants built *after* April 1994.  Accordingly, the burden shifts to

2  Defendant to show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at

3  324; *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.[22]

4        **D.     Defendant's Door Force Arguments**

5        Because Plaintiffs have satisfied their initial burden of demonstrating an absence of a triable

6  issue of material fact as to those interior doors listed in Exhibits 3 and 4, and because Plaintiffs have

7  satisfied their initial burden of demonstrating an absence of a triable issue of material fact as to some

8  of the exterior doors listed in Exhibit 5, the Court now turns to Defendant's arguments as to why

9  summary judgment on the issue of door force is inappropriate.  *See Celotex Corp.*, 477 U.S. at 323.

10                **1.     Denial of "Effective Access"**

11        Defendant argues that in order for Plaintiffs to prevail they must initially show that

12  Defendant's exterior and interior doors actually deprived Plaintiffs of "effective access."  Defendant

13  posits that Plaintiffs have failed to satisfy the initial burden of demonstrating a denial of "effective

14  access."  In support of its position, Defendant argues that the factual record is devoid of evidence

15  establishing that Plaintiffs cannot open the doors at issue without assistance and therefore they have

16  failed to show that the doors are a barrier to their "effective access."

17        It is true that to be entitled *monetary damages* the class members must demonstrate a denial

18  of "equal access."    *See Donald v. Café Royale, Inc.*, 218 Cal. App. 3d 168 (Cal. Ct. App. 1990).[23]

19  However, to be entitled to *injunctive relief*, under both California law and the ADA's new

20  construction provisions, Plaintiffs must only demonstrate that the architectural elements at issue

21  were built in violation of Title 24 or the DOJ Standards, respectively.  Because the current motion

22  seeks summary judgment as to liability and injunctive relief, and not monetary relief, the Court finds

23  Defendant's monetary relief argument here to be unconvincing.

24        In *Donald*, the court explained the difference between the necessary showings for injunctive

25

---

26        [22]Defendant makes weight of the fact that there is no DOJ Standard for exterior door opening force.  However,
27  because Plaintiffs do not rely on any DOJ Standards to establish any exterior door force ADA violations, the Court finds this
    argument to be irrelevant to the factual record now before this Court.

28        [23]Plaintiffs concede that in order to obtain monetary damages, Plaintiffs must show that the non-compliant doors
    denied class members "equal access."  *Donald*, 218 Cal. App. 3d at 183.

United States District Court

For the Northern District of California

versus monetary relief under Title 24.  *Id*. at 183.  In doing so, the court first noted that the

California legislature recognized that the specifications in Title 24 are the "minimum requirements

to insure that buildings, structures and related facilities . . . are accessible to" persons with

disabilities, Cal. Govt. Code § 4452, and that the legislature provided a private right of action to

enforce these minimum standards.  *See* Cal. Civ. Code § 55; Cal. Health & Safety Code § 19953.  In

applying these standards, the court stated,

> Sections 19955 *et seq*., 4450 *et seq*. and 54 *et seq*., taken together, provide for a
> two-fold procedure.  A designated public agency or an individual may initiate an
> action to enforce compliance with the handicapped access standards provided for by
> section 19955 *et seq*. and section 4450 *et seq*. On the other hand, <u>to maintain an
> action for damages pursuant to section 54 *et seq*. an individual must take the
> additional step of establishing that he or she was denied equal access on a particular
> occasion</u>. . . . For example, let us take a restaurant that is required to have 100 percent
> of its dining area accessible to the handicapped, but in fact only 90 percent of the
> dining area meets this standard.  If a handicapped individual is readily seated and
> served in the 90 percent primary dining area which meets all handicap access
> requirements, then he or she <u>would not have a cause of action for damages</u> for denial
> or interference with admittance pursuant to Civil Code section 54.3, but an individual
> or a designated public agency <u>could pursue an action under one of the enforcement
> provisions to bring about full compliance</u> by the restaurant.

*Id*. at 183 (emphasis added).

Here, as to the doors in Exhibit 3, Plaintiffs have established that those doors violate the DOJ

Standards, and thus Plaintiffs are entitled to a finding of liability and injunctive relief under the

ADA.  As to the doors in Exhibits 4 and the doors in Exhibit 5 constructed after April 1, 1994,

Plaintiffs have established violations of Title 24, and thus Plaintiffs are entitled to a finding of

liability and injunctive relief under state law.  *Id*.  Defendant's argument to the contrary relies on the

ADA standard for preexisting facilities, which is not applicable to the doors at issue.  For these

reasons, the Court finds Defendant's arguments do not preclude a grant of summary judgment for

Plaintiffs.

