1  GREENBERG TRAURIG, LLP
   GREGORY F. HURLEY(SBN 126791)
2  RICHARD H. HIKIDA (SBN 196149)
   3161 Michelson Drive, Suite 1000
3  Irvine, California 92612
   Telephone: (949) 732-6500
4  Facsimile:  (949) 732-6501
   Email:  hikidar@gtlaw.com
5
   Attorneys for Defendant
6  TACO BELL CORP.

7

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                          OAKLAND DIVISION

12

13 FRANCIE MOELLER, et al.,        CASE NO. C 02-5849 PJH JL

14            Plaintiffs,          **DEFENDANT TACO BELL CORP.'S
                                   NOTICE OF MOTION AND MOTION
15 vs.                             FOR PARTIAL SUMMARY JUDGMENT;
                                   MEMORANDUM OF POINTS AND
16 TACO BELL CORP.                 AUTHORITIES IN SUPPORT THEREOF**

17            Defendant.           [Declarations of Steve Elmer, Robert G.
                                   Reeves, Richard H. Hikida filed concurrently
18                                 herewith]

19                                 DATE:        December 16, 2009
                                   TIME:        9:00 a.m.
20                                 CTRM:        3
                                   JUDGE:       Hon. Phyllis J. Hamilton
21

22

23        TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

24        PLEASE TAKE NOTICE that on December 16, 2009, at 9:00 a.m., or as soon thereafter as the

25 motion may be heard before the Honorable Phyllis J. Hamilton in Courtroom 3 of this Court, 1301 Clay

26 Street, Oakland, California, defendant Taco Bell Corp. hereby moves for partial summary judgment.

27        This motion is based upon this Notice of Motion, the Memorandum of Points and Authorities in

28 support thereof, the concurrently-filed Declarations of Steve Elmer, Robert G. Reeves, and Richard H.

Hikida, all other papers and pleadings on record with this Court, and upon such other arguments and

items as may be presented to the Court at the hearing of this matter.

DATED:  October 20, 2009                    GREENBERG TRAURIG, LLP


By  /s/_____
        Gregory F. Hurley
        Attorneys for Defendant
        TACO BELL CORP.

**Error! Reference source not found.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................. **Error! Bookmark not defined.**

II. STATEMENT OF THE ISSUES TO BE DECIDED ......................... **Error! Bookmark not defined.**

III. STATEMENT OF FACTS ................................................. **Error! Bookmark not defined.**

IV. ARGUMENT ................................................................. **Error! Bookmark not defined.**

    A. The Mootness Doctrine Applies ........................................... **Error! Bookmark not defined.**

        1. Legal Standard for Injunctive Relief........................... **Error! Bookmark not defined.**

        2. Mootness Legal Standard........................................... **Error! Bookmark not defined.**

        3. Taco Bell Lacks Any Legal Authority to Modify Any Features at Stores that Have Either Permanently Closed or Were Sold to Franchisees . **Error! Bookmark not defined.**

        4. Taco Bell Has Modified the Vast Majority of Features Raised in Plaintiffs' Expert Reports of May 1, 2009 ................................................... **Error! Bookmark not defined.**

        5. Taco Bell Has Modified the Vast Majority of Features Raised in Plaintiffs' Meet and Confer Charts of 2006..................................................... **Error! Bookmark not defined.**

        6. Taco Bell Has Expended Over $8 Million to Remediate Its California Taco Bell Company-Owned Stores Since 2006 ............................... **Error! Bookmark not defined.**

        7. Taco Bell Has Retained Maintco to Conduct Twice a Year ADA Maintenance Inspections of Its California Taco Bell Stores .................. **Error! Bookmark not defined.**

    B. Taco Bell's Defenses Other Than the Mootness Doctrine ...... **Error! Bookmark not defined.**

        1. Even Assuming that Self-Service Dispensers and Other Elements Are Subject to the ADAAG, Taco Bell Provides Equivalent Facilitation in the Form of Customer Assistance ........................................................................ **Error! Bookmark not defined.**

        2. The City of La Mirada Has Refused to Allow Taco Bell to Install an Accessible Path of Travel Connecting the Public Sidewalk to the Store Entrance of Store #5636 ..... **Error! Bookmark not defined.**

        3. The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Ramp at Store #82 ........................................................................ **Error! Bookmark not defined.**

        4. The ADAAG Only Obligates a Facility Operator to Ensure an Accessible Route *Within* the Boundary of the Site and Not Beyond............. **Error! Bookmark not defined.**

        5. The ADAAG Does Not Require that Elements at a Facility Be Accessible If They Are Not on an Accessible Route for Use By Disabled Customers ......... **Error! Bookmark not defined.**

        6. Running Slope of Walkways ...................................... **Error! Bookmark not defined.**

        7. Cross-Slope of Walkways........................................... **Error! Bookmark not defined.**

        8. The ADAAG Provides a 36" Minimum Width Standard Generally for an Accessible Rout.................................................................... **Error! Bookmark not defined.**

9. The ADAAG Only Provides a 36" Minimum Width Standard for a Pedestrian Ramp .................................................................................... **Error! Bookmark not defined.**

10. The ADAAG Does Not Require that a Landing Length Exceed 60 Inches ....... **Error! Bookmark not defined.**

11. The ADAAG Does Not Require Handrail Extensions on Ramps If the Handrails Are Continuous ..................................................................... **Error! Bookmark not defined.**

12. The ADAAG Does Not Regulate Whether Handrail Extensions May Be Turned 90 Degrees to the Run of the Ramp ..................................... **Error! Bookmark not defined.**

13. McSwain's Measurement Methodology of Measuring the Length of a Ramp Landing Only to an Expansion Joint Is Flawed .............................. **Error! Bookmark not defined.**

14. The ADAAG Does Not Require a Minimum 72 Inches in Length Ramp at a Change in Direction ..................................................................... **Error! Bookmark not defined.**

15. The ADAAG Provides that Curb Ramps Do Not Need Handrails .. **Error! Bookmark not defined.**

16. The ADAAG Does Not Require Tow-Away Signage **Error! Bookmark not defined.**

17. The ADAAG Does Not Require that Accessible Parking Be Located Immediately Next to an Accessible Entrance ........................................ **Error! Bookmark not defined.**

18. The ADAAG Does Not Preclude Diagonal Parking Spaces or Access Aisles ... **Error! Bookmark not defined.**

19. The ADAAG Does Not Provide a Minimum Length Standard for Either an Accessible Parking Space or Access Aisle ....................... **Error! Bookmark not defined.**

20. The ADAAG Does Not Require that the Access Aisle Be Located on the Passenger Side ................................................................................. **Error! Bookmark not defined.**

21. The ADAAG Does Not Require Any Pavement Signage In the Van Accessible or Standard Accessible Parking Space .................................. **Error! Bookmark not defined.**

22. The ADAAG Does Not Require the Words "NO PARKING" Painted in the Access Aisl .................................................................................. **Error! Bookmark not defined.**

23. The ADAAG Does Not Regulate with a Specific Standard the Minimum Height of Parking Signage ............................................................. **Error! Bookmark not defined.**

24. The ADAAG Does Not Preclude the Accessible Route from an Accessible Parking Space to Travel Behind Another Person's Parked Vehicle ............. **Error! Bookmark not defined.**

25. Plaintiffs Contradict Themselves By Seeking to Use Accessible Seating From the Narrow End at Store #137 ................................................. **Error! Bookmark not defined.**

26. The ADAAG Does Not Require that an Accessible Route Connect Two Store Entrances ......................................................................... **Error! Bookmark not defined.**

27. The ADAAG Does Not Necessarily Require Multiple Accessible Entrances ... **Error! Bookmark not defined.**

Error! Reference source not found.

28. Taco Bell Has Complied with the Special Master's Recommendation to Install Directional Signage at Certain Stores in Lieu of More Extensive Modifications ..... **Error! Bookmark not defined.**

29. Secondary Entrances .................................................. **Error! Bookmark not defined.**

30. Plaintiffs No Longer Challenge Directional Signage to the Accessible Entrance as a Solution ......................................................................... **Error! Bookmark not defined.**

31. The ADAAG Only Requires One Leaf to Be Accessible at a Double-Leaf Doorway Intended to Be Accessible ................................................ **Error! Bookmark not defined.**

32. The ADAAG Does Not Require ISA Signage at All Entrances Under All Circumstances ................................................................ **Error! Bookmark not defined.**

33. The ADAAG Does Not Regulate Exterior Door Opening Force .... **Error! Bookmark not defined.**

34. Plaintiffs Ignored a 9.5 Pound Door Opening Force Measurement in M&C Charts ...................................................................................... **Error! Bookmark not defined.**

35. The ADAAG Does Not Require At Least 24 Inches of Pull Side Width Maneuvering Clearance Beyond the Strike Jamb at Exterior Doors ...... **Error! Bookmark not defined.**

36. The ADAAG Does Not Require Interior Warning Signage at an Inaccessible Exit Door ....................................................................... **Error! Bookmark not defined.**

37. Thresholds at Doorways ........................................... **Error! Bookmark not defined.**

38. The ADAAG Does Not Contain Any Enforceable Standard as to Floor Mats .. **Error! Bookmark not defined.**

39. High Chairs Are Full Service Items Requiring Customer Service for a Disabled Customer to Use ............................................................ **Error! Bookmark not defined.**

40. The Advertising Stand at Store #3904 Does Not Deprive Access Because the ADAAG Permits a Vertical Change in Level of Up to ¼ Inch in the Accessible Route ...................................................................................... **Error! Bookmark not defined.**

41. The ADAAG Provides that Only One Service Counter with a Cash Register Should Be Accessible ................................................................ **Error! Bookmark not defined.**

42. The Alleged Obstructions on Accessible Service Counters Did Not Deprive Plaintiffs of Full and Equal Enjoyment of the Services Offered By Taco Bell ...... **Error! Bookmark not defined.**

43. The ADAAG Provides a 36" AFF Maximum Height for Service Counters with Cash Registers ......................................................................... **Error! Bookmark not defined.**

44. The So-Called "Low Shelves" In Front of the Remodeled Service Counters Protrude Less Than Ten Inches and Permit a Side Approach to the Service Counte ............... **Error! Bookmark not defined.**

45. The ADAAG Does Not Require a Forward Reach to Use a Drink Dispenser:  Floor Sinks Do Not Affect the Usability of Drink Dispensers ... **Error! Bookmark not defined.**

**Error! Reference source not found.**

46. The ADAAG Allows a 54 Inch Side Reach Maximum Over "Obstructions", and the ADAAG's Sliding Scale of Side Reach Ranges for ATMs Applies to Non-ATM Element ....................................................................................... **Error! Bookmark not defined.**

(a) The Pickup Counter Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standar....................................... **Error! Bookmark not defined.**

(b) The Drink Dispenser Table Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standar......................................... **Error! Bookmark not defined.**

(c) The Condiment Counter Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standar.............. **Error! Bookmark not defined.**

47. Plaintiffs' Experts' Measurement of Reach Ranges at Tableware and Condiment Dispensers Is Flawed ....................................................... **Error! Bookmark not defined.**

48. Plaintiffs' Apparent Position that Duplicate Dispensers Dispensing the Same Item Need to Be Within Reach Ranges Is Flawed .................... **Error! Bookmark not defined.**

49. Many Site Inspections Occurred Before Taco Bell's Stores Opened to the Public, Depriving Taco Bell of the Opportunity to Organize and Get the Stores Ready for Operations ....................................................................... **Error! Bookmark not defined.**

50. The Drink Dispenser Table Is Not Subject to a 34" AFF Maximum Standard Because It Is Not a "Food" Service Lin ........................................... **Error! Bookmark not defined.**

51. Plaintiffs Cannot Contradict Their Prior Request for Additional Accessible Seating at a Particular Area in the Dining Room.............................. **Error! Bookmark not defined.**

52. The ADAAG Does Not Require that Accessible Seating Accommodate Companions ........................................................................... **Error! Bookmark not defined.**

53. The ADAAG Does Not Require Counter or Booth Seating to Be Accessible ...**Error! Bookmark not defined.**

54. McSwain Has Failed to Propose Any Specific Location for the Accessible Seating in Order to Be "Well" Dispersed ......................................... **Error! Bookmark not defined.**

55. The ADAAG Does Not Regulate Emergency Exits in Existing Facilities.........**Error! Bookmark not defined.**

56. The ADAAG Provides a 48 Inch Maximum Height Standard for Door Hardware, Which Should Be Measured From Its Centerline ............. **Error! Bookmark not defined.**

57. This Court Has Already Ruled that Plaintiffs Lack Standing to Litigate Hardware ....................................................................... **Error! Bookmark not defined.**

58. The Measurement of Door Opening Force Does Not Apply to the Force Required to Engage or Disengage Devices Including Bolts Used to Keep the Door in a Closed Position ...................................................................... **Error! Bookmark not defined.**

59. The ADAAG Standard for Pull Side Depth Maneuvering Clearance Is 48 Inches Minimum If the Restroom Door Does Not Have a Closer **Error! Bookmark not defined.**

60. The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Pull Side Depth Clear Floor Area............................................. **Error! Bookmark not defined.**

61. Stub-Out Walls or Wing Walls Pose No Obstruction to Usability of Restroom Door ......................................................................................... **Error! Bookmark not defined.**

62. The ADAAG Standard for Push Side Depth Maneuvering Clearance Is 42 Inches Minimum If the Restroom Door Does Not Have a Closer **Error! Bookmark not defined.**

63. The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Push Side Depth Clear Floor Are ............................................... **Error! Bookmark not defined.**

64. The ADAAG Does Not Regulate the Extent to Which a Restroom Door Is Permitted to Swing Into the Wheelchair Turning Space .................. **Error! Bookmark not defined.**

65. Movable Objects Such as Trash Cans Are Not Architectural Barriers............... **Error! Bookmark not defined.**

66. The Wall-Mounted Semi-Recessed Waste Receptacle Does Not Deprive Taco Bell's Customers of Full and Equal Enjoyment of the Restrooms............. **Error! Bookmark not defined.**

67. The ADAAG Does Not Regulate Slope Surrounding a Floor Drain on an Accessible Route Any Differently Than Any Other Portion of the Accessible Route ............... **Error! Bookmark not defined.**

68. The ADAAG Does Not Require an Automatic Closing Device on an Accessible Toilet Stall...................................................................... **Error! Bookmark not defined.**

69. Plaintiffs' Failure to Apply the Toilet Stall Door Maneuvering Clearances in Fig. 30(a) of the ADAAG Is Wrong ....................................... **Error! Bookmark not defined.**

70. The ADAAG Does Not Require a Minimum 60 Inch Wide Envelope Surround the Water Closet.................................................................... **Error! Bookmark not defined.**

71. The ADAAG Does Not Require At Least 48 Inches of Clear Floor Space In Front of the Front End of the Water Closet ................................... **Error! Bookmark not defined.**

72. The ADAAG Does Not Require that the Front End of the Side Grab Bar Be Positioned Exactly 24 Inches In Front of the Water Closet............. **Error! Bookmark not defined.**

73. The ADAAG Does Not Specify a Particular Maximum Distance Between Toilet Paper Dispenser and the Rear Wall ................................. **Error! Bookmark not defined.**

74. Measurements Applicable to Interior Toilet Stalls Such As the 36 Inch Distance of the Toilet Paper Dispenser from the Rear Wall Do Not Apply to "Water Closets\... **Error! Bookmark not defined.**

75. The ADAAG Does Not Require Self-Closing Accessible Stall Doors .............. **Error! Bookmark not defined.**

76. The ADAAG Does Not Regulate the Projection of a Urinal.... **Error! Bookmark not defined.**

77. The ADAAG Does Not Regulate the Precise Minimum Distance Between the Centerline of a Lavatory and the Side Wall...................... **Error! Bookmark not defined.**

78. The ADAAG Does Not Require that the Entirety of the Drain Pipe Be Covered ......................................................................................... **Error! Bookmark not defined.**

**Error! Reference source not found.**

79.  The ADAAG Does Not Require the Insulation of a Hot Water Line If It Was Not Accessible Under the Lavatory ......................................... **Error! Bookmark not defined.**

80.  The ADAAG Does Not Impose an Insulation Standard Over Cold Water Supply Line ............................................................................ **Error! Bookmark not defined.**

81.  The ADAAG Allows the Forward Reach to Go Beyond the Toe Space ............**Error! Bookmark not defined.**

82.  The ADAAG Does Not Require That Restroom Dispensers and Controls Be Mounted No Higher Than 40 Inches AFF ........................ **Error! Bookmark not defined.**

83.  Maintenance Issues Cannot Trigger ADA Liability .. **Error! Bookmark not defined.**

84.  Plaintiffs Seek Technically Infeasible Modifications **Error! Bookmark not defined.**

V. CONCLUSION ................................................................................. **Error! Bookmark not defined.**

**Error! Reference source not found.**

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

4

*Access 4 All, Inc., v. Atlantic Hotel Condominium Ass'n,*
   No. 04-6174-CIV, 2005 WL 5643878 (S.D. Fla. Nov. 23, 2005) ........................................ 9

