UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANCIE MOELLER, et al.,

        Plaintiffs,

        v.

TACO BELL CORP.,

        Defendant.

_____/

No. C 02-5849 PJH

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

The case was filed as a proposed class action case under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Unruh Civil Rights Act, Cal. Civ. Code § 51 et seq. ("Unruh Act"), and the California Disabled Persons Act, Cal. Civ. Code § 54 et seq. ("CDPA").

Plaintiffs are physically disabled California residents who use electric scooters or wheelchairs as their primary means of mobility. Plaintiffs filed this action on December 17, 2002, against defendant Taco Bell Corp. ("TBC"), alleging that its corporate-owned restaurants in California contained architectural barriers that prevented plaintiffs' access to and enjoyment of the restaurants, in violation of the ADA, the Unruh Act, and the CDPA.

On February 23, 2004, the court certified the following class:

> All individuals with disabilities who use wheelchairs or electric scooters for mobility who, at any time on or after December 17, 2001, were denied, or are currently being denied, on the basis of disability, full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of California Taco Bell corporate restaurants.

Moeller v. Taco Bell Corp., 220 F.R.D. 604, 613-14 (N.D. Cal. 2004).

On October 5, 2004, the court granted the parties' stipulated request to appoint Bob Evans as Special Master to conduct site visits of all TBC-owned Taco Bell restaurants in

1 | California; to determine the dimensions, values, and measurements of the customer-

2 | accessible elements at those Taco Bell restaurants, under both federal and state

3 | standards; and to make recommendations for bringing into compliance any elements

4 | whose dimensions, values, or measurements did not comply with those standards.  The

5 | Special Master issued his report in mid-2005.

6 | On February 23, 2007, plaintiffs moved for partial summary judgment as to three

7 | types of barriers – the configuration of the queue lines in 77 restaurants, the door force in

8 | 171 restaurants, and the indoor accessible seating in 54 restaurants.  In an order issued

9 | August 8, 2007, the court denied the motion as to queue lines, finding triable issues that

10 | precluded summary judgment; granted the motion as to interior door force and as to

11 | exterior door force for those restaurants constructed after April 1, 1994, and denied it as to

12 | exterior door force for those restaurants constructed prior to April 1, 1994; and granted the

13 | motion as to the number of accessible seating positions.  See Moeller v. Taco Bell Corp.,

14 | 2007 WL 2301778 (N.D. Cal. Aug. 8, 2007) ("Moeller Summ. J.")

15 | In October 2009, TBC filed a motion for partial summary judgment, addressing

16 | numerous ADA violations.  At the December 16, 2009 hearing, the court denied TBC's

17 | motion, and advised that it would conduct a trial as to one exemplar restaurant to be

18 | chosen by plaintiffs, following a period of discovery.  In the follow-up December 23, 2009

19 | order, the court set a deadline for plaintiffs to provide TBC with a list of all ADA and Title 24

20 | violations; a deadline for the parties to meet and confer, and prepare a list of all the

21 | violations, for each restaurant, that had been remediated; a deadline for discovery; and a

22 | deadline for plaintiffs to select the exemplar restaurant.  Plaintiffs chose Taco Bell 4518.

23 | On April 5, 2010, the court issued an order bifurcating discovery and the trial of the

24 | exemplar restaurant, advising that the first stage of the trial would be on the issues of

25 | whether there had been violations of federal and/or state law, and appropriate injunctive

26 | relief, with the remaining issues, including trial of the damages phase of the exemplar

27 | restaurant, to be scheduled thereafter.

28 | From June 6 to June 16, 2011, the court convened an exemplar trial as to Taco Bell

**United States District Court**
For the Northern District of California

4518, addressing liability and injunctive relief.[1]  Plaintiffs limited their claims at the exemplar

trial to the following twelve elements, as having been in violation of the ADA, the Unruh Act,

and/or the CDPA during the class period:  (1) the width of access aisle next to van

accessible parking space; (2) signage at van accessible parking space; (3) force required

to open north entry door; (4) time for north entry door to close; (5) queue line; (6) reach

ranges for self-service drink lid dispenser; (7) knee and toe clearance under accessible

dining tables; (8) push side maneuvering clearance at women's restroom door; (9) height

and position of water closet in the women's restroom (height of seat and distance between

centerline of water closet and nearest side wall); (10) obstructions in clear floor space at

the water closets in the men's and women's restrooms (position or placement of movable

trash cans); (11) height of soap dispenser and toilet seat cover dispenser in the men's and

women's restrooms; and (12) lavatory insulation.

Plaintiffs' claims for both liability and injunctive relief are based on alleged violations

relating to these twelve elements.  Plaintiffs seek injunctive relief compelling TBC to ensure

that its restaurants are, and remain, in compliance with applicable standards.  They also

seek minimum statutory damages under the Unruh Act and/or the CDPA, and attorneys'

fees.

**BACKGROUND**

A.    Customer Witnesses

1.    Katherine Corbett

Named plaintiff Katherine Corbett testified at trial.  She has used a power wheelchair

for fifteen years.   Her 18-year-old daughter also uses a wheelchair for mobility.  Ms.

Corbett eats at Taco Bell restaurants frequently because she likes the food.  She has

patronized the Taco Bell restaurant 4518 in San Pablo.

The first time Ms. Corbett went inside Taco Bell 4518 was in 2002.  Although Ms.

---

[1] On June 23, 2010, plaintiffs submitted a proposed permanent injunction, setting forth
the injunctive relief requested as to all Taco Bell restaurants that are the subject of this action.

3

Corbett often uses the drive-through, she has also been inside the restaurant on a number of occasions.  She estimated that she has patronized that restaurant approximately 80 times between 2002 and 2010; of these visits, she estimated she went inside two to ten times.  She tends to eat inside the restaurant when she is with her daughter, and prefers to do that if she has the time.  She intends to go inside Taco Bell 4518 in the future.

Ms. Corbett uses a van for transportation.  When she visited Taco Bell 4518 in 2002, the width of the then-existing access aisle next to the van-accessible parking space was insufficient for her to deploy the lift on her van, roll off the lift, and retract the lift back into the van.  If she had parked in the designated space and a car later parked in the adjacent space, there would not have been enough space for her to deploy her ramp and enter her van.

However, on this occasion in 2002, Ms. Corbett was able to park and go inside because the designated accessible parking space was unoccupied, as were the space to the left of it and the space to the right of the access aisle.  Because of that, she parked her van half in the designated accessible space and half in the adjacent empty space, although it made her uncomfortable to occupy two spaces.  After that experience, when she went to Taco Bell 4518 between 2002 and 2010, she parked at another store in the same mall that had wider access aisles.

On her 2002 visit, although Ms. Corbett was able to open the north entry door to Taco Bell 4518, it was heavy.  In addition, during that visit, she encountered a "queue line" that TBC had put in place to guide customers lining up to place their orders at the counter. The queue line was too narrow for Ms. Corbett to navigate in her wheelchair, and there was a chain extending from the end of the queue line closest to the entrance and the counter. Ms. Corbett could not enter from the far side of the queue line because there was already a customer there.  There were no signs indicating what she should do given that she could not fit through the queue line, and she was not offered any direction by TBC employees. With some difficulty, she removed the chain and approached the counter.

During a later visit, Ms. Corbett encountered the same queue line, although the

United States District Court

For the Northern District of California

chain was not in place.  Nevertheless, there was no signage, and no TBC employee offered

assistance.  Since there were people in the queue line, Ms. Corbett attempted to keep her

place in line by getting the attention of the last person then in line, and saying, "I just want

you to know I am going to be over there, but I am in line behind you."  As later customers

arrived, she continued to let them know where she was in line, despite the fact that she had

to wait off to the side rather than in the queue with others.

When it eventually came her turn, however, people were staring at her and one said

to her, "Hey, . . . no cutting. . . . You are not in line."  The second cash register was

available when it came her turn.  However, the presence of other customers lined up at the

counter also made it difficult for Ms. Corbett to get to the second cash register in the space

available between the queue line and the counter.

During the 2002 visit, Ms. Corbett was also unable to reach the drink lids from the

self-serve dispenser.  No employee offered to assist her, so she asked another customer to

hand her a drink lid.

During the visit in 2002, when Ms. Corbett looked for a table, she noticed that most

had fixed seats that would have prevented her from pulling her wheelchair up to the table.

There was no signage indicating the location of accessible seating, but she did find a table

with a removable chair.  She was not, however, able to pull completely up to that table

either, because the supporting post was centered under the table, blocking her feet.

In 2002, Ms. Corbett had trouble using both the water closet and the sink in the

restroom.  The seat of the water closet was too low, making it difficult to transfer on and off.

The drain pipe under the sink was not insulated, making it a risk for scalding if Ms.

Corbett's legs came in contact with it.  As a result, she washed her hands in cold water.

On a subsequent visit, there was a loose trash can under the sink, which meant that

she could not get her legs under the sink to wash her hands.

Ms. Corbett testified that it was upsetting and unpleasant to encounter so many

inaccessible features at the restaurant.  The queue lines made her feel like she was cutting

in line and being rude, or being privileged or special.  She would have used the queue line

5

1  if it had been wider; indeed, she prefers "to use what everybody else uses" if possible, and

2  "to be treated like [a] regular customer[ ]."

3      2.    Jacques Bronson

4      Jacques Bronson testified at trial concerning his mother's experiences at Taco

5  Bell 4518.  Mr. Bronson's mother, former class member Elizabeth Googens Bronson,

6  passed away in 2009.  Ms. Bronson used a wheelchair and a scooter, and Mr. Bronson

7  lived with her in order to provide assistance.

8      In the years prior to Ms. Bronson's death, the Bronsons patronized Taco Bell 4518,

9  Ms. Bronson in a motorized scooter.  They patronized that particular Taco Bell because it

10  was close to a grocery store where Ms. Bronson liked to shop.  She would shop there once

11  a month, and went to Taco Bell almost every time.

12      Each time the Bronsons patronized Taco Bell 4518, Ms. Bronson was unable to

13  use the queue line because she could not fit her scooter through it.  The chain at the queue

14  line was in place some of the times they were there; other times it was not.  Although Ms.

15  Bronson was able to order, pay for, and carry her own food at other businesses, her son

16  had to order for her and bring the food to her table at Taco Bell 4518, because of the queue

17  line.

18      There were no signs that told Ms. Bronson what to do, nor did any TBC employee

19  ever offer assistance to either of the Bronsons.  In fact, on one occasion, when Ms.

20  Bronson pulled up to the chain to wait for Mr. Bronson to go through the queue line, a TBC

21  employee told her that she couldn't stay there.  Mr. Bronson asked to speak to the

22  manager, and asked if his mother could go around the far end of the queue line to go to the

23  front of the line.  The manager said, "No," because people in line might object.  Mr.

24  Bronson observed that his mother appeared frustrated by this interaction, and resigned by

25  the need to rely on her son.  After this interaction, when the Bronsons went to Taco Bell

26  4518, Ms. Bronson would go straight to a table while her son ordered for her.

27      3.    Uverda Harry

28      Class member Uverda Harry testified at trial.  She uses a wheelchair.  Ms. Harry first

United States District Court
For the Northern District of California

6

**United States District Court**
For the Northern District of California

1  patronized Taco Bell 4518 in 1994.  She eats there because it is economical, and because

2  it is close to her medical appointments, including physical therapy.  On average, she goes

3  to Taco Bell 4518 three times per month, and expects that she will continue to patronize

4  Taco Bell 4518 on future days when she has physical therapy appointments.

5         Ms. Harry testified that the north double doors close too quickly, and have closed on

6  the leg extenders of her wheelchair and on her ankle as she was attempting to move

7  through the doors.  She has also had trouble opening the north entry door, finding it too

8  heavy.  When she had trouble opening the door, no TBC employee did anything to assist

9  her.

10        Ms. Harry has encountered the queue line at Taco Bell 4518, both with and without

11  the chain.  On one occasion, Ms. Harry attempted to go through the queue line in her

12  wheelchair, but became stuck.  Because of the queue line, Ms. Harry found it necessary to

13  ask others – her children, acquaintances, and strangers – to place her order for her.  On

14  one occasion, she had to rely on a colleague, even though she was embarrassed to have

15  to ask.

16        Ms. Harry never attempted to proceed directly to the counter to place her order, as

17  she thought that would be cutting in line, nor to go around the far end of the queue line,

18  because she observed that that was where customers picked up items.  She never

19  observed any signs telling her what to do if she couldn't use the queue line, nor did any

20  TBC employee ever offer her assistance placing her order or instructions on what to do in

21  light of the queue line.

22        Ms. Harry testified that she wants to be an independent person, and that not being

23  able to do things for herself makes her feel like a failure.  Her experience with the doors

24  made her feel futile, and having to rely on her children or a colleague to place her order

25  made her feel a little distraught and even brought her to tears on several occasions.  Ms.

26  Harry would have preferred an accessible queue line because it would not have made her

27  feel like she was different than other customers.

28        Ms. Harry never used the restroom at Taco Bell 4518 because she observed that

1   it would have been difficult for her to navigate up to the door and use the handle to open it.

2       Several years ago, Ms. Harry complained to TBC by using their toll-free number.

3   She voiced concerns about the doors, the queue line, and the counter, and provided her

4   name and phone number, but never heard back from TBC.

5       4.    Yvonne Westbrook-White

6       Yvonne Westbrook-White testified at trial.  She uses a scooter for mobility.  Ms.

7   Westbrook-White patronized Taco Bell 4518 approximately twice per month between 2001

8   and 2005.  She stopped going in 2005 because she was trying to eat a healthier diet.

