CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER
Timothy P. Fox, Cal. Bar No. 157750
Amy F. Robertson, *Pro Hac Vice*
104 Broadway, Suite 400
Denver, CO 80203
Tel:     (303) 757-7901
Email:    tfox@creeclaw.org

Mari Mayeda, Cal. Bar No. 110947
PO Box 5138
Berkeley, CA  94705
Tel:     (510) 917-1622
Fax:     (510) 841-8115
Email: marimayeda@earthlink.net

LAWSON LAW OFFICES
Antonio M. Lawson, Cal. Bar No. 140823
6146 Mazuela Dr.
Oakland, CA 94611
Tel:   (510) 418-2656
Email:   tony@lawsonlawoffices.com

THE IMPACT FUND
Jocelyn Larkin, Cal. Bar No. 110817
125 University Ave.
Berkeley, CA 94710
Tel:     (510) 845-3473
Fax:     (510) 845-3654
Email:   jlarkin@impactfund.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| FRANCIE E. MOELLER *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TACO BELL CORP.,<br><br>Defendant. | Case No.       C 02 5849 PJH<br><br>**PLAINTIFFS' MOTION FOR ENTRY OF A PERMANENT INJUNCTION**<br><br>**The Honorable Phyllis J. Hamilton**<br>**Courtroom 3, 3rd Floor**<br>**Hearing Date: March 21, 2014**<br>**Hearing Time: 8:30 a.m.** |

\

# <u>TABLE OF CONTENTS</u>

NOTICE AND RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE RECORD IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    This Court Has Already Determined That TBC Has
      Committed Numerous and Widespread Violations
      of Access Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   TBC's Deficient Centralized Practices and Policies . . . . . . . . . . . . . . . . . . . . . . 2

      A.    TBC's Accessibility Practices and Policies Are Centralized . . . . . . . . . . . . 2

      B.    Many Elements in TBC Restaurants Change Frequently . . . . . . . . . . . . . . . 3

      C.    TBC's History of Not Following its Own Access Policies . . . . . . . . . . . . . . 3

            1.    In 2005, Years after this Lawsuit Was Filed,
                  TBC Still Did Not Have Policies in Place Covering the
                  Accessibility of Many Architectural Elements, and
                  Was Not Following Those Policies That it Did Have . . . . . . . . . . . . . 3

            2.    By 2009, TBC Had Changed its Access Policies, but it
                  Still Was Not Following Those Policies . . . . . . . . . . . . . . . . . . . . . . . 4

            3.    By 2011, Almost Ten Years after this Case Was Filed,
                  TBC Had Once Again Changed its Access Policies, but
                  Still Was Not Following Those Policies . . . . . . . . . . . . . . . . . . . . . . . 6

                  a.    Maintenance Technician Checklist . . . . . . . . . . . . . . . . . . . 6

                  b.    Maintco twice-yearly surveys . . . . . . . . . . . . . . . . . . . . . . . 7

                  c.    Success walks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                  d.    Pre-Opening "Access for the Disabled Walks" . . . . . . . . . . . 8

      D.    TBC's Remediation Efforts Are Motivated by a Litigation Strategy . . . . . . 9

      E.    TBC's Access Policies Are Vague and Contradictory, and Have Changed
            Frequently over Time, Often for the Worse . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    Plaintiffs and the Class Have Standing to Seek Injunctive Relief . . . . . . . . . . . . 11

      A.    Standing Is Different than Mootness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    The Class Has Established Standing Based on TBC's
            Repeated Past Violations of Accessibility Requirements . . . . . . . . . . . . . . 11

C.     The Class Has Established Standing Because its Injuries Stem
from Critically Deficient Centralized Practices and Policies . . . . . . . . . . . . . 12

II.     The Class Is Entitled To Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.     TBC Has Not Come Close to Meeting Its Burden of Demonstrating that
Class Injunctive Claims are Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.     TBC Could Change or Rescind its Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.     TBC Has a Decade-Long History of Not Following its Own Policies  . . . . . . 15

        C.     TBC's Policies Are Vague and Contradictory . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.     TBC's Remediation Efforts Are Motivated by a Litigation Strategy  . . . . . . . 17

        E.     TBC Refuses to Acknowledge Wrongdoing  . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        F.     The Record in this Case Against a Mootness Finding Is Far Stronger
than in Numerous Other Cases in Which the Ninth Circuit Reversed
District Courts That Found Injunctive Relief Moot . . . . . . . . . . . . . . . . . . . . 18

IV.     A Systemwide Injunction Is Warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.     The Numerous and Widespread Violations Already Established by this Court,
by Themselves, Warrant Entry of a Systemwide Injunction  . . . . . . . . . . . . . 21

        B.     A Systemwide Injunction Is Warranted because These Violations Resulted
from TBC's Critically Deficient Centralized Practices and Policies . . . . . . . 21

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## Cases

*Am. Cargo Transp., Inc. v. United States*,
  625 F.3d 1176 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
  643 F.3d 1165 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Armster v. U.S. Dist. Court*, 806 F.2d 1347 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bell v. City of Boise*, 709 F.3d 890 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Binsz v. Cody*, 1994 WL 577558 (10th Cir. Oct. 17, 1994) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Clement v. California Department of Corrections*,
  364 F.3d 1148 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
  2 F.3d 1486 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*E.E.O.C. v. Am. Home Furnishings, Inc.*,
  220 F. App'x 704 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*E.E.O.C. v. Goodyear Aerospace Corp.*,
  813 F.2d 1539 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Feldman v. Pro Football, Inc.*,
  419 F. App'x 381, 2011 WL 1097549 (4th Cir. Mar. 25, 2011) . . . . . . . . . . . . . . . 15

*Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) . . . . . . . . . . . . . . . . . 12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

*Gluth v. Kangas*, 951 F.2d 1504 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Moeller v. Taco Bell Corp.*,
  2007 WL 2301778 (N.D. Cal. Aug. 8, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22

*Moyle v. County of Contra Costa*,
  2007 WL 4287315 (N.D. Cal. Dec. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Moreno v. La Curacao*, 463 F. App'x 669 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . 21

*Pereira v. Ralph's Grocery Co.*,
　　2007 WL 7543254 (C.D. Cal. Oct. 25, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pereira v. Ralph's Grocery Co.*,
　　329 F. App'x 134 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Seneca v. Arizona*, 345 F. App'x 226 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Sheely v. MRI Radiology Network, P.A.*,
　　505 F.3d 1173 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

*United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) . . . . . . . . . . . . . . . . . 15, 18

*United States v. Oakland Cannabis Buyers' Coop.*,
　　532 U.S. 483 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Statutes**

42 U.S.C. § 12188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Regulations**

Cal. Code Regs. tit. 24, § 1133B.2.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Notice and Relief Sought**: On March 21, 2014, at 8:30 a.m., before the Honorable Phyllis J. Hamilton, Plaintiffs will move for an order entering Plaintiffs' proposed permanent injunction.