### 2.    "Readily Achievable" Standard

As to the restaurants constructed *before* January 26, 1993, Defendant maintains that Plaintiffs

cannot satisfy their prima facie burden under the ADA of demonstrating that removal of the

architectural barriers is "readily achievable."  However, Defendant again applies an improper

standard.  As explained above, Plaintiffs do not rely on the ADA's "readily achievable" standard

United States District Court

For the Northern District of California

applicable to preexisting facilities.  To the contrary, Plaintiffs rely on the new construction standard

for buildings constructed after January 26, 1993, which are by definition not preexisting facilities.

*See Mannick*, 2006 WL 1626909 at *4-*6 (explaining the different standards for new construction

versus preexisting facilities).[24]  Accordingly, Defendant's argument does not preclude a grant of

summary judgment for Plaintiffs.

### 3.    Administrative Agency Discretion and Certificates of Occupancy

Defendant asserts that California Heath and Safety Code and Title 24 provide local building

departments with discretion to grant exceptions to the California Building Code where doing so

would create practical difficulty or unnecessary hardship.  According to Defendant, the certificates

of occupancy for each restaurant indicate that a building inspector "either determined that the stores

in question complied with the California Building code or determined that some type of exemption

warranted some deviation from the California Building Code."  (Def.'s Opp. at 27:25-28:3; 32:25-

33:3.)  Defendant avers that Plaintiffs' motion for partial summary judgment improperly assumes

that Defendant has not received a hardship exemption for the restaurants at issue, and that even if

Defendant has not received any hardship exemptions to date, it may nevertheless retroactively apply

for them.  Plaintiffs reply that building officials do not have unfettered discretion to approve

facilities that violate Title 24, that no such exception applies here and that it would be improper for

the Court to presume that any exception applied.  As discussed below, the Court finds Defendant's

argument here problematic.

The fact that building inspectors have discretionary governmental immunity as to the

issuance of building and occupancy permits does not otherwise empower them to actually issue

permits for facilities that violate statutory or regulatory requirements.  Building departments and

other administrative agencies are "not . . . lawmaking bod[ies] and ha[ve] no power to disregard or

amend the ordinances which define [their] authority."  *City & County of San Francisco v. Bd. of

Permit Appeals*, 207 Cal. App. 3d 1099, 1109-10 (Cal. Ct. App. 1989).  "'An administrative agency,

---

[24]Defendant makes a related argument that Plaintiffs have also failed to satisfy their initial burden of demonstrating that "alterations" of the restaurants constructed before January 26, 1993.  This argument fails for the same reasons.  As set out above, Plaintiffs to not rely on DOJ Standards–for "alterations," or otherwise–as a means to establish any ADA violation for those restaurants.

28

therefore, must act within the powers conferred upon it by law and may not validly act in excess of such powers.'" *City & County of San Francisco v. Padilla*, 23 Cal. App. 3d 388, 400 (Cal. Ct. App. 1972) (citing *Ferdig v. State Personnel Bd.*, 71 Cal. 2d 96, 103 (1969)); *see also Bd. of Permit Appeals*, 207 Cal. App. 3d at 1105.  "Accordingly, it is well settled that 'when an administrative agency acts in excess of, or in violation, of the powers conferred upon it, its action thus taken is void.'"  *Padilla*, 23 Cal. App. 3d at 400 (citing *Ferdig*, 71 Cal. 2d 96 at 104); *Bd. of Permit Appeals*, 207 Cal. App. 3d at 1105.  In fact, courts have reversed building agency actions that exceeded the agency's statutory authority.  *See e.g., Horowitz v. City of Los Angeles*, 124 Cal. App. 4th 1344, 1347, 1355-56 (Cal. Ct. App. 2004) (rejecting city's argument that the court could not order it to revoke the permits because it would be contrary to the city's discretion, and stating, "the City has no discretion to issue a permit in the absence of compliance [with the municipal code]."); *Bd. of Permit Appeals*, 207 Cal. App. 3d at 1110.  Thus, while an agency may have discretion, it must exercise that discretion within the bounds set forth by the applicable law.