5

*Access Now, Inc. v. South Florida Stadium Corp.,*
   161 F. Supp. 2d 1357 (S.D. Fla. 2001) ................................................... 19, 22, 39

6

7

*Adelman v. Acme Markets Corp.,*
   No. 95-4037, 1996 WL 156412 (E.D. Pa. Apr. 3, 1996) ........................................ 4

8

9

*Ambulatory Surgery Center Group, Ltd.,*
   No. 99109CIVSEITZ, 2001 WL 617529 (S.D. Fla. May 2, 2001) ........................................ 9

10

11

*Antoninetti v. Chipotle Mexican Grill, Inc.,*
   No. 05CV1660-J (WMc), 2008 WL 111052 (S.D. Cal. Jan. 10, 2008) ........................................ 3, 24

12

13

*Association of Disabled Americans, Inc., v. Key Largo Bay Beach, LLC,*
   407 F. Supp. 2d 1321 (S.D. Fla. 2005) ................................................... 11, 42

14

15

*Blake v. Southcoast Health System, Inc.,*
   145 F. Supp. 2d 126 (D. Mass. 2001) ................................................... 4

16

*Bleakly v. Sierra Cinemas, Inc.,*
   No. CIV. S-07-052 WBS DAD, 2008 WL 109337 (E.D. Cal. Jan. 8, 2008) ........................................ 5

17

18

*Brother v. CPL Investments, Inc.,*
   317 F. Supp. 2d 1358 (S.D. Fla. 2004) ................................................... 6

19

20

*Chapman v. Pier 1 Imports,*
   No. CIV. S-04-1339 LKK CMK, 2006 WL 1686511 (E.D. Cal. June 19, 2006) .................. 15, 22, 42

21

22

*Colorado Cross-Disability Coalition v. Too (Delaware), Inc.,*
   344 F. Supp. 2d 707 (D. Colo. Nov. 10, 2004) ................................................... 41

23

*D'Lil v. Stardust Vacation Club,*
   No. CIV-S-00-1496 DFL PAN, 2001 WL 1825832 (E.D. Cal. Dec. 21, 2001) ..................... 19, 25, 38

24

25

*Doran v. 7-Eleven, Inc.,*
   524 F.3d 1034 (9th Cir. 2008) ................................................... 7

26

*Eiden v. Home Depot USA, Inc.,*
   No. CIV. S-04-977 LKK/CMK, 2006 WL 1490418 (E.D. Cal. May 26, 2006) ........................................ 15, 41

27

28

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
   528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ................................................... 6

*Grove v. De La Cruz,*
   407 F. Supp. 2d 1126 (C.D. Cal. 2005) ........................................................................... 5, 6

*Harris v. Costco Wholesale Corp.,*
   389 F. Supp. 2d 1244 (S.D. Cal. 2005) .............................................................................. 32

*Harris v. Del Taco, Inc.,*
   No. SACV 04-730 DOC (MLGx), 2004 WL 3744291 (C.D. Cal. Sept. 13, 2004) ...................... 36, 37

*Harris v. Stonecrest Care Auto Center, LLC,*
   No. 04-cv-2593-LAB-LSP, 472 F. Supp. 2d 1208 (S.D. Cal. 2007) ...................................... 4

*Hubbard v. 7-Eleven, Inc.,*
   433 F. Supp. 2d 1134 (S.D. Cal. 2006) ................................................................. 15, 18, 24

*Hubbard v. Rite Aid Corp.,*
   433 F. Supp. 2d 1150 (S.D. Cal. 2006) .............................................................................. 10

*Independent Living Resources v. Oregon Arena Corp.,*
   1 F. Supp. 2d 1124 (D. Or. 1998) ............................................................................... 22, 47

*Independent Living Resources v. Oregon Arena Corp.,*
   982 F. Supp. 2d 698 (D. Or. Nov. 12, 1997) ..................................................................... 6, 9

*Jones v. Taco Bell Corp.,*
   No. S-04-1030 GEB GGH, 2005 WL 1406098 (E.D. Cal. June 14, 2005) ................................ 15

*Long v. United States Internal Revenue Serv.,*
   693 F.2d 907 (9th Cir. 1982) ............................................................................................. 4

*Mannick v. Kaiser Foundation Health Plan, Inc.,*
   No. C 03-5905 PJH, 2006 WL 1626909 (N.D. Cal. June 9, 2006) ....................................... 38

*Martinez v. Home Depot USA, Inc.,*
   No. Civ. S-04-2272 DFL DAD, 2007 WL 926808 (E.D. Cal. Mar. 27, 2007) ...................... 41, 46

*Martinez v. Longs Drug Stores Corp.,*
   No. 05-17142, 281 Fed. Appx. 712, 2008 WL 2329712 (9th Cir. June 5, 2008) ..................... 6

*Massachusetts v. E*Trade Access, Inc.,*
   464 F. Supp. 2d 52 (D. Mass. 2006) ................................................................................. 41

*Moeller v. Taco Bell Corp.,*
   No. C 02-5849 MJJ, 2005 WL 1910925 (N.D. Cal. Aug. 10, 2005) .................................. 9, 36

*Ostendorf v. Dawson County Corrections Bd.,*
   No. 4:98CV3038, 2002 WL 31085085 (D. Neb. Sept. 18, 2002) ............................................ 5

**Error! Reference source not found.**

*Parr,*
   96 F. Supp. 2d 1065 ............................................................................................................ 3

*Pickern v. Pier 1 Imports (U.S.), Inc.,*
   457 F.3d 963 (9th Cir. 2006) .......................................................................................... 10

*Roberts v. Royal Atlantic Corp.,*
   445 F. Supp. 2d 239 (E.D.N.Y. Aug. 15, 2006) .......................................................... 10

*Sanford v. Del Taco, Inc.,*
   No. 04-cv-2154-GEB-EFB, 2006 WL 2669351 (E.D. Cal. Sept. 18, 2006) ............ 5, 34

*Sanford v. Del Taco, Inc.,*
   No. CIV-S-04-1337-DFL/CMK, 2006 WL 1310318 (E.D. Cal. May 12, 2006) ............ 34

*Sanford v. Roseville Cycle, Inc.,*
   No. Civ. 04-1114 DFL CMK, 2007 WL 512426 (E.D. Cal. Feb. 12, 2007) ................ 15

*Sharp v. Rosa Mexicano, D.C., LLC,*
   No. 06-1693 (JDB), 2007 WL 2137301 (D.D.C. July 26, 2007) .................................. 5

*Stringer v. White,*
   No. C-07-5516 SI, 2008 WL 344215 (N.D. Cal. Feb. 6, 2008) .................................... 4

*United States v. AMC Entertainment, Inc.,*
   549 F.3d 760 (9th Cir. 2008) ........................................................................................ 3

*United States v. National Amusements, Inc.,*
   180 F. Supp. 2d 251 (D. Mass. 2001) .......................................................................... 23

*White v. Divine Investments, Inc.,*
   No. CIV. S-04-0206 FCD/DA, 2005 WL 2491543 (E.D. Cal. Oct. 7, 2005) ...... 25, 27, 46

*Wilson v. Haria and Gogri Corp.,*
   No. CIV. S. 05-1239 LKK/DAD, 2007 WL 851744 (E.D. Cal. Mar. 22, 2007) ............ 6

*Wilson v. Norbreck, LLC,*
   No. 04-cv-00690-DFL-JFM, 2005 WL 3439714 (E.D. Cal. Dec. 14, 2005) ... 25, 34, 46, 48

*Wilson v. Pier 1 Imports (US), Inc.,*
   439 F. Supp. 2d 1054 (E.D. Cal. 2006) ................................................................... 15, 25

State Cases

*Donald v. Café Royale, Inc.,*
   218 Cal. App. 3d 168 (Cal. Ct. App. 1990) .................................................................. 4

**Federal Statutes**
42 U.S.C. § 12188(a)(1) ...................................................................................................... 6

**Error! Reference source not found.**

1

Cal. Retail Food Code § 114169                                                      33

2

**Federal Regulations**

3

28 C.F.R. § 36.304(a)                                                              41
28 C.F.R. Part 36                                                                   3
28 C.F.R. Pt. 36                                                          10, 37, 40
56 C.F.R. 35414-15 (July 26, 1991)                                                 41
56 Fed. Reg. 35                                                                41, 42

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Error! Reference source not found.**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Taco Bell Corp. ("Taco Bell") has expended over $8 million to modify and enhance the accessibility of its California company-owned Taco Bell stores since 2006.  In addition, in 2009, Taco Bell has commenced a twice a year inspection program of all of its California company-owned stores for accessibility-related issues via an outside general contractor, Maintco Corp. ("Maintco").  Further, in recent years, Taco Bell has implemented a formal policy of assisting disabled customers, including signage in stores reflecting such policy, which constitutes a reasonable modification of its self-service policy and equivalent facilitation to its wheelchair-bound customers in the event that they encounter any architectural barriers.  Taco Bell submits that the modifications Taco Bell has already completed and intends to still perform before the hearing on this matter have rendered the federal claim for relief moot as a matter of law.

Given that injunctive relief is the sole form of relief available for violations of ADA, and it is inappropriate given Taco Bell's demonstrated commitment to provide full and equal access to its wheelchair-bound customers, Taco Bell respectfully requests that the Court grant partial summary judgment as to plaintiffs' federal claim for relief under the ADA.

**II.**

**STATEMENT OF THE ISSUES TO BE DECIDED**

1.      Has Taco Bell Corp. rendered moot plaintiffs' requests for injunctive relief based on the ADA?

**III.**

**STATEMENT OF FACTS**

After the instant ADA action was commenced on December 17, 2002, a Special Master, Bob Evans, was appointed to conduct site inspections and to prepare survey reports after his appointment by the Court on October 5, 2004.  [Docket #98 & #101]  Such inspections took place in the fall of 2004 and spring of 2005, and resulted in the preparation of Interim Survey Reports, which plaintiffs filed on December 14, 2006.  [Docket #216-#240, #242]  Thereafter, pursuant to the October 5, 2004 order, the

1

parties commenced a formal "meet and confer" process that resulted in plaintiffs submitting to Taco Bell approximately 220 store-specific charts identifying certain alleged architectural barriers and plaintiffs' proposed solutions, if any.  Such "meet and confer" charts were provided to Taco Bell from April through June 2006.  As part of the "meet and confer" process, it became readily apparent that the parties disagreed or had questions as to the Special Master's measurement methodology used in conducting his surveys and the impact it had on his measurements.  (*See* Order Concerning Questions to the Special Master of 9/24/07) [Docket #326]  Without waiting for resolution of such matters, Taco Bell decided to proactively and voluntarily commence an ADA remediation program in 2006 immediately upon receipt of plaintiffs' "meet and confer" charts.  Such program has resulted in the expenditure to date of over $8 million in order to modify its California company-owned stores.  (S. Elmer decl. ¶ 2.)

On June 27, 2008, this Court issued an order requiring that plaintiffs commence "immediately" the inspection of Taco Bell's California company-owned stores via their accessibility experts.  (Order of 6/27/08 at 2:13) [Docket #386]  All of the subsequent 172 site inspections, which commenced on September 22, 2008 and were largely completed in February 2009, with the exception of a single inspection that took place in April 2009, were conducted by plaintiffs' retained expert, Eric McSwain ("McSwain").  Plaintiffs' other formally designated accessibility expert, James Terry, did not attend a single site inspection subsequent to the Court's June 27, 2008 order.  On May 1, 2009, which was the parties' cut-off date for exchanging their respective expert reports "on ADA liability", (Order of 6/27/08 at 2:23), plaintiffs exchanged McSwain's 420 page document (i.e., his expert report) identifying literally thousands of alleged barriers across the Taco Bell stores that he inspected in 2008 and early 2009.  Such document was marked as Exhibit 3 to McSwain's May 1, 2009 declaration and to date has not been supplemented.

Although Taco Bell has been feverishly remediating its California company-owned stores voluntarily in response to its receipt of McSwain's expert report, his expert report, which was supposed to be limited to "ADA liability," is grossly overbroad in its scope, contradicts plaintiffs' prior positions taken during the "meet and confer" stage of this case, and appears to improperly characterize certain alleged barriers as ADA violations notwithstanding the fact that the case law and federal Department of

Case No. 02-5849 PJH JL                              TBC's Mot. Partial Summ. J.
OC 286,421,313v1

Justice regulations implementing the ADA, *see* 28 C.F.R. Part 36, Appendix A (the "ADAAG"), indicate to the contrary.

**IV.**

**ARGUMENT**

**A.      The Mootness Doctrine Applies.**

      **1.      Legal Standard for Injunctive Relief**

      "Injunctive relief is an equitable remedy, and is not available as a matter of course." *Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 05CV1660-J (WMc), 2008 WL 111052, at *24 (S.D. Cal. Jan. 10, 2008) (Jones, J.). "It is the plaintiff's burden to establish these elements." *Id.* at *24. "Injunctive relief should be denied unless it is the *only* means of ensuring compliance." *Id.* at *24 (emphasis added).

      "A plaintiff seeking injunctive relief under the ADA 'must demonstrate that an injunction . . . is justified by the relief it will provide.'" *Id.* at *24 (quoting *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F. Supp. 2d at 1369). "[W]ether a requested alteration would be effective is relative to the impediment presented by the barrier and the associated *cost* of removing it." *Id.* at *24 (emphasis added); (denying injunctive relief in part because of the plaintiff's failure to present evidence as to the "cost or feasibility" of an injunction at a post-January 26, 1993 facility requiring that a wall be lowered to a maximum 36 inches instead of 44 inches).

      "Whether a requested alteration would be effective is relative to the impediment presented by the barrier and the associated cost of removing it.  For example, removal of a barrier that actually denies disabled persons access to an element of the accommodation would be greatly effective and the court would be justified in imposing a costly injunction, provided that the cost is proportionate to the benefit it offers.  Conversely, injunctive relief would not be appropriate for *de minimis* violations that 'do not materially impair the use of an area for its intended purpose, . . . [or] pose any apparent danger to persons with disabilities.'" *Id.* at 1369 (quoting *Parr*, 96 F. Supp. 2d 1065, 1086 n.26).

      "A district court has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008) (Wardlaw, J.).  "[A] trial court abuses its discretion by fashioning an injunction which is overly broad." *Id.*

3

1      The *Lyons* standing standard applies to injunctions sought for violations of the ADA.  *Blake v.*

2 *Southcoast Health System, Inc.*, 145 F. Supp. 2d 126, 132 (D. Mass. 2001) (Young, C.J.).

3      In determining whether injunctive relief should be granted, "the district court should seriously

4 consider the likelihood of recurrence, weighing the good faith of any expressed intent to comply, the

5 effectiveness, if any, of the discontinuance and the character of past violations."  *Long v. United States*

6 *Internal Revenue Serv.*, 693 F.2d 907, 909 (9th Cir. 1982).  "[A]n allegation of past disability

7 discrimination will not support a claim under the ADA for injunctive relief."  *Adelman v. Acme Markets*

8 *Corp.*, No. 95-4037, 1996 WL 156412, at *2 (E.D. Pa. Apr. 3, 1996) (Waldman, J.); *see Donald v. Café*

9 *Royale, Inc.*, 218 Cal. App. 3d 168, 184 (Cal. Ct. App. 1990) ("Injunctive relief will be denied where, at

10 the time of the order or judgment, no reasonable probability exists of the recurrence of the past acts.  An

11 injunction should not be granted as punishment for past acts where it is unlikely that they will recur.").

12      "If plaintiff cannot demonstrate a likelihood that he will suffer future discrimination at the hands

13 of a defendant, *even one who has discriminated against him in the past*, he does not have standing to

14 obtain an injunction under Title III."  *Stringer v. White*, No. C-07-5516 SI, 2008 WL 344215, at *6

15 (N.D. Cal. Feb. 6, 2008) (Illston, J.) (emphasis added).  "[A] plaintiff seeking to force compliance via

16 injunctive relief must demonstrate standing by establishing that defendant's allegedly wrongful behavior

17 will likely occur or continue and that the threatened injury is continuing."  *Gasper v. Marie Callender*

18 *Pie Shops, Inc.*, No. CV 05-1435 CBM (SSx), slip op. at 5:10-13 (C.D. Cal. June 27, 2006) (Marshall,

19 J.).

20      "While standing is established as of the filing of the suit, a claim may become moot even after

21 filing if a litigant does not continue to have a personal stake in the outcome of the lawsuit that is likely

22 to be redressed by a favorable decision."  *Harris v. Stonecrest Care Auto Center, LLC*, No. 04-cv-2593-

23 LAB-LSP, 472 F. Supp. 2d 1208, 1218 (S.D. Cal. 2007) (Burns, J.).

24      In *Dowling v. MacMarin, Inc.*, No. C-94-2899 WHO (N.D. Cal. Sept. 6, 1996) (Orrick, J.), the

25 court found that the defendant had recently constructed a new, fully ADA-compliant restroom rendering

26 the prayer for injunctive relief moot.  "This Court cannot order [defendant] to do more than what is has

27 already done: construct a fully disabled-accessible restroom."  *Id.* at 10.