9   However, she plans to go back because she likes the tacos.

10      On her first visit in 2001, Ms. Westbrook-White encountered the queue line; the

11  chain was in place at that time.  She saw that the queue line was narrow and the turn area

12  appeared too small for her to get in.  She did not, however, see any signs indicating what

13  she was supposed to do as a person using a scooter, nor did any TBC employee provide

14  instructions.  Assuming it was the way to place her order, Ms. Westbrook-White attempted

15  to use the queue line but got stuck at the turn.  By that time there were customers lined up

16  behind her in the queue, whom she had to interrupt in order to back all the way out of the

17  queue line.  She observed that the customers behind her appeared disgusted and

18  impatient.

19      When TBC employees saw her backing out, they told her to go to the far end of

20  the line.  She testified that the experience made her feel less than a person, because

21  "everyone else could get through the queue line, order their food, and go about their

22  business" while she had to "interrupt the people who that were trying to do just that, and

23  move them out of the way so [she] could get preferred treatment."  She did not like getting

24  preferred treatment, as she wants to be treated like everybody else.  Thus, she would have

25  preferred an accessible queue line.  She did not try to use the queue line after that first

26  visit, but instead went off to the side.

27      After she got her order, Ms. Westbrook-White was unable to reach the drink lids,

28  and ended up having to ask an employee for help, though she would have preferred to do

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   this herself.   When she tried to sit down at one of the accessible dining tables, she found

2   that the table leg made it impossible for her to get under the table.  This caused her to have

3   to sit sideways to the table to eat.  This is not her preferred way of eating because she

4   would like "to face [her] food like everybody else."

5           Ms. Westbrook-White spoke with employees of Taco Bell 4518 about the issues

6   described above but got, as she described it, a "typical kid reaction – 'Okay, ma'am,' and

7   on about their business."

8           5.       Curtis Cone

9           Class member Curtis Cone testified by deposition.  Ms. Cone uses a wheelchair.

10  She has patronized Taco Bell 4518 because it is close to an area where she shops.

11          Ms. Cone's major difficulty at Taco Bell 4518 was the queue line, which was too

12  narrow for her wheelchair.  She didn't try to use the queue line at Taco Bell 4518 because

13  she had become stuck in a Taco Bell queue line in the past.  Instead, she asked the person

14  she was with to order for her, though she does not like to do that.  However, she feels that

15  if she goes to the front of the line herself, it looks like she's cutting in front of people, which

16  she finds embarrassing and upsetting.

17          Although Ms. Cone is living temporarily in North Carolina, she testified that she will

18  probably patronize Taco Bell 4518 after she returns to the Bay Area.

19  B.     Special Master

20          In 2004, the parties agreed to have Bob Evans, a Certified Access Specialist, survey

21  twenty Taco Bell restaurants as part of a "Pilot Program," which he did in June and July

22  2004.  In September 2004, the parties jointly proposed to the court that it appoint Mr. Evans

23  as a Special Master.  On October 5, 2004, the court issued an order appointing Mr. Evans

24  Special Master to survey the remaining Taco Bell restaurants at issue in this action.

25          Mr. Evans is the principal of Equal Access, which specializes in all matters related to

26  accessibility.  He is a licensed architect, and, as a Certified Access Specialist in California,

27  was required to pass an exam administered by the state designed to ensure that those who

28  hold themselves out as access consultants in fact know the applicable codes and

standards. <u>See</u> Cal. Gov't Code §§ 4459.5-4459.8; Cal. Code Regs. tit. 21, § 111, et seq.

Mr. Evans surveyed approximately 223 Taco Bell restaurants. The purpose of the site visits was for Mr. Evans to use his expertise under the Department of Justice Standards for Accessible Design ("DOJ Standards" or "ADAAG"), 28 C.F.R. pt. 36, app. A, and Title 24 of the 2002 California Building Code ("Title 24 (2002)") to determine the dimensions, values and measurements of the customer accessible elements at the California Outlets under the ADAAG and/or Title 24 (2002) at the time of the site visit and to make recommendations as he saw fit for bringing into compliance those elements whose dimensions, values or measurements do not comply with ADAAG and/or Title 24.

Mr. Evans worked with an assistant, Larry Recht, to conduct the surveys in this case. Mr. Evans trained Mr. Recht in conducting the Special Master survey, instructed him to take photos of certain conditions in the restaurants he surveyed, and reviewed Mr. Recht's field notes and photos before incorporating them into the typewritten Special Master survey forms.

Mr. Recht surveyed Taco Bell 4518 on April 26, 2005, and the Special Master's report concerning that restaurant was sent to the parties in or about June 2005. Among other things, the Special Master found as follows with respect to Taco Bell 4518:

(1) the access aisle adjacent to the single designated accessible parking space was 60 inches wide;

(2) the force required to open the north entry door (the primary entrance) was ten pounds on the left side and seven and a half pounds on the right;

(3) the closing time of the north entry door was three seconds on the left and two seconds on the right;

(4) the width of the queue line was 21 3/4 inches at the entrance, 22 1/4 to 22 3/8 inches along the first lane, 22 inches at the turn, and 22 to 22 1/4 inches along the second lane;

(5) the reach range to the drink lids – which was over an obstruction –  was 52 inches high and 28 1/4 inches laterally;

1     (6) the depth of the knee clearance at the two designated accessible tables

2  was 10 1/2 to 11 inches, and the required depth of 19 inches was obstructed by the center

3  support pole under the table;

4     (7) the maneuvering clearance at the push side of the women's restroom door

5  was four inches beyond the strike jamb; the door had a closer and a latch;

6     (8) the centerline of the water closet in the women's restroom was 20 inches

7  to the near wall;

8     (9) the height of the water closet seat in the women's restroom was 15 1/2

9  inches;

10     (10) the height of the soap dispenser in the women's restroom was 45

11  inches;

12     (11) the height of the toilet seat cover dispenser in the women's restroom was

13  52 inches;

14     (12) the height of the soap dispenser in the men's restroom was 46 inches;

15     (13) the height of the toilet seat cover dispenser in the men's restroom was

16  52 1/2 inches;

17     (14) the distance from the water closet to the far wall in the men's restroom

18  was 38 inches; a trash can obstructed that area;

19     (15) the distance from the front of the water closet to the wall in front of it in

20  the women's restroom was 46 5/8 inches; a trash can obstructed that area.

21  C.     Later Conditions at Taco Bell 4518

22     In the summer of 2006, TBC retained Alianza Development International, LLC

23  ("Alianza") to serve as project manager over the modification of approximately 140

24  California corporate-owned Taco Bell restaurants that are at issue in this litigation, to

25  enhance their accessibility for individuals with mobility impairments.  Alianza surveyed Taco

26  Bell 4518 in February 2007, and subsequently oversaw accessibility modifications at Taco

27  Bell 4518 between February and June 2007.

28     In 2007, Alianza stated that it had restriped the access aisle adjacent to the

United States District Court

For the Northern District of California

1  accessible parking space to be eight feet wide; added new door closers to the double north

2  entrance doors; completely wrapped the drain pipes and hot water supply line in the men's

3  restroom; and removed the floor trash can from the women's restroom.

4        When Alianza restriped the parking space in the spring of 2007 to provide a

5  compliant van accessible space, it did not install a van accessible sign at the new space.

6  When the restaurant was surveyed by plaintiffs' experts in March 2008, there was still no

7  van accessible sign.  Photographs produced by TBC show that there was no sign in the

8  summer of 2009.

9        TBC argued that these photos were taken just before a new sign was installed.

10  However, Steve Allen Elmer, TBC's Director of ADA Compliance, testified at trial that TBC's

11  maintenance vendor, Maintco, was supposed to take photos both before and after

12  performing modifications, and while there is an "after" photo of the van accessible sign from

13  the summer of 2009, TBC did not provide a photo showing that sign in 2007 or 2008.

14        Mr. Elmer's testimony demonstrates that there was no sign in place when Maintco

15  inspected Taco Bell 4518 in the summer of 2009 – that is, before it added the sign – and

16  other photos show that there had been no sign on two prior occasions approximately a year

17  apart.

18        Plaintiffs conducted site inspections attended by one or more of their retained

19  accessibility experts at approximately 180 corporate-owned Taco Bell restaurants

20  throughout the fall of 2008 and spring of 2009.  Plaintiffs' accessibility expert Eric McSwain

21  – who has extensive experience surveying facilities for compliance with the ADAAG and

22  Title 24 – surveyed approximately 190 Taco Bell restaurants.  Among those restaurants

23  was Taco Bell 4518, which Mr. McSwain surveyed on March 17, 2008.

24        However, in his May 1, 2009 expert report, Mr. McSwain did not address all twelve

25  of the above-listed barriers at Taco Bell 4518.  Mr. McSwain's report addressed only the

26  lack of a van accessible parking sign, the door closing speed of the entrance door, whether

27  the lavatory drain pipe and hot water supply line were insulated or covered in the men's

28  restroom, and whether the loose trash can in the women's restroom posed an obstruction

12

United States District Court

For the Northern District of California

1    to the clear floor space at either the water closet or toilet seat cover dispenser.[2]

2          When Mr. McSwain surveyed Taco Bell 4518 in March, 2008, despite the fact that

3    the north entry door closer had been replaced in 2007, the door closing time of its two

4    leaves was 2.5 seconds and 2.75 seconds, respectively.

5          When Mr. McSwain surveyed Taco Bell 4518 in March, 2008, the insulation on

6    the men's restroom lavatory pipes was gone, despite the fact that it had been replaced by

7    Alianza in 2007.  Photographs produced by TBC show that there was no insulation on the

8    men's restroom lavatory pipes on several subsequent occasions in 2009.

9          Although Alianza stated that the floor trash can had been removed in the spring

10   of 2007, when Mr. McSwain surveyed Taco Bell 4518 in March 2008, it had returned to the

11   location in which the Special Master observed it to be an obstruction, and it was in that

12   same location in photographs taken in the summer and fall of 2009.

13         The van accessible parking sign, the men's restroom lavatory insulation, and the

14   trash can in the women's restroom were out of compliance in summer and fall of 2009

15   despite the fact that Mr. McSwain's report was issued on May 1, 2009, informing TBC of

16   these violations.

17         Mr. Evans surveyed Taco Bell 4518 on June 3, 2011 and did not find any of these

18   violations.

19   D.    Construction and Relevant Alterations at Taco Bell 4518

20         Taco Bell Restaurant 4518 was constructed on November 18, 1991.  Although the

21   building was issued a certificate of occupancy, TBC did not produce any evidence at trial

22   that it had applied for, or been granted, an unnecessary hardship or any other exemption

23   from the local building department in connection with the construction or any later

24   alterations of Taco Bell 4518 that would have excused any deviations from Title 24.

25         In addition, while TBC submitted building plans stamped by the City of San Pablo

26   Building Department, and while Mr. Elmer testified concerning the general practices of

27   _____

28         [2]  Prior to the trial, the court granted Taco Bell's motion in limine to exclude testimony
     by Mr. McSwain of alleged barriers not enumerated in his May 1, 2009 expert report.

United States District Court

For the Northern District of California

1  building departments concerning plan review and inspections, TBC did not offer testimony

2  from any individual with first-hand knowledge of the San Pablo Building Department's plan

3  review or inspection process with respect to Taco Bell 4518.

4         TBC admitted in its responses to plaintiffs' requests for admissions that the parking

5  lot at Taco Bell 4518 was re-striped in about 2003, and again in about 2004; and that the

6  restroom doors and the toilet in the women's restroom were removed and replaced in about

7  2003.

8  E.      Readily Achievable Barrier Removal

9         Plaintiffs rely on the ADA's readily achievable barrier removal requirement for

10  two of the violations at issue in Taco Bell 4518:  the door closing time of the north entry

11  doors, and the knee clearance under the two accessible dining tables surveyed in 2005.

12         Plaintiffs' expert James Terry estimated the cost (in 2001 dollars) of replacing

13  the door closer and replacing the bases of two accessible tables to achieve compliant knee

14  clearance at $1,386.04.  He testified further that because this type of modification could be

15  done while the restaurant was closed, there would be little impact on operations.

16         Plaintiffs' expert D. Paul Regan, a Certified Public Accountant, testified that it

17  would have been easily accomplishable without much difficulty or expense for TBC to have

18  incurred the cost of $1,386.04 to replace the door closers and table bases in 2001.  Mr.

19  Regan based this conclusion on an analysis of the profits from Taco Bell 4518 in 2001,

20  from all California corporate-owned restaurants, from Taco Bell Corp., and from Yum!,

21  TBC's parent corporation.

22         TBC did not offer any evidence relating to the cost, financial analysis, or impact

23  of barrier removal at Taco Bell 4518.

24  F.      TBC's Access Policies

25         1.      Policies in place prior to 2005

26         Mr. Elmer became Director of ADA Compliance for TBC in 2005, and he currently

27  holds that position at Yum! Brands, TBC's parent company.  In September 2005, plaintiffs

28  took Mr. Elmer's Rule 30(b)(6) deposition as TBC's "person most knowledgeable" about the

United States District Court
For the Northern District of California

1  company's practices and policies concerning accessibility of architectural features at

2  corporate restaurants in California.

3      At his 2005 deposition, Mr. Elmer testified that TBC had no policies in place to

4  monitor whether certain elements that change frequently remained in compliance with

5  accessibility requirements, including entrance and restroom door force, door closing time,

6  and restriping of parking lots.