## INTRODUCTION

This Court has already found that: (1) defendant Taco Bell Corp. ("TBC") has committed almost 400 violations of state and federal accessibility requirements spread among more than 160 restaurants; and (2) TBC has centralized accessibility practices and policies that it consistently has not followed, that are vague and contradictory, that change frequently often for the worse, and that could be changed or rescinded in the future.  These findings are supported by written policies in place at all covered restaurants that this Court has found to be deficient, and deposition and trial testimony from numerous TBC employees at all managerial levels taken over a six-year span from 2005 to 2011 covering various iterations of TBC's accessibility policies.

Plaintiffs below first describe the record in this case relevant to their request for a permanent injunction.  They then demonstrate that the weight of Ninth Circuit precedent sides decisively towards entry of a systemwide injunction, and denial of any argument that injunctive relief is moot.  The Ninth Circuit has, in numerous decisions cited below, affirmed district courts who have entered systemwide injunctions, and reversed district courts who have found such relief moot, in cases in which the record supporting entry of an injunction was much less compelling and comprehensive than the record here.  Plaintiffs thus ask this Court to enter their proposed injunction, submitted simultaneously with this motion.

## THE RECORD IN THIS CASE

**I.    This Court Has Already Determined That TBC Has Committed Numerous and Widespread Violations of Access Requirements.**

This Court, through its August 2007 partial summary judgment decision (ECF 307) and 2011 Findings of Fact and Conclusions of Law after the exemplar trial ("FFCL" (ECF 642)), has found that TBC has committed almost 400 violations of access requirements spread among more than 160 restaurants.  *See* FFCL at 52.

1  **II.    TBC's Deficient Centralized Practices and Policies.**

2      Plaintiffs summarize below the findings of this Court following the exemplar trial, as

3  well as deposition and trial testimony from five restaurant managers, a maintenance technician

4  responsible for 26 California corporate TBC restaurants, a DMA Ops Leader responsible for 34

5  California corporate TBC restaurants, and a facility leader responsible for 86 California

6  corporate TBC restaurants.  As set forth in detail below, each of these employees was charged

7  with critical responsibilities in implementing TBC's ever-changing centralized accessibility

8  policies, policies that TBC has on multiple occasions represented to this Court would ensure

9  that violations would not recur in its restaurants.  Across the board, and across various

10  iterations of TBC's policies, these employees testified that they knew virtually nothing about

11  TBC's access policies, often did not even know of their existence, and were not following

12  those policies.

13      **A.    TBC's Accessibility Practices and Policies Are Centralized.**

14      TBC develops its accessibility practices and policies from its corporate headquarters in

15  Irvine, transmitting those policies by memo to its restaurant managers, and/or placing those

16  policies in its Answer System, available to restaurant managers through the Internet.  *See, e.g.,*

17  Ex. 1 to Declaration of Timothy Fox ("Fox Dec.") (memo to all restaurant managers);[1] Fox

18  Dec. ex. 3 at 587:18-88:8 (describing Answer System).[2]  Thus this Court found that "TBC's

19  access policies are centralized -- policies in place at Taco Bell 4518 are also in place at all other

20  California corporate Taco Bell restaurants."  FFCL at 15; *see also* Fox Dec. ex. 3 at 734:23-

21  735:3 (Elmer trial testimony).

22

23

24

25      [1]      Many of the policy documents described herein were previously filed by TBC in
26  support of its mootness argument and/or admitted at the exemplar trial.  For the Court's
    convenience, Plaintiffs attach the documents as exhibits to the declaration of Timothy Fox, and
27  in that declaration, Plaintiffs provide the ECF and/or trial exhibit numbers for these documents.

28      [2]      The transcript pages from the exemplar trial cited herein are included in Exhibit
    3 to the Fox Declaration.

1

2        **B.      Many Elements in TBC Restaurants Change Frequently.**

2        This Court has already found that a number of architectural elements in TBC

3   restaurants change frequently.  FFCL at 42-43.  These elements include, for example, parking

4   striping and signs, entrance door force and closing time, position of chain blocking access in

5   queue line, obstruction of route from door to queue line, self-service dispensers, dining room

6   tables and chairs, restroom soap dispensers, and insulation on restroom lavatory pipes.  *Id.*; *see*

7   *also* Fox Dec. ex. 2 at ¶ 6 (declaration of Taco Bell facility leader describing architectural

8   elements that change frequently).  Indeed, the Court found -- based on TBC's assertion in a

9   signed pleading -- that "because of this frequent change, the fact that an element is in

10  compliance at one time 'is not dispositive of whether the same element is in compliance' at

11  another time.  Thus, evidence of the current compliant status of certain elements is not

12  dispositive of whether the elements will continue to be compliant in the future."  *Moeller v.*

13  *Taco Bell Corp.*, 2007 WL 2301778, at *8 (N.D. Cal. Aug. 8, 2007) (quoting Def.'s Motion

14  for Modification of Class Definition, ECF 110, at 3:13-18.)

15       Because architectural elements change frequently in TBC restaurants, it is imperative

16  that TBC have practices and policies in place to prevent violations from recurring.  As set forth

17  in the next section, despite having had a decade and multiple opportunities to do so, TBC has

18  completely failed to implement effective accessibility policies in its restaurants.

19       **C.      TBC's History of Not Following its Own Access Policies.**

20            **1.      In 2005, Years after this Lawsuit Was Filed, TBC Still Did Not Have
                     Policies in Place Covering the Accessibility of Many Architectural**
21            **Elements, and Was Not Following Those Policies That it Did Have.**

22       This case was filed in December 2002.  In September 2005, almost three years later,

23  Plaintiffs took the Rule 30(b)(6) deposition of Steve Elmer, TBC's Director of ADA

24  Compliance.  Based on this deposition testimony, this Court found in its FFCL that prior to

25  2005, TBC had no policies in place to monitor whether certain elements that change frequently

26  remained in compliance with accessibility requirements, including entrance and restroom door

27  force, door closing time, and restriping of parking lots.  FFCL at 15; *see also* Fox Dec. ex. 24 at

28  75:13 - 76:12; 77:7 - 77:11, 77:14 - 77:21; 78:17 - 78:23, 79:3 - 79:14; 79:18 - 79:23 (Elmer

1  deposition testimony).  Those policies that did exist relied heavily on Facility Leaders for

2  accessibility tasks, including for example to ensure that all repairs and minor construction

3  complied with accessibility requirements, and to provide informal training to restaurant

4  employees about accessibility.  FFCL at 15; Fox Dec. ex. 24 at 53:10-53:13, 53:17-54:10,

5  54:20-55:1, 57:11-57:16; 58:4-58:9; 70:23-71:12; 73:16-73:20, 73:24-74:9.  However, even

6  though TBC knew that accessibility regulations are "'highly technical, ha[ve] a number of

7  different aspects, [are] in many cases beyond the expertise level of a facilities leader . . .,'" it

8  did not provide Facility Leaders with accessibility training until 2005.  FFCL at 15; Fox Dec.