Defendant relies upon a series of cases that discuss the discretion afforded to administrative officials, such as building officials.  However, unlike the current case, each of Defendant's cases involve suits against governmental entities alleging failure to discharge their duties, thereby raising the issue of discretionary governmental immunity.  *See Thompson v. City of Lake Elsinore*, 18 Cal. App. 4th 49, 53-54 (Cal. Ct. App. 1993) (discussing California Government Code Section 815.6 in suit against city); *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 498-99 (Cal. 2000) (discussing section 815.6 in suit brought by property owner against city for city's failure to follow its own municipal code); *Inland Empire Health Plan v. Super. Ct.*, 108 Cal. App. 4th 588, 592-93 (Cal. Ct. App. 2003) (discussing public HMO's immunity under section 818.4 based on its discretionary decision to credential a certain physician); *Fox v. County of Fresno*, 170 Cal. App. 3d 1238, 1241-42 (Cal. Ct. App. 1985) (finding duties imposed on public entities by Health & Saf. Code, § 17980, to abate or take other appropriate action with regard to nuisances, are discretionary, not mandatory, therefore section § 815.6, which renders a public entity liable for injury caused by its failure to discharge a mandatory duty, was inapplicable, and the county was not liable for the fire damage); *Sutherland v. City of Fort Bragg*, 86 Cal. App. 4th 13, 18-19 (Cal. Ct. App. 2000) (finding

United States District Court

For the Northern District of California

29

United States District Court
For the Northern District of California

provisions at issue imposed a discretionary, rather than mandatory, duty, as required for liability under Gov. Code, § 815.6); *Creason v. Dep't of Health Servs.*, 18 Cal. 4th 623, 629-30 (Cal. 1998) (concluding the department did not have a mandatory duty, and its allegedly negligent exercise of discretion in selecting a particular standard would not support a cause of action under section 815.6.). These cases are inapposite on the question of whether permits were issued. Because the current case is factually and legally distinguishable from these cases, they are not helpful in resolving the issues now before the Court.

What is clear is that the legal authority presented by the parties demonstrates that building inspectors do not have discretion to issue building permits or certificates of occupancy for facilities that do not comply with Title 24. Because building inspector discretion is bounded by these provisions, to avoid summary judgment Defendant must show that the architectural elements at issue either: (1) complied with Title 24; or (2) that the building inspector applied a statutory or regulatory exception to the requirements of Title 24. Defendant concedes that the measurements are in violation of Title 24. Therefore, the Court turns to the issue of whether there is evidence that the building inspectors applied an exception to Title 24 for any of the restaurants at issue.

California law requires that public accommodations "shall conform" with the accessibility requirements of the Title 24 in effect at the time of construction "[e]xcept as otherwise provided by law." Cal. Gov't Code § 4451(c). Thus a public accommodation must comply with the architectural specifications of Title 24 unless a regulatory or statutory exception applies. California law provides for only two such exceptions: (1) where a covered entity can show that compliance with Title 24 would result in an unnecessary hardship, and (2) where the entity has shown that its access design will provide equivalent facilitation for people with disabilities. *See* Cal. Health & Safety Code § 19957; Cal. Gov't Code § 4451(f). Because the Court has already disposed of Defendant's equivalent facilitation argument above, the Court turns to Defendant's reliance upon the unnecessary hardship exception.

The unnecessary hardship exception applies where compliance with the building standard at the time of construction would make a construction project "unfeasible" based on, among other factors, the cost of providing access, and the cost of all construction contemplated. *See* Title

United States District Court
For the Northern District of California

1   24-1981 § 2-422(c); Title 24-1984 § 2-422(c); Title 24-1987 § 2-422 at 29; Title 24-1989 § 422(c);

2   Title 24-1994 § 422(c); Title 24-1999 § 222-U at 28; Title 24-2001 § 222-U at 22-23.  According to

3   California's Office of the State Architect, which promulgated the Title 24 access regulations, the

4   undue hardship exception applies only where compliance would be "difficult or impossible because

5   the cost of providing access is too high in relationship to the total cost of the job."   Cal. Gov't Code

6   § 4450(b); Office of the State Architect, California State Accessibility Standards Interpretive

7   Manual § 110A(b)11A at 11 (3d ed. 1989) (interpreting "unreasonable hardship").[25]  Here,

8   consistent with the rules of statutory construction, the burden of proving the unreasonable exception

9   applies falls on Defendant.  (Joint Status Conference Statement ¶ 27 (Docket No. 157) (stipulating

10  that Defendant has the burden of proof of establishing that the unreasonable hardship exception

11  applies); *see also  N.L.R.B. v. Ky. River Cmty. Care, Inc*., 532 U.S. 706, 711 (2001) (discussing "'the

12  general rule of statutory construction that the burden of proving justification or exemption under a

13  special exception to the prohibitions of a statute generally rests on one who claims its benefits.'"