28    **2.**      **Mootness Legal Standard**

4

1   "When a defendant remedies the challenged conditions to bring them within ADA compliance, a

2   plaintiff's ADA claim becomes moot and the defendant is entitled to summary judgment." *Bleakly v.*

3   *Sierra Cinemas, Inc.*, No. CIV. S-07-052 WBS DAD, at *1 (E.D. Cal. Jan. 8, 2008) (Shubb, J.).

4   "'A claim for equitable relief is moot 'absent a showing of irreparable injury, a requirement that

5   cannot be met where there is no showing of any real or immediate threat that the plaintiff will be

6   wronged again.'" *Ostendorf v. Dawson County Corrections Bd.*, No. 4:98CV3038, 2002 WL 31085085,

7   at *6 (D. Neb. Sept. 18, 2002) (citation omitted).

8   Numerous federal district courts have applied the mootness doctrine in the context of federal

9   court actions based upon Title III of the ADA.  *See, e.g.*, *Bleakly v. Sierra Cinemas, Inc.*, No. CIV. S-

10   07-052 WBS DAD, 2008 WL 109337, at *1 (E.D. Cal. Jan. 8, 2008) (Shubb, J.); *Rodriguez, et al. v.*

11   *Ralphs Grocery Co.*, No. 07-CV-02311-R (PLAx), slip op. (C.D. Cal. Nov. 7, 2007) (Real, J.); *Sharp v.*

12   *Rosa Mexicano, D.C., LLC*, No. 06-1693 (JDB), 2007 WL 2137301, at *3 (D.D.C. July 26, 2007)

13   (Bates, J.); *Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 05CV1660-J (WMc), slip op. at 21:23-26,

14   22:20-22 (S.D. Cal. June 14, 2007) (Jones, J.); *Molski v. Foster Freeze Paso Robles*, No. CV 04-03780

15   DDP (JWJx), slip op. at 10:15-12:12 (C.D. Cal. May 10, 2007) (Pregerson, J.); *Hubbard v. Kayo Oil*

16   *Co.*, No. 05CV2076 BEN (BLM) slip op. at 1:18-22 (S.D. Cal. Dec. 22, 2006) (Benitez, J.); *Sanford v.*

17   *Del Taco, Inc.*, No. 04-cv-2154-GEB-EFB, 2006 WL 2669351, at *4 (E.D. Cal. Sept. 18, 2006) (Burrell,

18   J.); *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1130 (C.D. Cal. 2005) (Snyder, J.).

19   "A case is moot when 'events have so transpired that the decision will neither presently affect

20   the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Sharp v.*

21   *Rosa Mexicano, D.C., LLC*, No. 06-1693 (JDB), 2007 WL 2137301, at *3 (D.D.C. July 26, 2007)

22   (Bates, J.).  "Mootness deprives the Court of its ability to take remedial action because 'there is nothing

23   for [the court] to remedy, *even if [it] were inclined to do so.*'" *Id.* (emphasis added).

24   In *Sharp*, the district court held that the defendant's evidence clearly demonstrated that the

25   alleged unlawful conduct cannot reasonably be expected to recur.  The stall included an accessible sink-

26   equipment that is a "fixture" within the restaurant.  *Id.* at *4.  The court held, "The alleged

27   discrimination cannot reasonably be expected to recur because 'structural modifications . . . are unlikely

28   to be altered in the future.'" *Id.* at *4 (quoting *Indep. Living Resources v. Oregon Arena*, 982 F. Supp.

5

698, 774 (D. Or. 1997)); *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1130-31 (C.D. Cal. 2005) (holding that installation of grab rails by restaurant rendered moot plaintiff's ADA complaint requesting installation of such rails, finding no basis to conclude the challenged conduct would be repeated).

In *Martinez v. Longs Drug Stores Corp.*, No. 05-17142, 281 Fed. Appx. 712, 2008 WL 2329712 (9th Cir. June 5, 2008), the Ninth Circuit affirmed the district court's refusal to award injunctive relief in an ADA action notwithstanding the plaintiff's argument that certain architectural barriers such as the placement of the garbage can and aisle displays were likely to recur.  Id. at *1.  In support, the Ninth Circuit cited the U.S. Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 193, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000), which held that the district court may "conclude that an injunction would be an excessively intrusive remedy".

In *Foster Freeze Paso Robles*, *supra*, the district court noted, "Defendants have already remedied a number of architectural barriers without being enjoined to do so," and "[t]here is no indication that Defendants would attempt to undo those remedies if the Court refrained from granting injunctive relief."  *Id.* at 12:3-7.

"In order to prove discrimination stemming from an architectural barrier, plaintiff must demonstrate that (1) he is disabled, (2) the facility in question is a place of public accommodation, (3) the facility contains an architectural barrier, (4) the plaintiff had <u>actual knowledge</u> of the architectural barrier precluding his full and equal access to the facility."  *Wilson v. Haria and Gogri Corp.*, No. CIV. S. 05-1239 LKK/DAD, 2007 WL 851744, at *3 (E.D. Cal. Mar. 22, 2007) (Karlton, J.) (emphasis added).

"Plaintiffs do not have standing to complain about alleged barriers which they were unaware of at the filing of their complaint."  *Brother v. CPL Investments, Inc.*, 317 F. Supp. 2d 1358, 1368 (S.D. Fla. 2004).  The actual knowledge requirement is derived from both Article III standing and the "futile gesture" language set forth in 42 U.S.C. § 12188(a)(1):

> "Nothing in this section shall require a person with a disability to engage in a *futile gesture* if such person has *actual notice* that a person or organization covered by this subchapter *does not intend to comply with its provisions*."

42 U.S.C. § 12188(a)(1) (emphasis added).  In other words, a person has not suffered actionable disability discrimination under the ADA without the requisite actual notice that the public

6

accommodation at issue "does not intend to comply with" the ADA provisions.  Only if such actual notice exists can a person avoid making the "futile gesture" stated in the ADA provision and state a claim for injunctive relief.

"[P]laintiff] bears the burden of producing sufficient evidence to defeat summary judgment regarding each of the store's alleged ADA violations because he would bear the burden of proving such violations at trial."  *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008) (Gould, J.) (2-1 decision).

### 3.     Taco Bell Lacks Any Legal Authority to Modify Any Features at Stores that Have Either Permanently Closed or Were Sold to Franchisees.

As an initial matter, Taco Bell lacks any legal authority to modify any features at stores that have either permanently closed or have been sold to franchisees.

Nevertheless, plaintiffs continue to identify store #1496 as a store for which plaintiffs continue to seek injunctive relief against Taco Bell.  Store #1496, however, was sold to a franchisee effective as of April 24, 2009.  (Elmer decl. ¶ 16.)

### 4.     Taco Bell Has Modified the Vast Majority of Features Raised in Plaintiffs' Expert Reports of May 1, 2009.

Taco Bell has modified the vast majority of features raised in plaintiffs' expert reports of May 1, 2009.  (*See* S. Elmer decl. ¶¶ 18-57 Ex. 18; R. Reeves decl. ¶¶ 3-164.)  Given that Taco Bell is still in the process of documenting the remediation work performed by its outside contractors, which remains ongoing to date, Taco Bell intends to supplement its papers with additional information as to additional accessibility modifications before the Court's scheduled hearing.

### 5.     Taco Bell Has Modified the Vast Majority of Features Raised in Plaintiffs' Meet and Confer Charts of 2006.

This Court can and should infer that the elements raised in plaintiffs' 2006 Meet and Confer charts have been remediated based on their omission from plaintiffs' expert reports following over 180 site inspections performed by at least one of plaintiffs' two retained accessibility experts.  As one can see from plaintiffs' lengthy Meet and Confer Charts, (Hikida decl. ¶ 3 Ex. 2), plaintiffs sought extremely burdensome and costly modifications.

7

1     **6.     Taco Bell Has Expended Over $8 Million to Remediate Its California Taco Bell**
2         **Company-Owned Stores Since 2006.**

3     Taco Bell has expended over $8 million to remediate its California company-owned stores since
4 2006. (Elmer decl. ¶ 2.)

5     **7.     Taco Bell Has Retained Maintco to Conduct Twice a Year ADA Maintenance**
6         **Inspections of Its California Taco Bell Stores.**

7     Beginning in or about April 2009, Taco Bell retained an outside general contractor, Maintco
8 Corp., to conduct twice a year inspections of all of its California Taco Bell company-owned stores
9 regarding ADA accessibility issues. (Elmer decl. ¶ 5.) Thus, Taco Bell's interest in being barrier-free
10 as to the mobility-impaired is an ongoing commitment.

11 **B.     Taco Bell's Defenses Other Than the Mootness Doctrine.**

12     **1.     Even Assuming that Self-Service Dispensers and Other Elements Are Subject to the**
13         **ADAAG, Taco Bell Provides Equivalent Facilitation in the Form of Customer**
14         **Assistance.**

15     Taco Bell's policy of assisting disabled customers, including signage reflecting such policy,
16 constitutes a reasonable modification of its self-service policy. (Elmer decl. ¶¶ 6-14.) The ADAAG
17 expressly recognizes that departures from particular technical and scoping requirements in federal
18 guidelines is permissible if alternative designs and technologies provide substantially equivalent or
19 greater access to and usability of the facility. (ADAAG, 2.2.) ADAAG 2.2 provides, "Departures from
20 particular technical and scoping requirements of this guideline by the use of other designs and
21 technologies are permitted where the alternative designs and technologies used will provide
22 _substantially_ equivalent or greater access to and usability of the facility." (ADAAG, 2.2) (emphasis
23 added).

24     "The purpose of the Title III regulations is to ensure that persons with disabilities have the
25 opportunity to benefit from public accommodations. The various design standards are only the
26 _designated_ means for accomplishing those objectives. The equivalent facilitation exception is an
27 acknowledgment that the federal government does not enjoy a monopoly on good ideas, and that _there_
28 _may be more than one means to accomplish a particular objective_." _Independent Living Resources v._

8

Case No. 02-5849 PJH JL                  TBC's Mot. Partial Summ. J.
OC 286,421,313v1

*Oregon Arena Corp.*, 982 F. Supp. 2d 698, 727 (D. Or. Nov. 12, 1997) (Ashmanskas, Mag. J.) (emphasis added).  "DOJ has acknowledged that in some instances an equivalent facilitation may be appropriate so that a designer can comply with both the ADA and state or local building codes." *Id.* at 727.  The *Oregon Arena* court rejected a new technology requirement for equivalent facilitation.  *Id.*

Even a facility that constitutes new construction can make use of equivalent facilitation.  *See, e.g.*, *Access 4 All, Inc., v. Atlantic Hotel Condominium Ass'n*, No. 04-6174-CIV, 2005 WL 5643878, at *15 (S.D. Fla. Nov. 23, 2005) (Cohn, J.) ("Although a newly constructed building should strive to be the most accessible it can be, ADAAG § 5.2 clearly allows the form of equivalent facilitation of having service available at a nearby table.").

In *Moeller v. Taco Bell Corp.*, No. C 02-5849 MJJ, 2005 WL 1910925 (N.D. Cal. Aug. 10, 2005) (Jenkins, J.), the district court held, "[T]he Court finds that there are only two requirements for an equivalent facilitation:  1) it is an *alternative design or technology*; and 2) it provides equal or greater access to subject facilities." *Id.* at *3 (emphasis added).  "It appears that the purpose of the exception is to give architects the flexibility to design facilities that may not strictly comply with the Accessibility Standards but nonetheless provide equivalent facilitation." *Id.* at *3.  The equivalent facilitation exception allows facilities to bypass the technical requirements laid out in the ADAAG.  *Id.* at *3 n.1.

"[E]quivalent facilitation stands on its own as an appropriate standard for certain results that may differ from the ADAAG standards." *Access Now, Inc.  v. Ambulatory Surgery Center Group, Ltd.*, No. 99109CIVSEITZ, 2001 WL 617529, at *4 (S.D. Fla. May 2, 2001) (Garber, Mag. J.).

## 2.    The City of La Mirada Has Refused to Allow Taco Bell to Install an Accessible Path of Travel Connecting the Public Sidewalk to the Store Entrance of Store #5636.

In 2008, Taco Bell attempted to install an accessible route of travel between the public sidewalk on the north side of La Mirada Boulevard and the south entrance of store #5636.  Taco Bell obtained building permits to engage in such work.  After Taco Bell had begun construction on the path of travel, on or about June 21, 2008, the City of La Mirada changed its position and ultimately refused to allow Taco Bell to complete the path of travel to the public sidewalk based on the explanation that such path of travel would traverse the drive thru lane and pose a hazard.   Thus, after Taco Bell had expended the expense of digging up the grass landscaping in the area next to the public sidewalk and demolishing a

9

portion of the concrete walkway on the south side of the store in preparation for the anticipated path of travel across the drive thru lane, Taco Bell was forced by the City to remove the new walkway and return the store to its former condition.

### 3. The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Ramp at Store #829.

The ADAAG provides a "technically infeasible" defense that applies to the ramp at store #829. (28 C.F.R. Pt. 36, App. A, ADAAG, § 4.1.6(1)(j).)

At store #829, plaintiffs' apparent request for bottom, intermediate, and top landings that are at least 60 or 72 inches in length on the same ramp at issue is technically infeasible. (ADAAG 4.1.6(j).) Taco Bell has provided accessibility to the maximum extent feasible via the installation of new continuous handrails on the entire length of the ramp at issue. (ADAAG 4.1.6.)

### 4. The ADAAG Only Obligates a Facility Operator to Ensure an Accessible Route *Within* the Boundary of the Site and Not Beyond.

The ADAAG provides, "At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance." (ADAAG 4.1.2(1).) In addition, the ADAAG provides, "At least one accessible route complying with 4.3 shall connect accessible buildings, accessibility facilities, accessible elements, and accessible spaces that are on the same site." (ADAAG 4.1.2(2).)

In *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006) (Hug, J.), the Ninth Circuit affirmed the district court's holding that a private entity had no legal obligation to build a walkway across 10-foot wide piece of public land to connect to a public sidewalk. *Id.* at 967-68; see also *Roberts v. Royal Atlantic Corp.*, 445 F. Supp. 2d 239, 246 (E.D.N.Y. Aug. 15, 2006) (Wexler, J.) (holding that the construction of a switch back ramp involved the use of public property so this proposal was flawed); *Hubbard v. Rite Aid Corp.*, 433 F. Supp. 2d 1150, 1165, 1169 (S.D. Cal. 2006) (Hayes, J.) (holding that the defendant could not modify the barriers on the parcel that it owned or leased because of the unresolved slope problems on the adjoining parcels owned by others that would create elevation and tripping problems); *Dodson v. Dollar Tree Stores, Inc.*, No. 2:04-cv-1068-MCE-CMK, slip op. at *1

10

(E.D. Cal. July 25, 2006) (England, J.) (holding that the store does not own, lease or control the common areas or the parking lot of the shopping center at issue); *Association of Disabled Americans, Inc., v. Key Largo Bay Beach, LLC*, 407 F. Supp. 2d 1321, 1342 (S.D. Fla. 2005) (King, J.) ("There is no legal basis to find an ADA violation pertaining to property not owned by these Defendants."); *Hooper v. Calny Inc.*, No. CIV-S-03-0167 DFL/GGH, slip op. at 6:13-7:3 (E.D. Cal. May 7, 2004) (Levi, J.) (holding that sidewalks were outside of the boundary of the restaurant site at issue).

Plaintiffs' expert, Eric McSwain, measured the slope and cross-slope of the public sidewalk where it crossed the driveway apron at numerous stores (*i.e.*, #99, #137, #283, #863, #2423, #2755, #2918, #2961, #3027, #3055, #3070, #3079, #3152, #3160, #3196, #3209, #3222, #3471, #3579, #4325, #4510, #4578, #5223, #5259, #5513, #9489, #15573, #16140, #16812, #17363, #17471, #17751, #18606, #18687, #19289, #19344, #19591, #19744, #20180, #20578).  McSwain's measurement of features that are in the public sidewalk and, therefore, the public right-of-way is flawed because Taco Bell does not have the ability to control the public right-of-way, which is under the local municipality's exclusive control.  Taco Bell is unaware of any case law that supports McSwain's slope measurements of a driveway apron that is in the public right-of-way.

## 5.  The ADAAG Does Not Require that Elements at a Facility Be Accessible If They Are Not on an Accessible Route for Use By Disabled Customers.

The ADAAG provides, "At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance." (ADAAG 4.1.2(1).)  In addition, the ADAAG provides, "At least one accessible route complying with 4.3 shall connect accessible buildings, accessibility facilities, accessible elements, and accessible spaces that are on the same site."  (ADAAG 4.1.2(2).)  To the extent that plaintiffs are relying upon ADAAG 4.1.2 for the proposition that all elements at a site that could potentially be used by disabled customers be made accessible, that interpretation of the ADAAG is wrong.

Indeed, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the ramp at the service entrance at the back of store #3196.