7      Mr. Elmer also testified that Facility Leaders were responsible for a number of

8  accessibility tasks.  Facility Leaders, for example, were responsible for ensuring that all

9  repairs, and all minor construction that did not rise to the level of a restaurant remodel,

10  complied with accessibility requirements.  Facility Leaders were also responsible for

11  providing "informal" training to restaurant employees about accessibility.

12      Mr. Elmer testified that accessibility regulations are "highly technical, ha[ve] a

13  number of different aspects, [are] in many cases beyond the expertise level of a facilities

14  leader . . ."  Nevertheless, TBC did not provide Facility Leaders with accessibility training

15  until 2005.

16      For example, Jamie de Beers, the Facility Leader for Northern California from 1997

17  to 2005, testified in her deposition that she had not received any formal accessibility

18  training until she attended an accessibility meeting in 2005.  As a result, Ms. de Beers

19  testified that, prior to the 2005 meeting, she had "no clue" about various accessibility

20  requirements.  She thought access regulations simply required being "able to get to the

21  counter and be served. That, to me, was access and have a parking spot.  And, now, it's so

22  confusing with the inches and the height."

23      2.      Policies from 2005 to present

24      Beginning in 2005, and ending in late 2010, TBC issued a series of documents

25  setting forth its accessibility policies.  TBC's access policies are centralized – policies in

26  place at Taco Bell 4518 are also in place at all other California corporate Taco Bell

27  restaurants.  Over time, provisions in later policies contradicted provisions in earlier

28  policies, and omitted architectural elements that had been covered by earlier policies.

United States District Court

For the Northern District of California

1    For example, TBC's policy concerning door force changed from 8 pounds in 2005,

2    to 5 pounds in 2006, to 5 pounds or 8.5 pounds in April 2009, depending upon the

3    permitting date of a restaurant.  By 2010, there were three policies in effect, each of which

4    set forth a different standard for exterior door force.  TBC's "DMA Ops Leader" Erich

5    Moxley testified at trial that it was his understanding that it is TBC's policy that door opening

6    force should be 8.5 pounds regardless of when the store was built, and a form dated

7    October 2010 asks only whether the exterior doors open with 8.5 pounds of pressure or

8    less.

9    Similarly, although TBC's 2005 policy covered closing time on restroom and

10   entrance doors, Mr. Elmer testified that that issue had been omitted from TBC's 2006 and

11   2009 policies.

12   In addition, the evidence submitted at trial demonstrated that TBC had repeatedly

13   violated its own policies.  For example, Mr. Elmer testified that it has been TBC's policy

14   since 2005 to have accessible signs designating accessible parking spaces.  Nevertheless,

15   photographs admitted at trial demonstrated that there was no such signage at Restaurant

16   4518 in June 2007, March 2008, and the summer of 2009.

17   Mr. Elmer also testified that it has been TBC's policy since December 2006 not to

18   locate trash cans in front of restroom accessories.  However, photographs admitted at trial

19   demonstrated that there was a trash can in front of the toilet seat cover dispenser in the

20   women's restroom of Restaurant 4518 in March 2008, in the summer of 2009 and at some

21   point between August and October 2009.

22   Mr. Elmer testified further that it has been TBC's policy since at least at least 2007 to

23   insulate water supply and drain pipes under restroom lavatories, yet photographs admitted

24   at trial demonstrated that the pipes under the lavatory in the men's restroom at Restaurant

25   4518 were not insulated in March 2008, in the summer of 2009, and at some point between

26   August and October 2009.

27   3.    Current policies concerning maintaining access.

28   During the trial, Mr. Elmer identified four TBC policies that are intended to ensure

16

1    that accessibility is maintained at its restaurants:  (a) the Maintenance Technician

2    Checklist; (b) Maintco surveys and the "3rd Party ADA Maintenance Vendor Checklist,"

3    which is meant to be used during the surveys; (c) "Success Walks"; and (d) Pre-Opening

4    "Access for the Disabled Walks" and the checklist of items that are supposed to be checked

5    during those walks.  According to Mr. Elmer, these four policies are in place at Taco Bell

6    4518, as well as all other California corporate Taco Bell restaurants.

7                          a.      Maintenance Technician Checklist.

8           According to testimony from Mr. Elmer, each time a Maintenance Technician visits a

9    restaurant, he or she is supposed to check each of the 34 items listed on the ADA

10   Maintenance Technician Checklist.  The Maintenance Technician for Taco Bell 4518 is

11   Doug Henry.  TBC did not call Mr. Henry as a witness at trial.

12          Nevertheless, during his deposition, Mr. Henry testified that he had never seen the

13   ADA Maintenance Technician Checklist, that he did not understand what some of the items

14   on the Checklist meant, and that his standard practice was to check only five of the 34

15   items on the Checklist.

16          The ADA Maintenance Technician Checklist includes the following language in bold:

17   "If a deviation from an applicable guideline is detected following an inspection, these

18   item(s) shall be reviewed by our ADA Compliance team to determine whether certain

19   limited exceptions to the guidelines apply, which will be evaluated on an item-by-item

20   basis."

21                          b.      Maintco twice-yearly surveys

22          According to Mr. Elmer, TBC has entered into a year-to-year contract with Maintco

23   to perform twice yearly surveys of its restaurants.  Those surveys began in mid-2009.

24   Each time it surveys a Taco Bell restaurant, Maintco sends an invoice to TBC, and also

25   sends a completed Maintco Checklist.

26          At trial, TBC submitted invoices from Maintco for surveys of Taco Bell 4518.  Based

27   on those invoices, there was no Maintco survey at Taco Bell 4518 between June 12, 2009

28   and August 3, 2010.  Based on Mr. Elmer's testimony that Maintco began its surveys of

Taco Bell 4518 by at least June 2009, there should be at least four, and possibly five, Maintco Checklists for that restaurant.  At trial, TBC submitted only two such checklists for Taco Bell 4518.

The Maintco Checklist includes the following language in bold:  "If a deviation from an applicable guideline is detected following an inspection, these item(s) shall be reviewed by our ADA Compliance team to determine whether certain limited exceptions to the guidelines apply, which will be evaluated on an item-by-item basis."

           c.     Success walks

According to Mr. Elmer, every 30 minutes, the manager in charge of a Taco Bell restaurant conducts a "success walk" through the restaurant, during which "they check for access for the items that the plaintiffs have raised here."  TBC did not submit the checklist used for the Success Walks at trial.

Jeffrie Kuan-Bone, who for the last two years has been the Restaurant General Manager ("RGM") at Taco Bell 4518, testified during his deposition that success walks do not address disability or ADA issues.  TBC did not call Mr. Kuan-Bone as a witness at trial.

           d.     Pre-opening "Access for the Disabled Walks"

According to Mr. Elmer, each morning before a Taco Bell restaurant opens, the manager in charge is supposed to check each of the accessibility items on Ex. A-50, the "Access for the Disabled Walk."  Taco Bell RGMs were responsible for making sure that these walks occurred.

Taco Bell did not call any employees at Taco Bell 4518 who were involved in the process of opening the restaurant, or whose responsibilities included conducting the preopening Access for the Disabled Walk.

The only Taco Bell 4518 employee to testify in person, Ms. Contreras, testified that her shift started after the restaurant opened.  Mr. Kuan-Bone testified during his deposition that he had never heard of a disabled walk, that he had never been given a checklist with specific disability issues, and that the pre-opening walk did not include any accessibility issues.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Having considered the evidence introduced at trial and the arguments made by counsel, the court now makes the following findings of fact and conclusions of law.

A.    Legal Standards

The plaintiff class brings claims under the ADA, the Unruh Act, and the CDPA, alleging violations of applicable accessibility standards throughout the class period.

1.    Title III of the ADA

Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.  42 U.S.C. § 12182(a).

To state a claim under Title III of the ADA, a plaintiff must show that he or she is disabled within the meaning of the ADA; that the defendant is a private entity that owns, leases, or operates a place of public accommodation; and that the plaintiff was denied public accommodation by the defendant because of his or her disability.  Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc., 603 F.3d 666, 670 (9th Cir. 2010).

The class is limited to individuals who use wheelchairs or scooters, and thus plaintiffs satisfy the first element.  It is undisputed that the Taco Bell restaurants are places of public accommodation, which satisfies the second element.  See 42 U.S.C. § 12181(7)(B).

The third element – whether plaintiffs were denied public accommodations on the basis of disability – is met if there was a violation of applicable accessibility standards. See, e.g., Chapman v. Pier 1 Imports (U.S.), Inc., 631 F.3d 939, 945 (9th Cir. 2011); Donald v. Cafe Royale, 218 Cal. App. 3d 168, 183 (1990).

There are three categories of accessibility requirements under Title III of the ADA – the "new construction" provisions, which apply to public accommodations constructed after January 26, 1993; the "alteration" provisions, which apply to post-January 26, 1992 alterations to buildings that existed as of that date; and the "readily achievable" provisions,

which apply to unaltered portions of buildings constructed before January 26, 1993.

All facilities built for first occupancy after January 26, 1993 are required to be "readily accessible to and usable by persons with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of the ADAAG, 28 C.F.R. pt. 36, app. A.  See 42 U.S.C. § 12183(a)(1).  All facilities built for first occupancy after January 26, 1993 must comply with the ADAAG.  28 C.F.R. § 36.406.

Because Taco Bell 4518 was constructed in 1991, it is not governed by the "new construction" provisions of Title III.  However, both the "alteration" and the "readily achievable" provisions do apply.  Under the "alteration" provisions, the altered portion of any existing building altered after January 26, 1992 is required, to the maximum extent feasible, to be "readily accessible to and useable by" individuals with disabilities.  42 U.S.C. § 12183(a)(2).  To meet this standard, alterations must comply with the ADAAG.  28 C.F.R. § 36.406(a).

In existing but unaltered facilities, barriers must be removed where it is "readily achievable" to do so.  The removal of barriers is "readily achievable" when it is "easily accomplishable and able to be carried out without much difficulty or expense."  42 U.S.C. §§ 12181(9), 12182(b)(2)(A)(iv).  The Ninth Circuit has not decided whether the plaintiff or the defendant bears the burden of proof in showing that removal of an architectural barrier in a non-historic building is readily achievable, but various district courts throughout the Circuit have applied the burden-shifting framework set forth in Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership I, 264 F.3d 999 (10th Cir. 2001).  See, e.g., Johnson v. Beahm, 2011 WL 3665114 at *2 (E.D. Cal. Aug. 19, 2011); Vesecky v. Garick, Inc., 2008 WL 4446714, at *2 (D.Ariz. Sept. 30, 2008).

In Colorado Cross, the Tenth Circuit held that the "[p]laintiff bears the initial burden of production to present evidence that a suggested method of barrier removal is readily achievable" and that if plaintiff meets that burden, the burden shifts to the defendant, who "bears the ultimate burden of persuasion regarding its affirmative defense that a suggested method of barrier removal is not readily achievable."  Id., 264 F.3d at 1006.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Under either the "alterations" or "readily achievable" provision, whether an

2    architectural element denies full and equal access to persons with disabilities is determined

3    based on the ADAAG. Chapman, 631 F.3d at 945.

4    2.    The Unruh Act and the CDPA

5    The Unruh Act and the CDPA prohibit discrimination on the basis of disability in the

6    full and equal access to the services, facilities, and advantages of public accommodation.

7    Public accommodations constructed subsequent to July 1, 1970 are subject to the

8    requirements of Division 13, Part 5.5 of the California Health & Safety Code, relating to

9    access to public accommodations by physically handicapped persons; and to the

10   provisions of Chapter 7 (commencing with § 4450) of Division 5 of Title 1 of the California

11   Government Code (access to public buildings by physically handicapped persons).

12   Since December 31, 1981, the standards governing the physical accessibility of

13   public accommodations in California include those set forth in Title 24 of the California

14   regulatory code ("California standards" or "Title 24"). The California Standards apply to all

15   alterations to facilities, requiring that the altered portion – including a primary entrance to a

16   building, the primary path of travel to the altered portion of the facility, and restrooms

17   serving the altered area – be brought into compliance with the then-applicable standards.

18   See Cal. Code Regs., tit. 24 (1981) § 2-105(b)(11)(B)(4); id. (1984) § 2-105(b)(11)(B)(4); id.

19   (1987) § 2-110(b)(11)(B)(4); id. (1989) § 110A(b)(11)(B)(4); id. (1994) § 110(11)(B)(4); id.

20   (1989) § 1134B.2.1.

21   Because Taco Bell 4518 was constructed in 1991, all elements must comply with

22   Title 24, and the applicable standards are those promulgated in 1989. Cal. Code Regs., tit.

23   24 (1989). Title 24 also applies to alterations, requiring that the altered portion be brought

24   into compliance with the then-applicable standards. See id. (1989) § 110A(b)(11)(B)(4); id.

25   (2002) § 1134B.2.

26   A violation of the standards in Title 24 constitutes a violation of both the Unruh Act

27   and the CDPA. See, e.g., Arnold v. United Artists Theater Circuit, Inc., 866 F.Supp. 433,

28   439 (N.D. Cal. 1994). In addition, the Unruh Act, since 1992, and the CDPA, since 1996,

United States District Court

For the Northern District of California

1   have also provided that "[a] violation of the right of any individual under the [ADA] . . .

2   constitute[s] a violation of this section."  Cal. Civ. Code §§ 51(f), 54(c).

3          3.      Maintenance of accessible features

4          Both the ADA and state law require TBC to "maintain in operable working condition

5   those features of facilities and equipment that are required to be accessible to and usable

6   by persons with disabilities.  28 C.F.R. § 36.211; Cal. Code Regs., tit. 24 (2002) § 1101B.3.