9  ex. 24 at 63:10-14.  As a result, Jaime de Beers, a Facility Leader responsible for 87 restaurants

10  in Northern California,[3] testified in her deposition that she had "'no clue' about various

11  accessibility requirements."  FFCL at 15; Fox Dec. ex. 25 at 123:22 - 124:4, 126:23 - 127:7 (de

12  Beers deposition testimony).

### 2. By 2009, TBC Had Changed its Access Policies, but it Still Was Not Following Those Policies.

By 2009, TBC had issued new access policies in a document entitled "ADA Guidelines/Checklist for Operations" (Fox Dec. ex. 5).  It circulated a hard copy of these Guidelines to restaurant managers in April 2009, and an electronic version was posted on the Answer System.  Fox Dec. exs. 4 & 5; ex. 19 at 26:19 - 27:4.

The ADA Guidelines consisted of a list of various accessibility items that restaurant employees were responsible for checking, including for example making sure that paths of travel inside and outside of restaurants were kept free of obstructions, arranging lids and dispensers so that they were within reach range of people using wheelchairs, and ensuring that trash cans in restrooms did not impede wheelchair access.  *See* Fox Dec. ex. 5.  In addition, these Guidelines prohibited managers from replacing any restroom signs, dispensers, mirrors, sinks, toilets, urinals, faucets, etc. without first consulting an Area Coach or Facility Leader. *Id.*

---

[3]    FFCL at 42.

Restaurant managers were responsible for ensuring that the ADA Guidelines were "being followed," that each team member was "complying with the ADA Guidelines," and that any team member who was not complying with the ADA Guidelines was provided training. Fox Dec. ex. 4.

In September 2009, Plaintiffs deposed four Taco Bell restaurant managers. These depositions revealed that the restaurant managers -- who were supposed to have significant responsibility for ensuring that the ADA Guidelines were followed -- were in actuality almost entirely ignorant of the Guidelines, or their responsibility for implementing them. Indeed, three of the four managers testified that they had never even seen the Guidelines or any other policy or other document relating to the use of the restaurant by people who use wheelchairs or scooters. Fox Dec. ex. 6 at 19:9-17, ex. 7 at 19:5-17 and ex. 8 at 20:4-6, 22:15-20. Further, other than general customer service training applicable to all customers, the managers had not received any training relating specifically to the use of the restaurant by people who use wheelchairs or scooters, and had not provided any such training to restaurant employees. Fox Dec. ex. 6 at 19:18-24, ex. 7 at 19:18 - 20:10, ex. 8 at 15:19 - 16:19, ex. 9 at 11:21 - 12:3. The testimony of restaurant manager Maria Solis was representative:

> Q. Have you ever seen any documents relating to the use of your restaurant by people who use wheelchairs or scooters?
>
> A. No.
>
> Q. Have you ever seen any documents on the Internet, the website that you talked about [the Answer System], relating to the use of your restaurant by people who use wheelchairs or scooters?
>
> A. No.
>
> Q. Do you provide training to your store employees?
>
> A. Training, yes.
>
> Q. And does that training relate in any way to the use of your restaurant by people who use wheelchairs or scooters?
>
> A. No.

Fox Dec. ex. 6 at 19:9-24.

1  Finally, although the Guidelines required managers to contact an Area Coach or Facility

2  Leader before replacing any restroom signage or equipment (to make sure that replaced items

3  were installed in a manner that complied with the ADA), every one of these managers testified

4  that they believed they had the authority to replace such items on their own without consulting

5  their superiors.  Fox Dec. ex. 6 at 10:4 - 11:6, ex. 7 at 12:19 - 14:17, ex. 8 at 12:13 - 14:14, ex.

6  9 at 9:1 - 10:8.

7          **3.**     **By 2011, Almost Ten Years after this Case Was Filed, TBC Had**
                    **Once Again Changed its Access Policies, but Still Was Not Following**

8                      **Those Policies.**

9  In 2010, TBC once again revised its access policies, and based on these policies, it

10  argued during the 2011 exemplar trial -- for the third time[4] -- that class injunctive claims were

11  moot.  There was thus a substantial amount of evidence admitted at the exemplar trial

12  concerning TBC's current policies, and this Court addressed these policies in detail in its

13  FFCL.  Specifically, the Court found as follows.

14  TBC has four policies that are intended to ensure that accessibility is maintained at its

15  restaurants: (a) the Maintenance Technician Checklist; (b) Maintco surveys and the "3rd Party

16  ADA Maintenance Vendor Checklist," which is meant to be used during the surveys;

17  (c) "Success Walks"; and (d) Pre-Opening "Access for the Disabled Walks" and the checklist

18  of items that are supposed to be checked during those walks.  These four policies are in place at

19  all California corporate TBC restaurants.  FFCL at 16-17; Fox Dec. ex. 3 at 734:23 - 735:3,

20  790:21 - 791:12.

21          **a.**     **Maintenance Technician Checklist.**

22  Each time a Maintenance Technician visits a restaurant, he or she is supposed to check

23  each of the 34 items listed on the ADA Maintenance Technician Checklist.  FFCL at 17; Fox

24  Dec. ex. 3 at 633:8 - 635:5; 791:19 - 792:11.  The Maintenance Technician for TBC 4518 was

25  Doug Henry, who was also responsible for 25 other California TBC restaurants in his area.

26  _____

27      [4]    TBC had argued on two previous occasions that Plaintiffs' claims were moot: in
response to Plaintiffs' 2007 Motion for Partial Summary Judgment, ECF 260 at 4, 34-38, 39-

28  40; and in its own 62-page motion for summary judgment in 2009, ECF 458 at 3-8.  The Court
rejected both arguments.  *Moeller*, 2007 WL 2301778, at *8; *id.*, ECF 512 at 1.