14  (Citation omitted.)).

15          In the current case, Plaintiffs have produced evidence indicating that certain architectural

16  elements of Defendant's restaurants are in violation of Title 24.  (Fox Decl., ¶¶ 6, 7, and 11, Exs. 4,

17  5, and 8.)  Having satisfied their initial burden, Plaintiffs have shifted the burden to Defendant to

18  present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*,

19  477 U.S. at 324.  In response Defendant has failed to identify evidence from which the Court could

20  find: (1) that any of the occupancy permits for any of the restaurants at issue were based on a

21  hardship exception; or (2) that any such hardship exception was merited.  Defendant's conjecture

22  that the building inspectors may have applied the hardship exception is insufficient to create a

23  material issue of fact to defeat Plaintiffs' motion for partial summary judgment.  *Anderson*, 477 U.S.

24  at 247-48.

25          Alternatively, Defendant asks the Court to presume that the building inspectors granted

26  hardship exemptions, citing *E.R. Bringle v. Bd. of Supervisors*, 54 Cal. 2d 86, 89 (Cal. 1960) (stating

27

28          [25]An agency's interpretation of its regulations is "controlling" unless it is "'plainly erroneous or inconsistent with the regulation.'"  *See Basiri*, 463 F.3d 927at 930 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

31

United States District Court

For the Northern District of California

1    that where an authorized board grants a variance it will be presumed that an official duty was

2    performed and that the existence of the necessary facts was found.)  However, that presumption does

3    not apply here because Title 24 regulations require "details of any finding of unreasonable hardship

4    shall [to] be recorded and entered in the files of the enforcing agency."  *See* Title 24-1981 §

5    2-422(c); Title 24-1984 § 2-422(c); Title 24-1987 § 2-422 at 29; Title 24-1989 § 422(c); Title

6    24-1994 § 422(c); Title 24-1999 § 222-U at 28; Title 24-2001 § 222-U at 22-23.  Courts have

7    determined that where an agency must make such findings, and set forth the relevant supportive

8    facts, the presumption does not apply.  *Broadway, Laguna, Vallejo Ass'n v. Bd. of Permit Appeals*,

9    66 Cal. 2d 767, 773 (Cal. 1967) ("The presumption that an agency's rulings rest upon the necessary

10   findings and that such findings are supported by substantial evidence . . . does not apply to agencies

11   which must expressly state their findings and must set forth the relevant supportive facts."); *see also*

12   *Bd. of Permit Appeals*, 207 Cal. App. 3d at 1107.  Because Defendant has failed to present any

13   evidence of any hardship findings or determinations, the Court cannot presume any such findings or

14   determinations were made.  Absent any evidence supporting the application of any hardship

15   exceptions, the Court is left with Plaintiffs' unrebutted evidence that Defendant's restaurants

16   contained architectural elements that violated Title 24.

17          Having considered each of Defendant's arguments above, the Court finds that Defendant's

18   have failed to show there is a genuine issue of fact for trial with respect to the following aspects of

19   Plaintiffs' motion.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co.*, 475

20   U.S. at 586-87.  Accordingly, the Court **GRANTS** Plaintiffs' motion for partial summary judgment

21   as to the *interior* door force for those restaurants listed in Exhibit 3; the Court **GRANTS** Plaintiffs'

22   motion for partial summary judgment as to the *interior* door force for those restaurants listed in

23   Exhibit 4; the Court **GRANTS** Plaintiffs' motion for partial summary judgment as to the exterior

24   door force for those restaurants listed in Exhibit 5 that were constructed after April 1, 1994; and the

25   Court **DENIES** Plaintiffs' motion for partial summary judgment as to the exterior door force for

26   those restaurants listed in Exhibit 5 that were constructed before April 1, 1994.

27   **VI.    Fixed Seating**

28          The final architectural barrier at issue is the number of, and knee clearance at, accessible

1   seating positions in the fixed indoor areas of Defendant's restaurants.