11

At store #4622, the east ramp run surveyed by McSwain is not on any accessible route.  It clearly ends next to the drive thru lane and is inaccessible.  (*See* EM11591.)  Thus, McSwain erred by surveying such ramp including the handrail extensions, which McSwain take issue with.

These omissions constitutes evidence that the ramp to the service entrance did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

Similarly, at store #20310, McSwain takes issue with the turn knobs to exterior patio doors even though such knobs are not for use by any customer.  The turn knobs are used only by building security to lock the exterior patio doors in the evening after the Discovery Science Center, which contains the in-line Taco Bell store, closes for the day.  Thus, McSwain's measurement is irrelevant.

### 6.    Running Slope of Walkways

Even if the Court does not find that Taco Bell's modifications have rendered certain issues moot, *plaintiffs failed to challenge as noncompliant walkways that had a 6.0% running slope at store number* 3053 in their 2006 Meet and Confer Charts.  The apparent reason why plaintiffs failed to challenge such running slope is that plaintiffs determined that the slope did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

This omission constitutes evidence that such cross-slope in accessible walkways did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

### 7.    Cross-Slope of Walkways

Even if the Court does not find that Taco Bell's modifications have rendered certain issues moot, *plaintiffs failed to challenge as noncompliant walkways that exceeded 3.0% cross-slope at store numbers* 3027 (3.3%) and 3471 (3.8%) in their 2006 Meet and Confer Charts.  The apparent reason why plaintiffs failed to challenge such cross-slope is that plaintiffs determined that the cross-slope did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

These omissions constitute evidence that such cross-slope in accessible walkways did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

### 8.    The ADAAG Provides a 36" Minimum Width Standard Generally for an Accessible Route.

12

1        In general, the ADAAG provides a 36 inch minimum width standard for an accessible route.

2  (ADAAG 4.8.3.)  The minimum clear width standard specified in the ADAAG is even smaller (i.e., 32

3  inches) at short distances of up to 24 inches in length.  (ADAAG 4.13.5.)  Indeed, plaintiffs failed to

4  challenge in their 2006 Meet and Confer Charts as noncompliant the width of the accessible route even

5  though they were less than 48 wide as follows:   45-1/2 inches for a distance of 33 inches at store 5636.

6  These omissions constitutes evidence that the width of the accessible route did not deprive plaintiffs of

7  "full and equal enjoyment" of the services provided at the Taco Bell stores.

8        **9.**      **The ADAAG Only Provides a 36" Minimum Width Standard for a Pedestrian**

9        **Ramp.**

10        McSwain challenges the width of the ramp at store #2423 as less than 48 inches wide.  The

11  ADAAG provides a 36 inch minimum width standard for pedestrian ramps.  (ADAAG 4.8.3.)  Indeed,

12  plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the width of

13  pedestrian ramps even though they were less than 48 wide as follows:   44 inches at store 2423.  These

14  omissions constitutes evidence that the width of the pedestrian ramps did not deprive plaintiffs of "full

15  and equal enjoyment" of the services provided at the Taco Bell stores.

16        **10.**     **The ADAAG Does Not Require that a Landing Length Exceed 60 Inches.**

17        The ADAAG provides that the landing length shall be a minimum of 60 inches clear.  (ADAAG

18  4.8.4(2).)  Thus, the existing landing at store #17572 exceeds the ADAAG standard.

19        **11.**     **The ADAAG Does Not Require Handrail Extensions on Ramps If the Handrails Are**

20        **Continuous.**

21        The ADAAG requires handrail extensions beyond the ramp run only if the handrails are not

22  continuous.  (ADAAG 4.8.5(2).)  At store #4622, the handrails were continuous at the ramp runs at

23  issue.  (See EM11591.)  At store #17572, the handrails were continuous at the ramp at issue.  (*See*

24  EMP010448.)

25        **12.**     **The ADAAG Does Not Regulate Whether Handrail Extensions May Be Turned 90**

26        **Degrees to the Run of the Ramp.**

27        Even assuming that handrail extensions are required at certain ramps wherein the handrails are

28  not continuous, the ADAAG does not regulate the circumstances wherein handrail extensions may be

turned 90 degrees to the run of the ramp.  (*See* ADAAG 4.8.5.)  Thus, whether the extension of the handrail would create a hazard unless it is turned is irrelevant at stores like #3471.

### 13. McSwain's Measurement Methodology of Measuring the Length of a Ramp Landing Only to an Expansion Joint Is Flawed.

McSwain's measurement methodology is flawed because he measured the length of the so-called bottom landing at store #22691 by measuring the distance to the concrete expansion joint in the ramp instead of measuring beyond the expansion joint.  Had he done so, he would have discovered that the 3-1/2 inches area beyond the expansion joint is between 2.2% and 2.7% running slope.  Plaintiffs have agreed to 3% running slope at a ramp landing as an "acceptable measurement".  Thus, the landing length is 60 inches, which complies with ADAAG 4.8.4.

### 14. The ADAAG Does Not Require a Minimum 72 Inches in Length Ramp at a Change in Direction.

At store #22691, McSwain's characterization of the intermediate ramp landing as not in the same direction as the so-called upper ramp run is misleading.  McSwain's photographs demonstrate that the landing at issue is in the same general direction as the upper ramp run, and there was no attempt by McSwain to measure the precise change in direction, which is insignificant.  The ADAAG does not regulate the change in direction at issue.  Thus, McSwain cannot rely upon the ADAAG in seeking a 72 inches minimum length intermediate landing.

### 15. The ADAAG Provides that Curb Ramps Do Not Need Handrails.

At store #22691, McSwain requests the installation of handrails on what he characterizes as a ramp, which is better characterized as a curb ramp.

The ADAAG provides that handrails "are not required on curb ramps."  (ADAAG 4.8.5.)  A curb ramp is defined as a "short ramp cutting through a curb or built up to it."  (ADAAG 3.5.)  The ADAAG does not specify the length of a "short" ramp.  The maximum length of an accessible "ramp" is defined in the ADAAG as having a horizontal projection or "run" that is either 30 or 40 feet in length, contingent up the running slope and "rise".  (ADAAG Fig. 16.)

Plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the length of curb ramps even though their horizontal projection or "run" were as follows:   13' at store 3079; 11' 2-

14

1/2" at store 757[1]; 10'-6" at store 19744.  Indeed, plaintiffs expressly proposed the construction of a new *curb cut ramp* in the same location at store #19744, but made no reference to converting the curb ramp into a pedestrian ramp with handrails.  These omissions constitutes evidence that the length of curb ramps did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

### 16.    The ADAAG Does Not Require Tow-Away Signage.

Contrary to plaintiffs' position, the ADAAG does not require any tow-away signage.  "The absence of tow-away signs at the parking lot entrance does not violate the ADA."  *Sanford v. Roseville Cycle, Inc.*, No. Civ. 04-1114 DFL CMK, 2007 WL 512426, at *2  (E.D. Cal. Feb. 12, 2007) (Levi, J.); *see also Wilson v. Pier 1 Imports (US), Inc.*, 439 F. Supp. 1054, 1068 (E.D. Cal. 2006) (Karlton, J.) (refusing to address purported Title 24 violations regarding the tow-away signage as not subject to the ADAAG standards); *Jones v. Taco Bell Corp.*, No. S-04-1030 GEB GGH, 2005 WL 1406098, at *1 (E.D. Cal. June 14, 2005) (Burrell, J.) (holding that "the ADAAG does not require tow away signs"); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1149 (S.D. Cal. 2006) (Lorenz, J.) (holding that "there is no federal ADA requirement for tow signs; they are only governed by state law"); *Eiden v. Home Depot USA, Inc.*, No. CIV. S-04-977 LKK/CMK, 2006 WL 1490418, at *14 (E.D. Cal. May 26, 2006) (Karlton, J.) (granting summary judgment to the defendant because the tow away signage claim was only a California Building Code claim).  "[T]he court cannot expect defendant to comply with a standard that does not exist."  *Chapman v. Pier 1 Imports*, No. CIV. S-04-1339 LKK CMK, 2006 WL 1686511, at *12 (E.D. Cal. June 19, 2006) (Karlton, J.).

Indeed, plaintiffs failed to challenge as noncompliant the number of towing signs at store number 2984 in their 2006 Meet and Confer Charts.

Similarly, plaintiffs failed to challenge whether the existing towing signage included all required information at store numbers 3420 in their M&C charts.  Indeed, the towing signage at store number 3420 expressly included only the City of Hemet's name and its phone number and no towing company

---

[1]     Indeed, plaintiffs failed to provide Taco Bell with any Meet and Confer Chart for store #757 in 2006.

15

information.  Yet, plaintiffs remained silent in their M&C chart as to the lack of towing company information.

### 17.     The ADAAG Does Not Require that Accessible Parking Be Located Immediately Next to an Accessible Entrance.

The ADAAG provides that "[a]ccessible parking spaces serving a particular building shall be located on the shortest accessible route of travel from adjacent parking to an accessible entrance." (ADAAG 4.6.2.)  The location of the "adjacent parking", however, is not specified.  Thus, the "adjacent parking" serving a particular facility could be quite a distance away from the store entrance due to constraints in complying with local building code requirements as to the width of the driveway, which is contrary to plaintiffs' position.

Indeed, plaintiffs failed to challenge as noncompliant the distance between the location of the "adjacent parking" to the accessible store entrance at store number 17984 in their 2006 Meet and Confer Charts.  In fact, plaintiffs proposed that the accessible parking spaces at store #19509, which were in the immediate vicinity of the store entrance, be relocated further away from the store entrance across the driveway.

### 18.     The ADAAG Does Not Preclude Diagonal Parking Spaces or Access Aisles.

Plaintiffs contend that diagonal parking spaces and/or access aisles at certain stores are too short. In particular, plaintiffs contend that:  (i) certain diagonal accessible parking spaces are too short because they do not extend for the full length of the adjoining diagonal access aisle (store #863, #2915, #3064, #3096, #3130, #18003); and/or (ii) certain access aisles are too short because they do not extend for the full length of the adjoining diagonal accessible parking space (store #459, #2915, #3064, #3119, #3130, #3145, #18003).

As an initial matter, Taco Bell challenges McSwain's measurement methodology, which is to measure only a portion of the striped van accessible parking space and/or access aisle that is located within a rectangular portion of the *combined* accessible parking space and access aisle, i.e., "on the square".  For example, McSwain measures perpendicular to the front end of the outside line striping for the access aisle (typically located on the passenger side of the vehicle in the van accessible parking space) that is furthest away from the van accessible parking space, and also measures perpendicular to

16

the bottom end of the outside line striping for the van accessible parking space.  Alternatively, McSwain measures perpendicular to the front end of the outside line striping for the van accessible parking space (or between 30 to 36 inches in front of the wheelstop in the van accessible parking space), and also measures perpendicular to the bottom end of the outside line striping for the access aisle.  Under either scenario, McSwain measures a rectangular area overlapping between the van accessible parking space and the access aisle.

By measuring the *combined* rectangular area overlapping between the van accessible parking space and access aisle, such measurements necessarily disregard the full length of the line striping for either the van accessible parking space or access aisle.  The ADAAG does not endorse such methodology.  If McSwain's measurement methodology was correct, then diagonal parking spaces would be precluded by the ADAAG because, as a practical matter, in order for the combined area located within the rectangular space measured by McSwain to be a minimum 18 feet length in compliance with California's standards (as requested by McSwain), the outside line striping for a diagonal van accessible parking space would need to be extremely long (i.e., 24-1/2 feet in length based on a 45 degree angle parking space).

The ADAAG, however, does not regulate the usage of diagonal parking spaces in order to comply with the minimum width standards for accessible parking spaces (i.e., 96 inches minimum for accessible spaces including van spaces; 60 inches minimum for access aisles except for van access aisles, which are 96 inches minimum).  Even under California's typically more restrictive standards, diagonal style of parking stalls and an adjoining access aisle are depicted in Fig. 11B-18C with no indication that the van accessible parking space and access aisle are to be measured "on the square" via a combined measurement.

Moreover, even assuming that McSwain's methodology is correct, which is disputed, the ADAAG does not contain any length standard for a van accessible parking space, standard accessible parking space, or access aisle.

Indeed, plaintiffs failed to challenge as noncompliant the diagonal parking spaces and access aisles at store numbers 3055 and 18003 in their 2006 Meet and Confer Charts.

17

19.     **The ADAAG Does Not Provide a Minimum Length Standard for Either an Accessible Parking Space or Access Aisle.**

McSwain challenges the length of the access aisle at store #3078 as not 18 feet in length.

The ADAAG does not provide a minimum length standard for a van accessible or standard accessible parking space or access aisle.  (See ADAAG 4.6.3 & Fig. 9.)  Indeed, Figure 9 of the ADAAG depicts an overhang of the back end of the depicted vehicle in the accessible parking space beyond the back end of the line striping for the stall.

20.     **The ADAAG Does Not Require that the Access Aisle Be Located on the Passenger Side.**

McSwain claims that the existence of the access aisle on the driver's side poses a barrier at store numbers 2961, 3078, 3498, 4622, and 15379.  The ADAAG, however, does not require that the access aisle be located on the passenger side.  In fact, Figure 9 of the ADAAG depicts a common access aisle that is on the driver's side, as referenced in ADAAG 4.6.3.  (ADAAG 4.6.3 & Fig. 9.)

21.     **The ADAAG Does Not Require Any Pavement Signage In the Van Accessible or Standard Accessible Parking Space.**

At store #2961, McSwain apparently claims that under the ADA there should be pavement signage depicting an ISA symbol in the back end of the accessible parking space.  The ADAAG, however, does not require any pavement surface ISA symbol or ISA logo in the van accessible parking space or standard accessible parking space.  (ADAAG 4.6.4.)

22.     **The ADAAG Does Not Require the Words "NO PARKING" Painted in the Access Aisle.**

The ADAAG does not require the words "NO PARKING" painted in the access aisle for either the van accessible parking space or standard accessible parking space.  (*See* ADAAG 4.6.4 & Fig. 9); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1145 (S.D. Cal. 2006) (Lorenz, J.).

23.     **The ADAAG Does Not Regulate with a Specific Standard the Minimum Height of Parking Signage.**

The ADAAG does not regulate the minimum height of parking signage via a specific standard.

18

1   Indeed, plaintiffs proposed installing parking signage with a bottom edge of 36 inches above the

2   ground at store #4633 in their 2006 Meet and Confer Charts.

3   **24.    The ADAAG Does Not Preclude the Accessible Route from an Accessible Parking**

4   **Space to Travel Behind Another Person's Parked Vehicle.**

5   McSwain challenges the accessible route from the accessible parking space to the store entrance

6   at store #1827, #2297, and #4622 because it requires traveling behind another person's parked vehicle.

7   The ADAAG, however, does not preclude the accessible route from an accessible parking space not to

8   traverse behind another vehicle nor does it require a separate path of travel outside of the drive aisle

9   used by motor vehicles.

10  **25.    Plaintiffs Contradict Themselves By Seeking to Use Accessible Seating From the**

11  **Narrow End at Store #137.**

12  At store #137, the trash can does not obstruct access to the outdoor accessible table because the

13  accessible route to the table does not overlap with the trash can at issue.  The accessible route to the

14  outdoor accessible table is at least 36 inches wide and only a 90 degree turn is contemplated.  Thus, the

15  trash can does not deprive any wheelchair-bound customer of the "full and equal" enjoyment of the

16  services at the store at issue.  *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-1496 DFL PAN, 2001 WL

17  1825832, at *5 (E.D. Cal. Dec. 21, 2001) (Levi, J.) ("[A]t trial, [plaintiff] must still prove that [the room

18  in question] contained actual barriers that hindered her access to the room; she cannot rely solely on the

19  [resort's] deviation from ADAAG to establish her Title III claim.") (emphasis added).

20  In addition, the tabletop under McSwain's proposed approach is the narrow end, which is less

21  than 30 inches wide.  McSwain has consistently taken the position elsewhere that an accessible tabletop

22  must be at least 30 inches wide in order to comply with ADAAG 4.32.3.  Thus, McSwain's position

23  contradicts his position elsewhere.  In other words, McSwain's apparent proposal would trigger

24  expanding the concrete walkway in front of the accessible table, which would, in turn, negatively impact

25  the parking space adjacent to the concrete walkway and driveway aisle as well.  Plaintiffs have failed to

26  meet their prima facie burden of showing that the removal of the alleged barriers identified by either

27  plaintiffs and/or the Special Master at the entrance at issue is readily achievable.  *Access Now, Inc. v.*

28  *South Florida Stadium Corp.*, 161 F. Supp. 2d 1357, 1368 (S.D. Fla. 2001) (Moore, J.) ("A finding of

19

noncompliance [with the ADAAG] is not tantamount to finding an ADA violation; plaintiff carries the additional burden of showing that removal of the barriers is readily achievable.”).