7   B.     Standing

8          TBC argues that because it has remediated the numerous barriers found by the

9   Special Master and plaintiff's expert, and because it has implemented new policies since

10  the filing of this lawsuit, plaintiffs have no standing to seek injunctive relief, which is the only

11  remedy available to private parties for violations of the ADA.

12         Standing is a threshold matter central to the court's subject matter jurisdiction.

13  Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007); see also Summers v.

14  Earth Island Inst., 555 U.S. 488, 129 S.Ct. 1142, 1148 (2009) (Article III limits judicial power

15  to "cases" and "controversies").  Constitutional standing has three elements.  To establish

16  standing, a plaintiff must show that he or she has suffered or is threatened with an injury

17  that is both "concrete and particularized," and "actual or imminent, not conjectural or

18  hypothetical;" that there is a causal link between the injury and the conduct of which the

19  plaintiff complains – that is, that the injury is "fairly traceable" to the challenged conduct;

20  and that the injury is "likely" to be "redressed by a favorable decision."  Bates, 511 F.3d at

21  985 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quotations

22  omitted)); see also Skaff v. Meridien North America Beverly Hills, LLC, 506 F.3d 832, 837

23  (9th Cir. 2007).

24         The evidence relevant to the standing inquiry consists of "the facts as they existed at

25  the time the plaintiff filed the complaint."  D'Lil v. Best Western Encina Lodge & Suites, 538

26  F.3d 1031, 1036 (9th Cir. 2008) (quoting Skaff, 506 F.3d at 838); see also Lujan, 504 U.S.

27  at 569 n.4.  A plaintiff must demonstrate standing for each form of relief sought.  Friends of

28  the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 185 (2000);

22

United States District Court

For the Northern District of California

1    Bates, 511 F.3d at 985.  In a class action, standing is satisfied if at least one named plaintiff

2    meets the requirements.  Armstrong v. Davis, 275 F.3d 849, 860 (9th Cir. 2001), abrogated

3    in part on other grounds by Johnson v. California, 543 U.S. 499, 504-05 (2005).

4    Under the ADA, when a disabled person encounters an accessibility barrier violating its

5    provisions, it is not necessary for standing purposes that the barrier completely preclude

6    the plaintiff from entering or from using a facility in any way.  See Doran v. 7-Eleven, Inc.,

7    524 F.3d 1034, 1041 n. 4 (9th Cir. 2008) (the ADA "does not limit its antidiscrimination

8    mandate to barriers that completely prohibit access").  Rather, the barrier need only

9    interfere with the plaintiff's "full and equal enjoyment" of the facility.  42 U.S.C. § 12182(a).

10        Once a disabled individual has encountered or become aware of ADA violations that

11   interfere with his access to a place of public accommodation, "he has already suffered an

12   injury in fact traceable to the defendant's conduct and capable of being redressed by the

13   courts, and so he possesses standing under Article III."  Doran, 524 F.3d at 1042 n.5.

14        In addition, an ADA plaintiff who has Article III standing as a result of at least one

15   barrier at a place of public accommodation may, in one suit, challenge all barriers in that

16   public accommodation that are related to his or her specific disability.  Chapman, 631 F.3d

17   at 950-51 (citing Doran, 524 F.3d at 1047).  Thus, a plaintiff need not have encountered all

18   the barriers that impede his or her access in order to have standing to seek an injunction to

19   remove those barriers.  Id. at 951-53.  In addition, in evaluating whether a civil rights litigant

20   has satisfied the requirements set forth in Lujan, the court should take a broad view of

21   standing, "especially where, as under the ADA, private enforcement suits are the primary

22   method of obtaining compliance with the Act."  Doran, 524 F.3d at 1039-40 (citation and

23   quotation omitted).

24        Here, TBC does not argue that plaintiffs lacked standing at the time the original

25   complaint was filed in 2002.  Indeed, testimony at trial established that in 2002, named

26   plaintiff Katherine Corbett personally encountered barriers at Taco Bell 4518, which

27   impaired her full and equal enjoyment of the facility due to her particular disability – as did

28   other members of the class.  Thus, Corbett and the class members had standing to sue as

United States District Court
For the Northern District of California

1    to those barriers in addition to other barriers related to their disability.  See Chapman, 631

2    F.3d at 944.

3        However, because "a disabled individual claiming discrimination must satisfy the

4    case or controversy requirement of Article III by demonstrating his standing to sue at each

5    stage of the litigation," Chapman, 631 F.3d at 946, TBC argues that plaintiffs do not

6    currently have standing to seek injunctive relief.  In the alternative, TBC asserts that

7    because Taco Bell 4518 is currently compliant, plaintiffs' claims have become moot.

8        The argument that plaintiffs do not currently have standing to seek injunctive relief

9    appears to be a challenge to the second prong of the "injury in fact" requirement – the

10   requirement that the injury be "actual or imminent" – or, possibly, to the "redressability"

11   requirement – the requirement that the injury is likely to be redressed by a favorable

12   decision.  See Lujan, 504 U.S. at 560-61.

13       When a plaintiff is seeking injunctive relief, the requirement that the injury be "actual

14   and imminent" can be satisfied only where the plaintiff demonstrates "a sufficient likelihood

15   that he will again be wronged in a similar way;" that is, he "must establish a real and

16   immediate threat of repeated injury."  D'Lil, 538 F.3d at 1036-37; Bates, 511 F.3d at 985;

17   see also Chapman, 631 F.3d at 946, 948.  Here, TBC argues, because plaintiffs have

18   conceded that Taco Bell 4518 is currently a compliant facility, they lack standing to seek

19   injunctive relief because they cannot show that the injury is likely to recur.

20       In Armstrong, the Ninth Circuit described two ways in which a plaintiff can show that

21   an injury is likely to recur.  First, a plaintiff may show that the defendant had, at the time of

22   the injury, a written policy, and that the injury "stems from" that policy.  Id., 275 F.3d at 861.

23   "[W]here the harm alleged is directly traceable to a written policy, there is an implicit

24   likelihood of its repetition in the immediate future."  Id. (citation and quotation omitted).

25   Second, the plaintiff may demonstrate that the harm is part of a "pattern of officially

26   sanctioned . . . behavior, violative of the plaintiffs' [federal] rights."  Id. (quoting LaDuke v.

27   Nelson, 762 F.2d 1318, 1323 (9th Cir. 1985)).  "[W]here the defendants have repeatedly

28   engaged in the injurious acts in the past, there is a sufficient possibility that they will

United States District Court
For the Northern District of California

1   engage in them in the near future to satisfy the 'realistic repetition' requirement." Id.

2       Later, in Chapman, the Ninth Circuit identified additional ways in which a plaintiff can

3   show a likelihood of future injury.  First, he can demonstrate an intent to return to a

4   noncompliant accommodation.  Id., 631 F.3d at 948-49.  Evidence of past injury is

5   particularly relevant to making this showing.  Id.  Second, he can demonstrate that he was

6   deterred from visiting a noncompliant accommodation because he has encountered

7   barriers related to his disability there.  Id. at 949-50.

8       TBC contends that because Taco Bell 4518 is currently compliant, plaintiffs cannot

9   establish standing to pursue injunctive relief by demonstrating an intent to return to a

10  noncompliant facility.  TBC asserts further that the trial record is devoid of any evidence

11  indicating that named plaintiff Katherine Corbett had the specific intention to return to Taco

12  Bell 4518 to re-encounter the noncompliant barriers that she encountered during her pre-

13  lawsuit visit to Taco Bell 4518.

14      The court finds, however, that plaintiffs have standing to seek injunctive relief in this

15  case.  First, named plaintiff Ms. Corbett, and class members Ms. Harry, and Ms.

16  Westbrook-White, all testified at trial that they plan to patronize Taco Bell 4518 in the

17  future.  In her deposition, class member Ms. Cone also testified that she plans to patronize

18  Taco Bell 4518 once she has returned to California from her temporary stay in North

19  Carolina.  Whether plaintiffs will encounter barriers on those return trips cannot be known

20  with certainty.  However, the court finds that plaintiffs have sufficiently established a

21  likelihood that the injury will recur by showing that TBC "repeatedly engaged in injurious

22  acts in the past."  See Armstrong, 275 F.3d at 861.

23      Finally, to the extent that TBC argues that the court lacks jurisdiction over plaintiffs'

24  claims because the violations have been remediated, and the claims are therefore moot,

25  the court notes that while the doctrine of mootness requires that an actual, ongoing

26  controversy exist at all stages of the federal court proceeding, the mootness doctrine is

27  "applied . . . flexibly, particularly where the issues remain alive." Pitts v. Terrible Herbst,

28  Inc., __ F.3d __, 2011 WL 3449473 at *3 (9th Cir., Aug. 9, 2011).  This issue is addressed,

United States District Court

For the Northern District of California

1   below, in the discussion of TBC's voluntary cessation defense.

2   C.      Findings regarding twelve elements at Taco Bell 4518

3          Both the ADAAG and Title 24 provide that "all dimensions are subject to

4   conventional building industry tolerances for field conditions."  ADAAG § 3.2; see also, e.g.,

5   Cal. Code Regs., tit. 24 (2002) § 1101B.4.  In this case, the parties stipulated in their

6   February 1, 2005 Joint Status Conference Statement that once plaintiffs had established a

7   prima facie case of a violation, TBC would bear the burden of proof to put on expert

8   testimony regarding applicable conventional building industry tolerances.  The parties

9   subsequently stipulated to a number of specific tolerances, and TBC provided others in

10  responses to interrogatories.  The only elements not covered by either stipulations or

11  interrogatory responses are door force, door closing time, and knee clearance.

12         Following the exemplar trial, and the parties' submission of their proposed findings,

13  TBC submitted additional argument to the court, in which it asserts that based on the Ninth

14  Circuit's recent decision in Oliver v. Ralph's Grocery Company, __ F.3d __, 2011 WL

15  3607014 (9th Cir., Aug. 17, 2011), any findings by the court in this action with respect to

16  barriers that violate the ADA must be limited to specific barriers alleged in the first amended

17  complaint ("FAC"), which is the operative complaint.  TBC contends that because the FAC

18  identified only two barriers at Taco Bell 4518 – the narrow queue line and inaccessible

19  parking – plaintiffs failed to give TBC "fair notice" of the claims asserted against it, as

20  required under Federal Rule of Civil Procedure 8(a).

21         The court does not agree that Oliver controls this case.  As an initial matter, Oliver is

22  distinguishable because it was not a class action.  To apply the reasoning in Oliver to a

23  class action would arguably vitiate Federal Rule of Civil Procedure 23.  While the named

24  plaintiffs know which barriers they encountered, they do not necessarily know which of the

25  barriers that existed at the time the suit was filed posed a problem for the unnamed class

26  members.  At most, Oliver would require the named plaintiffs to list the barriers they

27  themselves encountered, which the have done.

28         Nor does the court agree that plaintiffs failed to give TBC notice of the specific

26

1   claims asserted against it.  This case, which was filed in December 2002, has been

2   pending for nearly nine years.  TBC took the depositions of the named plaintiffs in 2003, at

3   which time the plaintiffs described encountering the following barriers:  inaccessible

4   parking, inadequate parking signage, path of travel to entry doors, heavy and otherwise

5   inaccessible entry and restroom doors, narrow queue lines, inaccessible self-service items,

6   insufficient accessible seating, low toilet seats, uninsulated lavatory pipes, and inaccessible

7   restroom amenities.  TBC acknowledged many of these claimed barriers in its opposition to

8   plaintiffs' motion for class certification.

9          TBC was also put on notice of the claimed barriers when it received the report of

10  Bob Evans, the Special Master, in mid-2005.  Mr. Evans is an accessibility expert who was

11  jointly retained by plaintiffs and TBC to conduct a survey of all the Taco Bell restaurants

12  (starting with a pilot program of 20 stores).  He was instructed jointly by the parties as to

13  which elements he should survey in each restaurant.  It is undisputed that Mr. Evans

14  provided a complete survey of all the barriers existing in TBC's corporate restaurants in

15  2004-2005.  Many of the barriers were also documented by plaintiffs' own expert Eric

16  McSwain in his May 2009 report, to which TBC provided a line-by-line response, and by

17  TBC's contractors in 2007 and 2009.  For TBC to argue, based on the facts in Oliver, that it

18  was not placed on notice of the claimed violations because not all the barriers were listed in

19  the FAC, is to elevate form over substance.

20         Moreover, when it denied TBC's 2009 motion for summary judgment, the court

21  ordered an exemplar trial as to a single store, and ordered plaintiffs to submit a list showing

22  remediated, unremediated, and recurring violations, which plaintiffs did on June 23, 2010.

23  Further, in preparation for the trial of the exemplar store, the parties filed a Joint Pretrial

24  Statement on April 7, 2011, in which plaintiffs listed the barriers at Taco Bell 4518, relying

25  on their June 23, 2010 filing.  At the pretrial conference, TBC objected and attempted to

26  limit the barriers, but the objection was overruled, on the basis that TBC had been on notice

27  for a year (since June 23, 2010) of all the barriers, including those at Taco Bell 4518.

28         The court indicated that the barriers listed on pages 29 and 30 of the Pretrial

27

United States District Court

For the Northern District of California

1   Statement would be the ones that would be tried during the exemplar trial.  Pleadings are

2   superceded by a pretrial order, see DP Aviation v. Smiths Indus. Aerospace & Def. Sys.

3   Ltd., 268 F.3d 829, 842 (9th Cir. 2001), and parties are therefore held to be on notice that

4   issues set forth in a pretrial order are the issues to be tried.