FFCL at 17; Fox Dec. ex. 10 at 7:8-14, 9:3-17.  TBC did not call Mr. Henry as a witness at trial.  Nevertheless, during his deposition, Mr. Henry testified that he had never seen the ADA Maintenance Technician Checklist, that he did not understand what some of the items on the Checklist meant, and that his standard practice was to check only five of the 34 items on the Checklist.  FFCL at 17; Fox Dec. ex. 10 at 14:22 - 15:5; 23:15 - 24:7, 33:11-20, 39:10 - 40:13, 42:5 - 43:8.

The ADA Maintenance Technician Checklist includes the following language in bold: "If a deviation from an applicable guideline is detected following an inspection, these item(s) shall be reviewed by our ADA Compliance team to determine whether certain limited exceptions to the guidelines apply, which will be evaluated on an item-by-item basis."  FFCL at 17; Fox dec. ex. 14 at 4.

### b.    Maintco Twice-Yearly Surveys.

According to Mr. Elmer, TBC has entered into a year-to-year contract with Maintco to perform twice yearly surveys of its restaurants, which began in mid-2009.  FFCL at 17; Fox Dec. ex. 3 at 732:10-21, 759:15 - 760:12.  Each time it surveys a TBC restaurant, Maintco sends an invoice to TBC, and also sends a completed Maintco Checklist.  FFCL at 17; Fox Dec. ex. 3 at 611:2-22; 731:16 - 732:18.

At trial, TBC submitted invoices from Maintco for surveys of TBC 4518.  Based on those invoices, there was no Maintco survey at TBC 4518 between June 12, 2009 and August 3, 2010.  FFCL at 17.  Based on Mr. Elmer's testimony that Maintco began its surveys of TBC 4518 by at least June 2009, there should be at least four, and possibly five, Maintco Checklists for that restaurant.  At trial, TBC submitted only two such checklists for restaurant 4518.  *Id.* at 17-18.

The Maintco Checklist includes the following language in bold: "If a deviation from an applicable guideline is detected following an inspection, these item(s) shall be reviewed by our ADA Compliance team to determine whether certain limited exceptions to the guidelines apply, which will be evaluated on an item-by-item basis."  *Id.* at 18; Fox Dec. ex. 15 at 4.

1

**c.      Success Walks**.

2       According to Mr. Elmer, every 30 minutes, the manager in charge of a TBC restaurant

3  conducts a "success walk" through the restaurant, during which "they check for access for the

4  items that the plaintiffs have raised here."  FFCL at 18; Fox Dec. ex. 3 at 34:3-7; 586:3 -

5  587:17; 832:10 - 833:18.  TBC did not submit the checklist used for the Success Walks at trial.

6  FFCL at 18.

7       Jeffrie Kuan-Bone, who since 2009 has been the Restaurant General Manager ("RGM")

8  at TBC 4518, testified at trial by deposition that success walks do not address disability or

9  ADA issues.  *Id.*; Fox Dec. ex. 16 at 11:24 - 12:4.  TBC did not call Mr. Kuan-Bone as a

10  witness at trial.  FFCL at 18.

11

**d.      Pre-Opening "Access for the Disabled Walks."**

12       According to Mr. Elmer, each morning before a TBC restaurant opens, the manager in

13  charge is supposed to check each of the accessibility items on the "Access for the Disabled

14  Walk."  FFCL at 18; Fox Dec. ex 3 at 652:12 - 653:6; 793:20 - 794:10, ex. 17.  TBC RGMs

15  were responsible for making sure that these walks occurred.  FFCL at 18; Fox dec. ex. 3 at

16  795:17-24, ex. 18.  Mr. Kuan-Bone, however, testified at trial by deposition that he had never

17  heard of a disabled walk, that he had never been given a checklist with specific disability

18  issues, and that the pre-opening walk did not include any accessibility issues.  FFCL at 18; Fox

19  Dec. ex. 16 at 12:13 - 13:20.

20       Finally, TBC asserts that area coaches check the door force at each restaurant, but at

21  trial, Erich Moxley -- a DMA Ops Leader who supervises five area coaches and has 34 stores in

22  his area[5] -- testified that it was his understanding that door opening for should be 8.5 pounds

23  regardless of when the restaurant was constructed,[6] notwithstanding the fact that at least one

24  TBC policy provided that the force should be 5 pounds for newer restaurants,[7] and

25

26       [5]      Fox dec. ex. 3 at 848:9-21.

27       [6]      *Id.* at 879:7 - 880:9.

28       [7]      FFCL at 16; Fox Dec. ex. 14 at 2.

1  notwithstanding that this had been the standard since 2002, Cal. Code Regs. tit. 24,

2  § 1133B.2.5.

3        In light of the extensive evidence establishing that TBC is not following its own access

4  policies, and has not for at least a decade, it is not surprising that this Court found during the

5  exemplar trial a number of violations of those policies.  For example:

6     •    Although it has been TBC's policy since 2005 to have accessible signs

7          designating accessible parking spaces, photographs admitted at the exemplar

8          trial demonstrated that there was no such signage at Restaurant 4518 in June

9          2007, March 2008, and the summer of 2009.

10    •     It has been TBC's policy since December 2006 not to locate trash cans in front

11         of restroom accessories.  However, photographs admitted at trial demonstrated

12         that there was a trash can in front of the toilet seat cover dispenser in the

13         women's restroom of Restaurant 4518 in March 2008, in the summer of 2009

14         and at some point between August and October 2009.

15    •    It has been TBC's policy since at least at least 2007 to insulate water supply and

16         drain pipes under restroom lavatories, yet photographs admitted at trial

17         demonstrated that the pipes under the lavatory in the men's restroom at

18         Restaurant 4518 were not insulated in March 2008, in the summer of 2009, and

19         at some point between August and October 2009.

20  FFCL at 16.

21        **D.    TBC's Remediation Efforts Are Motivated by a Litigation Strategy.**

22        TBC acknowledged in declarations submitted to this Court and admitted as exhibits at

23  the exemplar trial that its motive for its remediation efforts"was to render the federal and state

24  injunctive relief claims in the instant action subject to the mootness doctrine."  Fox Dec. exs.

25  11 & 12, ¶ 3.

26

27

28

1

2

**E.     TBC's Access Policies Are Vague and Contradictory, and Have Changed Frequently over Time, Often for the Worse.**

3

TBC has a history of frequently changing its accessibility policies, often for the worse, with later policies contradicting earlier policies.  As this Court has already found, "[o]ver time, provisions in later policies contradicted provisions in earlier policies, and omitted architectural elements that had been covered by earlier policies."  FFCL at 15.