2       Plaintiffs assert that the restaurants listed in Exhibits 6, 7, and 8 are in violation of applicable

3   new construction standards.  As to the fixed accessible seating listed in Exhibits 6 and 7[26], Plaintiffs

4   claim that the seating is in violation of the ADA, and therefore also in violation of the CDPA, and

5   Unruh.  As to the accessible seating listed in Exhibits 8[27], Plaintiffs claim that the seating is in

6   violation of Title 24, and therefore in violation of the CDPA.  Defendant responds that summary

7   judgment is inappropriate because knee clearance is a measurement that is not required to be

8   centered under the table, and it is unknown whether the Special Master's methodology  imposed

9   such a requirement.

10          **A.      Exhibits 6 and 7 – ADA, Unruh, and CDPA**

11      The fixed seating listed in Exhibits 6 and 7 are statistics and measurements, respectively,

12  taken from restaurants built after January 26, 1993.  For facilities built in that time frame, Plaintiffs

13  rely on violations of the DOJ Standards for newly-constructed facilities as basis for liability under

14  the ADA, and also as a predicate for liability under Unruh and the CDPA .  *See* Part 36 of 28 C.F.R;

15  *see also* ADAAG (incorporated into the DOJ regulations as Appendix A of 28 C.F.R. Part 36); 28

16  C.F.R. § 35.151(c)).

17      Fixed seating for restaurants built after January 26, 1993 are required to comply with DOJ

18  Standards.  DOJ Standards for fixed seating require that "at least five percent (5%), but not less than

19  one, of the fixed or built-in seating areas or tables" must be accessible, that is, must comply with

20  section 4.32 of the DOJ Standards.  28 C.F.R. pt. 36, app. A, § 4.1.3(18).  Section 4.32.3 requires a

21  knee space that is 27 inches high, 30 inches wide and 19 inches deep.  *Id*. at § 4.32.3.  The parties

22  have stipulated to the following tolerances: 26½ inches high; 29 inches wide; 18 inches deep.  (Fox

23  Decl. at ¶ 14, Ex. 9, Stipulated Tolerances.)  The Court now turns to the Special Master's findings in

24  Exhibits 6 and 7.

25          **1.      Exhibit 6**

26

27      [26]The fixed accessible seating measurements in Exhibits 6 and 7 are taken from buildings built after January 26,
    1993.

28      [27]The fixed accessible seating measurements in Exhibit 8 are taken from buildings built after 1981.

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    The restaurants identified in Exhibit 6 have fixed seating that does not include at least five

2  percent accessible seating positions as required by DOJ Standards.  (Fox Decl. at ¶ 9, Ex. 6)

3  Because the seating positions in Exhibit 6 violate the DOJ Standards, they violate the ADA, and in

4  turn, also violate the CDPA and Unruh.  *See, e.g., Arnold*, 866 F. Supp. at 439.

5         **2.     Exhibit 7**

6    As reported by the Special Master, the restaurants identified in Exhibit 7 have knee

7  clearances that do not comply with section 4.32.3, as subject to the parties' agreed tolerances.  (Fox

8  Decl. at ¶ 10, Ex. 7.)  However, Defendant argues that summary judgment is not appropriate as to

9  the measurements identified in Exhibit 7 because there is a legal question whether the 30-inch

10  dimension – the side-to-side width of the knee clearance under the table – must be centered under

11  the table or whether it can be off to one side.  Defendant asserts that 30-inch-wide knee clearance

12  mandated by section 4.32.3, is not required to be centered under the table.  Accordingly, Defendant

13  contends that summary judgment is inappropriate on the current record given that the Special

14  Master's methodology in collecting the table measurements was incomplete.

15    Plaintiffs agree that it is not clear whether the Special Master measured knee clearances from

16  the center of the tables, but contend that summary judgment is appropriate regardless of the Special

17  Master's measuring  methodology.  (Pl.'s Rep. at

18  25:6-8.)  As explained                                   below, the Court finds

19  Plaintiffs' reasoning                                    persuasive.

20         Initially, the                                   Court notes that the DOJ

21  Standard for knee                                        clearance support's

22  Plaintiffs' position that                                the knee clearance

23  measurement is to be                                     made from the center of the

24  table.  Most compelling                                  is that fact that section 4.32.3

25  cross references Figure                                  45.  28 C.F.R. pt. 36, app. A,

26  § 4.32.3.  As set forth below, Figure 45 indicates that the 30-inch dimension is centered on the table

27  in question.