**26.     The ADAAG Does Not Require that an Accessible Route Connect Two Store Entrances.**

The ADAAG provides, “At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance.” (ADAAG 4.1.2(1).)  In addition, the ADAAG provides, “At least one accessible route complying with 4.3 shall connect accessible buildings, accessibility facilities, accessible elements, and accessible spaces that are on the same site.”  (ADAAG 4.1.2(2).)  To the extent that plaintiffs are relying upon ADAAG 4.1.2(2) for the proposition that an *exterior* accessible route must connect two accessible entrances, the ADAAG does not make that statement.  Indeed, plaintiffs ignore that there is nothing in the ADAAG that prevents Taco Bell from complying with 4.1.2(2) by ensuring an *interior* accessible route connecting two accessible building entrances.  Plaintiffs’ experts have failed to challenge any *interior* accessible routes connecting two accessible building entrances.

Indeed, plaintiffs failed to challenge as noncompliant the lack of an exterior accessible route connecting two accessible entrances at store number 21295 in their 2006 Meet and Confer Charts.

**27.     The ADAAG Does Not Necessarily Require Multiple Accessible Entrances.**

Although plaintiffs assume that multiple accessible entrances must be provided at each and every Taco Bell store, such assumption is wrong.  The ADAAG provides that in “new construction,” two separate requirements shall both be met:

(i) “At least 50% of all public entrances . . . must be accessible.”

(ii) “Accessible entrances must be provided in a number at least equivalent to the number of exits required by the applicable building/fire codes.”  (ADAAG 4.1.3(8)(a)(i)-(ii).)  This begs the question as to the number of exits required by the applicable building/fire codes.  Plaintiffs have made no attempt to demonstrate via their discovery responses in this action that Taco Bell has failed to satisfy both requirements.  In particular, plaintiffs have failed to demonstrate the number of required exits at a particular store based upon the particular building/fire code that is applicable to that particular store.

20

**28.    Taco Bell Has Complied with the Special Master's Recommendation to Install Directional Signage at Certain Stores in Lieu of More Extensive Modifications.**

Taco Bell has complied with the Special Master's recommendation to install directional signage directing disabled customers to use the accessible west entrance in lieu of the north entrance at store number 5523.

**29.    Secondary Entrances**

Plaintiffs failed to challenge as noncompliant secondary entrances at store number 2423 in their 2006 Meet and Confer Charts.  The apparent reason why plaintiffs failed to challenge such secondary entrances is that plaintiffs determined that the alleged barriers did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores via primary entrances or because the necessary modification work would not have been readily achievable.

Indeed, the Special Master has proposed directional signage as the solution at numerous stores including, but not limited to, store numbers 2918, 3145, 4558, and 17572.

In several instances, plaintiffs were silent as to the Special Master's proposed solution to install directional signage to the primary entrance of the facility (e.g., store numbers 3027, 4622, 5223, 15379, 15570).  Indeed, plaintiffs expressly proposed the installation of directional signage at store numbers 2861, 2930, 3064, and 16370.  At store number 2861, plaintiffs literally waited until their December 17, 2008 discovery response before changing their mind as to directional signage as the appropriate solution.  This omission constitutes evidence that such secondary entrance did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

**30.    Plaintiffs No Longer Challenge Directional Signage to the Accessible Entrance as a Solution.**

Although plaintiffs initially challenged the use of directional signage at certain Taco Bell stores via their Meet and Confer Charts, plaintiffs and their expert both now agree that directional signage to an accessible entrance is an acceptable solution at certain stores.  For example, at store #3948, the single door north entrance has a noncompliant landing slope, which is why Taco Bell has designated this entrance as inaccessible and installed signage directing disabled customers to use the accessible double door west entrance.  Plaintiffs, in their May 11, 2009 discovery response as to store #3948, and their

21

1   expert, Eric McSwain, in his May 1, 2009 declaration, failed to challenge the directional signage

2   solution implemented by Taco Bell in 2007.

3       **31.**    **The ADAAG Only Requires One Leaf to Be Accessible at a Double-Leaf Doorway**

4             **Intended to Be Accessible.**

5          ADAAG 4.13.4 provides that at a double-leaf doorway, only one leaf shall be accessible.  Thus,

6   the fact that one leaf is partially obstructed by the high chair at store #18901 is irrelevant.  It is

7   undisputed that the left leaf (outside looking into the store) was not obstructed by the high chair at issue.

8       **32.**    **The ADAAG Does Not Require ISA Signage at All Entrances Under All**

9             **Circumstances.**

10         The ADAAG provides accessible entrances shall be identified with the International Symbol of

11  Accessibility ("ISA") "when not all [entrances] are accessible."  (ADAAG 4.1.2(7)(c).)  "Inaccessible

12  entrances shall have directional signage to indicate the route to the nearest accessible entrance . . . ."  *Id.*

13         Thus, contrary to plaintiffs' position, not all accessible entrances must be identified with the ISA

14  under the ADAAG.  Indeed, plaintiffs failed to challenge as noncompliant the lack of an ISA decal on

15  the accessible door even though the door was intended to be accessible at store numbers 5223 and 15570

16  in their 2006 Meet and Confer Charts.

17      **33.**    **The ADAAG Does Not Regulate Exterior Door Opening Force.**

18         The ADAAG does not regulate exterior door opening force.  (*See* ADAAG 4.13.11) ("exterior

19  hinged doors:  (Reserved)"); *Chapman v. Pier 1 Imports*, No. CIV. S-04-1339 LKK CMK, 2006 WL

20  1686511, at *11 (E.D. Cal. June 19, 2006) (Karlton, J.) (granting summary judgment to the defendant as

21  to the entrance door opening force issue because it was only an issue under the California Building

22  Code) ("Plaintiff fails to cite to any section of ADAAG."); *Independent Living Resources v. Oregon*

23  *Arena Corp.*, 1 F. Supp. 2d 1124, 1155 (D. Or. 1998) (holding that exterior doors might justifying a

24  higher maximum opening force requirement, but there is no force standard for exterior doors).  This is

25  not surprising given the varying atmospheric conditions such as wind that affect the measurement of

26  force at an exterior door.  Indeed, McSwain admitted that his measurement of door opening force at

27  store #1034 was affected by "wind gusts".  (McSwain decl. Ex. 3 at 22.)

28

In *United States v. National Amusements, Inc.*, 180 F. Supp. 2d 251 (D. Mass. 2001) (Young, C.J.), the district court rejecting the U.S. Attorney General's attempt to rely upon the general provisions in the DOJ regulations in lieu of specific provisions. "[T]he Court concludes that the specific provisions of ADAAG control over the general provisions set forth in 28 C.F.R. sections 36.201-203. *Id.* at 259. "Compliance with a specific regulation must mean something; the Court rejects the Attorney General's attempt to render such compliance entirely meaningless by opening it to challenge under general regulatory provisions." *Id.* at 260.

### 34.     Plaintiffs Ignored a 9.5 Pound Door Opening Force Measurement in M&C Charts.

The ADAAG does not regulate the door opening force at an exterior entrance door.  (ADAAG 4.13.11.)  Indeed, the ADAAG indicates that the standard has been expressly "Reserved".  *Id.*

Plaintiffs' counsel proposed a maximum 9-1/2 pounds as an "acceptable measurement" in an email to defense counsel sent and received on February 15, 2006.

Plaintiffs failed to challenge as noncompliant the door opening force at an exterior entrance door though the door opening force was recorded at 9.5 pounds at store number 20052 in their 2006 Meet and Confer Charts.  Similarly, the Special Master proposed an 8-1/2 pound solution for exterior door opening force at many stores, *which plaintiffs largely ignored*.  These omissions constitutes evidence that the door opening force at these stores did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

### 35.     The ADAAG Does Not Require At Least 24 Inches of Pull Side Width Maneuvering Clearance Beyond the Strike Jamb at Exterior Doors.

Although McSwain claims that the door maneuvering clearance width for an exterior door on the pull side of an exterior door must be at least 24 inches beyond the strike jamb, the ADAAG provides an 18 inches minimum standard, based on a forward approach.  (ADAAG Fig. 25(a).)

Thus, McSwain's measurement of 21-3/4 inches width beyond the strike jamb on the pull side of the entrance door at store #2241 exceeds the 18 inches minimum standard set forth in the ADAAG. (ADAAG Fig. 25(a).)

### 36.     The ADAAG Does Not Require Interior Warning Signage at an Inaccessible Exit Door.

23

1    Although plaintiffs contend that the ADAAG requires interior warning signage at an inaccessible

2    exit door, the ADAAG does not require any signage at an inaccessible exit.  Thus, this issue is only

3    subject to Title 24.  Plaintiffs rely exclusively upon section 1007.7 of Title 24, which became effective

4    as of January 1, 2008, but that section, which addresses signage identifying the location of "accessible

5    means of egress", cannot apply to the store in question because "accessible means of egress" are not

6    required at "alterations to existing buildings".  It is undisputed that the stores at issue constituted an

7    existing building as of January 1, 2008.

8         **37.    Thresholds at Doorways**

9         McSwain challenges the certain alleged changes in level at or near thresholds at doorways at

10   stores such as store #176.

11        At store #176, Taco Bell's photographs depict little to no change in level at all.  (TBGT238319,

12   TBGT238242.)  In addition, Taco Bell challenges McSwain's measurement methodology because the

13   camera angle of his photo purporting to depict the height measurement of the change in level at issue is

14   clearly elevated. (*See* EM01077.)  Thus, McSwain's height measurement is distorted.  McSwain has

15   provided no explanation in his May 1, 2009 declaration as to why he did not use the plastic tool for

16   measuring door threshold height distributed by Evan Terry Associates (retained expert James Terry's

17   company) that McSwain has used to survey numerous other Taco Bell stores whenever a change in level

18   has arisen.  The Court can and should draw a negative inference that had such measurement tool been

19   used, the height measurement would have been less than McSwain's measurement.

20        Moreover, Taco Bell's policy of assisting disabled customers, including signage reflecting such

21   policy, constitutes a reasonable modification of its self-service policy.  *Hubbard v. 7-Eleven, Inc.*, 433 F.

22   Supp. 2d 1134, 1148 (S.D. Cal. 2006) (Lorenz, J.) (holding that coffee pots at the coffee counter and

23   other merchandise beyond reach ranges for disabled customers did not constitute an ADA violation

24   because of the store's policy of assisting customers including customer service signage); *Antoninetti v.*

25   *Chipotle Mexican Grill, Inc.*, No. 05CV1660-J (WMc), 2008 WL 111052, at *21 (S.D. Cal. Jan. 10,

26   2008) (Jones, J.) ("Policies and practices that provide substantially equivalent or greater access to and

27   usability of a facility constitute a form of equivalent facilitation.").

28

                                        24

The customer service solution implemented by Taco Bell does not deprive any wheelchair-bound customer of the "full and equal" enjoyment of the services at the store at issue.  *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-1496 DFL PAN, 2001 WL 1825832, at *5 (E.D. Cal. Dec. 21, 2001) (Levi, J.) ("[A]t trial, [plaintiff] must still prove that [the room in question] contained actual barriers that hindered her access to the room; she cannot rely solely on the [resort's] deviation from ADAAG to establish her Title III claim.") (emphasis added).

Moreover, plaintiffs failed to challenge as noncompliant thresholds at doorways that were ½ inch, which existed at store number 3055 in their 2006 Meet and Confer Charts.  This omission constitutes evidence that such thresholds did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

**38.     The ADAAG Does Not Contain Any Enforceable Standard as to Floor Mats.**

In *Wilson v. Pier 1 Imports (US), Inc.*, 439 F. Supp. 2d 1054, 2006 WL 1991450 (E.D. Cal. July 14, 2006) (Karlton, J.), the district court held that door mats are not a barrier covered by the ADAAG.  *Id.* at 1073.  Similarly, in *Wilson v. Norbreck, LLC*, No. 04-cv-00690-DFL-JFM, 2005 WL 3439714, at *4 (E.D. Cal. Dec. 14, 2005) (Levi, J.), the district court held that the ADA does not apply to floor mats.  *Id.* at *5; *see also White v. Divine Investments, Inc.*, No. CIV. S-04-0206 FCD/DA, 2005 WL 2491543, at *6 (E.D. Cal. Oct. 7, 2005) (Damrell, J.) (holding that floor mats are not "carpets" regulated by ADAAG 4.5.3), *aff'd mem*, 286 Fed. Appx. 344, 2008 U.S. App. LEXIS 12221 (9th Cir. June 5, 2008).

Most recently, in *Doran v. 7-Eleven Inc.*, No. SACV 04-1125 JVS (ANx), slip op. (C.D. Cal. Dec. 22, 2008) (Selna, J.), the district court held that floor mats are "furnishings" that are not covered by the ADAAG.  *Id.* at 6.  The ADAAG Manual provides, "Furniture, furnishings, and equipment not fixed to building construction are not scoped or specified in ADAAG . . . ."  (ADAAG Manual at 7.)

**39.     High Chairs Are Full Service Items Requiring Customer Service for a Disabled Customer to Use.**

McSwain contends in his declaration that the high chairs at store #3064 are inaccessible because they are in an "alcove" between a standard dining room table and an interior wall in the dining room.  McSwain assumes that a high chair is a self-service item for the mobility-impaired.  McSwain's assumption is mistaken.  There are three types of high chairs currently used at Taco Bell's stores.  One

25

style is wooden.  The other two styles are plastic.  Depending on the style, the weight of a high chair ranges between 17-20 pounds.  Plaintiffs experts have failed to proffer any expert testimony indicating that the average mobility-impaired patron can be expected to use high chairs without assistance.  Thus, the high chair is a full service item for the mobility-impaired that requires customer service from a Taco Bell employee.

**40.     The Advertising Stand at Store #3904 Does Not Deprive Access Because the ADAAG Permits a Vertical Change in Level of Up to ¼ Inch in the Accessible Route.**

At store 3904, plaintiffs challenge the advertising stand as an obstruction to the accessible route to the service counter.  The ADAAG provides that an accessible route can be 32 inches wide for 24 inches of depth.  (ADAAG 4.3.3, 4.13.5, Fig. 24(e).)  The base of the advertising stand at issue created a change in level of ¼ inch or less (see EMP033503), which is compliant under the ADAAG.  (ADAAG Fig. 7(c).)  Thus, the change in level due to the base of the advertising stand did not deprive any disabled customer of the full and equal enjoyment of Taco Bell's services.

**41.     The ADAAG Provides that Only One Service Counter with a Cash Register Should Be Accessible.**

The ADAAG provides a 36 inches AFF maximum height for service counters with cash registers, for a 36 inches length.  (ADAAG 7.2(1).)   Only one service counter with a cash register is required to meet this standard.  Plaintiffs' contrary position ignores ADAAG 7.2(1).  Indeed, the Special Master treated the ADAAG's counter space standard as applicable to a service counter containing two cash registers and measured the counter space for only one of the two cash registers at the single, long counter at store #955.  *Plaintiffs failed to challenge as noncompliant the service counter space even though the clear space was less than 36 inches length at store number 955* in their 2006 Meet and Confer Charts.

Indeed, although plaintiffs raised the accessibility of the secondary cash register at store #4466, plaintiffs' expert, Eric McSwain, omitted the issue in his May 1, 2009 expert report.

**42.     The Alleged Obstructions on Accessible Service Counters Did Not Deprive Plaintiffs of Full and Equal Enjoyment of the Services Offered By Taco Bell.**

26

Case No. 02-5849 PJH JL                    TBC's Mot. Partial Summ. J.
OC 286,421,313v1

Plaintiffs challenge the length of accessible counters at store numbers 991, 2241, 2915, 2933, 3208, 3209, 3390, 3471, 4311, 21453, 22691, and 22871.  The ADAAG provides a 36 inches minimum length standard for service counters with cash registers.  (ADAAG 7.2(1).)  Only one service counter with a cash register is required to meet this standard.  Given that the advertising placards, donation banks, napkin dispensers, and drink cups surveyed by McSwain did not pose an obstruction because they were lightweight, portable, and easily moved during a transaction, an accessible service counter at these stores that had at least 36 inches length of clear space existed at the time of McSwain's surveys.

**43.    The ADAAG Provides a 36" AFF Maximum Height for Service Counters with Cash Registers.**

McSwain noted that the height of service counters at store numbers 283, 757, 2861, 3055, 3070, 3078, 3184, 3579, 4284, 4704, 5138, 5223, 5512, 9414, 9489, 16276, 16370, 16812, 17224, and 20310 exceeded 34 inches AFF.  This is irrelevant to the ADA.

The ADAAG provides a 36 inch AFF maximum height for service counters with cash registers.  (ADAAG 7.2.)  Indeed, the Special Master expressly noted that "ADAAG allows 36" high countertops" in his Pilot Program Survey Report for store #2423.  The Special Master indicated that the 36 inches AFF service counter height was compliant at store #16812.  *Id.*  The Special Master also indicated that the 35-1/2 inches AFF service counter height was compliant at store #20310.

The Special Master also noted in his Pilot Program Survey Report for store #4704 in regards to a service counter that he measured at 36-5/8 inches AFF, "A countertop that is 5/8 higher than the code allows is not an architectural barrier.  In its existing configuration[,] the countertop is usable by disabled and non-disabled customers."