5         1.     Van accessible parking space

6        Wheelchair vans generally have lifts or ramps that fold out of the passenger side;

7   thus, they require a wider access aisle to permit the user to wheel down and then off the lift

8   or ramp, and then to retract the lift or ramp into the van.  See United States Dep't of

9   Justice, ADA Technical Assistance, Design Details: Van Accessible Parking ("Design

10  Details"), http://www.ada.gov/adata1.pdf at 15.

11       Although the 1989 version of Title 24 did not require van accessible spaces,

12  both the ADAAG and Title 24 (2002) require that one out of every eight spaces be van

13  accessible, defined as an accessible space adjacent to a 96-inch-wide access aisle.

14  ADAAG § 4.1.2(5)(b); Cal. Code Regs., tit. 24 (2002) § 1129B.3.2.  Because the parking lot

15  at Taco Bell 4518 was restriped in 2003 and 2004, the alterations provisions of both laws

16  required that TBC bring the parking lot into compliance with the ADAAG and Title 24.

17       The Special Master measured the access aisle at 60 inches in 2005.  The parties

18  have stipulated that the ADAAG tolerance for the width of the access aisle is 94 inches,

19  and TBC stated in interrogatory responses that the same tolerance applies under Title 24.

20  The access aisle is thus out of compliance with the ADAAG and Title 24 (2002).

21       TBC argues that restriping is not an alteration sufficient to invoke the requirement

22  that it provide a van accessible space with required access aisle.  However, the Special

23  Master testified that each time the parking lot was restriped constituted an alteration and

24  TBC was thus required to comply with the ADAAG and Title 24 (2002).  In addition, the

25  Department of Justice has provided specific technical assistance stating that, "[i]f you

26  restripe the parking area, you must restripe so that you provide the correct number of

27  accessible parking spaces, including van accessible parking."  Design Details,

28  http://www.ada.gov/adata1.pdf at 17.  Because van accessible parking is defined as a

28

1   parking space with a 96-inch access aisle, ADAAG § 4.1.2(5)(b), TBC was required to

2   provide such an aisle.

3        TBC also relies on Title 24(2002) § 1134B.2.1, Exception 4,  which excepts from the

4   alterations requirement "cosmetic work that does not affect items regulated by this code,

5   such as painting."  However, parking striping is an "item regulated by" Title 24, and thus

6   cannot be considered merely cosmetic.

7        Because the parking lot was restriped in 2003 and 2004, and because the Special

8   Master found that the access aisle at the single van accessible parking space was 60

9   inches wide in 2005, the van accessible parking access aisle was in violation of the ADA

10  and state access laws.

11          2.      Van accessible parking signage

12        Both the ADAAG and Title 24 (2002) require signage identifying van accessible

13  parking spaces.  ADAAG § 4.6.4; Cal. Code Regs, tit. 24 (2002) § 1129B.4.  Although there

14  was a van accessible sign in place at Taco Bell 4518 when it was surveyed by the Special

15  Master in 2005, a sign was not installed when the original 60-inch aisle was restriped to

16  create a compliant van accessible space in 2007.  It appears that no sign was installed until

17  the summer of 2009.

18        TBC was required to maintain access and failed to do so by removing the van

19  accessible sign.  In addition, because TBC altered the van accessible signage by removing

20  it after 2002, it was required by the ADAAG and 2002 version of Title 24 to reinstall

21  compliant signage.  The fact that it did not do so until 2009 was a violation of the ADA and

22  state access laws.

23          3.      North entry door force

24        Title 24 places a limit on the amount of force required to open an exterior door.  In

25  1989, the maximum door force was 8 1/2 pounds.  Cal. Code Regs, tit. 24 (1989)

26  § 3304(i.2)(1).  The Special Master found in 2005 that the force required to open the north

27  entry double door at Taco Bell 4518 was 10 pounds on the left, and 7 1/2 pounds on the

28  right.

1    In the August 2007 summary judgment order, the court applied a one-pound

2 tolerance and concluded that the door at Taco Bell 4518 was non-compliant.  The court

3 also held, however, that with respect to restaurants built before 1994, only the "primary

4 entrance" was required to comply.  TBC has since stipulated that the door in line 209 of the

5 Special Master's survey for restaurant 4518 is the "primary entrance."  Based on the above,

6 the court finds that the north entry door was out of compliance with the new construction

7 standard in the 1989 version of Title 24.

8    TBC argues that it is difficult to adjust door force so that it is compliant.  Although

9 the fact that the north entry door was out of compliance with the 1989 standard was

10 resolved by the court in its August 2007 summary judgment decision, it is also true that the

11 fact that it is difficult to comply with a law does not make it legal to violate it.  TBC's expert

12 testified at trial that, if the door pressure standard were difficult to meet, TBC had the option

13 of installing an automatic door opener, an option he has "suggested . . . many times," and

14 the applicable 1989 version of Title 24 states that "[c]ompensating devices or automatic

15 door operators may be utilized to meet the above standards."  Cal. Code Regs, tit. 24

16 (1989) § 3304(i.2)(l).

17    TBC argues that equivalent facilitation is established by the fact that the right door of

18 the two-door entry complied with the 1989 Standard.  The court finds, however, that

19 because the right door leaf did not comply with the applicable door timing standard, the

20 door as a whole was noncompliant.  It would be unreasonable to require a wheelchair-

21 bound patron who encounters a door too heavy to open to try the adjacent door rather than

22 assume that it too would likely be noncompliant.

23    4.    North entry door closing time.

24    The ADAAG and Title 24 (since 2002) require that doors take at least three seconds

25 to close.  ADAAG § 4.13.10; Cal. Code Regs. tit. 24 (2002) §1133B.2.5.1.  The door closing

26 time of the right-side door of the north entry was 2 seconds when measured by the Special

27 Master in 2005.  TBC has stated in interrogatory responses that the tolerance on door

28 closing time should be 2.5 seconds.

30

United States District Court

For the Northern District of California

1    The Special Master's measurement of 2 seconds in 2005 shows that the north entry

2    door was out of compliance with the ADAAG.  Because the ADAAG's door closing standard

3    was not in effect when Taco Bell 4518 was built, plaintiffs rely on the ADA's readily

4    achievable provision to argue that TBC should have replaced the door closer by 2001 – the

5    beginning of the class period – to achieve a compliant door closing time.

6    Plaintiffs have made a sufficient showing that replacing the door closers was readily

7    achievable in 2001.  TBC contends that plaintiffs put on evidence only as to cost, and did

8    not address the other factors in 42 U.S.C. § 12181(9).  However, plaintiff also presented

9    expert evidence of the impact on operations, and an expert analysis of the cost in light of

10   TBC's profits at several different levels, from the individual store to the parent corporation.

11   This court finds this evidence sufficient, even under the more stringent <u>Colorado Cross</u>

12   standard, to shift the burden to TBC to demonstrate that it was not readily achievable to

13   replace the door closers.

14   TBC made no effort to satisfy its burden.  Plaintiffs' evidence concerning costs,

15   finances, and impact on operations was unrebutted.  The court holds that it was readily

16   achievable in 2001 to replace the north entry door closers.  As a result, the right leaf of the

17   door was in violation of applicable standards in 2005.

18   TBC installed new door closers on the north entry doors in 2007.  The door closing

19   time would subsequently have had to comply with the ADAAG and 2002 Title 24 standards

20   requiring a minimum of 3 seconds.  However, when Taco Bell 4518 was surveyed by Mr.

21   McSwain in 2008, the door closing times for the leaves of the north entry door were 2.5

22   seconds and 2.75 seconds.  This does not comply with Title 24 or the ADAAG.

23   Although Mr. McSwain's measurements are within the tolerance stated in TBC's

24   interrogatory, plaintiffs assert that these measurements are out of compliance.  Despite

25   having the burden to do so, TBC did not put on expert testimony concerning the

26   appropriate tolerances for door closing time.

27   Mr. Terry testified that construction tolerances would not apply to door closing

28   speed, as it is adjustable and thus required to be maintained to be accessible.  TBC did

United States District Court
For the Northern District of California

1   not rebut this testimony.

2       Because allowable tolerances must be based on "conventional building industry

3   tolerances for field conditions," ADAAG § 3.2; Cal. Code Regs., tit. 24 (2002) § 1101B.4,

4   TBC's general references to the effect of wind and ventilation, or the difficulty of

5   compliance, are insufficient to meet its burden of proof.  Moreover, as wind and ventilation

6   would affect any building's exterior door, those factors cannot serve as an excuse for

7   noncompliance.

8       Based on the above, the court holds that the door closing times were in violation of

9   applicable standards.

10          5.      Queue line

11      The court has already held that the queue line at Taco Bell 4518 violated the

12  new construction provisions of Title 24.  In granting summary judgment on this issue, the

13  court held that TBC – relying on Mr. Blackseth's declaration – had raised a triable issue of

14  fact as to whether the separate auxiliary access was discriminatory.  This question is

15  addressed below, in the discussion of TBC's defense of equivalent facilitation.

16          6.      Reach range for drink lid dispenser

17      Both Title 24 and the ADAAG govern the location of objects that wheelchair users

18  must be able to reach from their wheelchairs.  If the individual is able to pull up immediately

19  next to the object, he can reach higher than if he is required to reach laterally over an

20  obstruction.

21      In 2005, the Special Master established that the reach range to the drink lids at Taco

22  Bell 4518 was over an obstruction, but required a reach up of 52 inches and a lateral reach

23  of 28 1/4 inches.  As noted below, the ADA applies only to equipment that is fixed or built

24  into the structure of the facility.  However, because the 1989 version of Title 24 limits

25  reaches over obstructions to 46 inches in height and 24 inches laterally, Cal. Code Regs.

26  tit. 24 (1989) § 522(c) & Fig. 5-5D, the reach to the drink lids was out of compliance.

27      TBC has stated in interrogatory responses that, at a height of 52 inches, the

28  tolerance on the maximum lateral reach over an obstruction should be 15 inches, and on

United States District Court

For the Northern District of California

1    the maximum lateral reach overall should be 25 inches.  TBC argues that the 1989 version

2    of Title 24 did not govern the height of the object over which one is reaching.  See Cal.

3    Code Regs., tit. 24 (1989) Fig. 5-5D.  While true, this does not render the drink lid location

4    as compliant.  That same figure set limits on the height and lateral reach, and the

5    placement of the lids did not comply with these standards.

6            7.      Knee and toe clearance at accessible tables[3]

7            The ADAAG provides minimum dimensions for the clearance under an accessible

8    dining table so that the legs and toes of a person in a wheelchair can fit under the table.

9    Among other things, the knee space is required to be 19 inches deep from the front of

10   the table.  ADAAG § 4.32.3.

11           The knee clearance at two designated accessible tables was 10 1/2 to 11 inches

12   when measured by the Special Master in 2005.  Because the ADAAG's knee clearance

13   standard was not in effect when Taco Bell 4518 was built, plaintiffs rely on the ADA's

14   readily-achievable provision to argue that TBC should have replaced the two table bases by

15   2001 – the beginning of the class period – to achieve a compliant knee clearance.

16           The parties stipulated to a tolerance for the depth of the knee clearance under

17   dining tables – 18 inches – but this applies only to new construction and alterations under

18   the ADAAG, while plaintiffs here apply the ADAAG under the readily-achievable provision.

19   TBC did not provide evidence of an appropriate tolerance for the depth of knee clearance

20   under the readily achievable provision.  Plaintiffs' expert Mr. Terry testified that no

21   construction tolerance applies to knee clearance depth.  TBC did not rebut this testimony.

22           Plaintiffs made a sufficient showing that replacing two table bases was readily

23   achievable in 2001.  Again, TBC argues that plaintiffs put on only evidence as to cost, and

24   did not address the other factors in § 12181(9).  The court notes, however, that plaintiffs

25   also put on expert evidence of the impact on operations, and an expert analysis of the cost

26   in light of TBC's profits at several different levels, from the individual store to the parent

27   _____

28           [3]  The court has already ruled that Taco Bell 4518 did not have a sufficient number of
     accessible dining tables for the number of seats in the restaurant.

United States District Court

For the Northern District of California

1    corporation.  This court finds that this evidence is sufficient, even under the more stringent

2    <u>Colorado Cross</u> standard, to shift the burden to TBC to demonstrate that it was not readily

3    achievable to replace the table bases.

4          TBC made no effort to satisfy its burden.  Plaintiffs' evidence concerning costs,

5    finances and impact on operations was unrebutted.  The court finds that it was readily

6    achievable in 2001 to replace the bases of two designated accessible tables.

7          8.     Maneuvering clearance at women's restroom door

8          The ADAAG and the 2002 version of Title 24 require maneuvering clearances on

9    either side of a door.  A push door that has a closer and a latch must have an additional

10   space of 12 inches to the side of the door with the latch hardware, providing space for the

11   wheelchair-user's feet as he or she reaches for the door handle.  Cal. Code Regs. tit. 24

12   (2002) § 1133B.2.4.2 & Fig. 11B-26A(a); ADAAG § 4.13.6 & Fig. 25(a).  TBC has stated in

13   interrogatory responses that the tolerance for this requirement should permit a minimum of

14   8 inches.

15         According to the Special Master's survey, the women's restroom door had a closer

16   and latch, but had a space of only 4 inches to the side of the door.  All that was required to

17   bring the door into compliance was to remove the latch.  Plaintiffs were not requesting that

18   TBC reconfigure the door to add eight inches to the latch side, and the Special Master

19   testified that replacing the latch remedied plaintiffs' concerns with the women's restroom

20   door maneuvering clearance.