4

5

6

This Court made a number of factual findings demonstrating this point, including:

7

8

•     TBC's policy concerning door force changed from 8 pounds in 2005, to 5 pounds in 2006, to 5 pounds or 8.5 pounds in April 2009, depending upon the permitting date of a restaurant.  FFCL at 16; Fox Dec. ex. 13 at 1, ex. 20 at 5, ex. 3 at 738:22-739:5.  By 2010, there were three policies in effect, each of which set forth a different standard for exterior door force.  FFCL at 16; *compare* Fox Dec. ex. 21 (8.5 pounds) with ex. 22 at 6 (5 pounds) and ex. 14 at 2 (5 pounds or 8.5 pounds depending upon permitting date).  TBC's "DMA Ops Leader" Erich Moxley testified at trial that it was his understanding that it is TBC's policy that door opening force should be 8.5 pounds regardless of when the store was built, and a form dated October 2010 asks only whether the exterior doors open with 8.5 pounds of pressure or less.  FFCL at 16; Fox dec. ex. 3 at 879:7 - 880:9, ex. 21.

9

10

11

12

13

14

15

16

17

18

19

•     Similarly, although TBC's 2005 policy covered closing time on restroom and entrance doors, Mr. Elmer testified that that issue had been omitted from TBC's 2006 and 2009 policies.  FFCL at 16; Fox Dec. ex. 3 at 747:9-21, 748:3-13, 749:4-13, 750:5 - 751:3; Ex. 23.

20

21

22

23

**ARGUMENT**

24

Plaintiffs demonstrate below, based on this Court's factual findings and liability determinations, and testimony from TBC's employees, as described above, that (1) the Class has standing to seek injunctive relief in this case, (2) the Class has established that it is entitled to an injunction, (3) TBC has not met its "stringent" burden of demonstrating that it ""it

25

26

27

28

1  absolutely clear that the allegedly wrongful behavior could not reasonably be expected to

2  recur,'" and (4) a systemwide injunction is warranted.

3  **I.      Plaintiffs and the Class Have Standing to Seek Injunctive Relief.**

4       TBC at the November 2013 case management conference indicated that it would once

5  again argue that the class lacks standing to seek an injunction.  Plaintiffs briefly address this

6  issue here.

7       **A.      Standing Is Different than Mootness.**

8       TBC has in the past argued that its remediation efforts after the complaint was filed in

9  this case deprived the class of standing.  This argument confuses standing with mootness.

10      As this Court correctly found in its FFCL, standing is evaluated based on the

11 circumstances in existence at the time the suit was filed, while mootness is evaluated based on

12 circumstances that occur after the suit was filed.  FFCL at 22, 40.  TBC's argument that its

13 post-complaint remediation efforts impacted the standing of the class to seek an injunction has

14 been explicitly rejected by the Supreme Court, which held that this argument improperly

15 conflates "initial standing to bring suit" with "postcommencement mootness."  *Friends*

16 *of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 173-74 (2000).

17      Further, the burden of proof differs between standing and mootness.  A plaintiff bears

18 the burden of establishing standing by demonstrating that, at the time the suit was brought,

19 violations were "likely to recur."  *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001).  The

20 burden of establishing mootness, however, is on the defendant, and it is "stringent," requiring

21 the defendant to show that post-complaints events make "'it absolutely clear that the allegedly

22 wrongful behavior could not reasonably be expected to recur.'"  *Friends of the Earth*, 528 U.S.

23 at 189 (citation omitted).

24      **B.      The Class Has Established Standing Based on TBC's Repeated Past
            Violations of Accessibility Requirements.**

25      This Court previously held that a plaintiff can establish that violations are likely to recur

26 by demonstrating that "'the defendants have repeatedly engaged in the injurious acts in the

27 past.'"  FFCL at 24 (quoting *Armstrong*, 275 F.3d at 861); *see also* FFCL at 25 (Holding that a

28

1  plaintiff can establish standing by demonstrating an intent to return to a non-compliant

2  accommodation, and finding that evidence of past injury is particularly relevant to making the

3  showing.).

4          This Court in its February 2007 partial summary judgment decision found that TBC had

5  committed almost 400 violations of access regulations among more than 160 restaurants.  *See*

6  FFCL at 52.[8]  As a result, this Court further held in its 2011 FFCL that plaintiffs "have

7  established an intent to return to Taco Bell 4518, and because they have sufficiently

8  demonstrated that the injury is likely to recur based on TBC's pattern of past violations of

9  federal and state access laws."  *Id.* at 53.

10         Because standing is evaluated by the circumstances that existed at the time the suit was

11  filed, nothing that has occurred between the 2007 partial summary judgment decision and today

12  impacts this finding.

13         **C.      The Class Has Established Standing Because its Injuries Stem from
              Critically Deficient Centralized Practices and Policies.**

14
15         Another method by which a plaintiff can demonstrate that violations are likely to recur

    for standing purposes is by showing that the defendant had, "at the time of the injury, a written
16
    policy, and that the injury 'stems from' that policy."  FFCL at 24 (citing *Armstrong*, 275 F.3d
17
    at 861); *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)
18
    (applying same standard in Title III case).  When evaluating a defendant's policy, "injuries can
19
    stem from a failure to take action as well as from affirmative conduct," and so a likelihood of
20
    recurrence can be based on policies that omit important provisions.  *Armstrong*, 275 F.3d at
21
    863.  Finally, injuries that stem from defendant's deficient practices also establish a likelihood
22
    of recurrence; indeed, the Ninth Circuit in *Armstrong* devoted an entire section to a discussion
23
    of the defendant's practices.  *Id.* at 863-64.
24
           Here, as this Court has already found, at the time that this suit was filed, TBC "had no
25
    policies in place to monitor whether certain elements that change frequently remained in
26

27         _____

           [8]      *See also* ECF 216-240 (the Special Master's Interim Reports showing extensive
28  violations at over 200 stores).

compliance with accessibility requirements, including entrance and restroom door force, door closing time, and restriping of parking lots."  Those few policies that it did have relied almost entirely on facility leaders, who were not provided any training and thus had "'no clue'" about various accessibility requirements.  FFCL at 15 (discussing TBC's pre-2005 accessibility practices and policies).

These findings establish that at the time the suit was commenced, the injuries suffered by the class stemmed from TBC's critically deficient and centralized accessibility practices and policies, thus demonstrating that violations were likely to recur and conferring standing on the class to seek injunctive relief.