28

1

2

3

4

5

6

7   *See id*. at Fig. 45.  In this figure, the dotted line outlines the required clear floor space adjacent to

8   and underneath a fixed table.  The 30-inch dimension corresponds to the 30-inch-wide knee

9   clearance required by section 4.32.3.  This illustration clearly depicts the 30-inch dimension as

10  centered on the table in question.  Common sense also supports this interpretation because if the

11  knee clearance area were not required to be centered, a wheelchair-using patron could end up sitting

12  considerably off to one side, therefore unable to make use of a portion of the table.

13          Next, in addressing the asserted factual question raised by Defendant concerning the Special

14  Master's measuring methodology, the Court finds that regardless of the methodology, the tables are

15  non-compliant under the ADA.  Defendants' asserted factual question can result in only two

16  scenarios, neither of which raise a triable issue fact as to whether Defendants' tables are in

17  compliance.  First, if the Special Master correctly required the knee clearance to be centered on the

18  table, then all of the tables in Exhibit 7 are out of compliance.  Second, and alternatively, if the

19  Special Master incorrectly permitted the knee clearance to be off-center – that is, that the 30-inch

20  side-to-side width of the knee clearance could be anywhere along one side of the table – such

21  methodology would permit a much larger area to be considered as part of the required width.

22  Assuming , as Defendant contends, that the Special Master used this latter standard, and still found

23  less than the 30-inch required knee clearance, then the tables in Exhibit 7 would still be out of

24  compliance.  As Plaintiffs point out, the only result of such a mistake would be that many of the

25  tables at which the Special Master found compliant knee clearance – upon none of which Plaintiffs'

26  rely in their motion – would in fact be out of compliance.  Therefore, because the seating positions

27  in Exhibit 7 violate the DOJ Standards, they violate the ADA, and in turn, also violate the CDPA

28  and Unruh.  *See, e.g., Arnold*, 866 F. Supp. at 439.

**United States District Court**
For the Northern District of California

35

United States District Court
For the Northern District of California

**B.      Exhibit 8 – CPDA**

The fixed seating listed in Exhibit 8 are statistics taken from restaurants built after 1981.  For facilities built in that time frame, Plaintiffs rely on violations of Title 24 as a predicate for liability under the CDPA.  Title 24 has required, since 1981, that "[e]ach dining, banquet and bar area shall have one wheelchair seating space for each twenty seats . . . ."  Title 24-1981 § 2-611(c)(3); *see also* Title 24-1984 § 2-611(d)(3); Title 24-1987 § 2-611(d)(3); Title 24-1989 § 611(d)(3); Title 24-1994 § 3103A(b)4C; Title 24-1999 § 1104B.5.4; Title 24-2001 § 1104B.5.4.  The restaurants listed in Exhibit 8 do not have a minimum of one wheelchair seating space for each twenty seats – regardless of whether fixed or moveable – and are thus in violation of Title 24 and the CDPA.  *See, e.g., Arnold*, 158 F.R.D. at 447.

Because there are no triable issues of material fact regarding the number of fixed seating positions, the Court **GRANTS** Plaintiffs' motion for partial summary judgment as to the number of seating positions for those restaurants listed in Exhibits 6, 7, and 8.

**CONCLUSION**

For the foregoing reasons the Court:

**DENIES** Plaintiffs' motion for partial summary judgment as to the queue lines and auxiliary access lanes set forth in Exhibits 1 and 2;

**GRANTS** Plaintiffs' motion for partial summary judgment as to the interior door force for those restaurants listed in Exhibit 3 and 4;

**DENIES** Plaintiffs' motion for partial summary judgment as to the exterior door force for those restaurants listed in Exhibit 5 that were constructed before April 1, 1994;

**GRANTS** Plaintiffs' motion for partial summary judgment as to the exterior door force for those restaurants listed in Exhibit 5 that were constructed after April 1, 1994.

**GRANTS** Plaintiffs' motion for partial summary judgment as to the number of seating positions for those restaurants listed in Exhibits 6, 7, and 8.

**THE COURT FURTHER ORDERS** that this case is scheduled for a Status Conference on **September 18, 2007 at 2:00 p.m.**  A Joint Status Conference Statement is due 7 days prior to the conference.

36

**United States District Court**

For the Northern District of California

1  **IT IS SO ORDERED.**

2

3  Dated: August_7_, 2007

4                                    MARTIN J. JENKINS
                                     UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28