This is why modifications were not made as to the existing service counter height at store numbers 3184, 4284, 4704.

Plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the height of service counters even though they exceeded 34" AFF according to the Special Master as follows:   37 inches AFF at store number 2423; between 37 and 36-3/4 inches AFF at store number 2861; 36-5/8 inches AFF at store number 4704; between 36-3/8 and 36-1/4 inches AFF at store number 5138; between 36-1/2 to 36-1/4 inches AFF at store numbers 4466; between 36-1/4 to 36 inches AFF at store

27

number 9489; 36 inches AFF at store numbers 283, 3055, 3078, 3579, 4284, 9414, 16276; between 36 inches to 35-3/4 inches AFF at store number 16370; 35-7/8 inches at store number 3070; 35-5/8 inches at store number 5512.[2]

These omissions constitutes evidence that the height of such service counters did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

At store #5138, the existing service counter complies with the 36 inches AFF ADAAG standard for service counters with cash registers.  (ADAAG 7.2(1).)  McSwain's two measurements range between exactly 36 inches AFF and 36-3/8 inches.  The location of McSwain's 36-3/8 inches measurement, depicted in EMP021394, is flawed because that measurement was taken on the corner of the service counter that is not the location of the accessible counter.  The second measurement of 36 inches AFF, depicted in EMP021393, is directly across from the cash register next to the accessible service counter with a 36 inches length distance.

**44.     The So-Called "Low Shelves" In Front of the Remodeled Service Counters Protrude Less Than Ten Inches and Permit a Side Approach to the Service Counter.**

At store number 22691, plaintiffs challenge the usability of the service counters at remodeled stores insofar as they contain a so-called low shelf in front of the accessible service counter, which is intended merely for aesthetics and not actual usage by any customer.  Plaintiffs ignore that the shelf has a depth of less than 10 inches and so it does not preclude a side reach to the service counter via a parallel approach.  (ADAAG Fig. 6(a).)  The ADAAG does not require a forward approach to a service counter.

**45.     The ADAAG Does Not Require a Forward Reach to Use a Drink Dispenser:  Floor Sinks Do Not Affect the Usability of Drink Dispensers.**

Although plaintiffs contend that certain floor sinks pose an obstruction to the use of the drink dispenser at store numbers 1687, 3007, 3053, 3129, 5138, 5223, 15362, 15570, 16140, 16276, 16336, 16381, 17363, 17471, 17576, 17751, 18112, 19298, 19498, 20052, 20180, 20578, 21000, and 21343, plaintiffs are wrong.  As an initial matter, plaintiffs' analysis is premised exclusively upon a forward

---

[2]     Taco Bell voluntarily modified the service counter height at stores #2423, #4466.

Case No. 02-5849 PJH JL                          TBC's Mot. Partial Summ. J.
OC 286,421,313v1

approach to the drink dispenser.  Plaintiffs ignore that a side reach is feasible at each of the stores in which the floor sinks are at issue, and such side reach does not overlap with any floor sink.

Even under a forward reach, there is nothing to indicate that the two small front wheels of a standard wheelchair would be obstructed by the floor sink at issue.  A standard wheelchair's footrest is elevated, (ADAAG Fig. 5), and up to 6 inches of clear floor space can count towards toe clearance, (ADAAG Fig. 31), which necessarily means that the front wheels are no closer than 6 inches from the front end of the footrest.  Indeed, even under a forward approach, plaintiffs failed to challenge as noncompliant the identical floor sinks at store numbers 1687 and 21343 in their Meet and Confer Charts even though the Special Master surveyed and photographed the identical floor sinks underneath identical drink tables that continue to exist unmodified to date.  This omission constitutes evidence that such floor sinks did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

In addition, plaintiffs ignore that section 114193 of the California Retail Food Code requires that floor sinks must be readily accessible for inspection and cleaning.  Plaintiffs' relocation request would "fundamentally alter" the services and accommodations provided by Taco Bell by causing the floor sink to not be accessible for inspection and cleaning.  42 U.S.C. § 12182(b)(2)(A)(ii).

### 46.    The ADAAG Allows a 54 Inch Side Reach Maximum Over "Obstructions", and the ADAAG's Sliding Scale of Side Reach Ranges for ATMs Applies to Non-ATM Elements.

Although plaintiffs contend that various elements such as the pickup counter, drink table, and condiment counter all pose an obstruction that is subject to an absolute 34" AFF maximum standard, which is exceeded at certain counters, plaintiffs are wrong.  ADAAG Fig. 54 clearly depicts a 54 inch side reach maximum over items that clearly exceed 34 inches AFF.  ADAAG Fig. 54 is expressly cited in ADAAG 5.6.  Indeed, the Special Master's proposed solution for relocating items within an accessible side reach made no mention of any 34 inch AFF maximum height for any obstruction posed by the leading edge of a pickup counter, drink table, or condiment counter.

In addition, side reach ranges set forth in ADAAG § 4.34.3(2)(b) are applicable to non-ATM elements.  In particular, plaintiffs expressly cited and relied upon the reach range table set forth in

29

ADAAG 4.34.3(2)(b) in their M&C charts as to non-ATM elements at store numbers #4027, #4704, #5138, and #19591.

Plaintiffs' contrary interpretation leads to absurd results.  For example, although plaintiffs contend in numerous instances that the drink dispenser table itself poses an obstruction that is subject to an absolute 34" AFF maximum standard, which is exceeded by the so-called "tray slides" or parallel raised edges, it is beyond dispute that the raised edges are well beyond the front edge of the drink table. Thus, unless a customer were to reach horizontally at a height of approximately 34 inches AFF, a customer would not come into contact with such raised edges.  Given Fig. 54, plaintiffs' interpretation of how customers are expected to exercise their reach ranges is wrong.

  (a)  **The Pickup Counter Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standard.**

Indeed, plaintiffs failed to challenge as noncompliant the height of the pick up counter at store numbers 1034 and 3089 in their Meet and Confer Charts even though the Special Master measured the height as exceeding 34 inches AFF.

Similarly, plaintiffs failed to challenge as noncompliant the height of the pick up counter at store number 3078 in their Meet and Confer Chart even though the Special Master measured the height as exceeding 34 inches AFF.

  (b)  **The Drink Dispenser Table Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standard.**

Indeed, plaintiffs fail to challenge as noncompliant the height of the so-called tray slides on the drink table at store number 20190 even though their retained expert, Eric McSwain, claims *inconsistently* that the counter height is 34-1/4" AFF and elsewhere claims the height is 34-1/2" AFF. To make matters worse, the Special Master measured the identical so-called tray slide as a compliant 34" AFF.  If plaintiffs and their retained expert genuinely believe that the raised edges on the drink table pose an obstruction, then they should have raised it in connection with element 339.  Their failure to do so is telling.

Case No. 02-5849 PJH JL       TBC's Mot. Partial Summ. J.
*OC 286,421,313v1*

Similarly, plaintiffs failed to challenge as noncompliant the height of the so-called tray slides on the drink table at store number 18901 in their Meet and Confer Chart even though the Special Master measured the height as exceeding 34 inches AFF.

The Special Master recorded the height of the so-called tray slide at store #15362 as compliant even though it was 36-1/4 inches AFF.

Plaintiffs also failed to challenge as noncompliant tri-level drink lid dispensers contained on a drink table requiring a reach of approximately 48" above the floor with a lateral reach that exceeded 10 inches, which existed at store number 2984 in their 2006 Meet and Confer Charts.  This omission constitutes evidence that such counters did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

### (c)   The Condiment Counter Is Not an "Obstruction" to a Dispenser That Is Subject to a 34" AFF Maximum Standard.

Indeed, plaintiffs failed to challenge as noncompliant dispensers contained on two-tiered condiment counters that were approximately 42-1/4 inches AFF that existed at store numbers 1934 and 5019 and also failed to challenge dispensers on single-level condiment counters that were approximately 40-1/2 inches AFF that existed at store numbers 2423, 2861, 2984, 3184, 4622, 5513, 5539, 5641, 15614, 16336, 16909, 17243 in their 2006 Meet and Confer Charts.  Plaintiffs also failed to challenge dispensers on single-level condiment counters that were approximately 34-3/8 inches AFF that existed at store number 15625 in their 2006 Meet and Confer Charts.  The apparent reason why plaintiffs failed to challenge such dispensers is that plaintiffs were previously amenable to relying upon the ATM reach range set forth in ADAAG § 4.34.3(2)(b).  In particular, with respect to the drink dispenser at store #4027, plaintiffs stated in their Meet and Confer Chart, "See DOJ Stds. § 4.34.3(2)(b).  At 49½" height, 18" is the maximum lateral reach."  In other words, plaintiffs freely cited and relied upon the reach range table set forth in ADAAG 4.34.3(2)(b) regardless of the fact that it expressly relates to reach ranges to use an ATM machine.

This omission constitutes evidence that such condiment counters did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

1        Indeed, plaintiffs' Meet and Confer Chart for store #5259 proposes that drink lids be relocated

2   on top of the condiment counter despite its height above 34 inches AFF.

3        **47.      Plaintiffs' Experts' Measurement of Reach Ranges at Tableware and Condiment**

4                 **Dispensers Is Flawed.**

5        Plaintiffs' expert, Eric McSwain, has measured various tableware and condiment dispensers to

6   the back end of the dispenser including, but not limited to, bulk drink carriers.  Taco Bell challenges

7   such measurement methodology.  Indeed, the Special Master has repeatedly made centerline

8   measurements of lateral reach to tableware and condiment dispensers.  Indeed, McSwain's measurement

9   methodology at store #21453 is worth noting given that McSwain's lateral reach measurement was not

10  to the back end of the drink carrier, but rather only to the front end as depicted in his photos Bates-

11  labeled as EM14496-EM14497.  Thus, McSwain's measurement methodology is flawed.

12       In addition, in measuring the height of reach ranges relating to the drink tables, McSwain

13  measured to the top of the parallel ridges on top of the drink table, which is flawed because the

14  dispensers or self-service items at issue without dispensers (e.g., drink carriers) were not placed on top

15  of the parallel ridges.  Thus, McSwain's height measurements are flawed because they overstate the

16  actual height.

17       **48.      Plaintiffs' Apparent Position that Duplicate Dispensers Dispensing the Same Item**

18                 **Need to Be Within Reach Ranges Is Flawed.**

19       Plaintiffs' expert noted that a job applications dispenser was provided within a "compliant

20  reach" on the main service counter at store #2918, but nevertheless measured a wall-mounted job

21  applications dispenser as noncompliant.  (McSwain decl. Ex. 3 at 56.)  To the extent that plaintiffs imply

22  that each and every control or dispenser throughout a Taco Bell store must be within reach ranges even

23  if they are duplicative, plaintiffs' position is wrong.  *See Harris v. Costco Wholesale Corp.*, 389 F.

24  Supp. 2d 1244, 1251 (S.D. Cal. 2005) (Lorenz, J.) (holding that there was no ADA violation regarding

25  toilet paper dispenser distance to rear wall because one of two dispensers satisfied the 36 inch maximum

26  distance); *see also* (ADAAG 4.23.7) ("If controls, dispensers, receptacles, or other equipment *are*

27  provided, *then* at least one of each shall be on an accessible route and shall comply with 4.27.").

28

                                                32

49.   **Many Site Inspections Occurred Before Taco Bell's Stores Opened to the Public, Depriving Taco Bell of the Opportunity to Organize and Get the Stores Ready for Operations.**

Many of McSwain's site inspections occurred before stores were open for business to the general public and had restocked various condiment bins and other items.  Thus, McSwain's inspections are misleading to the extent that he documented store conditions before the store was open for business.

50.   **The Drink Dispenser Table Is Not Subject to a 34" AFF Maximum Standard Because It Is Not a "Food" Service Line.**

ADAAG 5.5 provides, "Tray slides shall be mounted no higher than 34 in (865 mm) above the floor (see Fig. 53)."  ADAAG 5.5 expressly pertains to "Food service lines" only and does not apply to drink dispensers.  Rather, self-service beverage dispensing devices are subject to ADAAG 5.6, which depicts Fig. 54.  Fig. 54 depicts a 54 inch side reach maximum over items that clearly exceed 34 inches AFF.  Thus, plaintiffs' assertion that a drink table cannot exceed 34 inches AFF is wrong.

Plaintiffs' request in their M&C charts to "[a]djust legs of the drink dispenser unit" reflects plaintiffs' lack of awareness that Taco Bell is compelled by California law to ensure 6 inches of clearance underneath the legs of the drink dispenser unit.  The California Retail Food Code provides, "[F]loor-mounted equipment that is not easily movable shall be sealed to the floor or elevated on legs that provide at least a six-inch clearance between the floor and the equipment."  (Cal. Retail Food Code § 114169.)

51.   **Plaintiffs Cannot Contradict Their Prior Request for Additional Accessible Seating at a Particular Area in the Dining Room.**

Plaintiffs' expert currently seeks to contradict the location of additional accessible seating previously installed at the request of plaintiffs via their M&C chart at store numbers 18808 because it is purportedly not dispersed.  Insofar as plaintiffs affirmatively requested the location of the accessible seating that was subsequently installed, this circumstance constitutes evidence that the location of such new accessible seating did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

52.   **The ADAAG Does Not Require that Accessible Seating Accommodate Companions.**

33

Plaintiffs' expert complains about the lack of four seat tables at store numbers 4633 and 4799. Plaintiffs' expert acknowledges that there are two seat accessible tables at these two stores.

There is no authority requiring that accessible seating have four-seat tables or frankly any minimum number of companions at the accessible table. In fact, the case law indicates that companion seating is not required.  In *Sanford v. Del Taco, Inc.*, No. CIV-S-04-1337-DFL/CMK, 2006 WL 1310318, at *2 (E.D. Cal. May 12, 2006) (Levi, J.), the district court held that tables do not have to be large enough to accommodate a companion at the very same table at which a disabled patron is seated. *Id.*

### 53.    The ADAAG Does Not Require Counter or Booth Seating to Be Accessible.

McSwain challenges the absence of accessible seating at the dining counter at store #459.

The Special Master's Interim Survey Report identified at store #459 a total of 26 seats and 2 designated seating positions (both of which have been subsequently modified), which is 7.7% (i.e., above the 5% min. standard set forth in the ADAAG.  (ADAAG 5.1.)  Even assuming that 2 seats were added (there are 4 counter seats currently depicted by McSwain whereas the Special Master depicted only 2 counter seats), that would still be 7.1%.  McSwain's implicit argument that the counter seating constitutes a different area than the fixed tables is without merit.  *Wilson v. Norbreck, LLC*, No. 04-cv-00690-DFL-JFM, 2005 WL 3439714, at *6 (E.D. Cal. Dec. 14, 2005) (Levi, J.) (holding that booths in a cocktail lounge sitting on an inaccessible raised platform are not a "dining area", but rather the cocktail lounge as a whole is a dining area)(holding that because the plaintiff failed to show that the cocktail lounge is itself inaccessible, there is no violation); *Sanford v. Del Taco, Inc.*, No. 04-cv-2154-GEB-EFB, 2006 WL 2669351, at *3 (E.D. Cal. Sept. 18, 2006) (Burrell, J.) ("[T]here is no requirement that both table and booth seating be accessible as Plaintiff asserts.").

### 54.    McSwain Has Failed to Propose Any Specific Location for the Accessible Seating in Order to Be "Well" Dispersed.

McSwain claims that the accessible tables at store #18003 are not "well dispersed."  ADAAG 5.1 provides, "In new construction, and where practicable in alterations, accessible fixed tables (or counters) shall be distributed throughout the space or facility."

Case No. 02-5849 PJH JL                              TBC's Mot. Partial Summ. J.
*OC 286,421,313v1*

McSwain, however, fails to propose any specific location for the new accessible table that was previously installed in response to the Special Master's proposed location at store #18003 and #18808. In fact, at store #18808, Taco Bell installed the third accessible table in precisely the location requested by both the Special Master in his Interim Survey Report and plaintiffs in their M&C chart.

**55.    The ADAAG Does Not Regulate Emergency Exits in Existing Facilities.**

McSwain incorrectly assumes that the emergency exits at stores #2961 and #2968 must be accessible.  ADAAG 4.1.3(9) provides, "In buildings or facilities, or portions of buildings or facilities, required to be accessible, accessible means of egress shall be provided in the same number as required for exits by local building/life safety regulations."  ADAAG 4.1.6(g), however, provides, "In alterations, the requirements of 4.1.3(9) . . . do not apply."  Thus, ADAAG 4.1.3(9), which applies to "new construction," does not apply to older facilities like the store at issue, which the parties stipulated as built on July 1, 1986.  (*See* Pls.' M&C Cht at 1.)  Indeed, the Special Master did not even address the emergency exit in his Interim Survey Report and plaintiffs omitted it in their 2006 Meet and Confer Chart.