21         Because the restroom doors were replaced in 2003, the new doors were required to

22   comply with the 2002 version of Title 24, which would have required that the new door not

23   have a latch.  The Special Master testified that if the restroom doors were replaced in 2003,

24   the 2002 version of Title 24 and the ADAAG would have applied during the Special Master

25   survey in 2005.  Thus, when the Special Master survey recorded the door as having a latch

26   and closer with only 4 inches of maneuvering clearance in 2005, it was out of compliance.

27         9.     Height and position of water closet in women's restroom

28         The version of Title 24 in effect when Taco Bell 4518 was built required that the

34

1   water closet seat be between 17 and 19 inches in height.  Cal. Code Regs tit. 24 (1989)

2   § 1502.  TBC has stated in interrogatory responses that the proper tolerance for this

3   requirement would permit a range of 16 to 20 inches.  According to the Special Master's

4   survey, the water closet seat in the women's restroom was 15 1/2 inches high.  As such,

5   the dimensions measured by the Special Master violated the new construction standards of

6   Title 24 applicable when Taco Bell 4518 was built.

7          The ADAAG and the 2002 version of Title 24 require that the centerline of the water

8   closet be 18 inches from the near wall.  ADAAG § 4.16.2 & Fig. 28; Cal. Code Regs. tit. 24

9   (2002) § 1115B.7.2.  According to the Special Master's survey, the centerline of the water

10  closet in the women's restroom was 20 inches from the near wall.  The parties have

11  stipulated that the ADAAG tolerance for the position of centerline of the water closet is 16

12  to 19 inches.

13         Because the women's restroom water closet was replaced in 2003, the new water

14  closet was required to comply with the ADAAG and 2002 version of Title 24, which required

15  that the centerline be 18 inches from the near wall.  The Special Master testified that if

16  water closet in women's restroom was replaced in 2003, the 2002 version of Title 24 and

17  the ADAAG would have applied during the Special Master survey in 2005.  Thus, when the

18  Special Master survey recorded the centerline measurement as 20 inches in 2005, it was

19  out of compliance.

20         10.    Clear floor space at water closet

21         The version of Title 24 in effect when Taco Bell 4518 was built required TBC to

22  provide a "clear space" of 32 inches to the side of the water closet, and 48 inches in front of

23  the water closet.  Cal. Code Regs tit. 24 (1989) § 511.1(a)(8).  In both the men's and

24  women's restroom, the clear space at the water closet complies with the applicable

25  standards as an architectural matter.  When surveyed by the Special Master, however,

26  these required clear spaces were obstructed by moveable trash cans.  Furthermore,

27  despite the fact that Alianza reported that it removed the movable trash can from the

28  women's restroom in 2007, the trash can had been returned to the precise place observed

1   by the Special Master when it was surveyed by plaintiffs' expert in March, 2008, and again

2   in photographs from TBC on two occasions in 2009.

3        TBC does not dispute that there were moveable trash cans in the required clear

4   space; rather, it argues that this does not constitute a violation because the ADAAG does

5   not apply to moveable objects and therefore permits a moveable trash can in the required

6   clear floor space.  However, plaintiffs do not rely on the ADAAG to support their claim

7   regarding this element.  TBC has not provided any evidence or citations to the effect that

8   Title 24 would permit obstructions in required "clear space."  Indeed, TBC's expert

9   concedes that a removable trash can "could be a barrier" . . . "depend[ing] upon how big

10  the trash can is or where it's placed."

11       In addition, with regard to whether the ADAAG permits moveable trash cans to

12  obstruct required clear floor space, the court notes that DOJ regulations implementing Title

13  III require that a public accommodation "maintain in operable working condition those

14  features of facilities and equipment that are required to be readily accessible to and usable

15  by persons with disabilities."  28 C.F.R. § 36.211(a).

16       In the DOJ's interpretation – which is entitled to deference – this regulation

17  recognizes that it is not sufficient to provide features such as accessible routes, elevators,

18  or ramps, if those features are not maintained in a manner that enables individuals with

19  disabilities to use them.  See Guidance on ADA Regulation on Nondiscrimination on the

20  Basis of Disability by Public Accommodations and in Commercial Facilities. originally

21  published on July 26, 1991, 28 C.F.R. Pt. 36, App. C (Mar. 15, 2011).  While isolated or

22  temporary obstructions are not prohibited, allowing obstructions to persist or "[f]ailure . . . to

23  ensure that accessible routes are properly maintained and free of obstructions . . . would

24  also violate this part."  Id.  The 2002 version of Title 24 contained language similar to 28

25  C.F.R. § 36.211(a).  See Cal. Code Regs. tit. 24 (2002) § 1101B.3.1.

26       And while it is true that the Access Board drafted the ADAAG to apply to fixed

27  elements, see Colorado Cross-Disability Coalition v. Too (Delaware), Inc., 344 F. Supp. 2d

28  707, 712 (D. Colo. 2004), the ADAAG also clearly governs – and requires – clear floor

1    space in restrooms.  See, e.g., ADAAG § 4.22.3.  "Clear floor space" is defined by the

2    ADAAG as "[t]he minimum unobstructed floor or ground space required to accommodate a

3    single, stationary wheelchair and occupant."  Id. § 3.5.

4          TBC's expert Kim Blackseth conceded that a moveable trash can could be a barrier,

5    but testified that he believed that TBC's trash cans were not barriers because they were

6    lightweight, and he could move them with his feet.  However, TBC provided no evidence

7    that class members with other disabilities or types of wheelchairs attempted this task.

8          TBC later argued that because the plaintiffs use motorized scooters or wheelchairs,

9    they can reasonably be expected to use the force of their motorized vehicles to move

10   lighter-weight obstructions out of the way.  However, TBC provided no evidence to support

11   this claim, nor any evidence, for example, that an amputee would be able to move the trash

12   can without feet, or even that a quadriplegic like Mr. Blackseth who had a foot injury would

13   be able or inclined to do so.  This evidence is insufficient to require a finding that

14   obstructions are permitted in space that is required to be "clear."

15         11.    Height of soap dispensers and toilet seat cover dispensers

16         At the time that Taco Bell 4518 was constructed, Title 24 required that dispensers in

17   restrooms be mounted no higher than 40 inches above the floor.  Cal. Code Regs tit. 24

18   (1989) § 511.1(b)(2).  TBC has agreed that a 2-inch tolerance would be appropriate.  The

19   Special Master's survey showed that both the soap dispenser and the toilet seat cover

20   dispenser in both the men's and women's restrooms were higher than 42 inches.

21         TBC argues that the ADAAG's height limitations, which are higher than those in Title

22   24, provide equivalent facilitation.  This argument is addressed below in the context of the

23   discussion of the equivalent facilitation defense.

24         12.    Lavatory insulation

25         Title 24 required, when Taco Bell 4518 was built, that the hot water and drain

26   pipes under the lavatory be insulated.  Cal. Code Regs tit. 24 (1989) § 1504(b).  Although

27   Alianza wrapped the drain pipes and hot water supply line in the men's restroom in 2007,

28   the insulation was missing from the men's restroom when the restaurant was surveyed by

1    plaintiffs' experts in March 2008.  It was also missing when TBC took photographs in the

2    summer of 2009 and in the August-October 2009 period.

3         TBC claims that because the City of San Pablo inspected and approved the design

4    of the lavatory, it "had to have had insulation" at the time of construction.  TBC asserts that

5    the above-described violations were isolated incidents, but the court finds it not credible

6    that plaintiffs' expert and TBC's representatives should have photographed the drain pipe

7    and hot water supply line on the only three days during the period from 2007 to 2009 when

8    there was no insulation.  The court finds that the conditions observed by Mr. McSwain and

9    portrayed in TBC's photos constitute a violation of Title 24.

10   D.   Entitlement to Injunctive Relief

11        To be entitled to an injunction, plaintiffs must show that TBC has violated the

12   ADAAG or Title 24.  See 42 U.S.C. § 12188(a)(2) ("In the case of violations of [the

13   accessibility provisions] of this title, injunctive relief shall include an order to alter facilities to

14   make such facilities readily accessible to and usable by individuals with disabilities" and,

15   "[w]here appropriate, injunctive relief shall also include requiring a provision of an auxiliary

16   aid or service [or] modification of a policy . . . "); Cafe Royale, 218 Cal. App. 3d at 183

17   (plaintiffs may file suit for injunctive relief under the CDPA to enforce compliance with the

18   standards).

19        Plaintiffs are not required to show other prerequisites generally required for

20   injunctive relief, as "'[t]he standard requirements for equitable relief need not be satisfied

21   when an injunction is sought to prevent the violation of a federal statute which specifically

22   provides for injunctive relief.'"  Antoninetti v. Chipotle Mexican Grill, Inc., 643 F.3d 1165,

23   1175-76 (9th Cir. 2010), cert. denied, 131 S.Ct. 2113 (Apr. 18, 2011).

24        As set forth above, and in this court's August 2007 order re plaintiffs' motion for

25   partial summary judgment, plaintiffs have established that TBC has engaged in numerous

26   violations of state and federal accessibility requirements.  At present, it is undisputed that

27   TBC has remediated all barriers at Taco Bell 4518.  At trial, Special Master Bob Evans

28   testified that he found no federal or state access violations during his June 3, 2011 site

United States District Court
For the Northern District of California

38

United States District Court

For the Northern District of California

1    inspection of Taco Bell 4518.  Based on this, TBC argues that plaintiffs' claims for injunctive

2    relief are moot.

3         However, as discussed below, because TBC has not met its burden under the

4    voluntary cessation doctrine, an injunction shall enter, and the only remaining question is

5    the scope of the injunctive relief.  "The scope of injunctive relief is dictated by the extent of

6    the violation established.  The key question . . . is whether the inadequacy complained of is

7    in fact widespread enough to justify system wide relief."  Armstrong, 275 F.3d at 870

8    (quotation and citation omitted).

9         A court need not address every violation in order to conclude that violations are

10   sufficiently widespread to necessitate a system wide injunction.  Rather, a court can enter

11   such an injunction based on evidence that is "symptomatic" of the defendant's violations,

12   including "individual items of evidence [that are] representative of larger conditions or

13   problems."  Id. at 871.  Finally, while the scope of relief must correspond to the injury

14   suffered, in a certified class action, the injury, and the corresponding relief, extends to the

15   class as a whole.  Id.

16   E.   TBC's Defenses

17        1.   Voluntary cessation doctrine.

18        TBC argues that because it has removed or remediated all barriers in Taco Bell

19   4518, and because it has issued new accessibility policies (and plaintiffs have not

20   requested that any specific changes be made to those policies) plaintiffs' claim for

21   injunctive relief is moot.

22        "A case is moot when the issues presented are no longer 'live' or the parties lack a

23   legally cognizable interest in the outcome."  City of Erie v. Pap's A.M., 529 U.S. 277, 287

24   (2000).

25        Mootness can be characterized as the doctrine of standing set in a time
     frame:  The requisite personal interest that must exist at the commencement

26   of the litigation (standing) must continue throughout its existence (mootness).
     Mootness is a jurisdictional issue, and federal courts have no jurisdiction to

27   hear a case that is moot, that is, where no actual or live controversy exists.  If
     there is no longer a possibility that an appellant can obtain relief for his claim,

28   that claim is moot and must be dismissed for lack of jurisdiction.

United States District Court

For the Northern District of California

1   Foster v. Carson, 347 F.3d 742, 745 (9th Cir. 2003) (citations and quotations omitted).

2       Thus, the central inquiry in any mootness challenge is whether changes in the

3   circumstances existing when the action was filed have forestalled any meaningful relief.

4   "[T]he question is not whether the precise relief sought at the time an application for

5   injunctive relief was filed is still available.  The question is whether there can be any

6   effective relief."  West v. Secretary of Dep't. of Transportation, 206 F.3d 920, 925 (9th Cir.

7   2000); see also San Francisco BayKeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1159 (9th

8   Cir. 2002).  So long as the court can grant some effective relief, it does not matter that the

9   relief originally sought is unavailable due to changed circumstances.  See Church of

10  Scientology of Calif. v. United States, 506 U.S. 9, 12-13 (1992).

11      Here, in effect, TBC asserts that by removing or remediating the barriers at Taco

12  Bell 4518, it has voluntarily ceased the challenged conduct.  A request for prospective

13  injunctive relief will be mooted by a defendant's voluntary compliance only if the defendant

14  meets the "formidable burden" of demonstrating that it is "absolutely clear the alleged

15  wrongful behavior could not reasonably be expected to recur."  Friends of the Earth, 528

16  U.S. at 190; see also Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 221 (2000);

17  Rosemere Neighborhood Ass'n v. U.S. Envtl. Protection Agency, 581 F.3d 1169, 1173 (9th

18  Cir. 2009).  That is, TBC has the "'heavy burden of persua[ding]' the court that the

19  challenged conduct cannot reasonably be expected to start up again."  Friends of the Earth,

20  528 U.S. at 189 (citation omitted); see also Adarand, 528 U.S. at 222.  Plaintiffs assert that

21  in this case, TBC fails to meet this burden.

22      The court agrees, and finds that a number of factors demonstrate that TBC has not

23  met its burden under the voluntary cessation doctrine.  The evidence presented at trial

24  demonstrates that TBC is not currently following its own access policies, and has a history

25  of not doing so; that TBC's policies are vague and contradictory; and that TBC could

26  rescind the policies at any time.