## II.      The Class Is Entitled To Injunctive Relief.

This Court in its FFCL set forth the standard for entitlement to injunctive relief: "To be entitled to an injunction, plaintiffs must show that TBC has violated the ADAAG or Title 24."[9] Further, "Plaintiffs are not required to show other prerequisites generally required for injunctive relief, as '[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief.'"[10]  Indeed, the Supreme Court has held that where the only relief provided by a statute is an injunction, as is the case with Title III, "[t]he district court lack[s] discretion because an injunction [is] the 'only means of ensuring compliance'" and thus entry of an injunction is required.  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001); *see also Moreno v. La Curacao*, 463 F. App'x 669, 670 (9th Cir. 2011) (reversing district court on ground that it had abused its discretion by not entering an injunction after finding that defendant had violated Title III).

Here, this Court has already determined that TBC has committed almost 400 violations of accessibility requirements among more than 160 restaurants, entitling the class to injunctive

---

[9]      FFCL at 38 (citing 42 U.S.C. § 12188(a)(2) and *Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168, 183 (1990).

[10]      *Id.* (citing *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175-76 (9th Cir. 2010)).

relief.  Thus the only remaining issues are whether TBC has met its stringent burden of demonstrating that class injunctive claims are moot, and if not, the scope of the injunction.

### III.     TBC Has Not Come Close to Meeting Its Burden of Demonstrating that Class Injunctive Claims are Moot.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. . . Thus, the central inquiry in any mootness challenge is whether changes in the circumstances existing when the action was filed have forestalled any meaningful relief.  '[T]he question is not whether the precise relief sought at the time an application for injunctive relief was filed is still available.  The question is whether there can be any effective relief.'  So long as the court can grant some effective relief, it does not matter that the relief originally sought is unavailable due to changed circumstances."  FFCL at 39-40 (citations omitted).

Here, the class seeks an injunction ensuring that when architectural elements in TBC restaurants change in the future -- which this Court has found occurs frequently -- they will remain in compliance with accessibility regulations.  TBC argues that this claim is moot because after this suit was filed, it voluntarily adopted policies that will ensure that its restaurants remain in compliance.

"A request for prospective injunctive relief will be mooted by a defendant's voluntary compliance only if the defendant meets the 'formidable burden' of demonstrating that it is 'absolutely clear the alleged wrongful behavior could not reasonably be expected to recur.'  That is, TBC has the 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again."  *Id* at 40. (citations omitted).  TBC has not met this burden.

#### A.     TBC Could Change or Rescind its Policies.

As this court found in its FFCL, "TBC could change or rescind its policies at any time.  Even if the court assumes for the sake of argument that TBC's accessibility policies are facially sufficient and are being followed, the fact that TBC could change these policies -- by, for example, not renewing its year-to-year contract with Maintco, or not providing access training

1   to new maintenance technicians -- means that TBC has not met its burden under the voluntary

2   cessation doctrine, particularly given the length of time required for TBC to remove or

3   remediate the barriers at Taco Bell 4518, and also given TBC's history of vague and

4   contradictory policies." FFCL at 42 (citing *Feldman v. Pro Football, Inc.*, 419 F. App'x 381,

5   2011 WL 1097549, at *5 (4th Cir., Mar. 25, 2011).).

6       The risk that TBC may change its policies in the future is enhanced by its history of

7   frequently doing so in the past. *See, e.g.*, *Binsz v. Cody*, 1994 WL 577558, at *3 (10th Cir. Oct.

8   17, 1994) (finding that a defendant's history of frequently changing its policies argued against a

9   finding of mootness).

10      Indeed, the Ninth Circuit has repeatedly found that the fact that a defendant could

11  change its policies in the future is sufficient by itself to preclude a mootness finding,[11] even

12  without the substantial additional evidence here precluding a mootness finding, such as, for

13  example, the delay by TBC in remediating its restaurants, its history of frequently changing its

14  policies and its history of not following its own policies.

15      **B.    TBC Has a Decade-Long History of Not Following its Own Policies.**

16      "A defendant's 'ongoing history of not following its own stated . . . procedures ma[kes]

17  necessary' an injunction." FFCL at 40-41 (quoting *United States v. Laerdal Mfg. Corp.*, 73

18  F.3d 852, 857 (9th Cir. 1995)).

19      TBC has a long history of not following its own accessibility policies and procedures.

20  For example, its pre-2005 accessibility policies relied heavily on Facility Leaders, but they had

21  not received any training on accessibility issues and thus had "no clue" about various

22  accessibility requirements. *See supra* at 3-4.

23      By 2009, TBC had instituted a new set of accessibility policies, which required

24  restaurant managers to make sure that restaurant employees, using TBC's "ADA Guidelines,"

25

26

27      [11]    *See, e.g., Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013) ("Even assuming Defendants have no intention to alter or abandon the Special Order, the ease with which the Chief of Police could do so counsels against a finding of mootness . . ."); *Seneca v.*

28  *Arizona*, 345 F. App'x 226, 227-28 (9th Cir. 2009).

1    inspected each restaurant on a daily basis, and to coach the employees on how to do so.

2    However, four different restaurant managers testified in 2009 that they had never seen the

3    Guidelines or any document relating to the use of the restaurant by people who use

4    wheelchairs, that they had not received any training relating specifically to the use of the

5    restaurant by people who use wheelchairs or scooters, and had not provided any such training

6    to restaurant employees. *See supra* at 4-6.  Further, although the Guidelines required managers

7    to contact an Area Coach or Facility Leader before replacing any restroom signage or

8    equipment, every one of these managers testified that they believed they had the authority to

9    replace such items on their own without consulting their superiors. *Id.*

10         By 2011, TBC had once again changed its accessibility policies, and its new policies

11   relied on maintenance technicians to use the Maintenance Technician Checklist to inspect

12   various accessibility items each time they visited a restaurant, on restaurant managers to

13   conduct pre-opening "Access for the Disabled Walks" and periodic "Success Walks," and on

14   Maintco to conduct twice yearly surveys of each restaurant.  None of these procedures was

15   being followed:

16         •    Mr. Henry, the Maintenance Technician responsible for 26 California TBC

17              restaurants, testified that he had never seen the ADA Maintenance Technician

18              Checklist, that he did not understand what some of the items on the Checklist

19              meant, and that his standard practice was to check only five of the 34 items on

20              the Checklist.

21         •    Mr. Kuan-Bone, the Restaurant General Manager for the exemplar restaurant,

22              testified that he had never heard of an Access for the Disabled walk, that he had

23              never been given a checklist with specific disability issues, and that the

24              pre-opening and success walks did not include any accessibility issues.

25         •    Although by the exemplar trial, Maintco should have surveyed the exemplar

26              restaurant at least four, and possibly five, times, TBC submitted evidence

27              showing only that two such surveys had occurred.

28

1    *See supra* at 6-9.