**56.    The ADAAG Provides a 48 Inch Maximum Height Standard for Door Hardware, Which Should Be Measured From Its Centerline.**

The ADAAG provides, "Hardware required for accessible door passage shall be mounted no higher than 48 in (1220 mm) above finished floor."  (ADAAG 4.13.9.)  Thus, plaintiffs' application of a 44 inch standard is wrong.

In addition, plaintiffs' assumption that door hardware should be measured at the top instead of the centerline is erroneous.  The Special Master measured to the centerline of the door hardware.  At store numbers 2918 and 4343, for example, the Special Master measured the push plate and the pull handle both at 37 inches above the floor based upon a *centerline* measurement.  Plaintiffs also failed to challenge the *centerline* measurement of door hardware including door locks, push plates, and pull handles at store numbers 2918 and 4343.

Plaintiffs failed to challenge as noncompliant the height of the door hardware including the deadbolt latch mechanism inside restrooms, which existed at store number 2918 in their 2006 Meet and

35

Confer Charts.  These omissions constitute evidence that the height of such restroom door locks did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

In addition, McSwain's contention that the interior handle at the south entrance at store #4284 is too high ignores the clearly visible push bar located below the handle.  The push bar is well below 48 inches AFF.

### 57.  <u>This Court Has Already Ruled that Plaintiffs Lack Standing to Litigate Hardware</u>.

In *Moeller v. Taco Bell Corp.*, No. C 02-5849 MJJ, 2005 WL 1910925 (N.D. Cal. Aug. 10, 2005) (Jenkins, J.), this Court held that plaintiffs in this action lack standing to sue for barriers affecting persons with limited use of their hands and arms such as the lack of continuous delivery of toilet paper and hardware (doors, locks, faucets, flush controls).  "Simply stated, the Plaintiff class has not been defined as to encompass persons with limited use of their hands and arms without regard to mobility." *Id.* at *4; *see also Harris v. Del Taco, Inc.*, No. SACV 04-730 DOC (MLGx), 2004 WL 3744291, at *3 (C.D. Cal. Sept. 13, 2004) (Carter, J.) ("[P]laintiff lacks standing to challenge those violations of the ADA that he observed at Defendants' restaurant that are not related to his disability of *limited mobility*.") (emphasis added).  Thus, Taco Bell need not address such elements.

### 58.  **The Measurement of Door Opening Force Does Not Apply to the Force Required to Engage or Disengage Devices Including Bolts Used to Keep the Door in a Closed Position.**

The ADAAG Manual, published by the Access Board, which is the author of the ADAAG, addresses the methodology for measuring opening force in relevant part as follows, "The maximum force pertains to the continuous application of force necessary to fully open a door, not the initial force needed to overcome the inertia of the door.  *It does not apply to the force required to retract bolts or to disengage other devices used to keep the door in a closed position*."  (ADAAG Manual at 58) (emphasis added).  Likewise, there is no door closing force maximum standard in the ADAAG.  Thus, plaintiffs' measurement of the force relating to engaging or disengaging bolts or other devices at certain stores is irrelevant.

### 59.  **The ADAAG Standard for Pull Side Depth Maneuvering Clearance Is 48 Inches Minimum If the Restroom Door Does Not Have a Closer.**

36

1   Plaintiffs rely exclusively upon a front or forward approach from the pull side of the restroom

2   door.  Plaintiffs ignore that as long as the restroom door does not have a closer, the standard is only 48

3   inches minimum based on a latch side approach.  (ADAAG Fig. 25(c).)  Even with a closer, the standard

4   is only 54 inches.  *Id.*

5   Thus, McSwain's measurements of pull side depth at store #124 (men's RR) is compliant under

6   the ADAAG.

7   McSwain's exclusive reliance upon a front/forward approach is misplaced at both restrooms at

8   store #3064.  Based on a latch side approach, the depth standard is only 54 inches even with a door

9   closer under the ADAAG to the extent that there is 24 inches minimum pull side width beyond the strike

10   jamb.  There is sufficient pull side width based upon McSwain's photos EMP010945 (men's RR) and

11   EMP011026, EMP011028 (women's RR) at store #3064.

12   At store number 19344, the Special Master measured the pull side depth maneuvering clearance

13   outside the women's restroom as 47-1/2 inches and observed that the "wall cannot be relocated,"

14   essentially applying the "technically infeasible" defense.  (28 C.F.R. Pt. 36, App. A, ADAAG, §

15   4.1.6(1)(j).)  The Special Master also noted that the "projection into clear floor space is insignificant."

16   Given that the restroom had a closer as recorded by the Special Master (element 537), the applicable

17   ADAAG standard was 54 inches minimum depth at the time of the Special Master's survey.  Thus, it is

18   significant that the 6-1/2 inch gap between the then-applicable 54 inch ADAAG standard and the 47-1/2

19   inch measurement was deemed to be "insignificant" by the Special Master.

20   Indeed, plaintiffs failed to challenge as noncompliant the men's restroom pull side depth at store

21   number 20180 in their Meet and Confer Chart even though the Special Master measured the depth as 58

22   inches.

23   These omissions constitutes evidence that the maneuvering clearance pull side depth did not

24   deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

25   **60.   The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Pull**

26   **Side Depth Clear Floor Area.**

27   The ADAAG provides a "technically infeasible" defense that applies to the pull side depth clear

28   floor area.  (28 C.F.R. Pt. 36, App. A, ADAAG, § 4.1.6(1)(j).)  Indeed, the Special Master made such

37

1  determination in his Interim Survey Reports as to store numbers 829 (men's RR), 3112 (men's RR),

2  3145 (women's RR), 3390 (men's RR), 4325 (women's RR), 19344 (women's RR), 20180 (women's

3  RR), 20353 (men's RR).

4      **61.    Stub-Out Walls or Wing Walls Pose No Obstruction to Usability of Restroom Door.**

5          Even if the Court does not find that Taco Bell's modifications have rendered certain issues moot,

6  plaintiffs failed to challenge as noncompliant the pull side depth maneuvering clearance inside

7  restrooms that have stub out walls, which existed at store number 829 in their 2006 Meet and Confer

8  Charts.  At store #829, assuming that the pull side depth is 44-7/8 inches as measured by the Special

9  Master instead of the "approximately 42" measurement taken by plaintiffs' experts (without any

10  photographic documentation of such measurement), the pull side depth shortfall is a mere 3-1/8 inches,

11  based on a 48 inches pull side latch standard.  (ADAAG Fig. 25(c).)

12          Similarly, plaintiffs failed to challenge as noncompliant the pull side depth maneuvering

13  clearance inside restrooms that have wing walls, which existed at store number 2961 in their 2006 Meet

14  and Confer Charts.  These omissions constitute evidence that such stub out walls or wing walls did not

15  deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.  Indeed,

16  the Special Master indicated that the stub out wall in the women's restroom at store #829 was "no

17  obstruction".  Similarly, the Special Master noted that the stub out wall at store #4284 was not a barrier.

18  In particular, the Special Master stated regarding the pull side depth maneuvering clearance, "offset does

19  not affect compliant function of the door".

20          Given that this store was constructed before January 26, 1993, the ADAAG provides merely

21  "guidance" only.  *Mannick v. Kaiser Foundation Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL

22  1626909, at *6 (N.D. Cal. June 9, 2006) (Hamilton, J.) ("Although existing facilities are not required to

23  comply with the ADAAG (unless they have been altered), the ADAAG nevertheless provides guidance

24  for determining whether an existing facility contains architectural barriers.") ("deviations from the

25  ADAAG are not necessarily determinative in establishing barriers to access").

26          This small shortfall does not deprive any wheelchair-bound customer of the "full and equal"

27  enjoyment of the services at the store at issue.  *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-1496

28  DFL PAN, 2001 WL 1825832, at *5 (E.D. Cal. Dec. 21, 2001) (Levi, J.) ("[A]t trial, [plaintiff] must still

38

prove that [the room in question] contained actual barriers that hindered her access to the room; she cannot rely solely on the [resort's] deviation from ADAAG to establish her Title III claim.") (emphasis added).

Moreover, Taco Bell's policy of assisting disabled customers, including signage reflecting such policy, constitutes a reasonable modification of its self-service policy.

Finally, plaintiffs have failed to meet their prima facie burden of showing that the removal of the alleged barrier is readily achievable. *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F. Supp. 2d 1357, 1368 (S.D. Fla. 2001) (Moore, J.) ("A finding of noncompliance [with the ADAAG] is not tantamount to finding an ADA violation; plaintiff carries the additional burden of showing that removal of the barriers is readily achievable.").

**62.    The ADAAG Standard for Push Side Depth Maneuvering Clearance Is 42 Inches Minimum If the Restroom Door Does Not Have a Closer.**

Plaintiffs rely exclusively upon a front or forward approach from the push side of the restroom door, which is typically in the corridor outside a restroom.  Plaintiffs ignore that as long as the restroom door does not have a closer, the standard is only 42 inches minimum based on a latch side approach. (ADAAG Fig. 25(c).)

At store number 3160, the Special Master determined that 43-7/8 inches was "within tolerance" for a push side depth maneuvering clearance.  Indeed, the Special Master determined that the push side depth measurements taken at the following stores were compliant even though the depth was less than 48 inches:  store #4211 (44-5/8 inches--men's RR); store #4284 (45-1/2 inches--women's RR); store #4633 (43-3/4 inches--women's RR).  At store number 3007, the Special Master expressly stated that the applicable standard was only 44 inches, presumably based upon the California standard.  The Special Master would have expressed the lower ADAAG standard of 42 inches if that was the only standard that he was considering.

Indeed, plaintiffs failed to challenge as noncompliant restroom push side depth maneuvering clearances at the following stores in their Meet and Confer Charts even though such measurements were less than 48 inches depth:  store #829 (44-1/8 inches--men's RR); store #2918 (44 inches--men's RR); store #4027 (45-5/8 inches--men's RR); store #4311 (45 inches--men's RR); store #4325 (44-1/2 inches-

39

-women's RR); store #5138 (43-1/2 inches--women's RR); store #5513 (44 inches--women's RR); store #17224 (46 inches--women's RR); #18377 (44 inches--women's RR); #21343 (45 inches--women's RR).

These omissions constitutes evidence that the maneuvering clearance push side depth did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

At store number 4704, plaintiffs failed to challenge as noncompliant the men's restroom push side depth in their Meet and Confer Chart apparently given that the Special Master measured the depth as 48 inches. Plaintiffs had their attorney attend such site inspection, which was part of the Pilot Program, so there is no excuse for plaintiffs to claim that they were unfamiliar with the Special Master's measurements taken at this particular store. It is unfair for plaintiffs to have taken the position that the Special Master's measurement should be adopted in full as 100% accurate, but to later challenge the Special Master's measurements as inaccurate years later.

### 63. The ADAAG Provides a "Technically Infeasible" Defense that Applies to the Push Side Depth Clear Floor Area.

The ADAAG provides a "technically infeasible" defense that applies to the push side depth clear floor area. (28 C.F.R. Pt. 36, App. A, ADAAG, § 4.1.6(1)(j).) Indeed, the Special Master made such determination in his Interim Survey Reports as to store numbers 955 (women's RR), 3184 (men's RR), 4343 (women's RR), 4558 (women's RR), 4617 (women's RR), 4622 (women's RR), 4799 (women's RR), 5081 (women's RR), 5512 (women's RR), 5636 (women's RR), 5641 (women's RR), 19509 (men's RR and women's RR).

### 64. The ADAAG Does Not Regulate the Extent to Which a Restroom Door Is Permitted to Swing Into the Wheelchair Turning Space.

At store #3184, McSwain challenges the extent to which the women's restroom door swings into the wheelchair turning space.

The ADAAG is silent as to the extent to which a restroom door is permitted to swing into the wheelchair turning space. Indeed, the proposed ADAAG 603.2.3 clarifies, "Doors shall be permitted to swing into the required turning space."

### 65. Movable Objects Such as Trash Cans Are Not Architectural Barriers.

40

The ADA only applies to "architectural barriers," 28 C.F.R. § 36.304(a), and not temporary or movable barriers. *Martinez v. Home Depot USA, Inc.*, No. Civ. S-04-2272 DFL DAD, 2007 WL 926808, at *4-*5 (E.D. Cal. Mar. 27, 2007) (Levi, J.); *Eiden v. Home Depot USA, Inc.*, No. CIV. S-04-977 LKK/CMK, 2006 WL 1490418, at *12 (E.D. Cal. May 26, 2006) (Karlton, J.) ("Neither the ADA nor the ADAAG addresses movable objects."); *Cherry, et al. v. The City College of San Francisco, et al.*, No. C 04-04981 WHA, slip op. at 13:4-5 (N.D. Cal. Jan. 12, 2006) (Alsup, J.) (holding that the burden is upon the plaintiffs to show that any blockage is persistent). Indeed, the Architectural and Transportation Barriers Compliance Board, which drafted the ADAAG, stated in the preamble that "[t]hese guidelines are intended to address only that equipment that is fixed or built into the structure of the building." 56 C.F.R. 35414-15 (July 26, 1991), *quoted in Colorado Cross-Disability Coalition v. Too (Delaware), Inc.*, 344 F. Supp. 2d 707, 712 (D. Colo. Nov. 10, 2004) (Babcock, J.).

In *Massachusetts v. E*Trade Access, Inc.*, 464 F. Supp. 2d 52 (D. Mass. 2006) (Lasker, J.), a case in which Tim Fox and Amy Robertson served as plaintiffs' counsel, the district court held, "Only equipment that is fixed or built in to the facility is covered by the accessibility standards (e.g., public pay telephones or built-in ATMs.)." *Id.* at 57 (citing ADA Title III Technical Assistance Manual, § III-5.3000 (1994 Supp.)), available at http://www.ada.gov/taman3up.html. "Interpretive guidance issued by the Access Board and adopted by the DOJ has specified that to be covered by ADAAG, equipment must be 'fixed or built into the structure of a building'." *Id.* at 57 (quoting 56 Fed. Reg. 35,408 at *12) (July 26, 1991). Significantly, the district court distinguished the decision in *Colorado Cross-Disability* as involving movable structures not contemplated during the building process.

In *Wilson v. Norbreck LLC*, No. Civ. S-04-690 DFL JFM, slip op. (E.D. Cal. Sept. 15, 2006) (Levi, J.), the district court held that wastebaskets near a lavatory were not barriers because "the wastebaskets are light in weight". *Id.* at 8:5. "The defense expert, himself a disabled person in a motorized wheelchair, credibly testified that the wastebaskets present no barrier to a disabled person." *Id.* at 8:5-8. The district court added, "[T]he court finds that the waste-baskets are easily moved to provide any needed access to the sinks." *Id.* at 8:8-10. "If the wastebaskets are in the way," "the vast majority of disabled persons . . . could with little effort slide them a few inches to the side." *Id.* at 8:10-

41

Case No. 02-5849 PJH JL                    TBC's Mot. Partial Summ. J.
OC 286,421,313v1

13. The court rejected the argument that such wastebaskets were actionable via a discriminatory "policy". *Id.* at 8:15-18.

In *Hubbard v. Sobreck, LLC*, No. 04cv1129 WQH, slip op. (S.D. Cal. Aug. 7, 2006) (Hayes, J.), the district court held that waste baskets are not architectural fixtures that create an obstruction to the lavatory. *Id.* at 5:13-15.

In *Chapman v. Pier 1 Imports*, No. CIV. S-04-1339 LKK CMK, 2006 WL 1686511 (E.D. Cal. June 19, 2006) (Karlton, J.), the district court granted summary judgment in favor of the defendant as to claims alleging that a ladder and merchandise obstructed an accessible route of travel to the restroom. The court held that "any obstruction was only temporary in nature." *Id.* at *10.

In *Association of Disabled Americans, Inc., v. Key Largo Bay Beach, LLC*, 407 F. Supp. 2d 1321 (S.D. Fla. 2005) (King, J.), the district court refused to issue injunctive relief as to portable lounge chairs at a hotel because "it is clearly futile for the Court to enter an injunction requiring lounge chairs to be moved where they are of the typical variety, constantly moved not only by staff, but also by guests." *Id.* at 1343. The court added, "As with the lounge chairs on the pool deck, *portable plastic waste cans* are not an item susceptible of an enforceable injunction." *Id.* at 1346 (emphasis added).

In *Jones v. Wild Oats Markets, Inc.*, No. 04-1018-WQH (WMc), slip op. (S.D. Cal. Nov. 29, 2005) (Hayes, J.), the district court held that the wastebasket was not an obstruction because the plaintiff testified that "she could have easily moved the trashcan out of her way." *Id.* at 18:25-19:2.

**66.     The Wall-Mounted Semi-Recessed Waste Receptacle Does Not Deprive Taco Bell's Customers of Full and Equal Enjoyment of the Restrooms.**

Plaintiffs argue that the wall-mounted, semi-recessed waste receptacle is a barrier at store #526. It is worth noting that plaintiffs refused to propose any particular solutions in this particular restroom in their 2006 M&C chart. Taco Bell, thus, proceeded unilaterally with what it viewed as an appropriate solution by installing the new wall-mounted semi-recessed waste receptacle. Simply put, there is nothing to indicate that it deprives wheelchair-bound customers of the full and equal enjoyment of the facility. Plaintiffs' expert's measurement indicates that it does not project more than 4 inches from the wall on which it is attached.