27      First, TBC is not currently following its own access policies, and has a history of not

28  doing so.  A defendant's "ongoing history of not following its own stated . . . procedures

40

ma[kes] necessary" an injunction.  United States v. Laerdal Mfg. Corp., 73 F.3d 852, 857

(9th Cir. 1995).  Here this factor is particularly important because TBC bases its claim that

violations will not recur in the future on a number of accessibility policies that it adopted or

revised in 2010.  The evidence shows, however, that TBC is not following those policies.

        For example, although TBC claims to have had a policy since September 2010

whereby each day before a restaurant opens, a manager is supposed to conduct an

"Access for the Disabled" walk to check various accessibility items, the RGM for Taco Bell

4518 testified in his deposition that he had never heard of an access walk, and the

pre-opening walk had nothing to do with disability or access issues.  Despite the fact that

the RGM was responsible for ensuring that the Access for the Disabled Walk was

performed, TBC did not call him as a witness at trial, or any other employee at Taco Bell

4518 who was involved in the process of opening the restaurant, or whose responsibilities

included conducting the preopening Access for the Disabled Walk.

        Similarly, although TBC claims that accessibility issues are checked every 30

minutes to two hours during "Success Walks", the RGM testified during his deposition that

these walks do not involve accessibility issues.  While TBC claims that Maintenance

Technicians use a written checklist of 34 different accessibility items each time they visit a

restaurant, the Maintenance Technician for Taco Bell 4518 testified during his deposition

he had never seen the checklist and checked only six accessibility items at most.

        Moreover, although TBC asserts that Maintco conducts access surveys of each

restaurant twice a year, and provides TBC with an invoice and a completed checklist for

each such survey, at trial, TBC submitted only two checklists for Taco Bell 4518 when there

should have been at least four completed during the relevant period, and the invoices

submitted by TBC indicated that there was a 14-month gap between Maintco surveys at

that restaurant.

        TBC also has a history of not following its own access policies.  For example,

photographs admitted at trial demonstrated that in the past five years, TBC had on multiple

occasions not followed its policy that accessible parking spaces have required signage, that

United States District Court

For the Northern District of California

1    trash cans in restrooms not block dispensers, and that pipes under lavatories in restrooms

2    be insulated.

3         Second, a voluntary cessation defense cannot be based on policies that are vague

4    or contradictory.  See, e.g., Gluth v. Kangas, 951 F.2d 1504, 1507 (9th Cir. 1991).  Here, at

5    least some of TBC's policies appear vague and contradictory.  For example, TBC's 2005

6    policy covered door closing time, but that element was omitted from its subsequent policies

7    up until 2010.  TBC's door force policy has changed numerous times over the years, and in

8    2010, there were three different door force standards set forth in TBC's access documents.

9    As a result, it is impossible for the court to determine what TBC's current door force policy

10   is, much less whether it complies with accessibility  regulations.

11        In addition, although TBC's Maintenance Technician Checklist and the Maintco

12   Checklist each identify specific accessibility items that are supposed to be inspected, both

13   of these checklists include a provision giving TBC the discretion to ignore violations of the

14   checklist based on unknown and unspecified criteria.  Thus it is impossible to determine the

15   circumstances under which elements that do not comply with a particular checklist will

16   actually be fixed.

17        Third, TBC could change or rescind its policies at any time.  Even if the court

18   assumes for the sake of argument that TBC's accessibility policies are facially sufficient

19   and are being followed, the fact that TBC could change these policies – by, for example,

20   not renewing its year-to-year contract with Maintco, or not providing access training to new

21   maintenance technicians – means that TBC has not met its burden under the voluntary

22   cessation doctrine, particularly given the length of time required for TBC to remove or

23   remediate the barriers at Taco Bell 4518, and also given TBC's history of vague and

24   contradictory policies.  See, e.g., Feldman v. Pro Football, Inc., 419 Fed. Appx. 381, 2011

25   WL 1097549, at *5 (4th Cir., Mar. 25, 2011).

26        Finally, the evidence showed that a number of architectural elements in Taco Bell

27   restaurants are subject to frequent change.  Jaime de Beers, a former TBC employee who

28   was Facility Leader for Northern California, with responsibility for 87 restaurants (including

42

United States District Court
For the Northern District of California

1    Taco Bell 4518), stated in an October 19, 2004 declaration subsequently admitted as an

2    exhibit at trial that certain elements at TBC restaurants are "subject to frequent change,"

3    including parking striping and signs, entrance door force and closing time, position of chain

4    blocking access in queue line, obstruction of route from door to queue line, self-service

5    dispensers, dining room tables and chairs, restroom soap dispensers, and insulation on

6    restroom lavatory pipes.  And although Mr. Elmer testified at trial that certain elements at

7    Taco Bell 4518 are unlikely to change in the future, he also testified that Taco Bell 4518 is

8    slated to undergo a major interior and exterior remodeling in 2012.

9         Moreover, in its January 10, 2005 response to an interrogatory asking for an

10   identification of alterations and modifications that had occurred in its restaurants, TBC

11   objected on the grounds that the request was "unduly burdensome to answer due to the

12   number and frequent changes that could and do occur in every store that may affect or may

13   have affected accessibility during the class period."

14        For all of these reasons, the court finds that TBC has failed to carry the "heavy

15   burden" of showing that violations of the ADA and Title 24 will not occur in the future at

16   Taco Bell 4518.

17        2.    Building Department argument

18        The evidence at trial demonstrated that several elements at Taco Bell 4518 were in

19   violation of Title 24 regulations in effect when the restaurant was constructed.  Based on

20   Bringle v. Board of Sup'rs of Orange County, 54 Cal. 2d 86, 89 (1960), TBC asks the court

21   to presume that an exception to Title 24's requirements was granted by the City of San

22   Pablo Building Department, based on the fact that it approved the building plans for Taco

23   Bell 4518, and issued a certificate of occupancy.

24        This argument, and the Bringle case specifically, were discussed extensively in

25   this court's August 8, 2007 order.  See Moeller Summ. J., 2007 WL 2301778.  As explained

26   in that order, building departments and other administrative agencies are "not

27   . . . lawmaking bod[ies] and ha[ve] no power to disregard or amend the ordinances which

28   define [their] authority."  Id., 2007 WL 2301778 at *17 (quoting City and County of San

United States District Court

For the Northern District of California

1    Francisco v. Board of Permit Appeals, 207 Cal. App. 3d 1099, 1109-10 (1989)).  As a

2    result, "while an agency may have discretion, it must exercise that discretion within the

3    bounds set forth by the applicable law."  Id.  In addition, under California law, "building

4    inspectors do not have discretion to issue building permits or certificates of occupancy for

5    facilities that do not comply with Title 24."  Id. at *18.

6           Thus, TBC must show either that the architectural elements at issue complied with

7    Title 24, or that a building inspector applied an exception to Title 24 that is allowed by a

8    statute or regulation.  Id.  Here, TBC has done neither.  Instead, it asks this court to

9    presume pursuant to Bringle that the building inspector granted an exception.

10          The Bringle presumption, however, does not apply where, as here, an agency is

11   required to make written findings in order to grant an exception.  Id. at *19 (citing

12   Broadway, Laguna, Vallejo Ass'n v. Bd. of Permit Appeals, 66 Cal. 2d 767, 773 (1967)

13   ("The presumption that an agency's rulings rest upon the necessary findings and that such

14   findings are supported by substantial evidence . . . does not apply to agencies which must

15   expressly state their findings and must set forth the relevant supportive facts.")).  Thus TBC

16   was required to present written evidence that the building inspector applied an exception to

17   Title 24, which TBC failed to do.

18          In any event, TBC's counsel agreed that any presumption arising from the building

19   department's approval of building plans, and issuance of a certificate of occupancy, can be

20   rebutted by "by evidence that whatever it approved was not in compliance."  Here even

21   assuming a presumption of compliance arose, that presumption was rebutted by evidence

22   admitted at trial showing that architectural elements were not in compliance with Title 24.

23          3.    Equivalent facilitation

24          TBC asserts that its "auxiliary access" provides equivalent facilitation for its narrow

25   queue line, that customer service provides equivalent facilitation for drink lids that are out of

26   reach range, and, with respect to exterior door force and the height of restroom amenities,

27   that a more lax or nonexistent ADAAG standard provides equivalent facilitation for a Title

28   24 standard.

44

United States District Court

For the Northern District of California

1    With respect to each of these elements, plaintiffs proceed under the new

2  construction standard of the 1989 version of Title 24.  As such, TBC relies on the

3  equivalent facilitation provisions in that version of Title 24.  In each case, equivalent

4  facilitation would be permitted only upon a written finding of unreasonable hardship by the

5  enforcing agency.  No such finding is in evidence.

6    In support of its Title 24 equivalent facilitation argument, TBC points to § 406(g) of

7  the 1989 version.  This is, however, only the definition of equivalent facilitation; it does not

8  state when a covered entity may use equivalent facilitation in lieu of compliance.  In 1989,

9  there was no general equivalent facilitation provision.  Rather, equivalent facilitation was

10  required if compliance was excused based on a written finding of unreasonable hardship, in

11  those specific provisions in which an unreasonable hardship exception was permitted.  This

12  was the case with respect to queue lines, but the provisions governing door force, reach

13  range, and height of restroom amenities did not permit such deviation.

14    Throughout the trial, TBC reiterated that the placement of the seal of the City of San

15  Pablo on their building plans and the issuance of a certificate of occupancy meant that the

16  City must have approved the configuration of its queue line.  The question of the authority

17  of the building department and the relevance of the certificate of occupancy in general are

18  addressed above.

19    The 1989 version of Title 24 contains specific provisions that would prevent any

20  inference that stamped building plans or a certificate of occupancy constituted an

21  endorsement of TBC's auxiliary queue line access as equivalent facilitation.

22    As the court previously found in the August 8, 2007 order, the Title 24 regulations

23  that apply to queue lines in pre-1993 stores such as Taco Bell 4518 are § 611(d)(4), which

24  requires that "cafeteria lines" be a minimum of 36 inches wide, and § 712(b)(7)(A), which

25  requires that "circulation aisles" – defined as "circulation path between objects such as

26  seats, tables, merchandise equipment, displays, shelves, desks, etc." – be 36 inches wide.

27  Sections 611(d) and 712(b) both also provide that "[i]n existing buildings, when the

28  enforcing agency determines that compliance with any regulation under this section would

United States District Court

For the Northern District of California

1  create an unreasonable hardship, an exception shall be granted when equivalent facilitation

2  is provided."  Moeller Summ. J., 2007 WL 2301778 at *8.

3        According to these exceptions, at the time it was constructed, Taco Bell 4518

4  would have been excused from compliance with the 36-inch requirement for queue lines

5  only if it were an existing facility which, by definition, it was not.  Thus, under the applicable

6  standards, TBC is not entitled to use equivalent facilitation in lieu of compliance with the

7  36-inch minimums in §§ 611(d)(4) and 712(b)(7)(A).

8        Even if the exception were extended to apply to buildings (like Taco Bell 4518)

9  constructed after the 1989 version of Title 24 was in effect, TBC would have been excused

10  from compliance only if the enforcing agency had determined in writing that compliance

11  would create an unreasonable hardship.  According to the definition of "unreasonable

12  hardship," such condition "exists where the enforcing agency finds that compliance with the

13  building standard would make the specific work of the project affected by the building

14  standard unfeasible" based on an evaluation of five factors.  Crucially, "[t]he details of any

15  finding of unreasonable hardship shall be recorded and entered in the files of the enforcing

16  agency."  Cal. Code Regs. tit. 24 (1989) § 422(c).

17        TBC has submitted no evidence of such a finding, nor even any evidence that

18  compliance with the 36-inch requirement would have made the specific work of the project

19  affected by the building standard unfeasible. Indeed, it is hard to imagine how it would have

20  been unfeasible to construct the queue line to be compliant or simply to have eliminated it

21  altogether, as TBC eventually did.

22        Based on the provisions on which it relies – the equivalent facilitation provisions

23  of the 1989 Title 24 – TBC is not excused from compliance with the 36-inch minimums in

24  §§ 611(d)(4) and 712(b)(7)(A).

25        The separate auxiliary access would not in any event have constituted "equivalent

26  facilitation" under the definition relied on by TBC.  TBC cites to the definition in section

27  406(g) of the 1989 version of Title 24.  That provision requires that "[i]n determining

28  equivalent facilitation, consideration shall be given to means that provide for the maximum

46

1   independence of persons with physical disabilities."  Cal. Code Regs tit. 24 (1989) § 406(g)

2   (note 2).

3        The narrow queue line and auxiliary access did not provide persons who use

4   wheelchairs or scooters with "maximum independence."  To the contrary, such persons

5   were forced to depend on staff, family, friends and total strangers to line up, keep their

6   place in line, order their food, and/or retrieve it.  Although reach ranges to drink lids are not

7   eligible for an unreasonable hardship/equivalent facilitation exception, it is also clear that

8   TBC's proposed equivalent facilitation – that customers with disabilities rely on staff

9   assistance to retrieve out-of-reach items – would not comply with note 2 of § 406(g).

10       Nor did the narrow queue line and auxiliary access provide persons who use

11  wheelchairs or scooters with access that was "equivalent" to an accessible queue line.  The

12  testimony of customer witnesses shows that such auxiliary access segregated persons with

13  wheelchairs or scooters, made them feel different than other customers, and made them

14  feel like they were cutting in line.  Customer witnesses testified that they would have

15  preferred an accessible queue line.