2        In addition, this Court determined that TBC has a history of not following its policies

3    that accessible parking spaces have required signage, that trash cans in restrooms not block

4    dispensers, and that pipes under lavatories in restrooms be insulated.  FFCL at 41-42.

5        Thus despite the fact that by 2011, this case had been pending for almost nine years and

6    TBC had been afforded repeated opportunities to implement effective accessibility policies, it

7    failed to do so.

8        As this Court has already recognized, TBC's history of not following its own policies is

9    particularly important here because TBC bases its claim that violations will not recur in the

10   future on its accessibility policies.  FFCL at 41-42.

11       **C.    TBC's Policies Are Vague and Contradictory.**

12       "[A] voluntary cessation defense cannot be based on policies that are vague or

13   contradictory."  FFCL at 42 (citing *Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir. 1991)).

14   This Court determined that some of TBC's accessibility policies have been contradictory, and

15   that TBC's Maintenance Technician Checklist and the Maintco Checklist both include a

16   provision giving TBC the discretion to ignore violations of the checklist based on unknown and

17   unspecified criteria.  Thus it is impossible to determine the circumstances under which

18   elements that do not comply with a particular checklist will actually be fixed.  FFCL at 42.

19       **D.    TBC's Remediation Efforts Are Motivated by a Litigation Strategy.**

20       "Where the defendant has ceased to engage in the challenged conduct only for practical

21   or strategic reasons -- such as avoiding litigation -- the cessation does not make the case moot."

22   *Moyle v. County of Contra Costa,* 2007 WL 4287315, at *13 (N.D. Cal. Dec. 5, 2007); *see also*

23   *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1186 (11th Cir. 2007) ("we are more

24   likely to find that cessation moots a case when cessation is motivated by a defendant's genuine

25   change of heart rather than his desire to avoid liability"); *Armster v. U.S. Dist. Court*, 806 F.2d

26   1347, 1357 (9th Cir. 1986) (holding that "[a] change of activity by a defendant under the threat

27   of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or

28

controversy [under the voluntary cessation exception to mootness].").  Here, TBC has asserted

in declarations filed by its attorneys that it would not have remediated its restaurants but for

this litigation, and the only reason it did so was to moot Plaintiffs' injunctive claims.  Fox Dec.

exs. 11 & 12, ¶ 3.

**E.     TBC Refuses to Acknowledge Wrongdoing.**

"[A] defendant's failure to acknowledge wrongdoing . . . suggests that cessation is

motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute

between the parties remains."  *Sheely*, 505 F.3d at 1187; *see also Laerdal*, 73 F.3d at 856

(Holding that a defendant's "intransigent insistence on its own blamelessness" supported

finding that violations were likely to recur).

Here, although TBC has been found to have committed hundreds of violations of access

requirements -- largely established by a jointly-selected, court-appointed Special Master -- it

has not once acknowledged any violation or wrongdoing.

**F.     The Record in this Case Against a Mootness Finding Is Far Stronger than in Numerous Other Cases in Which the Ninth Circuit Reversed District Courts That Found Injunctive Relief Moot.**

The evidentiary burden that a defendant must meet to establish mootness is high, and

this is amply demonstrated by the fact that the Ninth Circuit has reversed mootness findings in

cases with far less compelling facts than those that exist here.

For example, in *Pereira v. Ralph's Grocery Co.*, 2007 WL 7543254 (C.D. Cal. Oct. 25,

2007), a class of persons who use wheelchairs or scooters for mobility sued a chain of grocery

stores based on architectural barriers.  The defendant remediated the barriers and sought

summary judgment on the ground that the class injunctive claims were moot.

The plaintiffs conceded that the barriers that they had identified had been remediated,

but argued that injunctive relief was necessary to ensure that items that changed in the future

remain in compliance with accessibility requirements.  The district court rejected this argument

and found that the plaintiffs' injunctive claims were moot.  Significantly, the district court

1    distinguished the case at bar on the ground that the evidence that architectural elements change

2    frequently is much stronger in this case than it was in *Pereira*.  *Id.* at *5.

3         The Ninth Circuit summarily reversed, holding that "[t]he defendant's 'voluntary

4    cessation of allegedly illegal conduct' did not moot this case."  *Pereira v. Ralph's Grocery Co.*,

5    329 F. App'x 134, 134 (9th Cir. 2009).

6         In the employment discrimination context, the Ninth Circuit has repeatedly held that

7    "[v]ictims of employment discrimination generally are entitled to an injunction against future

8    discrimination, unless *the employer proves* it is unlikely to engage in similar unlawful conduct

9    in the future."  *E.E.O.C. v. Am. Home Furnishings, Inc.*, 220 F. App'x 704, 707 (9th Cir. 2007)

10   (emphasis added); *see also E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th

11   Cir. 1987) (same).  In *Goodyear*, the Ninth Circuit reversed a district court that had refused to

12   enter an injunction, holding: "An employer that takes curative actions only after it has been

13   sued fails to provide sufficient assurances that it will not repeat the violation to justify denying

14   an injunction.  Even if Goodyear ceased discriminating by promoting Pettigrew, its eleventh

15   hour change of heart fails to prove it is unlikely to retaliate again."  813 F.2d at 1544-45

16   (internal citation omitted).

17        In *Bell v. City of Boise*, 709 F.3d 890, 898-901 (9th Cir. 2013), the Ninth Circuit

18   reversed a district court that found injunctive relief moot based on a "Special Order" issued by

19   the defendants purporting to change their policies.  Significantly, in *Bell* -- unlike here -- there

20   was no evidence that the defendants had frequently changed their policies in the past, that they

21   had a history of not following their own policies, that there was a litigation motive for their

22   change in policy, or any of the other factors that exist here.  To the contrary, the court held that

23   "[e]ven assuming Defendants have no intention to alter or abandon the Special Order, the ease

24   with which the Chief of Police could do so counsels against a finding of mootness."  *Id.* at 900;

25   *see also Seneca v. Arizona*, 345 F. App'x 226, 227-28 (9th Cir. 2009) (reversing district court

26   that had found injunctive relief moot based on the defendant's post-complaint change in

27   policy).  The Ninth Circuit reached this conclusion despite the fact that the defendant in that

28

1  case was a governmental entity, and "'cessation of the allegedly illegal conduct by government

2  officials has been treated with more solicitude by the courts than similar action by private

3  parties.'" *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010)

4  (citations omitted).

5       Thus in *Pereira, Goodyear* and *Bell*, the fact that the defendants had waited until after

6  being sued to take curative actions and formulate new policies, and the fact that they could

7  change or rescind those policies in the future, were sufficient to preclude a mootness finding.