**67.     The ADAAG Does Not Regulate Slope Surrounding a Floor Drain on an Accessible Route Any Differently Than Any Other Portion of the Accessible Route.**

Plaintiffs assume incorrectly that the ADAAG imposes an analogous requirement upon the maximum slope surrounding a floor drain as imposed on the maneuvering clearance at a door.  The ADAAG expressly provides that the "floor or ground area within the required clearances [at doors] shall be level and clear."  (ADAAG 4.13.6.)  The ADAAG's omission that the accessible route within the restroom must be "level" is significant.  This means that the generally applicable ADAAG standards, equally applicable in an outdoor setting, apply inside a restroom, including the standards for minimum width of an accessible route, *i.e.*, 36 inches (except at doors which are subject to a 32 inch minimum standard), and a running slope maximum of 5% or even greater up to 8.3% (technically constituting a "ramp" even if the requirements for handrails have not been triggered), *see* ADAAG 4.3.7, 4.8.1, 4.8.2, 4.8.5.

The foregoing also demonstrates that the mere fact that the slope surrounding a floor drain inside a restroom is not "level" does not necessarily mean that an ADAAG violation has occurred.  For example, if the floor drain is not on any accessible route to an element that is required to be accessible, it is irrelevant.  In addition, even assuming that the non-level slope is on an accessible route, it is possible that the floor drain slope did not deprive a disabled customer of the "full and equal enjoyment" of the services provided at the facility at issue.

Indeed, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the slope surrounding floor drains in restrooms even though such slopes allegedly exceeded 2% based upon measurements taken by the Special Master as follows:   4.1% slope at women's RR in store number 99; 3.9% slope at men's RR in store number 20175; 4.0% slope at women's RR in store number 20175; 3.5% slope at women's RR in store number 20180.  Similarly, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the slope surrounding floor drains in restrooms even though such slopes allegedly exceeded 2% based upon measurements taken by plaintiffs' expert as follows: 3.8% slope at men's RR in store #1687; 5.3% slope at men's RR in store #4343; 4.2% slope at women's RR in store #4343; 5.3% slope at women's RR in store #19334.

1    These omissions constitute evidence that the slope of floor drains in restrooms did not deprive

2    plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

3    **68.    The ADAAG Does Not Require an Automatic Closing Device on an Accessible**

4    **Toilet Stall.**

5    Although McSwain challenges the lack of an automatic closing device at the women's restroom

6    accessible toilet stall at store #19509, the ADAAG does not require that an accessible toilet stall have an

7    automatic closing device.  (ADAAG 4.17.)

8    **69.    Plaintiffs' Failure to Apply the Toilet Stall Door Maneuvering Clearances in Fig.**

9    **30(a) of the ADAAG Is Wrong.**

10   Although McSwain appears to apply some unspecified form of door maneuvering clearance

11   standards in claiming that the pull side depth at the accessible toilet stall in the men's restroom at store

12   #18808 is a barrier, McSwain's analysis ignores the latch side approach that is feasible at this accessible

13   toilet stall.  (*See* EM13698, EM13700, EM13703, EM13704.)  Based on a latch side approach, the pull

14   side depth standard is a minimum 42 inches.  (ADAAG Fig. 30(a).)  McSwain's 49-1/2 inches

15   measurement exceeds this standard.

16   Similarly, at store #22691, McSwain's apparent application of the general door maneuvering

17   clearances in ADAAG Fig. 25 is erroneous.  McSwain's analysis ignores the latch side approach that is

18   feasible at this accessible toilet stall.  Based on a latch side approach, the pull side depth standard is a

19   minimum 42 inches, which is exceeded here.  (ADAAG Fig. 30(a).)  McSwain's analysis also ignores

20   that the measurements depicted in Figure 30(a) apply instead of the general door maneuvering

21   clearances set forth in Figure 25.  Otherwise, the minimum 42 inches pull side depth standard set forth

22   in Fig. 30(a) would not be applicable.

23   **70.    The ADAAG Does Not Require a Minimum 60 Inch Wide Envelope Surround the**

24   **Water Closet.**

25   Plaintiffs argue that the ADAAG requires a 60 inch width surround a water closet as measured

26   from the side wall closest to a water closet.  Plaintiffs are wrong.  As depicted in Fig. 28 of the

27   ADAAG, fixtures such as lavatories are depicted as compliant even if their side edge is 18 inches

28

44

1  minimum to the *centerline* of the water closet.  Thus, the actual distance between the side edge of a

2  lavatory and the side edge of the water closet is far less than 18 inches, and still compliant.

3      Indeed, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the

4  distance between the side edge of a lavatory in a restroom and the side edge of the adjoining water

5  closet based upon measurements taken by the Special Master as follows:   34-1/2 inches at men's RR in

6  store number 4168.

7      Similarly, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant

8  the distance between the side edge of a urinal in a restroom and the side edge of the adjoining water

9  closet based upon measurements taken by the Special Master as follows:   29 inches at men's RR in

10  store number 4343; 29-1/4 inches at men's RR in store number 4578.

11      Indeed, plaintiffs expressly proposed to Taco Bell that at store number 4510, that Taco Bell

12  relocate the water closet by 3 inches so that there would be at least 28 inches of distance between the

13  side edge of a urinal in a restroom and the side edge of the adjoining water closet.

14      *Plaintiffs' proposed solution in 2006 was either entirely useless and wasteful or plaintiffs were*

15  *proposing what they viewed as the most appropriate retrofitting solution at the time*.

16      These omissions constitute evidence that the less than 60 inches distance between the side edge

17  of a restroom fixture such as a lavatory or a urinal and the side wall in a restroom closest to a water

18  closet did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell

19  stores.

20      **71.**    **The ADAAG Does Not Require At Least 48 Inches of Clear Floor Space In Front of**

21          **the Front End of the Water Closet.**

22      McSwain has repeatedly asserted at various stores that the distance between the front end of the

23  water closet and the opposite restroom wall or toilet stall partition door is less than 48 inches in length.

24      The ADAAG, however, contains no such length standard in regards to the space in front of the

25  water closet itself applicable to a single-user restroom.  (*See* ADAAG 4.16.2 Fig. 28.)  Nor does the

26  ADAAG set forth such standard in an accessible toilet stall.  (*See* ADAAG 4.17.2, 4.17.3, Fig. 30(a).)

27      The clear floor space at the water closet complies with Figure 28 of the ADAAG at store

28  numbers 3184.

45

72.     **The ADAAG Does Not Require that the Front End of the Side Grab Bar Be Positioned Exactly 24 Inches In Front of the Water Closet.**

The ADAAG does not require that the front end of the side grab bar be positioned exactly 24 inches in front of the front end of the water closet.  (ADAAG Fig. 29(b).)

73.     **The ADAAG Does Not Specify a Particular Maximum Distance Between Toilet Paper Dispenser and the Rear Wall.**

There is no maximum distance from the toilet paper dispenser to the rear wall.  *Martinez v. Home Depot USA, Inc.*, No. Civ. S-04-2272 DFL DAD, 2007 WL 926808, at *5 (E.D. Cal. Mar. 27, 2007) (Levi, J.).  Under the federal standard, it merely needs to be "within reach".  *Wilson v. Norbreck, LLC*, No. 04-cv-00690-DFL-JFM, 2005 WL 3439714, at *4 (E.D. Cal. Dec. 14, 2005) (Levi, J.); ADAAG 4.16.6 ("Toilet paper dispensers shall be installed within reach, as shown in Fig. 29(b).").

Taco Bell has attempted to comply with the proposed ADAAG standard depicted in Figure 604.7, even though it is not currently in effect, which depicts a distance of 7-9 inches between the front end of the water closet and the *centerline* of the toilet paper dispenser.  Assuming that Taco Bell's water closets typically project approximately 28 inches from the rear wall, the centerline of a toilet paper dispenser would need to be between 35 to 37 inches from the rear wall in order to comply with the proposed ADAAG.  Thus, Taco Bell has retrofitted its accessible restrooms in California stores by relocating the toilet paper dispensers so that they are each 36 inches to the rear wall, as measured to the centerline of the dispenser.

74.     **Measurements Applicable to Interior Toilet Stalls Such As the 36 Inch Distance of the Toilet Paper Dispenser from the Rear Wall Do Not Apply to "Water Closets".**

In *White v. Divine Investments, Inc.*, No. CIV. S-04-0206 FCD/DA, 2005 WL 2491543 (E.D. Cal. Oct. 7, 2005) (Damrell, J.), *aff'd mem*, 286 Fed. Appx. 344, 2008 U.S. App. LEXIS 12221 (9th Cir. June 5, 2008), the district court granted the defendants summary judgment as to the location of the toilet tissue dispenser.  *Id.* at *7.  The defendants successfully argued that section 4.17.3 of the ADAAG, which was applicable to interior toilet stalls, was not applicable to water closets without any stalls.  *Id.* at *7 n.18.  Thus, it is improper for plaintiffs to rely upon standards applicable to interior toilet stalls, such as the 36 inch distance of the toilet paper dispenser from the rear wall depicted in Figure 30(d) of

46

the ADAAG in evaluating single-user water closets.  Indeed, courts have drawn a distinction between standards applicable to a toilet room versus a toilet stall.  *Independent Living Resources v. Oregon Arena Corp.*, 1 F. Supp. 2d 1124, 1143-44 (D. Or. 1998) ("designers have a choice in how to design a toilet room (as opposed to a toilet stall, which is covered by a different regulation)").

**75.     The ADAAG Does Not Require Self-Closing Accessible Stall Doors.**

McSwain surveyed stall doors as not self-closing at the men's restrooms at store numbers 2961, 4704, 19389, 19509, 20052, 21343, 22692 and the women's restroom at store number 2961.  The ADAAG does not regulate accessible stall doors as to whether the doors are self-closing or not.

**76.     The ADAAG Does Not Regulate the Projection of a Urinal.**

McSwain asserts that the projection of the urinal rim at store #4054 is noncompliant.  The ADAAG does not regulate the projection of a urinal from the wall.  (*See* ADAAG 4.18.)  Plaintiffs' counsel proposed a range of between 12 inches to 17-1/2 inches as an "acceptable measurement" in an email to defense counsel sent and received on February 15, 2006.

**77.     The ADAAG Does Not Regulate the Precise Minimum Distance Between the Centerline of a Lavatory and the Side Wall.**

The ADAAG does not regulate the precise minimum (or maximum or exact) distance between the centerline of a lavatory and the side wall.  Thus, McSwain's reliance on such issue as an alleged violation of the ADA as it pertains to men's restroom lavatories at store numbers 124, 2968, 3117, 3498, 4633, 5259, 19744, 22871 and the women's restroom lavatory at store number 3117 is misplaced.

Indeed, plaintiffs failed to challenge in their 2006 Meet and Confer Charts as noncompliant the precise distance between the centerline of a lavatory in a restroom and the side wall based upon measurements taken by the Special Master as follows:   15-5/8 inches at men's RR in store number 3117; 16-3/8 inches at men's RR in store #19744.

These omissions constitute evidence that the less than 18 inch distance between the centerline of a lavatory and the side wall in restrooms did not deprive plaintiffs of "full and equal enjoyment" of the services provided at the Taco Bell stores.

**78.     The ADAAG Does Not Require that the Entirety of the Drain Pipe Be Covered.**

47

The ADAAG does not impose an insulation standard over 100% of a drain pipe.  Rather, the ADAAG provides, "Hot water and drain pipes under lavatories shall be insulated or otherwise configured to protect against contact."  (ADAAG 4.19.4.)  In *Jones v. Wild Oats Markets, Inc.*, No. 04-1018-WQH (WMc), slip op. (S.D. Cal. Nov. 29, 2005) (Hayes, J.), the district court held that an ADA plaintiff had failed via her expert to establish that any violation of the ADAAG had occurred notwithstanding the fact that six inches of drain piping was uncovered.  *Id.* at 14:11-19.

### 79.   The ADAAG Does Not Require the Insulation of a Hot Water Line If It Was Not Accessible Under the Lavatory.

In *Wilson v. Norbreck, LLC*, No. 04-cv-00690-DFL-JFM, 2005 WL 3439714 (E.D. Cal. Dec. 14, 2005) (Levi, J.), the district court held that hot water lines did not require insulation because they were configured to prevent contact and were not accessible under the lavatory.  *Id.* at *5.  Indeed, at store number 4311, McSwain ignored the exposed portion of the hot water line, which is clearly visible.  The only logical explanation is that McSwain determined that the hot water line was configured to prevent contact.

### 80.   The ADAAG Does Not Impose an Insulation Standard Over Cold Water Supply Line.

At store #19298, McSwain's observation that the "cold angle stop insulation is loose" is irrelevant.  McSwain similarly makes an observation as to the insulation over the cold water line at stores #2007, #3117, #9454, #19532, #20635, and #21453.  Thus, the reference to the lack of cold water insulation appears to be deliberate.  The ADAAG does not impose an insulation standard over a cold water supply line.  (ADAAG 4.19.4.) ("Hot water and drain pipes under lavatories shall be insulated or otherwise configured to protect against contact.").

### 81.   The ADAAG Allows the Forward Reach to Go Beyond the Toe Space.

Even though plaintiffs requested the installation of wall-mounted trash receptacles in lieu of portable trash cans in their 2006 M&C charts, plaintiffs attack Taco Bell's newly installed wall-mounted combination paper towel dispenser/trash receptacles at some stores because they purportedly do not provide an appropriate forward reach with respect to toe clearance.  Plaintiffs' rationale is premised upon the assumption that a forward reach cannot never exceed the location of the toe space.  Plaintiffs

48

1  ignore ADAAG Appendix Fig. A3(a), which clearly depicts the forward reach as going beyond the toe

2  space.  Indeed, the location of the outstretched hand depicted in the Figure is within the minimum 48

3  inch length that is necessary for clear floor space for a single, stationary wheelchair and occupant.

4  (ADAAG 4.2.4.1, Fig. 4(a).)

5         Indeed, Taco Bell's measurements at a typical new combination paper towel dispenser/trash can

6  indicate that there is only two inches at most distance to reach inside the paper towel dispenser to grasp

7  a disposable paper towel.  Based upon the manufacturer's recommended barrier-free mounting height

8  for the new combination paper towel dispenser/trash receptacle, there would only be toe clearance of

9  only 4-5/8 inches, which is less than the 9 inch standard for toe clearance provided in the ADAAG Fig.

10 31.  Thus, the new unit is intended to be usable without providing toe clearance of 9 inches minimum

11 underneath the unit.

12     **82.    The ADAAG Does Not Require That Restroom Dispensers and Controls Be**

13              **Mounted No Higher Than 40 Inches AFF.**

14        At store #3184, McSwain challenges the height of the soap dispenser in the women's restroom

15 even though he measured it as 48 inches AFF.  This measurement complies with the ADAAG standards

16 for both forward and side reach ranges.  (ADAAG 4.2.5, 4.2.6 Fig. 5 & 6.)

17     **83.    Maintenance Issues Cannot Trigger ADA Liability.**

18        Plaintiffs cite loose toilet tissue rolls as architectural barriers even though they have been used

19 up 90%.  At store #5636, McSwain surveyed a missing flush handle on the water closet in the women's

20 restroom even though such restroom was marked "out of order" on the date of his site inspection.

21 Significantly, the location of the flush handle, which had broken off, was already on the wide side of the

22 water closet.  Taco Bell replaced the missing flush handle as part of its normal maintenance.  A broken

23 flush handle that is fixed as part of normal maintenance does not trigger ADA liability.  Taco Bell's

24 Director of ADA Compliance personally inspected the store during the week of January 5-9, 2009, and

25 such flush handle existed at that time.

26     **84.    Plaintiffs Seek Technically Infeasible Modifications.**

27        Plaintiffs seek technically infeasible solutions despite the fact that Taco Bell has made

28 modifications "to the maximum extent feasible" in compliance with the ADAAG's alterations standard.

49

(ADAAG 4.1.6(j).)  At store #4633, given plaintiffs' measurement of pull side depth as 61-1/8 inches, it is impossible to comply with both the 60 inches pull side depth standard and to also comply with the 17 inch minimum depth standard for a lavatory.  Plaintiffs apparent request for both 60 inches of pull side depth and 17 inches of lavatory depth within the same space is technically infeasible.  (ADAAG 4.1.6(j).)  Taco Bell has provided accessibility to the maximum extent feasible.  (ADAAG 4.1.6.)

## V.

## <u>CONCLUSION</u>

Based upon the foregoing, it is respectfully requested that the motion be granted and that this Court award such other and further relief as it deems appropriate.

DATED:  October 20, 2009                    GREENBERG TRAURIG, LLP


By /s/_____
    Gregory F. Hurley
    Attorneys for Defendant TACO BELL CORP.

Case No. 02-5849 PJH JL                    TBC's Mot. Partial Summ. J.
OC 286,421,313v1