16       As noted above, there was no provision for unreasonable hardship or equivalent

17  facilitation in the sections governing door force, Cal. Code Regs. tit. 24 (1989) § 3304

18  (i.2)(1), reach range to drink lids, id. § 522(c) & Fig. 5-5D, or height of restroom amenities,

19  id. § 511.1(b)(2).  TBC provides no evidence that it was not feasible to adjust the door

20  force, place the drink lids or install the soap or toilet seat cover dispensers so that the

21  positioning was compliant.

22       TBC also relies on the ADAAG's equivalent facilitation provision.  That provision, like

23  the provision in Title 24, would not permit TBC's auxiliary access in lieu of a compliant

24  queue line.  The ADAAG provide that "[d]epartures from particular technical and scoping

25  requirements . . . by the use of other designs and technologies are permitted where the

26  alternative designs and technologies used will provide substantially equivalent or greater

27  access to and usability of the facility." ADAAG § 2.2; see also Cal. Code Regs tit. 24 (2010)

28  § 1101B.1.2 (same).

United States District Court

For the Northern District of California

In enacting the ADA, Congress indicated that an "equivalent facilitation" provision would be appropriate because "[a]llowing these departures will provide public accommodations and commercial facilities with necessary flexibility to design for special circumstances and will facilitate the application of new technologies."  H. Rep. 101-485, pt. 2, at 119, reprinted in 1990 U.S.C.C.A.N. 303, 402.  Title 24 provides that "[i]n determining equivalent facilitation, consideration shall be given to means that provide for the maximum independence of persons with disabilities . . ."  Cal. Code Regs tit. 24 (2010) § 1101B.1.3.

This court previously held that "there are only two requirements for an equivalent facilitation:  1) it is an alternative design or technology; and 2) it provides equal or greater access to subject facilities."  Moeller v. Taco Bell Corp., 2005 WL 1910925, at *3 (N.D. Cal. Aug. 10, 2005).  Indeed, "the 'Equivalent Facilitation' provision does not allow facilities to deny access under certain circumstances, but instead allows facilities to bypass the technical requirements laid out in the [Accessibility] Standards when alternative designs will provide 'equivalent or greater access to and usability of the facility.'"  Id., 2005 WL 1910925 at *3 n.1 (quotations and citation omitted).

The Ninth Circuit recently addressed the question of what constitutes equivalent facilitation under ADAAG § 2.2 in the restaurant context.  In Antoninetti, the defendant fast food restaurant prepared customers' meals behind a 45-inch-high wall topped with a transparent plastic shield.  Customers who did not use wheelchairs could observe the preparation of their meals and were able to interact with staff concerning ingredients, portion size, and the like.  Id., 643 F.3d at 1169.  Because the height of the counter was out of compliance with the ADAAG, it obstructed the view of customers who used wheelchairs who were, in turn, unable to observe and interact in the same way nondisabled customers could.  Id. at 1170.

The defendant argued that its customer service policy provided equivalent facilitation, thereby excusing the noncompliance of the 45-inch-high wall.  Id. at 1170-71.  The court rejected this argument, holding that the policies did not constitute "equivalent facilitation" because they did not involve "use of other designs and technologies" or

48

United States District Court

For the Northern District of California

1    "provide [him with] substantially equivalent or greater access to and usability of the facility."

2    They merely provide a substitute experience that lacks the customer's personal

3    participation in the selection and preparation of the food that the full "Chipotle experience"

4    furnishes. Id. at 1173-74.  This language makes clear in the absence of "substantially

5    equivalent or greater access to or usability of the facility," no policy or design can constitute

6    equivalent facilitation.

7            TBC's separate auxiliary access fails this standard.  TBC argues that it provides

8    equivalent facilitation for its narrow queue line because customers who use wheelchairs

9    can line up off to the side of the queue.  However, the customer witnesses who testified at

10   trial experienced the auxiliary access as inconvenient, cumbersome, and embarrassing, as

11   it required them to rely on others to place their orders.

12           The only evidence TBC offered concerning its queue line practice was the testimony

13   of a single assistant manager that it was TBC's policy to take down the chain for customers

14   in wheelchairs and that team members were trained to do this.  On cross-examination,

15   however, this same witness testified that she had received no training instructing her to

16   take down the chain for customers in wheelchairs, or that this was TBC's policy.  In

17   addition, customer witnesses testified that TBC staff never offered to assist them or

18   explained how to use the auxiliary access, and Jacques Bronson testified that a TBC

19   employee told him that his mother could not line up at the chain nor could she go around to

20   the far side of the queue.

21           TBC never introduced evidence of a written policy addressing how customers

22   using wheelchairs were supposed to use the auxiliary access or how staff were supposed

23   to handle this situation.  There was no evidence indicating that there was signage offering

24   assistance to customers with disabilities in place in Taco Bell 4518 before 2009.  The 2005

25   photograph by the Special Master shows no sign; nor do the 2008 photographs by

26   plaintiffs' experts show any sign (although a TBC photograph from the summer of 2009

27   does show a sign stating, "Please Ask If You Need Assistance").

28           Thus, during the portion of the class period when the queue line was in place

49

1   in Taco Bell 4518 – from December 2001 to Spring 2007 – there was nothing to indicate to

2   customers in wheelchairs what they were supposed to do when confronted by a queue line

3   in which other customers were lined up, but that was clearly too narrow for them to

4   navigate, and no sign explaining that the area that was often blocked off by a chain was

5   supposed to serve as auxiliary access.

6         TBC introduced no lay witness testimony from customers who use wheelchairs

7   that they understood or endorsed the separate auxiliary access.  It offered only the

8   personal experience of its retained expert Mr. Blackseth – who uses a wheelchair – that he

9   was directed by TBC staff to use the auxiliary access and that he personally did not feel

10  discriminated against.  Mr. Blackseth also testified, however, that he "would have preferred"

11  that there be no queue lines, and that "if you are going to put them in, obviously I would

12  advise my client to put one in that was compliant."  Although auxiliary access worked for

13  him, he testified that it "wouldn't have been the one that I would have chosen" and that "it

14  wouldn't have been what I recommended."

15        Furthermore, although Mr. Blackseth testified that he personally did not object to the

16  auxiliary access, both he and TBC's director of ADA compliance, testified that they rely on

17  the DOJ's interpretation of Title III.  Mr. Blackseth agreed that "the [DOJ] provides the

18  interpretive direction for Title III," and that he would give "great weight" to the DOJ's

19  position on the requirements of Title III.  Similarly, Mr. Elmer testified, in response to a

20  question about a meeting with the DOJ concerning queue lines, that "the views of the

21  Department of Justice were important to Taco Bell."

22        Moreover, Mr. Blackseth's testimony concerning his experience at Taco Bell 4518

23  was not entirely consistent.  At trial, he testified that he had been to Taco Bell 4518 "10 to

24  30 times."  However, in his deposition, he testified that he had been to a Taco Bell with a

25  queue line only three to five times over the years, and that he was offered the option of

26  lining up at the side of the queue line "at least once, maybe twice."

27        Based on the evidence above, the court finds that where TBC's queue line is

28  narrower than required by applicable standards, auxiliary access whereby customers with

United States District Court

For the Northern District of California

50

United States District Court

For the Northern District of California

1   disabilities must line up to the side of the queue line does not provide substantially

2   equivalent or greater access to or usability of the Taco Bell restaurant and does not provide

3   for the maximum independence of persons with physical disabilities.

4        The auxiliary access also violates the ADA's integration mandate.  Title III requires

5   public accommodations to provide "[g]oods, services, facilities, privileges, advantages, and

6   accommodations . . . in the most integrated setting appropriate. . . ," 42 U.S.C.

7   § 12182(b)(1)(B) (emphasis added), and prohibits places of public accommodation from

8   providing people with disabilities with services, facilities, privileges, advantages, or

9   accommodations that are not equal to, or are different or separate from those provided to

10  other individuals, id. § 12182(b)(1)(A)(ii) & (iii).  "Providing services in the most integrated

11  setting is a fundamental principle of the ADA."  H.R. Rep. 101-485, pt. 2, at 102 (1990),

12  reprinted in 1990 U.S.C.C.A.N. 303, 385.

13       Finally, TBC argues that the Special Master found the auxiliary access to be

14  compliant.  There is no evidence that the Special Master did anything other than measure

15  the width of the opening.  The court previously ruled that equivalent facilitation was beyond

16  the scope of the Special Master order, which specifically reserved to the parties and the

17  court the question whether any given configuration complies with the ADA or state law.

18       With respect to door force and the height of restroom amenities, TBC makes the

19  additional argument that a more lax or nonexistent ADAAG standard provides equivalent

20  facilitation for a Title 24 standard. It argues that the complete lack of an ADAAG standard

21  governing exterior door force is equivalent facilitation for compliance with Title 24's exterior

22  door force requirement, and that its 54-inch reach range limit is equivalent facilitation for

23  compliance with Title 24's 40-inch limit on restroom amenities.

24       This interpretation of the equivalent facilitation defense finds no support in the law.

25  "Where California access standards provide greater accessibility than the ADA, the

26  California standards control."  Shimozono v. May Dep't Stores Co., 2002 WL 34373490, at

27  *16 (C.D. Cal. Nov. 20, 2002); Lieber v. Macy's West, Inc., 80 F. Supp. 2d 1065, 1074

28  (N.D. Cal. Oct. 28, 1999) (same).  Indeed, the ADA specifically states that it is not to be

1    "construed to invalidate or limit the remedies, rights, and procedures of any . . . law of any

2    State . . . that provides greater or equal protection for the rights of individuals with

3    disabilities than are afforded by this chapter."  42 U.S.C. § 12201(b).

4                                              **CONCLUSION**

5         The court previously held that almost 400 conditions in more than 160 Taco Bell

6    restaurants violated the applicable standards, and therefore violated the ADA and/or the

7    state access laws.  See Moeller Summ. J., 2007 WL 2301778 at *12-15, 20-22.  In addition,

8    the court finds that the evidence presented at trial establishes that TBC violated the ADA

9    and/or Title 24 at Taco Bell 4518, with regard to the 12 elements at issue, as follows:

10        •    TBC failed to provide an access aisle adjacent to the van-accessible parking

11   space that complied with the requirements of the ADAAG and Title 24 (2002);

12        •    TBC failed to install and/or maintain van accessible parking signage, in

13   violation of the ADAAG and Title 24 (2002);

14        •    TBC failed to maintain proper door entry force at the primary exterior door, in

15   violation of Title 24 (1989);

16        •    TBC failed to maintain the proper closing time at the north entry door, in

17   violation of the ADAAG and Title 24 (2002);

18        •    As previously determined by the court, the queue line at Taco Bell 4518

19   violated the new construction provisions of Title 24 (1989); in addition, TBC failed to

20   establish that its separate auxiliary access provided equivalent facilitation under either the

21   ADAAG or Title 24;

22        •    TBC failed to locate the drink lids at Taco Bell 4518 in compliance with the

23   limits set on height and lateral reach by Title 24 (1989);

24        •    The provision of adequate knee and toe clearance at the accessible tables,

25   while not subject to the ADAAG when Taco Bell 4518 was constructed, was nevertheless

26   readily achievable by TBC in 2001;

27        •    TBC failed to provide sufficient maneuvering clearance at the women's

28   restroom door, and failed to provide compliant doors when the women's restroom doors

                                                    52

United States District Court
For the Northern District of California

1   were replaced in 2003, in violation of the ADAAG and Title 24 (2002);

2          •      At the time the water closet in the women's restroom was replaced in 2003,

3   TBC failed to locate the water closet so that it was compliant with the ADAAG and Title 24

4   (2002);

5          •      TBC failed to provide clear floor space at the water closet in both the men's

6   and women's restroom, in violation of the ADAAG;

7          •      At the time Taco Bell 4518 was constructed, TBC failed to locate the soap

8   dispensers and toilet seat cover dispensers at a height compliant with Title 24 (1989); in

9   addition, TBC failed to establish that its auxiliary access provided equivalent facilitation

10  under either the ADAAG or Title 24;

11         •      TBC failed to maintain insulation on the lavatory hot water and drain pipes in

12  the men's restroom, in violation of Title 24 (1989).

13         The evidence shows that there were a significant number of violations at Taco Bell

14  4518 in 2005, and later, and that those barriers were in existence prior to the filing of the

15  lawsuit.  Thus, plaintiffs have standing to proceed in this action.  Defendants have not met

16  their burden of establishing any defense to the finding of liability.

17         The court finds further that plaintiffs have standing to seek injunctive relief,

18  notwithstanding that Taco Bell 4518 is currently a compliant accommodation, because they

19  have established an intent to return to Taco Bell 4518, and because they have sufficiently

20  demonstrated that the injury is likely to recur based on TBC's pattern of past violations of

21  federal and state access laws.

22         Finally, based on the court's prior findings in the August 8, 2007 order, and based on

23  the evidence presented at trial, including the testimony of TBC's Director of ADA

24  Compliance, the court finds that plaintiffs have established that classwide injunctive relief is

25  warranted, with regard to maintaining compliance, both as to Taco Bell 4518, and as to all

26  corporate Taco Bell restaurants in California.  However, given the pendency of TBC's

27  motion to decertify both the liability and the damages classes, and because the court finds

28  the proposed injunction submitted by plaintiffs in June 2010 to be overly broad, the court is

1   disinclined to approve that form of injunction.

2       Following the ruling on the parties' motions regarding class certification, the court will

3   decide on the form of injunctive relief to be issued in this case.

4

5   Dated: October 5, 2011

6                                                   _____
                                                    PHYLLIS J. HAMILTON
7                                                   United States District Judge

United States District Court

For the Northern District of California

54