8       Here, both of these facts exist, but in addition, there are numerous other facts not found

9  in *Pereira, Goodyear* or *Bell* that preclude a mootness finding, including that TBC has a

10  decade-long history of failing to follow its own accessibility policies, that it has a track record

11  of frequently changing its accessibility policies making it likely that it will do so in the future,

12  that its policies have been and are vague and ambiguous, and that it has explicitly

13  acknowledged that it has a litigation motive for its remediation efforts.  Indeed, in a case with

14  facts supporting a mootness finding that were far more compelling than the present, the

15  Eleventh Circuit concluded that the defendant "cannot establish (indeed, has not even come

16  close to establishing) that 'it is absolutely clear the allegedly wrongful behavior could not

17  reasonably be expected to recur.'"  *Sheely*, 505 F.3d at 1188 n.15 (quoting *Friends of the*

18  *Earth*, 528 U.S. at 190).  Thus the record in this case far exceeds any other case cited by the

19  parties in establishing that class injunctive claims are not moot.

20  **IV.    A Systemwide Injunction Is Warranted.**

21       As this Court found in its FFCL, "'[t]he scope of injunctive relief is dictated by the

22  extent of the violation established.  The key question . . . is whether the inadequacy complained

23  of is in fact widespread enough to justify system wide relief.'  A court need not address every

24  violation in order to conclude that violations are sufficiently widespread to necessitate a system

25  wide injunction.  Rather, a court can enter such an injunction based on evidence that is

26  'symptomatic' of the defendant's violations, including 'individual items of evidence [that are]

27  representative of larger conditions or problems.'  Finally, while the scope of relief must

28

1    correspond to the injury suffered, in a certified class action, the injury, and the corresponding

2    relief, extends to the class as a whole."  FFCL at 39 (citing *Armstrong*, 275 F.3d at 870-71).

3        ""[T]he decision to grant system-wide prospective injunctive relief does not occur in a

4    vacuum; it is intimately connected to determinations made earlier in the lawsuit."  *Armstrong*,

5    275 F.3d at 870-71.  Here, a systemwide injunction is warranted for two independent reasons:

6    (1) this Court has already determined TBC has committed hundreds of violations among more

7    than 160 of the 220 restaurants originally at issue, symptomatic evidence of systemwide

8    violations that far exceeds that found in cases in which the Ninth Circuit has affirmed entry of a

9    systemwide injunction; and (2) these violations resulted from deficient centralized practices

10   and policies.

11       **A.    The Numerous and Widespread Violations Already Established by this Court, by Themselves, Warrant Entry of a Systemwide Injunction.**

12

13       This Court has held that TBC has engaged in almost 400 violations spread among more

14   than 160 of the 220 restaurants originally at issue in this case.  FFCL at 52.  This record

15   exceeds the record in other cases in which the Ninth Circuit has held that a systemwide

     injunction was warranted.

16

17       For example, in *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1122 n.13 (9th Cir.

18   2003), the Ninth Circuit found that a determination that violations existed in just 7 out of 36

19   counties -- only 24% of the counties at issue -- was a sufficient basis for an injunction covering

20   all 36 counties.

21       Here, this Court has already held that violations existed in more than 160 of the 220

22   restaurants at issue, more than 70% of the covered restaurants.  This is an ample evidentiary

23   basis for a systemwide injunction.

24       **B.    A Systemwide Injunction Is Warranted because These Violations Resulted from TBC's Critically Deficient Centralized Practices and Policies.**

25       The Ninth Circuit in Armstrong held that "[s]ystem-wide relief is *required* if the injury

26   is the result of violations of a statute . . . that are attributable to policies or practices pervading

27   the whole system."  *Armstrong*, 275 F.3d at 870 (emphasis added).

28

Here, as set forth in detail above, this Court's findings in its FFCL, reinforced by the sworn testimony of numerous TBC employees at every managerial level taken over a six-year span, establish that TBC's centralized accessibility practices and policies have been, and are, critically deficient.  For example, TBC's practices and policies:

- have consistently not been not followed;
- place significant responsibilities on employees who have no idea how to carry out those responsibilities, as demonstrated by the fact that many are not even aware of the existence of these policies;[12]
-  are inconsistent, vague and contradictory;
- change frequently, often for the worse;
- give TBC complete discretion to ignore violations; and
- could be changed or rescinded at any time.

These critical deficiencies in TBC's accessibility practices and policies are even more problematic here because -- as this Court has already found based on TBC's admissions -- numerous architectural elements in TBC restaurants change frequently so that compliance at one time is not determinative of compliance at a future time.  *Moeller*, 2007 WL 2301778, at *8 (quoting Def.'s Motion. for Modification of Class Definition, ECF 110, at 3:13-18.)  Thus architectural elements will change in the future, and TBC has a decade-long history of demonstrating that despite being given multiple opportunities, it simply cannot put in place effective policies to ensure that these elements will remain in compliance with accessibility regulations when they do change.

The record here is far stronger than that in similar cases in which the Ninth Circuit has affirmed entry of systemwide injunctions based on violations that stemmed from deficient practices and policies.

---

[12]    *See Armstrong*, 275 F.3d at 863 (finding that violations were likely to recur based in part on the defendant's practice of delegating responsibility for compliance to untrained employees).

1    For example, in *Clement v. California Department of Corrections*, 364 F.3d 1148, 1153

2    (9th Cir. 2004), the Ninth Circuit held that the fact that the deficient policy at issue was in

3    place in just eight California prisons, and was being considered by others, was a sufficient basis

4    for entry of a systemwide injunction covering all prisons.  Unlike *Clement*, in which the

5    systemwide injunction was based only on the fact that the deficient policy was in place at a

6    subset of covered facilities, the deficient policies and practices here are in place at all covered

7    facilities.

8    This case is also stronger than *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d

9    1486, 1502 (9th Cir. 1996), in which the Ninth Circuit held that even though there existed

10   proof of only 14 violations, a systemwide injunction was warranted because these violations

11   resulted from a deficient statewide policy.  Here, as in *EasyRiders*, the deficient policies are in

12   place at all covered restaurants, but in addition, the hundreds of liability determinations already

13   established in this case far exceed the 14 in *EasyRiders*.

14                                          **<u>CONCLUSION</u>**

15   For the reasons set forth above, Plaintiffs respectfully request that their proposed

16   permanent injunction be entered.

17

18                                          Respectfully submitted,

19                                          CIVIL RIGHTS EDUCATION AND
                                            ENFORCEMENT CENTER
20

21                                          By:      /s/ Timothy P. Fox
                                                     Timothy P. Fox
22

23   January 15, 2014                       Attorneys for Plaintiffs

24

25

26

27

28